UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

|  |  |
|---|---|
| | : |
| | : |
| IN RE: LONDON SILVER FIXING, LTD., | : |
| ANTITRUST LITIGATION | : Case No. 14-MD-2573 (VEC) |
| | : |
| This Document Relates To | : ECF CASE |
| *DePaoli, et al. v. The London Silver Market Fixing,* | : |
| *Ltd., et al.,* No. 14-CV-09068 (VEC) | : |

------------------------------------------------------------x

**DEFENDANT UBS AG's MEMORANDUM OF LAW
IN SUPPORT OF ITS INDIVIDUAL MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

GIBSON, DUNN & CRUTCHER LLP

1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Phone: (202) 955-8500

555 Mission Street, Suite 3000
San Francisco, CA  94105
Phone:  (415) 393-8200

200 Park Avenue
New York, NY  10166-0193
Phone: (212) 351-4000

*Attorneys for Defendant UBS AG*

March 27, 2015

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 2

     I.     The Antitrust Claims Fail Because UBS Was Not A Silver Fixing Member
          And Plaintiffs Do Not Show That It Otherwise Conspired. .................................. 2

          A.     UBS Had No Role In Setting The Silver Fix Price.................................... 3

          B.     UBS Did Not Otherwise Join The Alleged Conspiracy To Suppress
                    Silver Prices. ......................................................................................... 4

     II.    The Commodities Manipulation Claims Fail Because UBS Did Not
          Intentionally Cause The Artificial Silver Fix Price That Allegedly Inflicted
          Injury.................................................................................................................. 9

CONCLUSION................................................................................................................ 10

## TABLE OF AUTHORITIES

<u>Pages</u>

**CASES**

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009)...................................................................................................... 2, 9

*Bell Atl. Corp. v. Twombly,*
 550 U.S. 544 (2007)........................................................................................... 1, 2, 3, 5, 8

*Cortec Indus., Inc. v. Sum Holding L.P.,*
 949 F.2d 42 (2d Cir. 1991) ............................................................................................. 5

*In re Amaranth Natural Gas Commodities Litig.,*
 730 F.3d 170 (2d Cir. 2013) ...................................................................................... 9, 10

*In re Commodity Exchange, Inc., Silver Futures & Options Trading Litig.,*
 560 F. App'x 84 (2d Cir. 2014) .............................................................................. 5, 9, 10

*In re Commodity Exchange, Inc., Silver Futures & Options Trading Litig.,*
 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012),
 aff'd, 560 F. App'x 84 (2d Cir. 2014) ......................................................................... 8, 9

*In re Elevator Antitrust Litig.,*
  502 F.3d 47 (2d Cir. 2007) ............................................................................................ 8

*In re Platinum & Palladium Commodities Litig.,*
 828 F. Supp. 2d 588 (S.D.N.Y. 2011) .......................................................................... 6

*Lipsky v. Commw. United Corp.,*
 551 F.2d 887 (2d Cir. 1976) .......................................................................................... 6

*Mayor of Balt. v. Citigroup,*
 709 F.3d 129 (2d Cir. 2013) .............................................................................. 2, 3, 4, 8

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE,*
 763 F.3d 198 (2d Cir. 2014) .......................................................................................... 5

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
 551 U.S. 308 (2007)..................................................................................................... 5, 7

*Yak v. Bank Brussels Lambert,*
 252 F.3d 127 (2d Cir. 2001) .......................................................................................... 5

TABLE OF AUTHORITIES
(cont'd)

<u>Pages</u>

**STATUTES**

15 U.S.C. § 1 .................................................................................................................... 2

7 U.S.C. § 1 ...................................................................................................................... 9

7 U.S.C. § 13 .................................................................................................................... 9

**RULES**

Fed. R. Civ. P. 12(b)(6)................................................................................................. 2, 5

Fed. R. Civ. P. 8(a)(2)....................................................................................................... 2

Fed. R. Evid. 201 .............................................................................................................. 5

## INTRODUCTION

The Complaint in this purported class action alleges that the members of the Silver Fix panel—which determined a reference price for silver until August 2014—conspired to artificially suppress silver prices for 15 years by setting the Silver Fix price at unduly low levels.  The panel members (Defendants Deutsche Bank, HSBC, and Bank of Nova Scotia) allegedly engaged in this artificial-suppression and false-pricing scheme to benefit their investments in certain instruments whose value is derived from the price of physical silver.  As Plaintiffs concede, however, **UBS never participated in the Silver Fix** with the panel members.  Plaintiffs nevertheless assert that UBS is liable under antitrust and commodities laws, among others.  UBS fully concurs with the other Defendants that the Complaint should be dismissed under Rule 12 in its entirety as to all Defendants.  The allegations as to UBS's conduct also suffer from additional, and even more glaringly fatal, flaws addressed in this separate motion.[1]  When the Complaint's labels and conclusory allegations are filtered out, as they must be, nothing remains to support an inference that UBS conspired with the Silver Fix panel members to suppress the price of silver.  At most, the Complaint describes a fleeting period of parallel conduct by UBS and a panel member, which is inadequate under Section 1 of the Sherman Act:  "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

The Complaint attempts to compensate for the lack of factual matter supporting a plausible inference of conspiracy by directing attention to four things:  **(1)** UBS's role as a market maker in various markets; **(2)** its participation in the price-setting regime that replaced the Silver Fix; **(3)** the November 2014 assertions by the Swiss financial regulatory agency about certain

---

[1] UBS incorporates by reference Defendants' Memorandum of Law in Support of their Motion to Dismiss the Consolidated Amended Class Action Complaint ("Co-Defendants' Memo").  To avoid needless redundancy, this Memorandum adopts the Background section of the Co-Defendants' Memo.  The Complaint should be dismissed as to all Defendants, and nothing in this separate motion by UBS should be construed otherwise.

1

inappropriate conduct by UBS employees that has nothing to do with Plaintiffs' claims; and

**(4)** UBS's price quotations on the short-term (spot) market for physical silver at various points on a single trading day in November 2009.  But none of these things gives rise to a plausible inference that UBS conspired with any other Defendants to exploit the Silver Fix.  Nor does the Complaint show that UBS intentionally caused the allegedly artificial prices to which Plaintiffs attribute their injuries.  Accordingly, in addition to the fatal insufficiency of the Complaint's allegations against all of the Defendants, the claims against UBS in particular are woefully inadequate under governing law, and should be dismissed under Rule 12(b)(6).

## ARGUMENT

### I.  The Antitrust Claims Fail Because UBS Was Not A Silver Fixing Member And Plaintiffs Do Not Show That It Otherwise Conspired.

The Complaint does not allege facts sufficient to show that Plaintiffs' antitrust claims against UBS have "facial plausibility."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 8(a)(2), 12(b)(6).  Plaintiffs allege that all Defendants engaged in a "combination and conspiracy" in violation of, *inter alia*, Section 1 of the Sherman Act, 15 U.S.C. § 1 (Complaint ("C.") 121 ¶¶ 257-56).  "The crucial question in a Section 1 case is . . . whether the challenged conduct 'stems from independent decision or from an agreement, tacit or express.'"  *Mayor of Balt. v. Citigroup*, 709 F.3d 129, 135 (2d Cir. 2013).  The "plaintiff's job . . . is to allege enough facts to support the inference that a conspiracy actually existed."  *Id.* at 135-36.

*Direct* allegations of a conspiracy "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level."  *Id.*  By contrast, "[c]ircumstantial facts" of a conspiracy require *more* than an allegation of "conscious parallelism."  *Id.* at 136 (emphasis added); *see Twombly*, 550 U.S. at 556.  The plaintiff must present "additional facts or circumstances," referred to as "plus factors," and those additional "facts must . . . lead to an in-

2

ference of conspiracy." *Mayor*, 709 F.3d at 137.  That is, "parallel conduct" allegations "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557.  Here, the Complaint does not allege "enough facts to support the inference that a conspiracy actually existed" as to *any* of the Defendants, but it is even more deficient as to UBS, given that UBS was not even a Silver Fix panel member.  The Complaint does not present any facts, or any required "plus factor," sufficient to portray UBS as a participant in the purported conspiracy.

**A.      UBS Had No Role In Setting The Silver Fix Price.**

The Silver Fix is at the heart of Plaintiffs' claims.  The Complaint's central contention is that the "Defendants exploited and abused their advantageous position *as Silver Fix panel members* by engaging in manipulative and collusive conduct to cause artificial silver prices during the Class Period."  C.35 (capitalization altered; emphasis added).  That is, Plaintiffs allege that "the Fixing Members," in "breach[]" of "their duties . . . as Silver Fix panel members" (C.38 ¶ 133), deployed their "*control over* the results of the Silver Fix, [and] colluded with each other about where to fix the price of silver" (C.38 ¶ 135) (emphasis added)—resulting in a "systematic" (C.5 ¶ 10; 5-6 ¶ 12; 6 ¶ 13; 86 ¶ 175) and "persistent" (C.117 ¶ 240) "[a]rtificial [s]uppression" of silver prices (C.116 ¶ 238 & App. C).  The Complaint thus asserts that the Silver Fix panel members took trading positions allowing them to "financially benefit from where they knew the price of silver was going to be fixed following" publication of the conference call outcome.  C.38-39 ¶ 135.  Plaintiffs further assert that "[t]he Silver Fixing entrust[ed] the global price of silver to a small group of competitors, making it easy for them to influence prices."  C.36 ¶ 126.

But UBS concededly was not a "Fixing Member" (C.21 ¶ 85; 25 ¶ 101; 36 ¶ 126), so even on Plaintiffs' theory UBS did not owe alleged "duties" based on such membership, did not have "control over the results of the Silver Fix," and was not poised to "influence prices."  Nor

3

does the Complaint describe communications between UBS and any Silver Fix panel member during the alleged "persistent downward manipulation" (C.48 ¶ 154) through which any supposed "informational advantage" inherent in Silver Fix panel membership was purportedly conveyed to UBS (C.5 ¶ 11).  Even if the Silver Fix panel members could be treated as having acted in agreement, which they cannot be, nothing would connect UBS to that alleged agreement.  The allegations as to the Silver Fix panel members thus cannot state an antitrust claim against UBS.

**B.**      **UBS Did Not Otherwise Join The Alleged Conspiracy To Suppress Silver Prices.**

Failing to present facts showing UBS to be a conspirator is a fatal deficiency, and what Plaintiffs *do* allege about UBS does not compensate for that deficiency.  The Complaint presents four clusters of allegations as to UBS—that **(1)** UBS is a market maker in the silver spot (short term) market (C.21 ¶ 84; 19 ¶ 77); **(2)** UBS is a participant in the new London Bullion Market Association ("LBMA") London Silver Price (C.61 ¶ 182 & n.102; 54 ¶ 169); **(3)** the Swiss Financial Market Supervisory Authority ("FINMA") made certain assertions about UBS conduct in precious metals trading in "settl[ing]" a proceeding (C.43 ¶ 146; 21 ¶ 84);[2] and **(4)** UBS allegedly quoted prices lower than market averages at intervals "around" and "throughout" the Silver Fix conference call on November 25, 2009 (C.106 ¶ 214; 108 ¶ 217).  These allegations do not amount to any valid "plus factor" because they are not "facts that tend to ensure that courts punish concerted action—an actual agreement—instead of the unilateral, independent conduct of competitors."  *Mayor*, 709 F.3d at 137.  That is, Plaintiffs have not described events showing that UBS engaged in, for example, "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an

---

[2]   UBS disagrees with the Complaint's characterization of the FINMA process, but for purposes of this motion it addresses the facts as pleaded.

advance understanding among the parties." *Twombly*, 550 U.S. at 556 n.4.

**1. Market Making.**  UBS's activities as a market maker—that is, a "dealer[] that … buy[s] and sell[s] silver on a regular and continuous basis at a publicly quoted price, in the spot market for physical silver"—cannot imply unlawful conduct in concert with the Silver Fix Panelists.  C.39 ¶ 136.[3]  The Complaint offers no basis whatsoever for inferring conspiracy from the mere fact of continuous active participation in a market.  As in the related commodities manipulation context, no "inference of intent" to engage in illicit conduct can be drawn from the fact that a firm is a major participant in a market, even where it has market power (which is not alleged here as to UBS).  *In re Commodity Exchange, Inc.*, 560 F. App'x 84, 86 (2d Cir. 2014) ("*COMEX II*").  If anything, UBS's market-making role undercuts the plausibility of the assertion that UBS had an economic motive to participate in the alleged scheme.  As a market maker, UBS was required to sell as well as to buy physical silver to satisfy orders in the market, the timing of which UBS could not dictate.  Improper suppression of silver prices would have devalued UBS's silver holdings, not benefitted UBS.

**2. New LBMA Price.**  UBS's role as an LBMA-accredited "price participant[]" supplying order information contributing to the new equilibrium price that replaced the Silver Fix arrangement cannot support an inference that UBS conspired with the Silver Fix panel members in the activities to which Plaintiffs trace their alleged injuries.  C.61 ¶ 182 & n.102; 54 ¶ 169.

---

[3]  "Market Making Members [of the LBMA] are required to quote prices to each other upon request throughout the London business day in any combination of the three main product categories—spot, forwards and options—in both gold and silver."  LBMA, *A Guide to the London Precious Metals Markets* 3 (2008) (Declaration of Joel S. Sanders, Ex. A); *see id.* at 13.  UBS respectfully requests that this Court take judicial notice of this LBMA publication.  Fed. R. Evid. 201.  At the Rule 12(b)(6) stage, the court examines the complaint "augmented by . . . 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'"  *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 202 (2d Cir. 2014) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)); *see Yak v. Bank Brussels Lambert*, 252 F.3d 127, 130-31 (2d Cir. 2001) (court properly views document "integral" to complaint because pleaded claims depend on its contents even when pleading "[c]arefully avoid[s] all mention" of it) (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991)).

While Plaintiffs express "concerns" with the new pricing, Plaintiffs assert that their injuries arose not from the new pricing but instead from supposed "abuse[]" of the Silver Fix—in particular, from the panel members' "control over the results of the Silver Fix," and purported "false pricing information" scheme, causing Plaintiffs to "transact[] at artificially lower prices each time they sold physical silver or silver financial instruments." C.38-39 ¶ 135; 38 ¶ 133; 116 ¶ 237.

**3. FINMA Assertions.** FINMA's assertions regarding the alleged "settlement" announced on November 12, 2014 do not implicate UBS in the conspiracy Plaintiffs allege. C.21 ¶ 84; 43 ¶ 146. Those assertions are "not an adjudication of the underlying issues" in Plaintiffs' case, and so Plaintiffs "are . . . prohibited from relying on the [FINMA statements] to plead the underlying facts of liability." *In re Platinum & Palladium Commods. Litig.*, 828 F. Supp. 2d 588, 594 (S.D.N.Y. 2011). Unadjudicated assertions, including "pleadings, settlements, and government investigations in other cases," should be stricken as "immaterial" under Rule 12(f). *Id.* at 593 (citing *Lipsky v. Commw. United Corp.*, 551 F.2d 887, 894 (2d Cir. 1976)).

In any event, even if Plaintiffs could avoid *Lipsky*, the FINMA assertions would not support Plaintiffs' claims.[4] The FINMA Release selectively quoted in the Complaint and the news

---

[4] Plaintiffs allege that on November 12, 2014, FINMA ordered UBS to pay approximately $139 million "to settle allegations of misconduct arising from its foreign exchange and precious metals investigation." C.43 ¶ 146; *see* C.21 ¶ 84. FINMA issued that day: (1) a press release, *FINMA sanctions foreign exchange manipulation at UBS* 1 (Nov. 12, 2014) ("FINMA Release"), and (2) a report setting forth FINMA's allegations, *Foreign exchange trading at UBS AG: investigation conducted by FINMA* 2 (Nov. 12, 2014) ("FINMA Report"). *Available at* http://www.finma.ch/e/aktuell/pages/mm-ubs-devisenhandel-20141112.aspx. Plaintiffs quote in part (C.21 ¶ 84; 43 ¶ 146) two sentences from the FINMA Release. "Foreign exchange traders," the FINMA Release asserted, "acted unacceptably frequently against the interests of their clients and counterparties. This conduct was partly coordinated with other banks.'" FINMA Release at 2. "In the improper business conduct in foreign exchange and precious metals trading, electronic communication platforms played a key role," the FINMA Release added. The Complaint also refers (C.21 ¶ 84; 43-44 ¶ 146) to a Bloomberg News article that discussed the FINMA report and that quoted UBS's chief executive officer, Mark Branson, as stating that "[t]he behavior patterns in precious metals were somewhat similar to the behavior patterns in foreign exchange," and that "[w]e have also seen clear attempts to manipulate fixes in the precious metals markets." N. Larkin & E. Logutenkova, *UBS Precious Metals Misconduct Found by Finma in FX Probe*, Bloomberg News, Nov. 12, 2014, *available at* http://www.bloomberg.com/news/articles/2014-11-12/finma-s-ubs-foreign-exchange-settlement-includes-precious-metals.

coverage of the related FINMA Report must be viewed in their proper context. *See Tellabs*, 551 U.S. at 322; *supra* note 3.  That report—which focused mainly on conduct in the foreign exchange market—briefly made assertions about events in precious metals markets in which UBS employees engaged in "*conduct against the interests of [the bank's] own clients*."  FINMA Report § 3.3.3, at 12 (emphasis added).  FINMA asserted that UBS employees had shared the confidential order information of UBS's precious metals trading customers with unnamed "third parties," and also engaged in impermissible "front running"—that is, capitalizing on confidential customer order information to trade on UBS's behalf—including as to "silver fix orders of one client."  *Id.*  But FINMA's report did not allege that the "third parties" were Silver Fix panel members, and Plaintiffs do not describe themselves as UBS customers whose confidential order information potentially was said to have been misused.  Plaintiffs' claims rest on purported "advance knowledge of the Silver Fix results," not knowledge about customer orders from a bank that never had control over the Silver Fix.  C.40 ¶ 137; 109 ¶ 221; 46-47 ¶ 151.

Departing from the FINMA release and report, which lend no support to the conspiracy allegations, the Complaint instead refers to a news article reporting an alleged assertion of FINMA's Mr. Branson regarding "clear attempts to manipulate fixes in the precious metals markets."  C.21 ¶ 84; 43-44 ¶ 146.  But Mr. Branson's reported allegation does not even mention silver or name UBS or any alleged co-participants.  In any event, "manipulate" has many possible meanings, and nothing in the Complaint shows that Mr. Branson used that term to assert that any specific company (let alone UBS in particular) participated in the conspiracy to suppress silver prices alleged in the Complaint.  Moreover, any such assertion would be inconsistent with the agency's own report, which contains no suggestion that UBS had any role in any conspiracy concerning "advance knowledge of the Silver Fix results."  C.40 ¶ 137.  Mr. Branson's alleged

remark thus would not "lead to an inference of conspiracy" as alleged.  *Mayor*, 709 F.3d at 137.

**4.  Price Quoting.**  Plaintiffs' assertions about UBS's price-quoting activity—based on a single day in November 2009—likewise fail to present a plausible claim.  Plaintiffs offer no facts connecting their description of alleged statistical disparities in silver pricing to any unlawful activity by UBS, so the Complaint instead directs attention to the trading activity on the specified 2009 date as purportedly "one example" of UBS and Deutsche Bank "systematically quot[ing] silver prices significantly below the quotes of other market participants" before and "during the Silver Fix."  C.40 ¶ 138.  But this is the only such "example" identified in the Complaint, out of allegedly "thousands" of suspicious trading days, and beyond labels and conclusions, the Complaint provides no facts establishing that the price quotations on that date raise a plausible inference of conspiracy, or even that they are representative of UBS's silver pricing conduct.

The bare submission of purportedly parallel or correlated price quotes in a dynamic market cannot support an inference of conspiracy, absent additional facts showing that such quotes "would *probably not* result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by *an advance understanding* among the parties."  *Twombly*, 550 U.S. at 556 n.4 (emphases added); *see also id.* at 557.  Here, Plaintiffs offer no non-conclusory grounds for inferring that UBS's price quotes on November 25, 2009, resulted from "an advance understanding" between UBS and Deutsche Bank or any other Defendant.  "[S]imilar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy."  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007).  The Complaint's "paragraphs describ[ing] . . . market price fluctuations," coupled with "bald assertions" that the fluctuations are the result of unlawful conduct, thus fall well short of the minimum Rules 8 and 12 demand.  *In re Commodity Exchange, Inc.*, 2012 WL 6700236, *20 (S.D.N.Y. Dec. 21, 2012)

("*COMEX I*"), *aff'd*, *COMEX II*, 560 F. App'x at 86-87.

## II. The Commodities Manipulation Claims Fail Because UBS Did Not Intentionally Cause The Artificial Silver Fix Price That Allegedly Inflicted Injury.

The Complaint does not allege facts sufficient to show that Plaintiffs' manipulation claims against UBS have "facial plausibility" under the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*—whether based on UBS's primary conduct as a principal (Third and Fourth Claims) or secondary conduct as an alleged aider and abettor (Fifth Claim). *Iqbal*, 556 U.S. at 678. Because the pleading fails to meet Rule 8, it also fails to meet Rule 9.

The CEA "prohibits any person from 'manipulat[ing] or attempt[ing] to manipulate the price of any commodity.'" *COMEX I*, 2012 WL 6700236, *10 (quoting 7 U.S.C. § 13). Manipulation is found "where (1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price." *In re Amaranth Natural Gas Commods. Litig.*, 730 F.3d 170, 173 (2d Cir. 2013) (internal quotation marks omitted); *COMEX II*, 560 F. App'x. at 86-87.

Plaintiffs' CEA theory fails as to UBS for the same reasons that the antitrust conspiracy theory fails. The Silver Fix is the moving force behind the alleged manipulation. C.35; 36 ¶ 126; 38 ¶¶ 133-35; 118 ¶ 245; *see* C.124 ¶ 275 (alleging, as to CEA claim, that "Defendants abused their position of trust and breached their duties and responsibilities *as Silver Fixing panel members* to cause . . . price artificiality in silver and silver futures prices"). But Plaintiffs allege no facts supporting a plausible inference that UBS had any role in that purported scheme.[5]

---

[5] Moreover, as discussed above, UBS's role as a market maker further undercuts the plausibility of the allegation that it had an economic motive to suppress prices over a 15-year period. *Supra*, Point I.B.1. Plaintiffs' further attempt to plead a CEA claim premised on "inside information obtained and used . . . in breach of [Defendants'] duty *as Silver Fix panel members*" (C.123-24 ¶ 275 (emphasis added)) fails as to UBS for all the reasons set forth in the Co-Defendants' Memo and also because UBS was not a "Silver Fix panel member[]" and thus had no such alleged duty or access (C.21 ¶ 85; 25 ¶ 101; 36 ¶ 126).

Plaintiffs fail to satisfy the elements of a CEA manipulation claim as to UBS.  UBS lacked "ability to influence" the Silver Fix outcome even under Plaintiffs' theory, given that UBS did not participate in the Silver Fix.  *Amaranth*, 730 F.3d at 173.  The Complaint also fails to show that UBS "[c]aused the artificial prices" alleged or that it "specifically intended to cause" any such price.  *Id.*

Furthermore, "[a]s plaintiffs fail[] to allege a CEA violation, their aiding and abetting claim [is] properly dismissed as well."  *COMEX II*, 560 F. App'x. at 87.  Moreover, aiding and abetting "requires knowledge of the primary violation and an intent to assist it," *Amaranth*, 730 F.3d at 183, but no alleged facts support those inferences.  And for the same reasons discussed above with respect to Plaintiffs' antitrust claim, none of the four clusters of allegations concerning UBS's conduct compensates for these deficiencies.  *See COMEX II*, 560 F. App'x. at 86-87 (quoting *Amaranth*, 730 F.3d at 183).

## CONCLUSION

For the foregoing reasons, all claims in the Complaint should be dismissed as to UBS.

DATE:  March 27, 2015                                    Respectfully submitted,

                                                        GIBSON, DUNN & CRUTCHER LLP

                                                        /s/  Thomas G. Hungar
Joel S. Sanders                                         Thomas G. Hungar
555 Mission Street, Suite 3000                          D. Jarrett Arp
San Francisco, CA  94105                                Melanie L. Katsur
Telephone: (415) 393-8200                               1050 Connecticut Avenue, N.W.
                                                        Washington, D.C.  20036
Peter Sullivan                                          Telephone: (202) 955-8500
Lawrence J. Zweifach                                    thungar@gibsondunn.com
Indraneel Sur
200 Park Avenue                                         *Attorneys for Defendant UBS AG*
New York, NY 10166
Telephone: (212) 351-4000