**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

---------------------------------- x

IN RE:                      :

LONDON SILVER FIXING ANTITRUST AND :    1:14-MD-02573 (VEC)
COMMODITIES LITIGATION         :
                          :   1:14-MC-02573 (VEC)
*This Document Relates to All Actions*    :
                          :   **ORAL ARGUMENT REQUESTED**
                          :

---------------------------------- x

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF DEFENDANTS DEUTSCHE BANK AG, HSBC BANK USA, N.A., THE BANK OF NOVA SCOTIA (AND AFFILIATED ENTITIES) TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Table of Contents

| | | Page |
|---|---|---|
| PRELIMINARY STATEMENT | | 1 |
| BACKGROUND | | 4 |
| A. | The Parties | 4 |
| B. | The Silver Market | 5 |
| C. | The Silver Fix | 7 |
| D. | The Complaint's Claims | 9 |
| ARGUMENT | | 13 |
| II. | The Complaint Does Not Plead a Violation of the Sherman Act. | 14 |
| A. | The Complaint Does Not Adequately Allege an Unlawful Agreement. | 14 |
| B. | The Complaint Fails To Allege Common Motive | 17 |
| C. | So-Called "Red Flags" Do Not Support an Inference of Collusion | 19 |
| D. | The Work of Plaintiffs' Paid Experts Is Insufficient To Establish a Conspiracy To Fix Prices. | 21 |
| E. | The Investigations Mentioned in the Complaint Are Irrelevant. | 23 |
| F. | Plaintiffs Lack Antitrust Standing.. | 24 |
| G. | The Complaint Does Not Allege Antitrust Injury | 29 |
| III. | The Donnelly Act Claims Must Likewise Be Dismissed. | 31 |
| IV. | The Complaint Does Not Plead a Claim for Violation of the CEA. | 31 |
| A. | The Complaint Fails to Plead a Price Manipulation Claim with Particularity. | 31 |
| 1. | The Alleged Facts do not Give Rise to a Strong Inference of Scienter. | 32 |
| 2. | The Complaint Fails To Allege the Existence of Artificial Prices. | 34 |
| 3. | The Complaint Fails To Allege That Defendants Caused Artificial Prices. | 36 |
| B. | The Complaint Fails to Plead A Manipulative Device Claim With Particularity. | 37 |
| C. | Plaintiffs' Claims Must Be Dismissed for Lack of Standing. | 40 |
| D. | The Complaint Fails to Allege Principal-Agent or Aiding and Abetting Liability. | 43 |
| V. | The Complaint Fails To State a Claim for Unjust Enrichment. | 44 |
| VI. | The Complaint's Antitrust and CEA Claims Are Time Barred | 46 |
| A. | The Complaint's Antitrust Claims Are Time-Barred. | 46 |
| B. | The Complaint's CEA Claims Are Time-Barred. | 47 |

C.      There Is No Basis on which To Toll the Statutes of Limitation. .......................... 48

CONCLUSION .................................................................................................................. 50

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Accurate Grading Quality Assur., Inc. v. Thorpe*,
  No. 12 CIV. 1343 (ALC), 2013 WL 1234836 (S.D.N.Y. Mar. 26, 2013)................................18

*In re Adelphia Commc'ns Corp.*,
  No. 03 MD 1529 (LMM), 2005 WL 1278544 (S.D.N.Y. May 31, 2005)...............................46

*Allen v. Dairy Farmers of Am., Inc.*,
  No. 09-cv-230, 2014 WL 2610613 (D. Vt. June 11, 2014) *supplemented,* No.
  13-md-2481 (KBF), 2014 WL 4743425 (S.D.N.Y. Sept. 15, 2014) .........................................26

*In re Aluminum Warehousing Antitrust Litig.*,
  13-md-2481 (KBF), 2015 U.S. Dist. LEXIS 26412 (S.D.N.Y. Mar. 4, 2015).........................31

*In re Aluminum Warehousing Antitrust Litig.*,
  No. 13-md-2481 (KBF), 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014)...................................19

*In re Amaranth Natural Gas Commodities Litig.*,
  587 F. Supp. 2d 513 (S.D.N.Y. 2008)................................................................................14, 43

*In re Amaranth Natural Gas Commodities Litig.*,
  612 F. Supp. 2d 376 (S.D.N.Y. 2009), *aff'd,* 730 F.3d 170 (2d Cir. 2013)........................32, 33

*In re Amaranth Natural Gas Commodities Litig.*,
  730 F.3d 170 (2d Cir. 2013).............................................................................................. 31-32

*Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*,
  116 F. Supp. 2d 1159 (C.D. Cal. 2000) ..................................................................................28

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
  No. 02 Civ. 5575 (SWK), 2004 WL 992991 (S.D.N.Y. May 5, 2004) ...................................46

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................................13, 14, 17, 22

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983)......................................................................................24, 26, 27

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)....................................................................................................38

*Atuahene v. City of Hartford*,
  10 F. App'x 33 (2d Cir. 2001) ........................................................................................16, 34

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................................................*passim*

*Billy Baxter, Inc. v. Coca-Cola Co.*,
    431 F.2d 183 (2d Cir. 1970)..............................................................................................24

*Blewett v. Abbott Labs.*,
    938 P.2d 842 (1997)..........................................................................................................46

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)..........................................................................................................29

*Butala v. Agashiwala*,
    916 F. Supp. 314 (S.D.N.Y. 1996) ..................................................................................49

*Cargill, Inc. v. Monfort of Colo., Inc.*,
    479 U.S. 104 (1986)......................................................................................................26-27

*Certain Underwriters at Lloyd's v. Milberg LLP*,
    08 Civ. 7522 (LAP), 2009 U.S. Dist. LEXIS 97284 (S.D.N.Y. Sept 29, 2009)......................49

*CFTC v. Leighton*,
    No. 12-cv-4012 (PSG), 2013 WL 4101874 (C.D. Cal. July 8, 2013)......................................37

*Chambers* v. *Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002)................................................................................................5

*Chiarella v. United States*,
    445 U.S. 222 (1980)..........................................................................................................39

*Cleary v. Philip Morris Inc*,
    656 F. 3d 511 (7th Cir. 2011) ..........................................................................................46

*Commercial Data Servers, Inc. v. Int'l Bus. Machs. Corp.*,
    262 F. Supp. 2d 50 (S.D.N.Y. 2003)................................................................................20

*In re Cox*,
    CFTC Docket No. 75-16, 1987 CFTC LEXIS 325 (CFTC July 15, 1987) ..............................31

*In re Crude Oil Commodity Litig. ("In re Crude Oil I")*,
    No. 06 Civ. 6677 (NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007)..............13, 14, 17, 22

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
    No. 09-cr-3690, 2014 WL 4083938 (N.D. Ill. Aug. 18, 2014)..........................................38, 41

*In re Digital Music Antitrust Litig.*,
    812 F. Supp. 2d 390 (S.D.N.Y. 2011)..............................................................................28, 45

*DNAML Pty, Ltd. v. Apple Inc.*,
   25 F. Supp. 3d 422, 430 (S.D.N.Y. 2014) ..............................................................................25

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005)...................................................................................................................38

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007)...........................................................................................16, 18, 21

*In re Energy Transfer Partners Natural Gas Litig.*,
   Civil Action No. 4:07–cv–3349, 2009 WL 2633781 (S.D. Tex. Aug. 26,
   2009), *aff'd sub nom. Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d
   239 (5th Cir. 2010).........................................................................................................32, 42-44

*Extraordinary Title Servs., LLC v. Florida Power & Light Co.*,
   1 So. 3d 400 (Fla. Dist. Ct. App. 2009) ...................................................................................45

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
   No. 09-Civ-4050 (PKC), 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010)................................23

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC*,
   711 F.3d 68 (2d Cir. 2013)............................................................................................25, 27, 29

*Georgia Malone & Co. v. Rieder*,
   19 N.Y.3d 511, 973 N.E.2d 743 (2012)...................................................................................45

*Gotlin* v. *Lederman*,
   367 F. Supp. 2d 349 (E.D.N.Y. 2005) ....................................................................................23

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
   17 F. Supp. 2d 275 (S.D.N.Y. 1998)........................................................................................31

*In re Graphics Processing Units Antitrust Litig.*,
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) ..................................................................................23

*Gross v. New Balance Ath. Shoe, Inc.*,
   955 F. Supp. 242 (S.D.N.Y. 1997) ..........................................................................................26

*Hayden v. Paterson*,
   594 F.3d 150 (2d Cir. 2010)...............................................................................................22-23

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
   620 F. Supp. 2d 499 (S.D.N.Y. 2009).....................................................................................49

*Hogan v. Fischer*,
   738 F.3d 509 (2d Cir. 2013).....................................................................................................13

*In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.* ("*In re HSBC*"),
   1 F. Supp. 3d 34 (E.D.N.Y. 2014) *on reconsideration* 14 F. Supp. 3d 99
   (E.D.N.Y. 2014) ..................................................................................................................44

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977).................................................................................................26, 45, 46

*In re Ind. Farm Bureau Coop. Assoc. Inc.*,
   No. 75-14, 1982 WL 30249 (CFTC Dec. 17, 1982) ...................................................35

*Koch v. Christie's Int'l PLC*,
   699 F.3d 141 (2d Cir. 2012).......................................................................................47

*Krause v. Forex Exch. Mkt., Inc.*,
   356 F. Supp. 2d 332 (S.D.N.Y. 2005)......................................................................43

*LaFlamme v. Societe Air France*,
   702 F. Supp. 2d 136 (E.D.N.Y. 2010) ....................................................................23

*Lawline v. Am. Bar Ass'n*,
   956 F.2d 1378 (7th Cir. 1992) .................................................................................30

*Laydon v. Mizuho Bank, Ltd.*,
   No. 12–cv–3419 (GBD), 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) ....................... *passim*

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR I*"),
   935 F. Supp. 2d 666 (S.D.N.Y. 2013)................................................................. *passim*

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR II*"),
   962 F. Supp. 2d 606 (S.D.N.Y. 2013).......................................................................42

*In re LIBOR-Based Fin. Instruments Antitrust Litig* ("*In re LIBOR III*"),
   27 F. Supp. 3d 447 (S.D.N.Y. 2014)....................................................33, 34, 43, 47

*Lipsky v. Commonwealth United Corp.*,
   551 F.2d 887 (2d Cir. 1976)......................................................................................23

*In re Livent, Inc. Noteholders Sec. Litig.*,
   151 F. Supp. 2d 371 (S.D.N.Y. 2001)................................................................. 42-43

*Mahon v. Ticor Title Ins. Co.*,
   683 F.3d 59 (2d Cir. 2012)..................................................................................44, 45

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).................................................................................................19

*In re Merrill Lynch & Co., Research Reports Sec. Litig.*,
   218 F.R.D. 76 (S.D.N.Y. 2003) ..............................................................................23

*Mid-W. Paper Prods. Co. v. Cont'l Grp., Inc.*,
   596 F.2d 573 (3d Cir. 1979)..................................................................................28

*Miller v. Wolpoff & Abramson, L.L.P.*,
   321 F.3d 292 (2d Cir. 2003)..................................................................................14

*Nicholson v. Bank of Nova Scotia*,
   No. 14-CV-5682 (VEC), 2014 WL 3689323 (S.D.N.Y. July 25, 2014) ................................47

*In re Nine W. Shoes Antitrust Litig.*,
   80 F. Supp. 2d 181 (S.D.N.Y. 2000)..................................................................................47

*In re NYSE Specialists Sec. Litig.*,
   503 F.3d 89 (2d Cir. 2007)..................................................................................14, 21

*Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*,
   No. 98-cv-4067, 1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999)........................................26, 27

*Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*,
   No. 12 CIV 2837 (KBF), 2012 WL 6082387 (S.D.N.Y. Dec. 3, 2012) ................................16

*Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*,
   467 F.3d 283 (2d. Cir. 2006)..................................................................................29

*Peterson v. Cellco P'ship*,
   164 Cal. App. 4th 1583 (2008) ..................................................................................46

*In re Platinum & Palladium Commodities Litig.*,
   828 F. Supp. 2d 588 (S.D.N.Y. 2011)..................................................................15, 18, 23, 43

*In re Pub. Offering Antitrust Litig.*,
   No. 98-Civ-7890 (LMM), 2004 WL 350696 (LMM) (S.D.N.Y. Feb. 25, 2004) ....................25

*Reading Indus., Inc. v. Kennecott Copper Corp.*,
   631 F.2d 10 (2d Cir. 1980)..................................................................................27, 28

*Ross v. Am. Exp. Co.*,
   35 F. Supp. 3d 407 (S.D.N.Y. 2014)..................................................................................19

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000)..................................................................................5

*Salinger v. Projectavision, Inc.*,
   934 F. Supp 1402 (S.D.N.Y. 1996) ..................................................................................47, 49

*Sheehan v. Daily Racing Form, Inc.*,
   104 F.3d 940 (7th Cir. 1997) ..................................................................................36

*In re Commodity Exch., Inc., Silver Futures & Options Trading Litig. ("In re Silver I"),*
No. 11-Md-2213 (RPP), 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012) ........................... *passim*

*In re Commodity Exch., Inc., Silver Futures & Options Trading Litig. ("In re Silver II"),*
560 F. App'x 84 (2d Cir. 2014) .................................................................................32, 43

*Simington v. Lease Fin. Grp., LLC,*
No. 10 Civ. 6052 (KBF), 2012 WL 651130 (S.D.N.Y. Feb. 28, 2012) ...................................44

*Siti-Sites.com, Inc. v. Verizon Commc'ns, Inc.,*
No. 10-cv-3751 (DLC), 2010 WL 5392927 (S.D.N.Y. Dec. 29, 2010) *aff'd,*
428 F. App'x 100 (2d Cir. 2011) ...........................................................................28

*Staehr v. Hartford Fin. Servs. Grp., Inc.,*
547 F.3d 406 (2d Cir. 2008) ...........................................................................5

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.,*
782 F. Supp. 2d 1059 (E.D. Cal. 2011) .....................................................................22

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,*
552 U.S. 148 (2008) .........................................................................................38

*Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.,*
738 F. Supp. 2d 505 (D. Del. 2010) ........................................................................23

*Tam Travel, Inc. v. Delta Airlines, Inc. (In re Travel Agent Comm'n Antitrust Litig.),*
583 F.3d 896 (6th Cir. 2009) ...............................................................................17

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield,*
552 F.3d 430 (6th Cir. 2008) ...............................................................................22

*Twombly v. Bell Atl. Corp.,*
425 F.3d 99 (2d Cir. 2005), *rev'd on other grounds,* 550 U.S. 544 (2007)....................16, 17

*U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C,*
554 F. Supp. 2d 523 (S.D.N.Y. 2008).......................................................................34

*U.S. Commodity Futures Trading Comm'n v. Parnon Energy, Inc.,*
875 F. Supp. 2d 233 (S.D.N.Y. 2012).......................................................................34

*Vanguard Mun. Bond Fund, Inc. v. Thomson Pub. Corp.,*
974 F. Supp. 1159 (N.D. Ill. 1997) ........................................................................44

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
401 U.S. 321 (1971)........................................................................................46

*Zinser v. Cont'l Grain Co.*,
  660 F.2d 754 (10th Cir. 1981) ...............................................................................25

**Statutes**

7 U.S.C. § 9................................................................................................................31

7 U.S.C. § 13..............................................................................................................31

7 U.S.C. § 25.................................................................................................40, 42, 47

15 U.S.C. § 15b..........................................................................................................46

N.Y. Gen. Bus. Law § 340(5) (1999) ................................................................31, 46

**Rules**

Fed. R. Civ. P. 9............................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6)................................................................................................8

**Regulations**

17 C.F.R. § 180.1.......................................................................................................37

17 C.F.R. § 240.10b-5................................................................................................38

72 Fed. Reg. 69288......................................................................................................7

73 Fed. Reg. 44620......................................................................................................7

76 Fed. Reg. 41398..............................................................................................38, 39

78 Fed. Reg. 198..........................................................................................................7

Defendants Deutsche Bank AG, HSBC Bank U.S.A., N.A., and The Bank of Nova Scotia,[1] respectfully submit this Memorandum of Law in Support of their Motion To Dismiss Plaintiffs' Consolidated Amended Class Action Complaint (the **Complaint**),[2] pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).

## PRELIMINARY STATEMENT

Defendants are alleged to have engaged in an on-again, off-again 15-year conspiracy to suppress the price of silver. (Compl. ¶¶ 108, 240.) Plaintiffs' theory relies on the assumption that Defendants held large net short silver positions – and thus profited from a scheme to suppress silver prices – for the entire Class Period.[3] No facts alleged in the Complaint support that irrational assumption, which requires the Court to conclude that four financial institutions, each subject to stringent risk-based capital controls, held massive unhedged short positions continuously *for 15 years*, during a period in which the price of silver concededly rose steadily and significantly. (Compl. ¶ 211.)

The Complaint suffers from further deficiencies. It asserts that Plaintiffs suffered cognizable injury by "transact[ing] at artificially lower prices each time they sold physical silver or silver financial instruments." (Compl. ¶ 237.) But the Complaint is silent as to when Plaintiffs

---

[1] In addition to these entities, the affiliated moving entities are: Deutsche Bank AG New York Branch; Deutsche Bank Securities Inc.; Deutsche Bank Trust Corporation; Deutsche Bank Trust Company Americas; Deutsche Bank Americas Holding Corp.; DB U.S. Financial Markets Holding Corporation (together with Deutsche Bank AG, **Deutsche Bank**); HSBC Holdings Plc, HSBC North America Holdings Inc., HSBC U.S.A. Inc. (together with HSBC Bank USA, N.A., **HSBC**); Scotia Capital (USA) Inc., Scotiabanc Inc., and Scotia Holdings (US) Inc. (together with The Bank of Nova Scotia, **Scotiabank**) (collectively, **Defendants**) (Compl. ¶¶ 31, 36-42, 46, 49-51, 55-57, 62, 70-74, 76, 86.)

[2] The Complaint, which is cited as "Compl.," contains duplicate paragraph numbering, which restarts at page 80, ¶ 165. Duplicate paragraphs are referred to by both page and paragraph number.

[3] Plaintiffs' self-styled "experts" purport to show "persistent suppression" of silver prices. The Complaint incongruously also alleges that Defendants would establish long positions if they decided that the Silver Fix price was going to be higher. (Compl. ¶¶ 135, 240.)

acquired their positions, the prices at which they bought or sold their positions, and the prices of any offsetting positions that they may have taken.[4]  More pointedly, the Complaint identifies neither a single transaction between a Plaintiff and a Defendant nor even a single transaction in which any Defendant participated – much less "reap[ed] large illegitimate profits."  (Compl. ¶ 108.)

Instead of facts or a coherent theory of injury, the Complaint impermissibly relies on self-commissioned "studies" of self-styled "experts."  (Compl. ¶¶ 8-13.)  Importantly, the Complaint omits the methodologies underlying these "studies" even though they are its primary basis.  Plaintiffs have tendered a complaint on what amounts to opinion testimony of experts who themselves render conclusions based on undisclosed methodologies.   Even if the fruits of commissioned studies were accepted as a valid basis for pleading (they should not be), the studies do nothing more than parrot the unsupportable positions on which the Complaint relies for its theories of harm.  Thus, the "experts" purport to have concluded that "price spikes" (Compl. at 65, ¶ 192; 85, ¶ 172) occurred most often around the time of the Silver Fix,[5] proceed to label those spikes "anomalous" and, therefore, deem them suggestive of wrongful conduct.  (Compl. ¶¶ 11-13.)  The Complaint's reliance on the studies only highlights the Complaint's key deficiencies.  For example, although the Complaint purports to provide a list of dates "on which Defendants' conduct resulted in an artificial suppression of prices" (*see* Compl. App. C), it is silent as to whether the "conspiracy" alleged was "on" for every trading day, or activated only on the "anomalous" days identified in the Complaint.  If the former, one strains to see the relevance of the "expert" studies.  If the latter, the Complaint fails to allege any facts suggesting (i) why Defendants chose to conspire

---

[4] These omissions might well be advertent, as a plaintiff who *bought and sold* during the purported 15-year Class Period may have suffered no injury.  (*See* Compl. ¶¶ 236, 240; Compl. Appendix (*App.*) C.)

[5] The daily fixing process described *infra* at 7 *et seq* is referred to as the **Silver Fix.**

only on certain days; (ii) how the "on" and "off" days were communicated and/or enforced; and (iii) how pricing on "off" days was a function of anything other than benign market forces.

The Complaint should be dismissed for several independent reasons:

*First*, the Complaint does not allege facts sufficient to support even a plausible inference of unlawful agreement among Defendants to suppress silver prices. It does not refer to a single communication among Defendants, much less a communication in which two or more Defendants discussed coordinated activity. Nor does the Complaint offer a plausible motive from which an unlawful agreement could be inferred. It relies instead on the tacit assumption that Defendants stood to benefit from *fifteen unbroken years* of price suppression because they were "short" throughout the Class Period, but it alleges no facts to support this proposition. That is not enough to state a Sherman Act claim, or to give license to Plaintiffs to spend tens of millions of discovery dollars in search of a fact that could support their pre-paid theory.

*Second*, Plaintiffs lack standing to assert antitrust claims because no Plaintiff alleges injury of the kind that the antitrust laws were designed to prevent. Although the Complaint asserts that Plaintiffs suffered injury by "transact[ing] at artificially lower prices each time they sold physical silver or silver financial instruments" (Compl. ¶ 237), there is no factual support for any of the transactions underlying their claims. Moreover, Plaintiffs are, at most, indirect purchasers who cannot assert claims for damages under the Sherman Act.

*Third*, the Complaint does not allege valid Commodity Exchange Act (*CEA*) claims because it does not allege that silver prices were artificial nor allege with the particularity required by Fed. R. Civ. P. 9(b), that Defendants had the wherewithal or intent to cause artificial pricing. The Complaint does not plead facts giving rise to an inference that Defendants specifically intended to cause artificial pricing, instead relying on generalized pleading of motive (Defendants'

purported incentive to "reap large . . . profits" in their trading positions). (Compl. ¶ 108.) Such a "motive" theory is legally insufficient. Even if the Complaint had pleaded the elements of a manipulation claim, Plaintiffs would still lack standing to assert claims under the CEA because the Complaint does not adequately allege that they suffered any actual damages as a result of the asserted CEA violations.

## BACKGROUND

### A.   THE PARTIES

Plaintiffs are individuals and businesses that allegedly sold physical silver, silver futures contracts and options, and mini silver futures contracts between January 1, 1999 and an unspecified end date (the "Class Period"). (Compl. ¶¶ 19-28.) The Complaint alleges that Plaintiffs sold silver and silver derivatives "throughout the Class Period" (Compl. ¶ 236), but does not provide precise timing, price, or counterparty information for any of these alleged transactions (*see* Compl. App. C at 13 *et seq*) and is silent as to when Plaintiffs purchased silver or silver derivatives (although one assumes that not all positions sold during the Class Period were acquired prior to 1999).

Defendants are the London Silver Market Fixing Ltd. (*LSMF*), the three institutions that were members of LSMF during the Class Period – Deutsche Bank, HSBC and Scotiabank – and UBS AG and certain of its affiliates (*UBS*). (Compl. ¶¶ 29-87.) The four financial institutions named as Defendants are, as the Complaint acknowledges, only four of at least 65 market makers for physical silver. (Compl. ¶ 136.) LSMF is a British private company located in London that administered the London Silver Fixing during the Class Period until August 14, 2014, when the mechanism and administration for the daily fixing changed. (Compl. ¶¶ 29, 101.)

### B.   THE SILVER MARKET

Physical silver and silver derivatives are traded in markets that are large and highly liquid. (Compl. ¶ 2; Ex. 1[6] (Andrew Caminschi, *Any Silver Linings? London Silver Fixing Impact on Public Markets Before and After the Introduction of Contemporaneous Futures Trading*, July 7, 2014 ("Caminschi") at 23-25.); Ex. 2 (Francesca Freeman, *Curtain to Fall on London's Historic Silver Benchmark,* The Wall Street Journal, May 14, 2014 ("Freeman I").) Market participants in the silver markets "span the globe and trade virtually around the clock" and include silver producers (both mining companies and refiners), consumers (such as jewelers and industrials), investors, speculators, private individuals, and central banks.   (Ex. 1 (Caminschi), at 2; Ex. 3 (Jeremy A. Charles, *Commodities Futures Trading Commission: Examination of Futures and Options Trading in The Metals Markets*, March 25, 2010 ("Charles") at 1.))   Market participants trade both physical silver and a wide variety of silver derivatives, including futures, exchange-traded funds (*ETFs*), and options. (Ex. 1 (Caminschi), at 2.)

Silver is traded in a variety of ways. (Compl. ¶ 111.)  Physical silver can be traded "over-the-counter" (*OTC*)  (Compl. ¶¶ 111-12), but silver can also be traded using futures and options contracts. (Compl. ¶ 113.)  The seller of a futures contract agrees to deliver, and the buyer agrees to accept, a stated quantity of physical silver, meeting certain standardized delivery specifications, at a set date in the future. (Compl. ¶¶ 115-116.)  The process of exchanging metals between buyer and seller is called "settlement." (Compl. ¶ 117.)  All futures contracts are settled upon expiration, but in most cases settlement does not actually result in an exchange of the underlying physical

---

[6] All references to "Ex." refer to the exhibits to the Declaration of Michael Lacovara, dated March 27, 2015.  On a motion to dismiss, a court can consider "any statements or documents incorporated" into the complaint, and "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit," *Rothman* v. *Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *accord Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002), and may take judicial notice of matters of public record. *Staehr* v. *Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).  Citation information, including URLs when appropriate, is provided in the Lacovara Declaration.

commodity because market participants are able to "offset," or "financially" settle, futures positions. *Id.* In a financial settlement, investors holding either the long or short position offset their obligations with an equal number of futures contracts in which they hold the opposing position.[7] *Id.* In this way, market participants engage in constant, dynamic hedging of physical positions with derivatives, and *vice versa.*

Silver derivatives are traded across multiple venues, including COMEX, the NYSE, the LIFFE exchange, the Intercontinental Exchange (*see* Compl. ¶ 114, n.37) and the Chicago Board of Trade (*CBOT*). (Compl. ¶ 114.) The physical silver market is an OTC market consisting of the dozens of market maker members of the London Bullion Market Association (*LBMA*). (*See* Ex. 1 (Caminschi), at 7.) Financial market data providers, such as Bloomberg or Thomson Reuters, "commonly consolidate the quotes from several [market makers] and report the consolidated feed under the general ticker 'XAG.'" *Id.* at 8.

The silver markets are characterized by significant intraday price volatility, with spikes in price observed at several times during most trading days, including during the "AM gold fixing," at the "opening of the COMEX trading pit," at the closing of the COMEX trading pit, and at the opening of US equity markets. (Ex. 1 (Caminschi), at 23-25.) Intraday volatility notwithstanding, over the course of the Class Period, the spot price of silver enjoyed a "historic" bull run, "increasing in price from $6.78 per ounce [on January 1, 2005] to $48.44 per ounce on April 28, 2011." (Compl. at 87, ¶ 178.)

---

[7] The difference between the two contract prices – for example, the difference between the price at which the initial contract was purchased and the price at which the later offsetting contract was sold – is the profit or loss on the transaction. (Compl. ¶ 118.) Investors with long positions generally benefit as the price of the underlying commodity rises, whereas investors with short positions benefit as the price decreases. *Id.*

HSBC, Deutsche Bank, Scotiabank, and UBS (and dozens of other firms) trade in both physical silver and silver futures and options contracts. (Compl. ¶ 135-36.) Some of them also act as custodians for silver investors. Banks that have exposure to changes in physical silver prices use futures or options transactions to hedge their positions and balance their cash market risk (*see* Ex. 3 (Charles) at 3-4.) which can render a bank "price neutral," meaning that the bank is indifferent to changes in the price of silver. The Defendants, as financial institutions, are subject to regulations and risk-based capital requirements obligating them to hedge commodities-related risks. (*See* Regulatory Capital Rules: Regulatory Capital, Implementation of Basel III, Capital Adequacy, 78 Fed. Reg. 198, 62017, 62094-95, October 11, 2013 ("Regulatory Capital Rules"); Supervisory Guidance: Supervisory Review Process of Capital Adequacy Related to the Implementation of the Basel II Advanced Capital Framework, 73 Fed. Reg. 44620, 44623-24 (July 31, 2008); Risk-Based Capital Standards: Advanced Capital Adequacy Framework, 72 Fed. Reg. 69288, 69303 (Dec. 7, 2007)) ("Supervisory Guidance").

### C.   THE SILVER FIX

The Silver Fix has "changed only slightly since it was established in 1897". (Ex. 1 (Caminschi), at 6.) Originally performed through daily, in-person meetings among the members, the Silver Fix came to be conducted through a single daily teleconference. *Id.* That process continued until August 14, 2014, when the Silver Fix was replaced by the London Silver Price. (Compl. ¶101; *see also* Ex. 4 (Xan Rice, *London Silver Price Fix Dies after nearly 120 years*, The Financial Times, May 14, 2014.) The membership of the Silver Fix has changed over time; its last remaining members were Deutsche Bank, HSBC, and The Bank of Nova Scotia. (Compl. ¶¶ 32, 52, 75.)

From the beginning of the Class Period until August 14, 2014, the Fixing members convened by teleconference once each day, at noon London time, to determine a benchmark price for physical silver. (*See* Compl. ¶ 101.) This teleconference, which typically lasted less than 10 minutes, was conducted as an auction, led by the Chairman, who was selected from among the panel's members. *Id.* The auction began with the Chairman's determination of the prevailing U.S. Dollar "spot price" (or current market price of physical silver) in the London market. (Compl. ¶ 102.) The spot price is largely a function of the futures price: as the Complaint acknowledges, traders in the spot market reference "the prices of COMEX silver futures contracts to calculate the spot market price of silver." *Id.* Following the announcement of the opening price, each member indicated, in 50-bar increments, how many LBMA Good Delivery bars of silver they would be willing to buy or sell at the opening price.[8] (Compl. ¶ 102.) If the amount of buying interest was equal to the amount of selling interest, then the Silver Fix concluded. (Compl. ¶103.) If there was an imbalance, the Chairman adjusted the price until the total amount of silver to be purchased was within 300 bars of the total amount sold. *Id.* If this 300-bar threshold could not be reached, the Chairman could set the price unilaterally, and the members were obliged to divide the excess supply or demand among themselves *pro rata*. (Compl. ¶ 104.) This process produced the silver fix price for each trading day, which was then immediately published to the market. (Compl. ¶ 105.)

On August 15, 2014, the Silver Fix was replaced by the LBMA Silver Price which is administered by the LBMA, in conjunction with CME Group and Thomson Reuters. (Compl. at 54, ¶ 169.) The LBMA Silver Price "keeps some of the main features of the silver fixing, in particular the auction-style process used to calculate the reference price." (Ex. 5 (Xan Rice, *New*

---

[8] An LBMA Good Delivery bar is approximately 1,000 troy ounces of silver. (Compl. ¶ 102.)

*Silver Price is 'Improvement' on Fix*, Financial Times, July 16, 2014)). However, the auction is now conducted electronically, with five participating members: HSBC, JP Morgan Chase Bank, Mitsui & Co. Precious Metals Inc., Scotiabank, and UBS. (Compl. at 61, ¶ 182.)

### D.   THE COMPLAINT'S CLAIMS

The Complaint alleges that, over a period of 15 years, Defendants agreed to submit false pricing information to the Silver Fix, and to engage in a variety of other misconduct (generally engaging in unspecified trades with unspecified inside information about the trajectory of the Silver Fix) so as to manipulate the price of silver and silver financial instruments. (Compl. ¶ 133.) Defendants are alleged to have seized "complete and unaudited" control over the Silver Fix for the entire 15-year Class Period, and, "in a scheme akin to front-running," used it to take advantageous positions in the silver market at Plaintiffs' expense. (Compl. ¶¶ 108, 135.) Based on this theory, the Complaint asserts: (a) conspiracy to restrain trade in violation of the Sherman and Donnelly Acts (Claims One and Two); (b) market manipulation, principal agent liability, and aiding and abetting in violation of the CEA (Claims Three, Four and Five) and (c) unjust enrichment (Claim Six). (Compl. ¶¶ 256-91.)

The Complaint alleges no direct evidence of an unlawful agreement among the Defendants. Instead, it suggests that a conspiracy to manipulate silver prices should be inferred from the following circumstantial allegations:

**Market Price Analyses:**  The centerpiece of the Complaint is "analysis" by paid, self-styled "experts." These "experts" allegedly reviewed silver spot and futures prices from a portion of the Class Period, January 1, 2000 to July 31, 2014, and then (without describing methodology and certainly without peer review or other indicia of reliability) declare the existence of "anomalies," and *then* declare those anomalies "consistent with" collusion. (Compl. ¶¶ 10 -14, at

64, ¶ 191, 86, ¶ 174., 116, ¶¶ 236-240).  These allegations are miscast as fact – and form the bedrock of the Complaint.

Specifically, the Complaint alleges that the pre-paid consultants "uncovered anomalous pricing behavior around the time of the Silver Fix that is consistent with a systematic suppression of prices" and "indicative of pricing information being 'leaked' to the silver market prior to the end of the Silver Fix."  (Compl. ¶¶ 10, 12; 86, ¶ 176.)  The Complaint asserts that this "anomalous pricing behavior" is evidence of systematic price suppression by the Defendants, which had a "persistent (and cumulative) impact on the price of silver" during the Class Period.  (Compl. at 91, ¶ 185.)  As a result of this alleged price suppression, Plaintiffs are alleged to have "transacted at artificially lower prices each time they sold physical silver or silver financial instruments, and received less than they otherwise would have in a competitive, unmanipulated market."  (Compl. ¶ 237.)  No reference is made to the effect of the alleged 15-year price suppression on the prices *paid* by Plaintiffs in *purchasing* silver.  Appendix C to the Complaint purports to provide a list of "sales by Plaintiff[s] on days impacted by Defendants' manipulative conduct," but the Complaint is bereft of so much as a single fact regarding the prices at which Plaintiffs entered into their positions, how long Plaintiffs held those positions, or the prices of any offsetting positions that Plaintiffs might have taken.

**Defendants' Alleged Financial Incentives:**  The Complaint alleges that Defendants could have benefitted from manipulating the silver market through a two-step process.  *First*, it claims that Defendants engaged in a "systematic" suppression of silver prices during the 15-year Class Period by using their price quotes in the spot market to initiate a downward price trend around the start of the daily Silver Fix.  (Compl. ¶ 13, 138.)  *Second*, Defendants allegedly seized the opportunity to use their "inside knowledge" of the suppression to take advantageous positions

based on their expectations of where "the price of silver was going to be fixed." (Compl. ¶ 135.)
Again there is not a single factual allegation regarding what positions Defendants established, and
thus no facts to show that this behavior actually occurred. (Compl. ¶¶ 108, 135.) What little
factual allegations exist contradict both the theory of manipulation and its presumed motivation:
although alleging that Defendants engaged in "systematic price suppression" (Compl. ¶ 190), the
Complaint suggests that Defendants would "establish *long* COMEX silver futures positions" at
times as well. (Compl. ¶ 135 (emphasis added).) Long positions would incur losses from price
suppression, a contradiction created, but unresolved, in the Complaint.[9]

**"Plus" Factors**: The Complaint deems numerous longstanding, and long-public, features
of the fixing process "red flags" indicative of collusion among Defendants. These allegations
highlight that the Complaint's essential quarrel (as well as that of Plaintiffs' "expert" analyses) is
with the *structure* of the Silver Fix. (*See, e.g.,* Compl. ¶¶ 130, 131 (citing alleged structural factors
underlying the Silver Fix)). Presumably that is the basis for the citation to the U.S. Department of
Justice Guidelines for Collaborations Among Competitors (2000) ("Collaboration Guidelines"), to
support their claim that certain alleged characteristics of the Silver Fix are "red flags indicative of
collusion." (*See* Compl. ¶ 130; *see also* Ex. 6 (Federal Trade Commission and the U.S.
Department of Justice, *Antitrust Guidelines for Collaborations Among Competitors*, April 2000
("Collaboration Guidelines").)   But the Collaboration Guidelines themselves identify several of

---

[9] The Complaint also describes a separate series of trades by two Defendants and a third party, BNP Paribas,
claiming that these trades show that the Defendants "systematically quoted silver prices significantly below the
quotes of other market participants leading up to and during the Silver Fix." (Compl. ¶ 214-217.) This is inaccurate,
as the charts prepared by Plaintiffs demonstrate: Deutsche Bank and UBS together submitted just as many price
quotes that were lower than the immediately preceding quote as quotes that were greater than or equal to the
immediately preceding quotes. *Id.* Moreover, on numerous occasions, BNP Paribas' quote is lower than either
Deutsche Bank's or UBS's immediately preceding quote. *Id.*

the factors mentioned in the Complaint as part of rule-of-reason analysis, and not therefore necessarily indicative of wrongful conduct. *See* Ex. 6 (Collaboration Guidelines), at § 3.34.

The alleged "red flags" include the "private nature of the fix" (Compl. ¶¶ 107, 125, 128); the small number of Fix members (Compl. ¶ 126); the frequency of Fixing calls (Compl. ¶ 127); the fact that Defendants allegedly engaged in Silver trading during the Fix (Compl. ¶ 129); the importance of the pricing information exchanged during the Fix (Compl. ¶¶ 125, 130); the use of current (as opposed to historical) pricing information during the Fix (Compl. ¶ 130); and the fact that the Fixing process has been conducted "throughout many years." *Id.* The Complaint also mentions in passing purported "interlocking directorates creating additional conflicts of interest," "multimarket contact among submitters enhancing the stability of collusion," "low benefits to cheating on a collusive agreement," "barriers to entry enhancing market power and the stability of collusion," "repeated similar behavior found in many similar benchmark settings," and the speed at which the Fixing process took place. (*Id.* at ¶¶ 131, 235.) But the Complaint does nothing with this litany; it alleges neither a single director on the board of multiple defendants, nor even mentions any other markets in which the Defendants interact, much less how those interactions relate to the Silver Fix.

This hodgepodge notwithstanding – and for all of its charts and graphs, and for its colorful adverbs and insinuations – the Complaint fails to describe even a single instance of collusive or manipulative conduct related to the Fixing process.[10]

**Government Investigations and Settlements:** The Complaint's final set of allegations discuss regulatory actions taken in relation to other markets and other (non-Defendant) market

---

[10] The Complaint references two communications – instant messages sent by unidentified traders, one from 2004 and one from 2009. Neither message refers to the Silver Fix, and it is unclear how they are supposed to be tied to the Complaint's allegations of collusion. (Compl. ¶¶ 152-53.)

participants.  The Complaint notes that UBS "settled" an investigation conducted by the Swiss Financial Market Supervisory Authority (*FINMA*) (Compl. ¶ 146), but ignores that (i) the focus of that settlement was foreign exchange rates, not the Silver Fix, in which UBS did not participate, and (ii) the "settlement" did not involve any allegation of collusion among the Defendants in this case. (*See* Compl. ¶ 144;  *see also* (Ex. 7 (FINMA, *Foreign exchange trading at UBS AG: investigation conducted by FINMA*, November 12, 2014.))  The Complaint also refers to an article in which the head of the German financial regulator, the Federal Financial Supervisory Authority (*BaFin*), expressed concern about "potential manipulation of the metals as well as the foreign exchange market," but omits to mention that, "[n]one of the banks have been accused of any wrongdoing." (Ex. 8 (Neil Hume, Alice Ross, and Emiko Terazono, *Deutsche Puts Gold Price Fix Role on Sale*, FINANCIAL TIMES, January 17, 2014.)   Finally, the Complaint refers to an investigation into the silver futures market that was commenced by the Commodity Futures Trading Commission (*CFTC*) in 2008.  (Compl. ¶ 147.)  But as materials cited in the Complaint make clear, that investigation did not result in a finding of wrongdoing on the part of *anyone,* including the Defendants.  *Id.* (citing CFTC public releases).)

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Hogan v. Fischer*, 738 F.3d 509, 514 (2d Cir. 2013) (citing *Iqbal*, 556 U.S. at 678).  Furthermore, statements of opinion (like the paid-for studies) need not be accorded a "presumption of truthfulness" on a motion to dismiss when "couched as factual allegations." *In re*

*NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (quoting *United States v. Bonnano Organized Crime Family of La Cosa Nostra*, 879 F.2d 20, 27 (2d Cir. 1989)). Although a court "must accept all allegations in the complaint as true, and draw all inferences in the non-moving party's favor," *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003) (internal quotation marks omitted), a court is not "bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Furthermore, where, as here, the Complaint's CEA manipulation claims "sound in fraud," they must be pleaded with the heightened particularity required by Fed. R. Civ. P. 9(b). *See In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR I*"), 935 F. Supp. 2d 666, 714 (S.D.N.Y. 2013).[11]

## II.     The Complaint Does Not Plead a Violation of the Sherman Act.

### A.     The Complaint Does Not Adequately Allege an Unlawful Agreement.

Because Section One of the Sherman Act proscribes "[e]very contract, combination . . . or conspiracy," a well-pleaded Section One claim must allege specific facts showing that Defendants entered into an unlawful agreement. *Twombly,* 550 U.S. at 556-57. "[C]onclusory allegation[s] of agreement at some unidentified point," or facts that merely support a "suspicion" or "possibility" of agreement, are insufficient to state a claim under Section One. *Id.* at 554-55, 557. Here, the Complaint must offer either (i) facts that constitute "direct evidence" of an illegal agreement

---

[11] These claims "sound in fraud" because the Complaint purports to be based on the submission of off-market price quotes during the Silver Fix, giving a false impression of supply and demand. (Compl. ¶ 133; *see In re LIBOR I,* 935 F. Supp. 2d at 714; *see also In re Crude Oil Commodity Litig.* ("*In re Crude Oil I*")*,* No. 06-cv-6677 (NRB), 2007 WL 1946553, at *5 (S.D.N.Y. June 28, 2007) (Rule 9(b) applicable where defendants allegedly "created [a] false impression" of supply (internal quotation marks omitted)); *cf. In re Amaranth Natural Gas Commodities Litig.* ("*Amaranth I*") 587 F. Supp. 2d 513, 535 (S.D.N.Y. 2008) (any "complaint that alleges manipulation of commodities prices must satisfy Rule 9(b)[].").

among Defendants, or (ii) "circumstantial facts supporting the *inference* that a conspiracy existed."
*Id.* The Complaint does neither.

As to direct evidence, there is nothing:  the Complaint does not point to a single "actual,
verbalized communication" of any sort among Defendants, *In re Platinum & Palladium
Commodities Litig.*, 828 F. Supp. 2d 588, 597 (S.D.N.Y. 2011), much less "specific
communications between the Defendants about any specific plan to cause artificial prices." *In re
Commodity Exch., Inc., Silver Futures & Options Trading Litig.* ("*In re Silver I*"), No. 11-Md-2213
(RPP), 2012 WL 6700236, at *11 (S.D.N.Y. Dec. 21, 2012); *In re Platinum* , 828 F. Supp. 2d at
597.  For all of its bombast and insinuation about conduct in which Defendants "could" have
engaged (Compl. ¶ 137), or what the structure of the Silver Fixing allegedly could "allow[]"
Defendants to do (*id.* ¶ 138), the Complaint does not identify a single telephone call, electronic
message, or chat room conversation between or among any of the Defendants – much less any
communication in which representatives of a Defendant coordinated activities.

The utter lack of evidence of collusion is nowhere as plain as in consideration of the two
communications identified in the Complaint – instant messages sent by unidentified traders, one in
2004 and one in 2009.   (Compl. ¶¶ 152-53.)   The Complaint posits that these messages
demonstrate some sort of generic "awareness" of price manipulation, but (a) the messages are *not*
tied to any Defendant; (b) neither has anything to do with the Silver Fix; and (c) neither was
created on one of the days that Plaintiffs' paid experts associate with "anomalous" pricing activity.
(*Compare id.* ¶¶ 152-53 and *id.* App. C.)

The Complaint's only allegations about an agreement among Defendants are generic and
conclusory:   that "Defendants" (without specifying which) "agree[d] to submit false pricing
information not reflective of legitimate supply and demand" (Compl. ¶ 133), and "colluded with

each other about where to fix the price of silver." (Compl. ¶ 135.)   Allegations that make no distinction among individual defendants are insufficient under *Twombly*.   *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007).   Plaintiffs are obligated to tender a Complaint that includes substantive allegations that each of the Defendants, "in *their individual capacities,* consciously committed themselves to a common scheme designed to achieve an unlawful objective." *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (citing *Ferro v. Ry. Express Agency, Inc.*, 296 F.2d 847, 851 (2d Cir.1961)); *Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*, No. 12 CIV 2837 (KBF), 2012 WL 6082387, at *6 (S.D.N.Y. Dec. 3, 2012). This sort of pleading, which "furnish[es] no clue as to which of the [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place," is insufficient under *Twombly*, and sensibly so. *See Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 118 n.14 (2d Cir. 2005), *rev'd on other grounds*, 550 U.S. 544 (2007).

Just as it lacks adequate direct allegations of conspiracy or agreement, so does the Complaint fail to allege circumstantial facts sufficient to support an inference of conspiracy. The closest the Complaint comes is to allege – out of a conspiracy that purportedly spanned *15 years* – one allegation of parallel conduct: that two Defendants, Deutsche Bank and UBS, engaged in parallel pricing on a single occasion. (*See* Compl. ¶¶ 138; 216-217.)   This is worth a pause: in purporting to analyze more than a decade of daily trading data, using their sophisticated "data mining software" (Compl. ¶¶ 149, 225), for what they concede was a multi-billion dollar trading market (Compl. ¶¶ 2, 95), Plaintiffs' paid experts came up with *one day* when two of the 65 Silver market makers (Compl. ¶ 136 and Fig 2) appeared to engage in parallel quotation behavior, and *from that one day*, the Complaint would have the Court infer a 15-year conspiracy among those two market participants, and two others (but *not* the other 61 silver market makers).

-16-

Sensibly, the governing jurisprudence requires "[s]omething more," namely, "additional facts or circumstances . . . [that] must . . . lead to an inference of conspiracy," and that "could not just as easily turn out to have been rational business behavior." *Twombly*, 550 U.S. at 554. In a dynamic market, participants can and do adjust their quotes to track market price volatility. Such conduct is "not only compatible with, but indeed . . . more likely explained by, lawful, unchoreographed free-market behavior." *Iqbal*, 556 U.S. at 680; *see also Tam Travel, Inc. v. Delta Airlines, Inc. (In re Travel Agent Comm'n Antitrust Litig.)*, 583 F.3d 896, 904 (6th Cir. 2009); *Twombly*, 550 U.S. at 554.

### B.   THE COMPLAINT FAILS TO ALLEGE COMMON MOTIVE

Without any facts that directly show the existence of a conspiracy, the Complaint must allege facts that would allow the Court to infer a conspiracy such as facts showing a common motive to conspire. *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 114 (2d Cir. 2005). But the Complaint does not even attempt to do this, instead averring only to a speculative possibility that Defendants could have benefitted from manipulating prices. The Complaint's confused and factually unsupported theory is inadequate.

*First*, the Complaint alleges nothing more than that Defendants held a position in the market from which they hoped to profit. But that allegation is legally insufficient. *Every* trader has some position in the market from which she hopes to profit. "Such a generalized motive . . . could be imputed to any corporation with a large market presence." *In re Crude Oil I*, 2007 WL 1946553, at *8. Alleged motivations "just as much in line with . . . unilateral[]" action as they are with conspiracy are insufficient to state an antitrust claim. *In re Elevator Antitrust Litig.*, 502 F.3d at 51 (quoting *Twombly,* 550 U.S. at 545) (internal quotation marks omitted).

*Second*, the alleged motive is contradicted by other allegations in the Complaint. The Complaint concedes that silver prices increased substantially during the Class Period (*see* Compl. ¶ 211 ("[b]etween 2000 and 2013, the price of silver increased from $5.14 to $19.50 per ounce."))[12] But the Complaint also suggests that Defendants would "establish long COMEX silver futures positions," which would create losses if the market were subjected to "the persistent *downward* manipulation of silver prices" alleged. (*See* Compl. ¶¶ 135, 154.) Finally, the suggestion that the motivation to manipulate the Silver Fix was a function of a desire to affect futures prices is (at best) difficult to harmonize with the Complaint's concession that futures prices influence spot prices (like the Silver Fix) and not the reverse. (*See* Compl. ¶ 122.) These deficiencies further warrant dismissal. *See Accurate Grading Quality Assur., Inc. v. Thorpe*, No. 12 CIV. 1343 ALC, 2013 WL 1234836, at *8 (S.D.N.Y. Mar. 26, 2013); *In re Platinum*, 828 F. Supp. 2d at 597.

*Third*, even if Defendants' desire to profit from suppressed prices were sufficient to allege motive, the Complaint offers no facts that support the conclusion that Defendants stood to profit from long-term price suppression. The Complaint does not allege that Defendants had a short position for all or any part of the 15-year Class Period. This omission is not surprising, because the assertion is itself (at best) highly implausible. Defendants are subject to risk-based capital controls and must generally hedge trading risk.[13] It strains credulity (especially absent *any* supporting factual allegations) to posit that Defendants established large, unhedged, short silver futures positions, and then maintained those short positions continuously for *15 years* when, as the

---

[12] Silver prices rose substantially during the Class Period both in absolute terms and, over many years of the Class Period, relative to the prices of gold, copper, platinum and aluminum as well. (*See* Ex.9, World Bank Global Economic Monitor (GEM) Commodities.))

[13] *See* Supervisory Guidance, at 44623-25; Regulatory Capital Rules, at 62093-95.

Complaint admits (Compl. ¶ 211), the price of silver was rising steadily and significantly.[14] The common motive on which Plaintiffs rely makes "no economic sense." *See In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2014 WL 4277510, at *29 (S.D.N.Y. Aug. 29, 2014) *supplemented,* No. 13-md-2481, 2014 WL 4743425 (S.D.N.Y. Sept. 15, 2014); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 575 (1986).

### C.   SO-CALLED "RED FLAGS" DO NOT SUPPORT AN INFERENCE OF COLLUSION.

The Complaint seeks to overcome the absence of direct or circumstantial evidence of collusion by portraying longstanding, publicly-known structural features of the Silver Fix as nefarious "red flags" indicative of collusion.[15]   (*See* Compl. ¶¶ 130-31.)   None supports an inference of collusion among the Defendants, and each "red flag" is something commonly referred to as a "plus factor," and only becomes a "plus factor" if the Complaint alleges parallel conduct that creates the ambiguity that the plus factors clarify. *See, e.g., In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2014 WL 4277510 at *32-33 (S.D.N.Y. Aug. 29, 2014). Here, the Complaint does not allege such parallel conduct.

At most (as the Complaint's language itself concedes), the market features identified suggest that Defendants might have had *opportunity* to engage in wrongful conduct, which is insufficient to plead collusion. *See Ross v. Am. Exp. Co.*, 35 F. Supp. 3d 407 (S.D.N.Y. 2014)

---

[14] Further undermining the plausibility of the alleged conspiracy is the fact that only four of the 65 market makers identified in the Complaint are alleged to have seen, and seized upon, the alleged virtue of this peculiar trading strategy (running a decade-and-a-half short position in the face of steadily rising prices).

[15] The Complaint identifies the following "red-flags": the "private nature of the fix" (Compl. ¶¶ 107, 125, 128); the small number of Fix members (Compl. ¶ 126); the frequency of Fixing calls (Compl. ¶ 127); the fact that Defendants engaged in Silver trading during the Fix (Compl. ¶ 129); the importance of the pricing information exchanged during the Fix (Compl. ¶¶ 125, 130); the use of current (as opposed to historical) pricing information during the Fix (Compl. ¶ 130); and the fact that the Fixing process has been conducted "throughout many years." *Id.* In addition, the Complaint points in passing to "interlocking directorates creating additional conflicts of interest," "multimarket contact among submitters enhancing the stability of collusion," "low benefits to cheating on a collusive agreement," "barriers to entry enhancing market power and the stability of collusion," "repeated similar behavior found in many similar benchmark settings," and the speed at which the fixing process took place – also described as "red flags" indicative of collusion. *Id.* ¶¶ 131, 235.

(citing *H.L. Moore Drug Exch. v. Eli Lilly & Co.,* 662 F.2d 935, 941 (2d Cir.1981)) ("[A] mere showing of close relations or frequent meetings between the alleged conspirators . . . will not sustain a plaintiff's burden absent evidence which would permit the inference that these close ties led to an illegal agreement.").

Moreover, many of the "red flags" are either inconsistent with other allegations in the Complaint, or entirely unmoored from any operative factual allegation supporting the Sherman Act claim.   For example, the Complaint vaguely identifies "market power" as an indicator of the potential for collusion, but the Complaint never alleges that Defendants had market power in the market for physical silver or any market for silver derivatives.   (*See* Compl. ¶ 131.)   To the contrary, the Complaint concedes that Defendants are merely a few of "the top 20 silver spot market participants." (*See* Compl. ¶ 136 and Fig. 2 (listing 65 silver market makers).)[16]   Likewise, the Complaint contains isolated references to "interlocking directorates," "barriers to entry," and other so-called "red flags," but Plaintiffs never develop these allegations with even rudimentary facts showing what the purported "interlocking directorates" or "barriers to entry" are – much less show the relationship between these so-called "red flags" and the allegations of conspiracy. (Compl. ¶ 131.)

If the market features identified in the complaint are "red flags," they are faded ones, for they have been manifest for decades.   Moreover, as noted above, the "red flag" factors listed in the Complaint are descriptive of certain market structures and absent more, do not substantiate the type of collusion that forms the basis of the Complaint.   *See supra*, Sec. II C (discussing alleged "plus" factors).   In any event, the materials cited in the Complaint concede that these structural aspects of

---

[16] *Commercial Data Servers, Inc. v. Int'l Bus. Machs. Corp.*, 262 F. Supp. 2d 50, 74 (S.D.N.Y. 2003) ("Courts have consistently held that firms with market shares of less than 30% are presumptively incapable of exercising market power.") (quoting *Union Carbide Corp. v. Montell N.V.*, 27 F. Supp. 2d 414, 417 (S.D.N.Y. 1998)).

the Silver Fix have existed for decades,[17] undercutting the notion that they became suggestive of collusion only on the apparently arbitrary date chosen as the beginning of the Class Period.

**D.    THE WORK OF PLAINTIFFS' PAID EXPERTS IS INSUFFICIENT TO ESTABLISH A CONSPIRACY TO FIX PRICES.**

The Complaint relies extensively on paid "expert" studies in an attempt to fill the yawning gaps in its conspiracy allegations. Lacking factual support, these studies constitute mere "opinions couched as factual allegations," and are thus not entitled to a "presumption of truthfulness" on a motion to dismiss. *See In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (quoting *United States v. Bonnano Organized Crime Family of La Cosa Nostra*, 879 F.2d 20, 27 (2d Cir. 1989)). Even if taken as alleged "fact," neither study suggests that Defendants engaged in a conspiracy. The studies claim that price spikes occurred most often around the time of the Silver Fix, which the "experts" then declare to be "anomalous." (Compl. ¶¶ 11-12) But, in a concession that is both candid and dispositive, the Complaint notes that this supposed finding is merely "*consistent*" with prices being artificial as a result of Defendants' conduct. (Compl. ¶ 10.) Allegations that are merely "consistent with an unlawful agreement" are insufficient as a matter of law. *In re Elevator Antitrust Litig.*, 502 F.3d at 50. *See Twombly,* 550 U.S. at 557 (plaintiffs must allege something more than "conduct that could just as well be independent action.")

The Complaint fails to acknowledge, much less address, "obvious alternative explanation[s]" for the studies' supposed central insight. *See Id.* at 567. The Complaint even ignores an alternative explanation raised by one of the paid experts, Andrew Caminschi, the "market push" explanation. As Mr. Caminschi concedes, one alternative explanation for price

---

[17] *See, e.g.*, Ex. 1 (Caminschi), at 6 (noting that, since 1897, the members of the Silver Fix have convened once each day, and that "[o]ver a hundred years later, the fixing has changed only slightly"); *see also* at 2 ("While [members'] names have changed, and their number has reduced, to this day fixing members meet at noon in London and fix the benchmark price for silver.")

spikes around the Fix is that "[p]articipants of the public markets are 'pushing' (manipulating) the short term prices of the public instruments to influence the fixing results," such that "the direction of causality is reversed." (*See* Ex. 1 (Caminschi) at 51-52.)  This explanation (that participants in the much larger derivatives market are seeking to influence the daily fixing of the spot price for physical silver) is consistent with the Complaint's concession that price causation often runs in that direction (that is, that futures prices influence spot prices, not *vice versa*).  (*See* Compl. ¶ 122.) Nor does the Complaint acknowledge the significance of Mr. Caminschi's conclusion that significant price spikes regularly occurred at several other times in the trading day, in response to market factors exogenous to the Fix.  (Ex. 1 (Caminschi) at 23.)

Likewise, the Complaint acknowledges that COMEX trading volume spikes at 12:02 pm (London time), just after the Fix commences, and that "[t]rading volume during this period increases more than threefold." (*See* Compl. at 95, ¶ 192.)  The Silver Fix – in contrast to the fixing process for other precious metals – takes place only once each day.  It is not surprising that large price movements would be clustered around the ten-minute period when the market is most active.  Nowhere does the Complaint grapple with the dispositive implications of multiple, and entirely benign, explanations for the behavior that the "experts" purport to have observed. *See Twombly,* 550 U.S. at 567-68; *Iqbal*, 556 U.S. at 682; *Hayden v. Paterson*, 594 F.3d 150, 167 (2d Cir. 2010).  And even the "studies" do not excuse the Complaint's failure to make *any* allegations regarding the timing and nature of Defendants' agreement to conspire, or to support the notion that its peculiar on-again/off-again pricing "anomalies" are a substitution for pleading facts describing the alleged conspiracy. *See Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436-37 (6th Cir. 2008); *see also Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 782 F. Supp. 2d 1059, 1075-76 (E.D. Cal. 2011).

### E.   THE INVESTIGATIONS MENTIONED IN THE COMPLAINT ARE IRRELEVANT.

Continuing to substitute irrelevance and insinuation for facts actually suggestive of conspiracy, the Complaint mentions reports that regulators have investigated Defendants and other parties for misconduct and that one Defendant settled a FINMA investigation related to foreign exchange trading. (Compl. ¶¶ 5, 84, 140-46.) Regulatory settlements are irrelevant at the pleading stage, and references to them in complaints should be stricken, or simply ignored, because such settlements are "not the result of an actual adjudication of any of the issues," *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976); *see also Gotlin* v. *Lederman*, 367 F. Supp. 2d 349, 363 (E.D.N.Y. 2005); *In re Platinum,* 828 F. Supp. 2d at 593-94; *In re Merrill Lynch & Co., Research Reports Sec. Litig.*, 218 F.R.D. 76, 78-79 (S.D.N.Y. 2003). Allegations of pending government investigations "carr[y] no weight in pleading," *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) because "the mere occurrence of [an] investigation is equally consistent with Defendants' innocence." *Superior Offshore Int'l, Inc.* v. *Bristow Grp. Inc.*, 738 F. Supp. 2d 505, 517 (D. Del. 2010). *See also LaFlamme* v. *Societe Air France,* 702 F. Supp. 2d 136, 154 (E.D.N.Y. 2010); *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09-Civ-4050 (PKC), 2010 WL 3790810, at *5 (S.D.N.Y. Sept. 28, 2010) (granting motion to strike allegations "insofar as they are based on pleadings, settlements, and government investigations in other cases.")

The Complaint's allegations are even thinner than the typical shopworn attempts to engage in this sort of pleading. Here, no regulator has concluded that Defendants unlawfully conspired to manipulate the price of silver. The Complaint notes that UBS "settled" an investigation conducted by FINMA (Compl. ¶ 146), but ignores that (i) the focus of that settlement was on foreign exchange rates, not the Silver Fix, in which UBS did not participate, and (ii) the "settlement" did

not involve any allegation of collusion among the Defendants in this case. The Complaint's reference to an investigation into the silver market commenced by the CFTC in 2008 is significant only for what it omits: that the investigation did not result in any finding of wrongdoing by *any* market participant, which makes the collusion now alleged, if anything, *less* likely. (*See* Compl. ¶ 147, n.55.)[18]

### F.   PLAINTIFFS LACK ANTITRUST STANDING.

In any case seeking damages under the Sherman Act, a Plaintiff must establish that it "is a proper party to bring a private antitrust action." *Assoc. Gen. Contractors of Cal.*, *Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983). "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Id.* at 534 (internal quotation marks omitted) (quoting *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n.14 (1972)). "While any antitrust violation disrupts the competitive economy to some extent and creates entirely foreseeable ripples of injury which may be shown to reach individual employees, stockholders, or consumers, it has long been held that not all of these have the requisite standing to sue for treble damages . . . ." *Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183, 187 (2d Cir. 1970); *see also In re LIBOR I*, 935 F. Supp. 2d at 687.

The Second Circuit has identified four factors to consider in determining whether a plaintiff is a proper party to seek damages under the Sherman Act:

> "(1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest

---

[18] The Complaint also refers to various statements made by Bart Chilton in connection with "internal discussions" at the CFTC about benchmarks generally. (Compl. ¶ 5.) Even though he makes a stray reference to "silver fixes in London" being of interest personally, *see* Ex.10, Statement of Commissioner Bart Chilton Before the International Roundtable on Financial Benchmarks, Washington, D.C. (February 26, 2013), Mr. Chilton's musings in 2013 have nothing to do with the allegations of the Complaint. Although the Complaint obscures the fact, Mr. Chilton is no longer a CFTC Commissioner, further attenuating the significance of generic statements that he made two years ago. (*See* Ex.11, CFTC, *Former Commissioners*.)

> would normally motivate them to vindicate the public interest in
> antitrust enforcement; (3) the speculativeness of the alleged injury;
> and (4) the difficulty of identifying damages and apportioning them
> among direct and indirect victims so as to avoid duplicative
> recoveries."

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 78 (2d Cir. 2013) (internal quotation

marks omitted). This analysis is not "a multifactor balancing test;" rather, the "directness . . . of

the asserted injury" must be demonstrated in every case. *DNAML Pty, Ltd. v. Apple Inc.*, 25 F.

Supp. 3d 422, 430 (S.D.N.Y. 2014).

Plaintiffs lack standing for multiple reasons, most fundamentally because they are (at best)

indirect sellers who cannot satisfy the "directness" requirement under *Gatt* and its progeny: the

Complaint nowhere alleges that *any* Plaintiff bought silver from, or sold silver to, any Defendant.

The Complaint does not even allege *indirect* purchases or sales. Neither Defendants nor the Court

has *any* specific information regarding when, how, and with whom Plaintiffs entered into any

silver-related purchases; the Complaint offers nothing more than the dates of Plaintiffs' silver sales

(not the time or counterparty for those sales).

Those omissions preclude a finding of standing: in cases alleging anticompetitive conduct

in the market for a physical good, the Supreme Court has "held that as a general rule, . . . only

direct purchasers of [the] monopolized product[]" have standing to sue under the antitrust laws. *In

re Pub. Offering Antitrust Litig.*, No. 98-Civ-7890 (LMM) 2004 WL 350696 (LMM), at *5

(S.D.N.Y. Feb. 25, 2004); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729 (1977). Thus, *Illinois

Brick* "precludes an antitrust action by a seller who alleges price-fixing by a defendant with whom

he has not dealt directly." *Zinser v. Cont'l Grain Co.*, 660 F.2d 754, 761 (10th Cir. 1981). Having

failed to identify any direct purchases or sales – indeed, *any purchases at all* (*see* Compl. App. C)

– Plaintiffs lack standing to pursue claims under the Sherman Act.

Presumably because no Plaintiff is able to allege injury by virtue of being a direct seller of silver to a Defendant, the Complaint seeks to ground standing by suggesting that Plaintiffs suffered harm as a result of general price suppression, whether or not they transacted with Defendants, asserting that "Plaintiffs transacted at artificially lower prices each time they sold physical silver or silver financial instruments, and received less than they otherwise would have in a competitive, unmanipulated market." (*See* Compl. ¶ 237.) This is known as the "umbrella theory" of liability, that a plaintiff was injured when it sold a good to non-conspirators who lowered their prices under the price umbrella of the alleged conspirators. "[N]o court in the Second Circuit . . . has recognized this theory of recovery." *Allen v. Dairy Farmers of Am., Inc.*, No. 09-cv-230, (KBF) 2014 WL 2610613, at *27 (D. Vt. June 11, 2014) (plaintiffs lacked antitrust standing where they sold milk to non-conspirators – rather than to defendants – at prices allegedly suppressed by defendants' anticompetitive conduct). On the contrary, courts in this Circuit have repeatedly rejected it. *See Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*, No. 98-cv-4067, 1999 WL 1201701, at *7 (S.D.N.Y. Dec. 15, 1999) (rejecting umbrella liability); *Gross v. New Balance Ath. Shoe, Inc.*, 955 F. Supp. 242, 245-46 (S.D.N.Y. 1997) (rejecting umbrella theory of liability because "the causal connection between the alleged injury and the conspiracy is attenuated by significant intervening causative factors," most notably, the independent pricing decisions of non-conspiring retailers).

**Superior Alternative Plaintiffs.** Plaintiffs fail the fundamental test for antitrust standing – the existence of direct injury based on the acts of Defendants. There is thus no basis to regard them as efficient enforcers capable of "vindicat[ing] the public interest in antitrust enforcement." *Assoc. Gen. Contractors,* 459 U.S. at 541-42. In determining whether a plaintiff is the "efficient enforcer" on whom standing should be conferred, *Gatt*, 711 F.3d at 76, 78, courts consider "the

existence of other parties that have been more directly harmed." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986); *see also Assoc. Gen. Contractors*, 459 U.S. at 541-42, 545-46. In this case, plaintiffs are not the efficient enforcers because there clearly are more directly injured parties who could bring suit—namely, market participants who purchased from, or sold to, one of the Defendants directly. *See Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*, No. 98 CIV. 4067(LAP), 1999 WL 1201701, at *7 (S.D.N.Y. Dec. 15, 1999) ("there are more direct victims than plaintiff" – who purchased only from non-conspirators – "such as those who purchased [] directly from the defendants.")

**Speculative Nature of Injury.** Because Plaintiffs' alleged injuries were the result of general price suppression, Plaintiffs' damages claim is too speculative to confer antitrust standing on them. *Assoc. Gen. Contractors*, 459 U.S. at 542. In *Laydon*, the court dismissed plaintiff's claim as speculative – where, as here, the alleged manipulation of a benchmark purportedly affected the pricing of certain derivative futures contracts. The court declined to "hypothesize the impact of [allegedly manipulated Euroyen TIBOR and Yen-LIBOR benchmarks] on the perceptions of the market participants whose activities would have influenced the prices of Euroyen TIBOR futures contracts." *Laydon v. Mizuho Bank, Ltd.*, No. 12–cv–3419 (GBD), 2014 WL 1280464, at *10 (S.D.N.Y. Mar. 28, 2014). To conclude otherwise would have forced the court to analyze a "complicated series of market interactions" involving the reactions of countless market players to LIBOR and TIBOR price signals – a task demanding "hopeless speculation" that was further complicated by "many independent factors that could influence perceptions in the market, and pricing decisions." *Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13 (2d Cir. 1980); *Laydon*, 2014 WL 1280464, at *10.

The same complexities, risks and invitation to "hopeless speculation" obtain here. The Complaint posits that conspiratorial conduct in London reverberated worldwide and caused other market participants, with no relationship with Defendants, to change the prices at which they were willing to buy silver. This claim would require the court to trace each market player and analyze whether each actually reacted to Silver Fixing prices in the way that the Complaint contends. "[C]ountless . . . market variables [other than the alleged conspiracy] could have intervened to affect [the] pricing decisions." *Reading*, 631 F.2d at 13-14; *see also Mid-W. Paper Prods. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 584 (3d Cir. 1979). One of Plaintiffs' own retained "experts" has acknowledged that price spikes occurred throughout the trading day as a result of factors wholly exogenous to the Silver Fix, including the opening and closing of COMEX, the opening of U.S. equities markets, the Gold Fixing call, and (potentially) a "market push" by traders seeking to shift the benchmark price. (*See* Ex. 1 (Caminschi) at 23, 54.) Assessment of Plaintiffs' remote and speculative claimed injury would require the Court to scrutinize these and other complex market interactions, separating the price effects of each from the effects of alleged misconduct − a proscribed undertaking. *Cf. In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 404 (S.D.N.Y. 2011) (dismissing CD-purchasers' claims because, *inter alia*, their injuries were "more speculative" than other potential plaintiffs).[19]

---

[19] Finally, any attempt to allocate damages among Plaintiffs, and the equally diffuse class they seek to represent, would create "the danger of duplicative recovery should any [better-situated plaintiffs] . . . bring damage suits of their own." *Antoine L. Garabet, M.D., Inc. v. Autonomous Technologies Corp.*, 116 F. Supp. 2d 1159, 1170 (C.D. Cal. 2000). For example, to the extent that plaintiffs who sold silver ETFs suffered losses from a drop in the price of silver, their injuries merely duplicate injuries suffered more directly by the ETF itself. Any alleged losses suffered by the investor-plaintiffs would be embedded in losses suffered by the ETF, a more proximate victim, and permitting recovery for such plaintiffs would risk duplicative recovery if the ETF brought a suit of its own. *Cf. Siti-Sites.com, Inc. v. Verizon Commc'ns, Inc.*, No. 10-cv-3751 (DLC), 2010 WL 5392927, at *4 (S.D.N.Y. Dec. 29, 2010) *aff'd*, 428 F. App'x 100 (2d Cir. 2011).

### G.   THE COMPLAINT DOES NOT ALLEGE ANTITRUST INJURY.

To adequately plead an antitrust claim, the Complaint must do more than allege an injury that was caused by Defendants' purportedly anticompetitive conduct; it must show that Plaintiffs "suffered a special kind of antitrust injury," *Gatt Commc'ns.*, 711 F.3d at 76 (internal quotation marks omitted), which is to say, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). In other words, Plaintiffs' claimed damages must be caused by "a competition-*reducing* aspect or effect of the defendant's behavior." *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290, 294 (2d. Cir. 2006) (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990)) (internal quotation marks omitted). This "'ensures that the harm claimed by the Plaintiff corresponds to the rationale for finding an antitrust violation in the first place.'" *Laydon*, 2014 WL 1280464, at *7 (quoting *Atl. Richfield*, 495 U.S. at 342).

Here, the Complaint fails to allege even an injury in fact, alleging only that Plaintiffs "transacted at artificially lower prices each time they sold physical silver or silver financial instruments, and received less than they otherwise would have in a competitive, unmanipulated market." (Compl. ¶ 237.)   No facts are alleged to support this assertion, and the Complaint is, again, silent on the particulars of *any* transaction underlying *any* Plaintiff's claims, "such as when [their positions] were initiated, how long they were held, and whether [they] exited those positions by entering into offsetting transactions or held them until their settlement dates." *Laydon*, 2014 WL 1280464, at *8. Given that the price of silver increased steadily throughout the Class Period (Compl. ¶ 211), there is no way to conclude that Plaintiffs sustained any loss as a result of

Defendants' conduct – especially since Plaintiffs were likely both sellers *and* buyers during the 15-year Class Period.

Even if the Complaint does allege *an* injury, it fails to allege an *antitrust* injury: it does not allege that Defendants' conduct harmed *competition*, as opposed to Plaintiffs personally.  *See Laydon*, 2014 WL 1280464, at *8.  The assertion that "Plaintiffs transacted at artificially lower prices each time they sold physical silver or silver financial instruments, and received less than they otherwise would have" (Compl. ¶ 237), is not an allegation that competition has been harmed. *Laydon*, 2014 WL 1280464 at *8 (no antitrust injury where Plaintiff merely alleged that he had "initiated short positions in CME Euroyen TIBOR futures contracts during the Class Period and suffered net losses on such contracts due to the presence of artificial Euroyen TIBOR futures prices proximately caused by Defendants' unlawful manipulation and restraint of trade.")

Most charitably construed, the Complaint seeks to allege an injury that flows not from an "anticompetitive aspect" of Defendants' conduct but from Defendants' purported "misrepresentation."  *In re LIBOR I*, 935 F. Supp. 2d at 688.  Plaintiffs allege that Defendants "submit[ted] false pricing information not reflective of legitimate supply and demand fundamentals during the Silver Fix." (Compl. 133) and that Plaintiffs were injured when they and other market participants relied on this information.  But even if Defendants injected false information into the marketplace, or caused others to do so, this would "not violate the antitrust laws" absent an allegation that Defendants had the power to "constrain others to follow" their inaccurate prices. *Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1383 (7th Cir. 1992) (internal quotation marks omitted). The Silver Fix offered *a* benchmark price, not *the* benchmark price (*see* Compl. ¶ 109); no market participant was required to reference that price in its contracts, and Plaintiffs, like all market participants, "were free to take various positions in the market, including long and short." *Laydon*,

-30-

2014 WL 1280464, at *9; *In re LIBOR I,* 935 F. Supp. 2d at 686 (emphasis omitted) (quoting *Atl.*

*Richfield,* 495 U.S. at 344).

### III.   The Donnelly Act Claims Must Likewise Be Dismissed.

The Complaint purports to plead a cause of action for price manipulation under New

York's Donnelly Act.  N.Y. Gen. Bus. Law § 340.  The claim is based on the same allegations as

the Complaint's Sherman Act claim, and it should be dismissed for the same reasons.  The

Donnelly Act is "modeled on the Sherman Act and should be construed in light of federal

precedent." *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 298 (S.D.N.Y.

1998) (internal quotation marks omitted) (dismissing Donnelly and Sherman Act claims on the

same basis); *In re Aluminum Warehousing Antitrust Litig.*, 13-md-2481 (KBF), 2015 U.S. Dist.

LEXIS 26412 (S.D.N.Y. Mar. 4, 2015) (dismissing Donnelly and Sherman Act claims on the same

basis).  Accordingly, the Court should apply the analysis with respect to the Sherman Act claim to

the Complaint's Donnelly Act claim, dismissing the latter on the same grounds as the former.

### IV.   The Complaint Does Not Plead a Claim for Violation of the CEA.

The Complaint's claims under the CEA fare no better.  There are two forms of

manipulation recognized under the CEA: a price manipulation claim under Sections 6(c) and

9(a)(2), 7 U.S.C. §§ 9(c) and 13(a)(2), and a manipulative device claim under Section 6(c)(1).

7 U.S.C. § 9(c)(1).  Neither should proceed here.

#### A.   THE COMPLAINT FAILS TO PLEAD A PRICE MANIPULATION CLAIM WITH PARTICULARITY.

A cognizable price manipulation claim must adequately plead that (1) Defendants had the

ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial

price; and (4) Defendants specifically intended to cause the artificial price.  *In re Amaranth*

*Natural Gas Commodities Litig.* ("*Amaranth III*"), 730 F.3d 170, 173, 183 (2d Cir. 2013); *In re Cox*, CFTC Docket No. 75-16, 1987 CFTC LEXIS 325, at \*9 (CFTC July 15, 1987).

### 1.   The Alleged Facts do not Give Rise to a Strong Inference of Scienter.

"[I]n relation to commodities fraud ... Rule 9(b) imposes a significant burden on allegations of scienter." *In re Amaranth Natural Gas Commodities Litig.* ("*Amaranth II*"), 612 F. Supp. 2d 376, 383 (S.D.N.Y. 2009), *aff'd*, 730 F.3d 170 (2d Cir. 2013).[20] "[P]laintiffs must ... allege facts that 'give rise to a *strong inference* of scienter.'" *See In re LIBOR I*, 935 F. Supp. 2d at 714; *In re Crude Oil I*, 2007 WL 1946553, at \*7.

In this context, scienter means that the defendant acted with "the *purpose or conscious object* of causing or [a]ffecting a price . . . in the market that did not reflect the legitimate forces of supply and demand." *In re Commodity Exchange, Inc. Silver Futures & Options Trading Litig.* ("*In re Silver II*"), 560 F. App'x at 84 (2d Cir. 2014) (alteration in original) (quotation omitted). Knowledge that conduct would influence price is not enough. *See In re Energy Transfer Partners Natural Gas Litig.*, Civil Action No. 4:07-cv-3349, 2009 WL 2633781, at \*6-7 (S.D. Tex. Aug. 26, 2009), *aff'd sub nom. Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239 (5th Cir. 2010). Plaintiffs may plead scienter in a CEA price manipulation case by alleging facts that (a) show that Defendants had both motive and opportunity to commit fraud, or (b) constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Amaranth II*, 612 F. Supp. 2d at 383. The Complaint does neither.

The Complaint suggests that Defendants had a motive to manipulate the price of silver because they stood to benefit from a suppressed silver price. As discussed in Section II.B. *supra,*

---

[20] As described *supra* n. 11, Rule 9(b) applies where, as here, Plaintiffs contend that defendants submitted "false pricing information not reflective of legitimate supply and demand" (Compl. ¶ 133) their claims "sound in fraud" and "must be pled with particularity." *In re LIBOR I*, 935 F. Supp. 2d at 714

the Complaint does not allege any details of Defendants' purported positions. In any event, allegations that a defendant had a particular trading position or strategy are insufficient to support an inference of motive. *In re Silver II*, 560 F. App'x at 86 ("[A]n inference of intent cannot be drawn from the mere fact that [defendant] had a strong short position."); *In re Crude Oil I*, 2007 WL 1946553, at *8 (a "generalized [profit] motive" is "insufficient to show intent" because it "could be imputed to any corporation with a large market presence in any commodity market.") And the suggestion that Defendants had net trading positions that would allow them to profit from a prolonged suppression of the price of silver is particularly implausible in light of the fact that Defendants were subject to risk-based capital controls and requirements that they hedge trading risk.[21]

The Complaint also attempts to allege a motive by claiming that Defendants had a "strong financial incentive to use the secretive Silver Fix process to their advantage" and to manipulate the Silver Fix in a particular direction in order financially to benefit their proprietary trading positions (Compl. ¶¶ 108, 129.) This is just a repackaging of the formulation rejected in *In re LIBOR III* as "implausible." *In re LIBOR III,* 27 F. Supp. 3d at 469. The Complaint is silent about any particular Defendant's market position. Finally, without any factual support, the Complaint presumes that Defendants' "trading positions" were for "proprietary" purposes, but offers no facts that suggest that orders placed by Defendants in the Silver Fix were for purposes of speculation, as opposed to hedging. Indeed, as the Complaint concedes, Defendants participated in the Silver Fix to fill both "orders from clients' brokerage accounts along with proprietary orders from that Silver Fix panel member's own trading desk." (Compl. ¶ 102.)

---

[21] *See* Supervisory Guidance, at 44623-44625; Regulatory Capital Rules, at 62093-95.

Nor does the Complaint allege facts suggesting conscious misbehavior or recklessness by Defendants are analogous to allegations in cases in which, unlike here, manipulation was sufficiently pleaded.[22] The Complaint here is threadbare: the isolated electronic communications it mentions (Compl. ¶¶ 122, 152-154), unlike those in the TIBOR and LIBOR cases, are not attributable to any of the Defendants and do not discuss any specific plan to cause a price trend in the silver futures market. *See In re Silver I*, 2012 WL 6700236, at *11.

Accordingly, even assuming that facts comparable to those alleged in other benchmark cases are sufficient to plead the elements of a price manipulation claim, the Complaint alleges no facts that could support a finding of conscious misbehavior or recklessness on the part of each Defendant. Because a complaint must "specifically allege the fraud perpetrated by each defendant, 'lumping' all Defendants together," as the Complaint does here, "fails to satisfy the particularity requirement." *In re Crude Oil I*, 2007 WL 1946553, at *6. The Complaint offers little more than undifferentiated speculation about Defendants' motives, which falls short of "creat[ing] a strong inference . . . [of] the requisite scienter." *Atuahene*, 10 F. App'x at 34

### 2.   The Complaint Fails To Allege the Existence of Artificial Prices.

The Complaint also fails to plead facts showing that silver prices were "artificial," that is "prices that do not reflect the forces of supply and demand in the market or do not otherwise

---

[22] *See, e.g.*, *Laydon*, 2014 WL 1280464, at *6 (denying motion to dismiss manipulation claim in case involving Euroyen TIBOR and Yen-LIBOR based on "overwhelming factual content" in the complaint, including "direct evidence [of scienter] from certain Defendants' communications"); *In re LIBOR III*, 27 F. Supp. 3d at 462-63 (permitting trading-motivated claims of manipulation to proceed only against two banks as to which plaintiffs alleged specific communications evincing intent to manipulate LIBOR); *U.S. Commodity Futures Trading Comm'n* v. *Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 532-33 (S.D.N.Y. 2008) (complaint included numerous communications such as instant messages); *U.S. Commodity Futures Trading Comm'n* v. *Parnon Energy, Inc.*, 875 F. Supp. 2d 233, 249 (S.D.N.Y. 2012) (CFTC's complaint set forth "multiple communications" evidencing defendants' intentions).

comport with contemporaneous prices in comparable markets." *In re Silver I*, 2012 WL 6700236, at *12. "When determining if artificial prices exist, a court may consider the underlying commodity's normal market forces, historical prices, supply and demand factors, price spreads, and also the cash market for the commodity at issue." *Id.*; *see also In re Ind. Farm Bureau Coop. Assoc. Inc.*, No. 75-14, 1982 WL 30249, at *4 n.2 (CFTC Dec. 17, 1982) (in determining artificiality, "the focus should not be as much on the ultimate price, as on the nature of the factors causing it.")

Although the Complaint asserts that a paid "expert" has "uncovered anomalous pricing behavior around the time of the Silver Fix that was consistent with a systematic suppression of prices" (Compl. at 86, ¶ 175), the Complaint ignores facts suggesting that such downward movements were consistent with "the forces of supply and demand in the market." *In re Silver I*, 2012 WL 6700236, at *12.[23] The Complaint concedes that trading volume was higher around the time of the Silver Fix than at other times of the day. (*See* Compl. at 95, ¶ 192.) Thus, it is unsurprising that, as the Silver Fix started and volume increased, prices might sometimes move sharply to reflect the level of supply and demand observed in the Silver Fix. Nor does the fact that prices went down more often than they went up in the period on which the Complaint focuses (*see* Compl. at 92-93, ¶¶ 186, 188) suggest manipulation. Silver refiners and other industrial producers may use the Silver Fix as an opportunity to sell inventory or hedges, in light of the high liquidity available around the time of the Silver Fix. (*See* Compl. at 95, ¶ 192.)

---

[23] The Complaint identifies only a single alleged instance of Defendants "adjust[ing] their spot market quotes to influence the market price of silver, moving it in a specific direction to financially benefit their silver positions." (Compl. ¶¶ 138, 214-216.) But as described *supra* at n.10, the Complaint incorporates a chart that shows that the narrative description of the episode is inaccurate and contradicts the Complaint's conclusion that "Deutsche and UBS systematically quoted silver prices significantly below" prevailing market prices. *Id.*

The Complaint does not allege that prices in the Silver Fix did "not . . . comport with contemporaneous prices in comparable markets." *In re Silver I*, 2012 WL 6700236, at *12.  It alleges just the opposite, asserting that "the price of COMEX silver futures contracts . . . tracks the results of the Silver Fix" (Compl. ¶ 120) and that "anomalous pricing behavior [around the time of the Silver Fixing] was accompanied by market activity in both the COMEX silver futures market and spot market for physical silver" (Compl. at 86, ¶ 176).  That prices simultaneously moved the same way in the spot and COMEX markets suggests, if anything, that exogenous market forces – not any manipulation by Defendants – created price movements at the time of the Silver Fix.

### 3.  The Complaint Fails To Allege That Defendants Caused Artificial Prices.

The Complaint, furthermore, does not sufficiently allege facts showing that Defendants were "the proximate cause of [any] price artificiality." *In re Silver I*, 2012 WL 6700236, at *16. Although Plaintiffs' "expert's" study purports to show that price spikes occurred most often around the Silver Fix, the Complaint concedes that this finding is merely "consistent" with prices being artificial as a result of Defendants' conduct.  (Compl. ¶ 10; 86, ¶ 175.)  The Complaint also claims that the Silver Fix directly affects prices of instruments traded on exchanges such as COMEX (Compl. ¶ 133), supporting this proposition only with an undescribed, purchased regression analysis that purportedly "shows a statistically significant relationship between the price of COMEX silver futures contracts and the results of the Silver Fix."  (Compl. ¶ 121.)  Even were it proper to rely on tendentious, undisclosed "studies" to assess a pleading, the regression does not purport to demonstrate a causal relationship between the two variables; a "correlation is not causation." *Sheehan v. Daily Racing Form, Inc.* 104 F.3d 940, 942 (7th Cir. 1997) ("[E]quating a simple statistical correlation to a causal relation…indicates a failure to exercise a degree of care that a statistician would use in his scientific work[].")  Plaintiff's expert and the Complaint concede

as much, with the former acknowledging the possibility that the "direction of causality could be reversed" and that "fixing results . . . are being driven by the price changes observed in the public markets," (*see* Ex. 1 (Caminschi), at 51), and the latter stating that "Class Counsel received information demonstrating that commercial silver traders use the prices of COMEX silver futures contracts to calculate the spot market price of silver." (Compl. ¶ 122.)

Because the Complaint alleges no "specific conduct" by which any Defendant took steps that caused prices to be artificial, *see In re Silver I*, 2012 WL 6700236, at *17, it retreats to an *ipse dixit* conclusion, not facts. Defendants agreed "to submit false pricing information not reflective of legitimate supply and demand fundamentals during the Silver Fix to manipulate the price of silver and silver financial instruments to artificial levels that benefitted their trading positions." (Compl. ¶ 133.) That is "speculation on the basis of sheer possibility." *In re Silver I*, 2012 WL 6700236, at *16. "[W]ithout corroborating factual allegations as to" causation, the Complaint's "impermissible speculation" does not satisfy Plaintiffs' pleading burden. *Id.*

## B. THE COMPLAINT FAILS TO PLEAD A MANIPULATIVE DEVICE CLAIM WITH PARTICULARITY.

The Manipulative Device Claim under CFTC Rule 180.1, 17 C.F.R. § 180.1 (*see* Compl. ¶¶ 273-277) must also be dismissed. This claim must be dismissed for conduct prior to August 15, 2011, because the relevant statute and regulation were not effective prior to that time. *Amaranth III*, 730 F.3d at 173 n.1; *see also CFTC* v. *Leighton*, No. 12-cv-4012 (PSG), 2013 WL 4101874, at *5-6 (C.D. Cal. July 8, 2013).

The remaining fraction of the Manipulative Device claim – which now rests on the slender reed of, *at most*, three transactions not alleged to have been undertaken through any of the

Defendant financial institutions – must be dismissed for failure to plead with particularity.[24] Rule 180.1 is modeled on Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5 and is to be interpreted in accordance with "the substantial body of judicial precedent applying the comparable language of SEC Rule 10b-5." *See* CFTC, *Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation*, 76 Fed. Reg. 41398, 41399.

Rule 180.1 thus requires plaintiffs to allege, at a minimum, (1) a manipulative act, (2) scienter, (3) reliance, (4) economic loss, and (5) loss causation. *See generally Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 341-42 (2005); *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007). That the Complaint fails to allege any claims for any time period with particularity has been discussed above: the same is true for manipulative conduct (*supra* Section IV.A), scienter (*supra* Section IV.A.1), or loss causation (*supra* Sections IV.A.3).[25] The deficiency is equally fatal for Rule 180.1 claims: the Complaint contains no particularized discussion of alleged manipulation on specific dates after August 15, 2011. The only discussion of a specific post-August 15, 2011 date relates to the price at which COMEX silver futures traded on February 11, 2013. (Compl. ¶ 233.) The Complaint, however, does not allege that February 11, 2013 is one of the dates when Defendants' conduct resulted in an artificial suppression of silver prices. (*See* Compl. App. C at 10.)

---

[24] Plaintiffs identify only 13 sales after August 15, 2011 that they claim were impacted by Defendants' conduct. (Compl. App. C at 25-26.) At least ten of the transactions are for physical silver (it is unclear whether the two references to "COMEX silver call" relate to physical silver). However, "[p]urchasers of physical commodities whose prices were affected by futures trading do not have a claim." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09-cr-3690, 2014 WL 4083938, at *38 (N.D. Ill. Aug. 18, 2014) (citation omitted). Thus, all of plaintiffs' CEA claims based on the trading of physical silver – including the transactions that post-date the effective date of Rule 180.1 – must be dismissed.

[25] Plaintiffs also do not allege either actual reliance nor any public misstatements that could support a fraud-on-the-market presumption of reliance. *See Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008).

Separately, the Complaint's Rule 180.1 claim should be dismissed to the extent that it is based on the theory that Defendants "used their advance, inside knowledge of the Silver Fix to establish positions in the silver market." (Compl. ¶¶ 134-135, 275.)  "Insider trading" liability is premised upon the fiduciary relationship that exists "between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation." *Chiarella* v. *United States*, 445 U.S. 222, 228 (1980) (citing *Cady, Roberts & Co.*, 40 S.E.C. 907 (1961)).  No such fiduciary duty exists in futures markets. *See, e.g.,* Ex. 12 (CFTC, *A Study of the Nature, Extent and Effects of Futures Trading by Persons Possessing Material, Nonpublic Information* at 55-56 (1984) ("1984 Study")); *see also* 76 Fed. Reg. 41398, 41403. Consistent with this principle, the CFTC limited the reach of Rule 180.1 to "trading on the basis of material nonpublic information in breach of a pre-existing duty (established by another law or rule, or agreement, understanding, or some other source), or by trading on the basis of material nonpublic information that was obtained through fraud or deception." 76 Fed. Reg. 41398, 41403. The Complaint offers no basis from which to infer a pre-existing duty owed by members of the London Silver Market Fixing, especially to Plaintiffs, with whom they are not even alleged ever to have transacted.  Nor does the Complaint allege that Defendants traded on the basis of information "obtained through fraud or deception."  The generic assertion that Defendants had a general duty not to "cause, exacerbate or further any manipulation of silver or silver futures prices" because of their "position of trust" and status as "sophisticated market participants" (Compl. ¶ 275) does not amount to the "pre-existing duty" envisioned by the CFTC in promulgating Rule 180.1.[26]

---

[26] To the extent the Complaint asserts that Defendants traded with "advance knowledge" of their own trading intentions (*e.g.*, Compl. ¶ 134), such activity is not unlawful. *See, e.g.*, Ex. 12 (1984 Study, at 8) ("[C]onsistent with the Congressional mandate, trading on the basis of one's own cash or futures markets positions is exempt from any discussion of insider trading.")

### C.   PLAINTIFFS' CLAIMS MUST BE DISMISSED FOR LACK OF STANDING.

Plaintiffs' CEA claims must also be dismissed for lack of standing.  The private right of action under Section 22 of the CEA is available only to persons who held a specific type of commodity derivative (*e.g.*, a futures contract) and suffered actual damage from that position, provided that the damage was caused by manipulative conduct defined in the statute.  7 U.S.C. § 25(a)(1).  The Complaint fails to assert manipulative conduct of the kind specified under Section 22 and fails to allege actual damages.

Section 22(a)(1)(D) provides that the alleged violation must constitute "a manipulation of the price of any such contract or the price of the commodity underlying such contract."  7 U.S.C. § 25(a)(1)(D).  The "commodity underlying" a futures contract is defined by reference to the contract's delivery terms.  *Hershey*, 610 F.3d at 241, 246-49.  The Complaint does not allege that Defendants manipulated the price of the COMEX silver futures contract.[27]  Rather, it asserts that Defendants "manipulate[ed] the Silver Fix" (*see*, *e.g.*, Compl. ¶ 95, 123, 129, 133).  But, the physical silver traded in the Silver Fix is not the commodity "underlying" the COMEX futures or options contract.

COMEX futures contracts are for the delivery of five bars of refined silver cast in bars of 1,000 troy ounces each, with a weight tolerance of 10% either higher or lower (*i.e.* 900 to 1,100 troy ounces), from a specific set of authorized refiners.  (Ex. 13 (CME Group, *NYMEX Rulebook: Chapter 112*).)  The Silver Fix, by contrast, involved the trading of London Good Delivery silver bars, which must be between 750 and 1,100 troy ounces of silver and manufactured by a specific set of authorized refiners.  (*See* Ex. 14 (London Bullion Market Association, *CME Group and*

---

[27] The Complaint also alleges that silver futures and options comparable contracts were traded on the NYSE LIFFE exchange and the CBOT during the Class Period. (Compl. ¶ 114.)

*Thomson Reuters operate the new LBMA Silver Price*) ("[T]he physical settlement for the LBMA Silver Price remains Loco London Silver as it has been historically."); Ex. 15 (London Bullion Market Association, *The Good Delivery Rules for Gold and Silver Bars: Speculations for Good Delivery Bars and Application Procedures for Listing*), at 12 (identifying specifications for loco London silver bars).) London Good Delivery silver bars are thus not the commodity underlying COMEX futures contracts. "[C]ourts have rejected arguments that a commodity with an indirect effect on a futures contract is the commodity underlying the futures contract." *In re Dairy Farmers*, 2014 WL 4083938, at *41; *see also In re LIBOR I*, 935 F. Supp. 2d at 719-21 (LIBOR is not the "commodity underlying" Eurodollar futures contracts). The Complaint makes no allegations giving rise to a strong inference that Defendants specifically intended to manipulate COMEX futures and options.

Equally important to the analysis, COMEX silver futures contracts do not settle against or otherwise reference the silver fixing price. Rather, COMEX silver futures settle based on CME Globex activity between 13:24:00 and 13:25:00 Eastern Time, following a detailed procedure set forth by CME Group. (Ex. 16, CME Group, *Silver Futures Daily Settlement Procedure*). *See In re Dairy Farmers*, 2014 WL 4083938, at *41 (rejecting argument that defendant manipulated the price of USDA Class III milk futures by manipulating the price of spot cheese – even where spot cheese was "a significant component" of the formula used to establish the settlement price of the futures contract – because CME cheese was not the "commodity specified for future delivery, the price of which determines the settlement price of the futures contract."). Thus, not only are the London Good Delivery silver bars traded during the Silver Fix not the commodity underlying the COMEX silver futures contracts, the price announced at the end of the Silver Fix is not even referenced when determining the settlement price of the COMEX silver futures contracts.

Moreover, the Complaint fails to allege actual damages. Under Section 22(a) of the CEA, "a plaintiff has standing to bring a commodities manipulation action only if he has suffered 'actual damages' as a result of defendant's manipulation." *In re LIBOR-Based Financial Instruments Antitrust Litig.* ("*In re LIBOR II*"), 962 F. Supp. 2d 606, 620 (S.D.N.Y. 2013) (quoting 7 U.S.C. § 25(a)(1)). To plead actual damages where, as here, plaintiffs claim that defendants engaged in isolated (though repeated) manipulative activity, plaintiffs must allege both (1) "that they engaged in a transaction at a time during which prices were artificial as a result of defendants' alleged . . . manipulative conduct," and (2) "that the artificiality was adverse to their position." *In re LIBOR II*, 962 F. Supp. 2d at 622; *cf. In re Energy Partners Natural Gas Litig.*, 2009 WL 2633781, at *9-11 (plaintiffs must show they transacted when the prices were artificial due to the manipulation). The Complaint alleges that prices were depressed beyond the Silver Fix, thus giving rise to harm so long as a Plaintiff transacted on a day in which manipulation is alleged. (*See* Compl. ¶¶ 185, 239). That hypothesis is undermined by the Complaint's allegations that: (i) there is a statistically significant relationship between the price of COMEX silver futures and the results of the Silver Fix (Compl. ¶ 121); (ii) the price dynamics of the Silver Fix do not reflect those of the broader silver market (Compl. ¶ 186); (iii) the market activity during the Fix "results in significantly different returns during the Silver Fix than observed across the trading day" (Compl. ¶ 188); (iv) there is a "statistically significant cluster of negative returns" near the Silver Fix and "[n]owhere else during the day is there such a concentration of negative returns" (Compl. ¶ 190); and (v) there is an informational advantage to insiders who can trade around the Silver Fix (Compl. ¶¶ 205-206). All of these allegations suggest that any disruption caused by the alleged manipulation is limited to the moments immediately preceding and following the Silver Fix. As such, the Complaint must allege that Plaintiffs traded during this window. *See In re Livent, Inc. Noteholders Sec. Litig.*, 151 F.

Supp. 2d 371, 406 (S.D.N.Y. 2001) (noting that the ability to plead in the alternative "cannot be construed as an invitation to incoherent, self-contradictory pleadings"); *see also In re LIBOR III*, 27 F. Supp. 3d at 469. Because plaintiffs have failed to allege they traded in or around the Silver Fix, they have failed to allege that they suffered actual damages.

### D. THE COMPLAINT FAILS TO ALLEGE PRINCIPAL-AGENT OR AIDING AND ABETTING LIABILITY.

The failure to state a primary claim against any Defendant requires dismissal of the principal-agent liability claim and the aiding and abetting claim (Claims Four and Five). *See, e.g.*, *Silver II*, 560 F. App'x at 87; *In re Platinum*, 828 F. Supp. 2d at 599-600.

The Complaint's principal-agent liability claim is further deficient because the Complaint does not allege "that [any] principal manifested an intent to grant [an] agent authority, the agent agreed, and the principal maintained control over key aspects of the undertaking." *Amaranth I*, 587 F. Supp. 2d at 546 (citations and internal quotation marks omitted). The Complaint offers nothing but "general, vague and conclusory" allegations to support its claim. *Id.* at 547; *see* Compl. ¶¶ 87, 279.

The Complaint similarly fails to allege an aiding and abetting claim (Claim Five) with the requisite particularity because it makes no factual allegations showing that any individual defendant "associate[d] [itself] with the venture, . . . participate[d] in it as in something that he wishe[d] to bring about, [and] . . . s[ought] by his actions to make it succeed." *Amaranth III*, 730 F. 3d at 182 (citing *United States* v. *Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)); *see also Krause* v. *Forex Exch. Mkt., Inc.*, 356 F. Supp. 2d 332, 338 & nn.49-50 (S.D.N.Y. 2005) (applying Rule 9(b) to CEA aiding and abetting claims). The Complaint also does not allege that any Defendant "knew that [the alleged primary violator] specifically intended to manipulate the price of [COMEX silver futures] and that [the alleged aiders and abettors] intended to help." *Amaranth III*, 730 F.3d at 183.

Where, as here, "the Complaint does not identify the persons alleged to have been involved in knowingly aiding and abetting the alleged manipulation" the aiding and abetting claim must be dismissed. *In re Silver I*, 2012 WL 6700236, at *19.

## V.   The Complaint Fails To State a Claim for Unjust Enrichment.

Plaintiffs' claims for unjust enrichment under the laws of 48 states, the District of Columbia, and Puerto Rico must be dismissed because the Complaint does not: (1) plead any connection to 46 of these jurisdictions; (2) sufficiently allege injury with respect to any jurisdiction; or (3) meet the unjust enrichment pleading requirements of the remaining four jurisdictions.

Plaintiffs lack standing to sue under the laws of 46 jurisdictions. On a motion to dismiss, "a plaintiff must demonstrate standing for each claim [s]he seeks to press," *Mahon* v. *Ticor Title Ins. Co.*, 683 F.3d 59, 64 (2d Cir. 2012) (citing *DaimlerChrysler Corp.* v. *Cuno*, 547 U.S. 332, 335 (2006)), and standing must be analyzed with respect to named plaintiffs, rather than the putative class as a whole. *See id.* Consequently, Plaintiffs "may only assert a state claim if a named plaintiff resides in, does business in, or has some other connection to that state." *In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*, 1 F. Supp. 3d 34, 49 (E.D.N.Y. 2014) ("*In re HSBC*") *on reconsideration* 14 F. Supp. 3d 99 (E.D.N.Y. 2014); *Simington* v. *Lease Fin. Grp., LLC*, No. 10 civ. 6052 (KBF), 2012 WL 651130, at *7 (S.D.N.Y. Feb. 28, 2012). Here, the named Plaintiffs plead connections to only four states: California; Florida; New York; and Washington.[28] (*See* Compl. ¶¶ 19-28.) The Complaint's claims under the laws of the remaining 46 jurisdictions must be dismissed for lack of standing. *See In re HSBC*, 1 F. Supp. 3d at *49 -*50.

---

[28] The allegation that some named Plaintiffs transacted in CBOT silver contracts does not confer standing under Illinois law. *See Vanguard Mun. Bond Fund, Inc. v. Thomson Pub. Corp.*, 974 F. Supp. 1159, 1163 (N.D. Ill. 1997).

The remaining claims also fail for want of standing. Named plaintiffs, and not the putative class, must, "*with respect to each asserted claim* . . . always have suffered a distinct and palpable injury to [themselves]." *Mahon*, 683 F.3d at 64 (emphasis in original) (citation omitted). The Complaint does not allege any particularized harm to the named plaintiffs, alleging only that the named plaintiffs "engaged in U.S.-based transactions" in silver or silver financial instruments at artificial prices. (*See* Compl. ¶¶ 19-28.) The Complaint does not allege that Plaintiffs only sold, but did not buy, silver or silver financial instruments at deflated prices during the Class Period. *See supra* Section I.D. Lacking any allegations plausibly suggesting injury-in-fact to the named Plaintiffs, all of the Complaint's unjust enrichment claims must be dismissed. *See Mahon*, 683 F.3d at 66.

The claims under New York and Florida law also must be dismissed for the further reason that the Complaint does not allege a "sufficiently close relationship with the other party." *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516, 973 N.E.2d 743, 746 (2012) (internal citation omitted); *see also Extraordinary Title Servs., LLC v. Florida Power & Light Co.*, 1 So. 3d 400, 404 (Fla. Dist. Ct. App. 2009). The Complaint does not allege *any* relationship between the Plaintiffs and Defendants. *See Georgia Malone*, 19 N.Y.3d at 517-18 (unjust enrichment claim dismissed because plaintiff and defendant "simply had no dealings with each other"); *Extraordinary Title Servs.*, 1 So. 3d at 404.

The Complaint's Washington claim fails on the additional ground that unjust enrichment claims may not be used to circumvent state policies that prohibit indirect purchasers from recovering under Washington's antitrust and consumer protection laws. *In re Digital Music*, 812 F. Supp. 2d at 413 ("Indirect purchaser[s] . . . may not recover restitution in states that follow the rule of *Illinois Brick*."); *see also id.* (states that have "not expressly passed *Illinois Brick* repealer

legislation . . . [are] presumed to follow . . . the *Illinois Brick* limitation on indirect purchaser claims"). Washington has not passed *Illinois Brick* repealer legislation, and indirect purchasers lack standing under Washington antitrust law. *See Blewett v. Abbott Labs.*, 938 P.2d 842 (1997).

Any claims under Illinois law must also be dismissed because, under the laws of that state, where an unjust enrichment claim "rests on the same improper conduct alleged in another claim," the unjust enrichment claim is tied to the related claim and "will stand or fall with the related claim." *Cleary v. Philip Morris Inc*, 656 F. 3d 511, 516-18 (7th Cir. 2011).

Finally, any claims under California law must also be dismissed because plaintiffs do not allege that they did not receive the benefit of their bargain. *Peterson* v. *Cellco P'ship*, 164 Cal. App. 4th 1583, 1593-94 (2008). Under California law, "[t]here is no equitable reason for invoking restitution when the plaintiff gets the exchange which he expected." *Id.* at 1593 (quoting *Comet Theatre Enters., Inc. v. Cartwright*, 195 F.2d 80, 83 (9th Cir.1952)).

## VI. The Complaint's Antitrust and CEA Claims Are Time Barred

### A. THE COMPLAINT'S ANTITRUST CLAIMS ARE TIME-BARRED.

Claims for violations of the Sherman and Donnelly Acts must be brought no later than four years after the asserted cause of action arises. 15 U.S.C. § 15b; N.Y. Gen. Bus. Law § 340(5) (1999). Antitrust actions accrue, and the limitations period begins to run, "when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). In a consolidated class action such as this one, an action is "commenced" for limitations purposes when the first Lead Plaintiff's complaint is filed. *In re Adelphia Commc'ns Corp.*, No. 03 MD 1529 (LMM), 2005 WL 1278544, at *6 (S.D.N.Y. May 31, 2005).[29]

---

[29] *In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.,* No. 1500, 02 Civ. 5575, 2004 WL 992991, at *6 (S.D.N.Y. May 5, 2004).

Where, as here, a Complaint alleges an ongoing price-fixing conspiracy, recovery is limited to acts alleged within the four-year statutory period. *In re Nine W. Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 191-2 (S.D.N.Y. 2000) (citing *Kiehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)). The Complaint alleges antitrust violations and corresponding injuries that date back to 1999. The vast majority of those violations are alleged to have occurred more than four years prior to July 25, 2014,[30] the date on which the first Interim Lead Plaintiff's complaint was filed in this action.[31] Thus all federal and New York antitrust claims based on alleged conduct predating July 25, 2010 fall outside the limitations period and must be dismissed, absent some basis for tolling.

### B.  THE COMPLAINT'S CEA CLAIMS ARE TIME-BARRED.

CEA claims must be brought within two years of the date on which a party is placed on inquiry notice of the asserted violation. 7 U.S.C. § 25(c) (2011); *In re LIBOR III*, 27 F. Supp. 3d at 471. A party is placed on inquiry notice when circumstances exist to suggest to "[a person] of ordinary intelligence the probability that she has been defrauded.'" *Id.* (quoting *In re LIBOR I*, 935 F. Supp. 2d at 698; *see also Koch v. Christie's Int'l PLC*, 699 F.3d 141, 151 (2d Cir. 2012)). The test for inquiry notice "is an objective one and dismissal is appropriate when the facts from which knowledge may be imputed are clear from the pleadings." *Salinger v. Projectavision, Inc.* 934 F. Supp 1402, 1408 (S.D.N.Y. 1996).

Plaintiffs were on inquiry notice of Defendants' alleged manipulation well prior to July 25, 2012 (two years before the first Complaint was filed in this action).[32] The Complaint cites publicly

---

[30] The Complaint specifies a Class Period that commenced in 1999, and therefore targets almost 12 years of alleged misconduct that is time-barred. Of the 1,734 "anomalous" dates that Plaintiffs identify, 1,165 are from the period *before* July 25, 2010. *See* Compl. App. C. Additionally, of the 571 sales that Plaintiffs allege they made during the Class Period, see *id.* at 13 *et seq*, *over eighty percent* are alleged to have occurred before July 25, 2010. *Id.*

[31] *See* Compl., *Nicholson v. The Bank of Nova Scotia et al.*, No. 14-CV-5682 (VEC), 2014 WL 3689323 (S.D.N.Y., July 25, 2014).

[32] *See* (Ex. 17 (CFTC, CFTC's 2008 Fiscal Year Enforcement Roundup (October 2, 2008)).)

available material from as early as 2008 that addresses the CFTC's then-ongoing investigation into price manipulation in the silver market. Because those materials (and other publicly available materials concerning the CFTC's investigation) were available to Plaintiffs in 2008, the inquiry notice standard is satisfied.[33] The purpose of including the reference to the CFTC investigation is to imply that the investigation was somehow suggestive of the existence of the conspiracy now alleged (*see supra* at II.F). It is therefore difficult to see how the publicly revealed investigation can be invoked by Plaintiffs *now* as an indicator of collusion, without them having to concede that the investigation also placed them on inquiry notice in 2008.

Other allegations in the Complaint (again included for the explicit purpose of suggesting circumstantial evidence of a conspiracy (*see supra* at II.D)) suggest that Plaintiffs were on notice of their claims far earlier than 2008. The Complaint proposes that collusion and manipulation be inferred from structural features of the Fixing process. (*See* Compl. ¶¶ 125-131.) But *everything* described in those paragraphs has been publicly known for decades. Plaintiff's paid expert, Mr. Caminischi, concedes that the allegedly collusive practices of the Silver Fix "changed only slightly" in the century prior to the Complaint's filing. (Ex. 1 (Caminschi) at 6; *see also* Compl. ¶¶ 2, 125-129). It strains credulity to suggest that these allegedly collusive practices did not place Plaintiffs on inquiry notice of their claims in this case.

### C.   THERE IS NO BASIS ON WHICH TO TOLL THE STATUTES OF LIMITATION.

The Complaint includes the boilerplate assertion that the applicable statutes of limitations should be tolled on account of Defendants' "fraudulent concealment" of operative facts. (Compl. ¶¶ 242-45.) To plead a claim for fraudulent concealment, a Plaintiffs must allege facts showing

---

[33] The Complaint suggests (no doubt to avoid the inquiry notice problem) that the focus of the CFTC's investigation were complaints that "were not specifically related to the Silver Fix," but then concedes that the core question before the CFTC was "whether COMEX silver futures prices were being manipulated artificially lower" – which is *exactly* what the Complaint deems a principal purpose of the Silver Fixing conspiracy alleged here. (Compl. ¶ 147.)

that: "(1) . . . the defendant concealed the existence of the antitrust violation[;] (2) . . . plaintiff remained in ignorance of the violation until sometime within the four-year antitrust statute of limitations; and (3) . . . his continuing ignorance was not the result of lack of diligence." *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 520 (S.D.N.Y. 2009) (internal quotation omitted). "[F]raudulent concealment must be pleaded in compliance with Fed. R. Civ. P. 9(b)." *Salinger v. Projectavision, Inc.*, 934 F. Supp. 1402, 1412 n.6 (S.D.N.Y. 1996). Plaintiffs do not adequately plead any of these elements.

As a threshold matter, the public facts which the Complaint invokes to support its substantive claims dispose of the fraudulent concealment argument. (*See supra* at 40-41.) The Complaint offers only the generic, unsubstantiated allegation that Defendants' conduct was "self-concealing," and that Defendants committed "active acts of concealment." (Compl. ¶¶ 242-44.) Courts give little credence to such empty assertions. *See Butala v. Agashiwala*, 916 F. Supp. 314, 320 (S.D.N.Y. 1996). The Complaint essentially asks the Court to ignore – but only for limitations purposes – the very public facts and behaviors that supposedly support Plaintiffs' substantive claims now. Again, the Complaint's invocation of the 2008 CFTC investigation for substantive pleading purposes is damning when it comes to the suggestion of concealment. *See* Compl. ¶ 148; *Certain Underwriters at Lloyd's v. Milberg LLP*, 08 Civ. 7522 (LAP), 2009 U.S. Dist. LEXIS 97284, at *24 (S.D.N.Y. Sept 29, 2009) (internal quotation marks omitted) (notice of a relevant government investigation clearly triggers a duty on the part of the plaintiff to inquire as to potential fraud.)

But it is not just the facts alleged that matter here – it is the *people* alleging them. *Four* of the Plaintiffs in this case, J. Scott Nicholson, Eric Nalven, Christopher Depaoli, and Kevin Maher, initiated class actions in 2010 and 2011 in this district against a number of financial institutions,

*including Defendant HSBC*, alleging that each had engaged in the improper suppression of silver futures prices, exactly what the now alleged Silver Fixing "conspiracy" sought to do.[34]  Plaintiffs cannot now plead that they were ignorant of the facts underlying their claims here.

The Complaint does not allege that Plaintiffs conducted any due diligence in the years that preceded their commencement of this action.  Rather, it breezily asserts that due diligence would have been futile if conducted before "Deutsche Bank announced its withdrawal from the Silver Fixing in January 2014."  (Compl. ¶ 242.)  That assertion does not comport with the facts, especially given the identities of Plaintiffs and their counsel here.

Because Plaintiffs' fraudulent concealment allegations are deficient and contradicted by the Complaint itself, and the conduct of at least four Plaintiffs, the Complaint's antitrust and CEA claims are time-barred to the extent described above.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Complaint be dismissed with prejudice.

Dated:  March 27, 2015
      New York, New York

Respectfully submitted,

_____

Michael Lacovara
Matthew J. Galvin
Leah Friedman
FRESHFIELDS BRUCKHAUS
DERINGER US LLP

---

[34] *See Nicholson v. JP Morgan Chase & Co. et al*, No.10-cv-8724 (RPP); *Nalven v. JPMorgan Chase & Co. et al*, No. 10-cv-8284 (RPP); *Depaoli v. JPMorgan Chase & Co. et al*, No. 11-cv-862 (RPP); *Maher v. JPMorgan Chase & Co. et al*, No. 10-cv-8548 (RPP).  Lawyers with four of the law firms representing plaintiffs in the instant litigation were also counsel of record in the prior Silver cases.

601 Lexington Avenue
New York, New York 10022
Tel: (212) 277-4000
Fax: (212) 277-4001
michael.lacovara@freshfields.com
matthew.galvin@freshfields.com
leah.friedman@freshfields.com

Attorneys for Defendants HSBC
Bank U.S.A., N.A., HSBC
Holdings Plc, HSBC North
America Holdings Inc., and
HSBC USA, Inc.


/s/ Stephen Ehrenberg____ _____.
Stephen Ehrenberg
Kenneth M. Raisler (of counsel)
John J. Hughes, III
SULLIVAN & CROMWELL
LLP
125 Broad Street
New York, New York  10005
ehrenbergs@sullcrom.com
raislerk@sullcrom.com
hughesj@sullcrom.com
Tel: (212) 558-4000
Fax:  (212) 558-3588

*Attorneys for Defendants The
Bank of Nova Scotia; Scotia
Capital (USA) Inc., Scotiabanc
Inc., and Scotia Holdings (US)
Inc.*


/s/. Joseph J. Bial  _ _____.
Charles F. Rule
Joseph J. Bial
Amy W. Ray
CADWALADER,
WICKERSHAM & TAFT LLP
700 Sixth Street, N.W.
Washington, D.C.  20001
Tel: (202) 862-2200
Fax: (202) 862-2400

Rick.Rule@cwt.com
Joseph.Bial@cwt.com
Amy.Ray@cwt.com

/s/ Peter J. Isajiw
Peter J. Isajiw
CADWALADER,
WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY 10281
Tel: (212) 504-6579
Fax: (212) 504-6666
Peter.Isajiw@cwt.com

*Attorneys for Defendants Deutsche Bank AG, Deutsche Bank AG New York Branch, Deutsche Bank Securities Inc., Deutsche Bank Trust Corporation; Deutsche Bank Trust Company Americas Deutsche Bank Americas Holding Corp., and DB U.S. Financial Markets Holding Corporation*