**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LONDON SILVER FIXING, LTD. ANTITRUST LITIGATION | 14-MD-02573-VEC<br>14-MC-02573-VEC |
| This Document Relates to: | The Honorable Valerie E. Caproni |
| ALL ACTIONS | |

**<u>SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................. 1

PARTIES ............................................................................................................................... 7

    I.      Plaintiffs .............................................................................................................. 7

    II.     Defendants .......................................................................................................... 9

        A.      Deutsche Bank Defendants ........................................................................ 9

        B.      HSBC Defendants ..................................................................................... 12

        C.      Bank of Nova Scotia Defendants ............................................................ 15

        D.      UBS Defendants ....................................................................................... 18

        A.      Jane Doe Defendants ................................................................................ 20

        B.      Agents and Co-conspirators ..................................................................... 21

JURISDICTION, VENUE, AND COMMERCE ................................................................ 21

SUBSTANTIVE ALLEGATIONS .................................................................................... 23

    I.      THE FIXING MEMBER DEFENDANTS, BY DOMINATING THE SILVER FIX, CONTROLLED THE PRICE OF SILVER ................................................. 23

    II.     THE FIX PRICE DIRECTLY IMPACTS THE VALUE OF MULTIPLE SILVER INVESTMENTS ................................................................................. 26

        A.      Physical Silver ......................................................................................... 27

        B.      Silver Financial Instruments ................................................................... 28

    III.    ECONOMETRIC ANALYSIS DEMONSTRATES THAT THE SILVER FIX CAUSES ARTIFICIAL SILVER PRICES ........................................................ 33

        A.      The Silver Fix Marks a Statistically Significant Change in Pricing Dynamics ................................................................................................. 33

        B.      Silver Prices Drop During the Silver Fix at an Abnormally High Frequency ................................................................................................. 38

        C.      The Decrease in Silver Prices During the Silver Fix Is Abnormally Large ........................................................................................................ 42

        D.      Prices Drop on an Abnormal Spike in Trade Volume and Price Volatility, Indicative of Trading by the Fixing Members and Co-Conspirators ........ 48

        E.      Spot Market Activity Directly Connects the Defendants to the Dysfunction in Silver Pricing Observed During the Silver Fix ..................................... 57

        F.      The Dysfunction in Silver Pricing Dynamics During the Silver Fix Is Not Caused by Legitimate Supply and Demand Factors ................................. 68

            1.  Silver Prices During the Silver Fix Are Not Caused by Macroeconomic Activity ............................................................................................. 68

            2.  The Drop in Silver Prices Follows the Start of the Silver Fix ............ 69

3. The Spike in Trading Volume Follows the Start of the Silver Fix ...... 70

G. The Dysfunction in Silver Pricing During the Silver Fix Had a Persistent Impact on Silver Prices Well Beyond the End of the Fixing Call ........... 71

IV. DEFENDANTS USED THE DYSFUNCTION IN SILVER PRICES CREATED BY THE SILVER FIX TO GENERATE INCREASED PROFITS .................... 74

A. Informed Traders with Advance Knowledge of the Fix Price Benefit Financially by Taking Advantage of the Dysfunction in Silver Pricing... 74

B. The Same Informational Advantage that Increased Trading Profits Allowed Defendants to Maintain Artificial, Fixed Bid-Ask Spread in the Spot Market ............................................................................................. 85

C. Defendants' Large Unhedged Trading Positions During the Class Period that Benefited from Their Manipulative Conduct ..................................... 91

V. DEFENDANTS IMPROPERLY SHARED PRIVATE INFORMATION TO COORDINATE THEIR TRADING IN ADVANCE OF THE SILVER FIX ...... 95

A. Defendants Used Electronic Chat Rooms to Share Private Information Regarding Their Proprietary Trading Positions and Those of Their Clients ...................................................................................................... 96

B. Defendants Intentionally Triggered Client Stop Loss Orders, Allowing them To Buy Silver at Artificially Lower Prices ..................................... 99

C. Defendants Engaged in Front Running of Incoming Silver Orders .......... 99

VI. PLAINTIFFS WERE INJURED BY TRANSCTING AT ARTIFICIAL PRICES CAUSED BY DEFENDANTS' MANIPULATIVE CONDUCT ...................... 101

VII. GOVERNMENT ENFORCERS ARE INVESTIGATING THE SILVER FIX  102

A. Government Enforcers Are Aware that the Silver Market Is Open to Manipulation ........................................................................................... 102

VIII. THE DEMISE OF THE SILVER FIX ................................................................ 106

A. Under Government Investigation, Deutsche Bank Put Its Seat on the Silver Fixing Panel Up for Sale .............................................................. 106

B. Deutsche Was Unable to Sell What Should Have Been a Valuable Seat 107

C. Deutsche Resigned Unable to Sell Its Seat ............................................. 107

D. The Full Panel Announced It Would Be Disbanding ............................. 108

EQUITABLE TOLLING AND FRADULENT CONCEALMENT ........................................ 110

CLASS ACTION ALLEGATIONS ....................................................................... 112

CLAIMS FOR RELIEF ..................................................................................... 114

FIRST CLAIM FOR RELIEF ............................................................................. 114

SECOND CLAIM FOR RELIEF ......................................................................... 116

THIRD CLAIM FOR RELIEF ............................................................................ 117

FOURTH CLAIM FOR RELIEF ......................................................................... 118

FIFTH CLAIM FOR RELIEF .................................................................................................. 121

SIXTH CLAIM FOR RELIEF .................................................................................................. 121

SEVENTH CLAIM FOR RELIEF ............................................................................................ 122

EIGHTH CLAIM FOR RELIEF ............................................................................................... 125

PRAYER FOR RELIEF ........................................................................................................... 126

DEMAND FOR JURY TRIAL ................................................................................................ 128

Plaintiffs Norman Bailey, Robert Ceru, Christopher DePaoli, John Hayes, Laurence Hughes, KPFF Investment, Inc., Kevin Maher, Eric Nalven, J. Scott Nicholson, and Don Tran (collectively "Plaintiffs"), individually and on behalf of those similarly situated, bring this class action for treble damages, disgorgement, restitution, injunctive and other relief, against Defendants, for their violations of law from at least January 1, 1999, through the date on which the effects of Defendants' unlawful conduct cease ("Class Period"), and, upon knowledge, information, belief, and investigation of counsel, allege:

## NATURE OF THE ACTION

1.     Throughout the Class Period three of the world's largest silver bullion banks – Deutsche Bank, HSBC, and The Bank of Nova Scotia (collectively the "Fixing Members") – dictated the price of silver during a daily, secret, and unregulated meeting known as the London Silver Fixing (the "Silver Fix").

2.     The Silver Fix was supposed to serve a "price discovery" function, determining the global benchmark price per ounce of silver (the "Fix price") based on supply and demand fundamentals resulting from a competitive silver auction among the Fixing Members.  Instead the Silver Fix, which was closed to outside observers and free from any regulatory oversight, was used to both conceal and facilitate the Defendants' agreement to manipulate and fix silver prices and the prices of silver financial instruments during the Class Period.

3.     The Fix price directly impacted the roughly $30 billion in silver and silver financial instruments traded each year.  "The guiding principal behind the Fixing is that all business, whether for large or small amounts, is conducted solely on the basis of a single

1

published Fixing price."[1]  During the Class Period, the silver and silver financial instruments that Plaintiffs and the Class transacted were priced, benchmarked, and/or settled to the Fix price.

4.      Thus the Fixing Members, as masters of the Silver Fix, exercised complete control over the prices of silver and silver financial instruments during the Class Period.  This unique position of control, unrivaled by any other market participant, allowed the Fixing Members and their co-conspirators, such as Defendant UBS AG, to use the daily Silver Fix as a manipulative device, causing a dysfunction in the normal competitive process of silver pricing[2] that fixed the prices of silver and silver financial instruments at artificial, anticompetitive levels for the Defendants' financial benefit.

5.      The dysfunction in market forces that Defendants' manipulative conduct created manifests itself as a statistically significant drop, on average more than 15 basis points, in both the spot market price of silver and prices of silver futures contracts beginning minutes *before* the start of the daily Silver Fix.

6.      This large decline in silver prices, which does not happen at any other time during the trading day, exhibits a particular market signature that distinguishes it from competitive trading activity because it (a) always occurs around the start of the Silver Fix; (b) has an extremely high frequency; (c) is abnormally large in size; (d) ignores whether the price of silver is increasing or decreasing; and (e) correctly predicts where the Fix price will be before it is ever released to the public.

---

[1] *A Guide to the London Precious Metals Markets*, LONDON BULLION MARKET ASSOCIATION, at 14, http://www.lbma.org.uk/assets/market/OTCguide20081117.pdf.

[2] *See* Andrew Caminschi, *Any Silver Linings? London Silver Fixing Impact on Public Markets Before and After the Introduction of Contemporaneous Futures Trading* (hereinafter *Silver Linings*), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2461098 (finding multiple deviations in silver market behavior around the Silver Fix).

7.     Furthermore, the drop in silver prices observed around the Silver Fix is accompanied by a statistically significant spike in both trading volume and price volatility that reaches its peak minutes *before* the Silver Fix is over and the Fix price is released to the market. As the only market participants with advance knowledge of the Fix price, the timing of the Defendants' trading directly contradicts well-established economic principles that, absent collusion, market prices and thus trade volume and volatility, should react upon the release of new information, not in advance.

8.     The timing of this volume spike and coincident drop in price is also significant, because of when it occurs during the trading day.  Unlike other precious metals fixings, which take place when trading volume is near its peak, the Silver Fix occurs at noon London time, *before* the futures markets in New York are fully open and the vast majority of silver futures contracts are traded.  As a result, the abnormally large surge in volume and drop in futures prices cannot be explained by normal futures market activity.

9.     Nor are these abnormal volume and pricing dynamics explained by market activity occurring outside of the Silver Fix.  Tellingly, the signature drop in price and coincident spike in both volume and volatility follow the Silver Fix as the time of the daily conference call changes with the start and end of British Summer Time.[3]  Days with no Silver Fix, for example, due to a British banking holiday, exhibit the opposite effect: the price of silver *increases* at the Silver Fix's normal time.

10.    Thus, it is trading during the fix that causes the observed break from previous and subsequent market behavior.  To demonstrate this, Plaintiffs have further connected the observed price drop directly to the Defendants' activity in the spot silver market.  By analyzing millions of

---

[3] British Summer Time is the U.K. equivalent of U.S. Daylight Savings Time and begins on the last Sunday of March and ends on the last Sunday of October.

bid and ask price quotes, there is clear evidence that Defendants' market activity initiates the downward price trend observed around the start of the Silver Fix.[4]  The impact of this systematic price suppression extends beyond the few minutes surrounding the Silver Fix, where large price drops are frequently observed, and extends into other days that do not exhibit such obvious price declines.

11.     Defendants' used this manufactured dysfunction in silver pricing mechanics to generate illegitimate trading profits by (a) taking positions in the silver market based on their advance knowledge of the Fix price; (b) manipulating their clients' order flow to financially benefit their silver market positions; and (c) maintaining an anticompetitive fixed "spread," or difference, between the bid and ask prices at which they offered to buy and sell silver in the spot market.

12.     While the complete details of Defendants' trading activity are unavailable to Plaintiffs at this time, a November 12, 2014 report by the Swiss Financial Market Supervisory Authority ("FINMA")[5] identified several strategies which, according to FINMA Director Mark Branson, UBS used in "clear attempts to manipulate fixes in the precious metals markets."[6]  This report describes how Defendants used the Silver Fix to create and exploit an advantage over the

---

[4] *See* Rosa M. Abrantes-Metz & Albert D. Metz, *Was The London Silver Fixing Fixed For Years*? (November 2014) (unpublished manuscript on file with counsel).

[5] *See Foreign Exchange Trading at UBS AG:  Investigation Conducted by FINMA*, FINMA (Nov. 12, 2014) http://www.finma.ch/e/aktuell/Documents/ubs-fx-bericht-20141112-e.pdf (hereinafter "UBS FINMA Report).

[6] *See* Elena Logutenkova & Nicholas Larkin, *UBS Precious Metals Misconduct Found By Finma in FX Probe*, BLOOMBERG L.P. (Nov. 12, 2014), http://www.bloomberg.com/news/articles/2014-11-12/finma-s-ubs-foreign-exchange-settlement-includes-precious-metals.

rest of the market by *inter alia* "jamming" clients, triggering stop loss orders[7] that forced clients to sell silver to the Defendants at artificially lower prices; sharing non-public client order information with third-parties; and front running client "silver fix orders," *i.e.*, orders placed before the Silver Fix to trade at the then unknown Fix price.

13.     Significantly, these are the same techniques UBS and HSBC employed to manipulate the foreign exchange ("FX") markets which are well-documented in their settlements with the U.S. Commodity Futures Trading Commission ("CFTC") and U.K. Financial Conduct Authority ("FCA").   The overlap in manipulative strategy is not surprising.   Both UBS and HSBC traded precious metals during the Class Period from their FX desks.   Their manipulative conduct, which worked so well in the FX markets was duplicated in the silver market.

14.     An informational advantage, whether in the form of an advance knowledge of a competitors' order flow, the trigger points for competitors' clients' stop-loss orders, or the results of a major global benchmark like the Silver Fix, is invaluable.   Plaintiffs' economic analysis determined that the advance knowledge of the Fix price available only to the Fixing Members and their co-conspirators created a real-world advantage of up to 40 basis points in the spot market and up to 25 basis points in the futures market for *every trade* Defendants placed during the Class Period, generating risk-free returns at the expense of Class members who were forced to transact at artificial prices.

15.     Increased regulatory scrutiny of the Silver Fix led Deutsche Bank to abandon its position as a Fixing Member,[8] rather than stand by the integrity of the benchmark, causing the

---

[7] A stop-loss order is a type of delayed order that is only executed when the price of silver drops to a certain level.

[8] *See* Francesca Freeman, *Deutsche Bank Leaves Gold, Silver Price-Setting Panela*, THE WALL STREET JOURNAL (Jan. 17, 2014), http://www.wsj.com/articles/SB10001424052702304603704579326202725433242.

end of the Silver Fix on August 14, 2014.[9]   The Silver Fix has since been replaced by the "London Silver Price," which despite losing the "unfortunate name," in favor of a bland one, and the "private teleconference," in favor of electronic trading, may not be any better.[10]   THE FINANCIAL TIMES reports that "anyone thinking there has been a complete change in the way the daily snapshot of the silver market is conducted would be mistaken.  The new benchmark . . . keeps some of the main features of the silver fixing, in particular the auction-style process used to calculate the reference price."[11]   Two of the other main features that continue are Defendants HSBC and Bank of Nova Scotia remaining on the London Silver Price panel, as does UBS and other recidivist banking corporations.

16.     New investigations into the Silver Fix continue.  In February 2015, both the U.S. Department of Justice and CFTC announced that they began investigating at least 10 banks, including all of the Defendants, for rigging the precious-metals markets by manipulating, among others, the Silver Fix.[12]

17.     Given these ongoing government investigations into the Silver Fix and the significant amount of economic evidence presented in this Complaint, Plaintiffs believe that further evidentiary support for their claims, as alleged herein, will be revealed after a reasonable opportunity for discovery.

---

[9] *See* Francesca Freeman, *New London Silver Fix to Be Decided in July*, THE WALL STREET JOURNAL (June 19, 2014), http://www.wsj.com/articles/seven-proposals-made-to-replace-the-london-silver-fix-1403169463.

[10] *New silver price is 'improvement' on fix*, THE FINANCIAL TIMES (July 16, 2014), http://www.ft.com/intl/cms/s/0/4053ff04-0ccb-11e4-90fa-00144feabdc0.html#axzz38yxp1nAQ.

[11] *Id.*

[12] *See* Jean Eaglesham and Christopher M. Matthews, *Big Banks Face Scrutiny Over Pricing of Metals*, THE WALL STREET JOURNAL (Feb. 23, 2015), http://www.wsj.com/articles/big-banks-face-scrutiny-over-pricing-of-metals-1424744801.

## PARTIES

I.    **Plaintiffs**

18.    Plaintiff Norman Bailey ("Bailey") is a natural person who resides in Ontario, Canada.  Plaintiff Bailey transacted Chicago Board of Trade ("CBOT") silver futures contracts, Commodity Exchange, Inc. ("COMEX") silver futures contracts and options during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade.  As a result, Baily was damaged and suffered legal injury resulting in a net loss on silver futures and options contracts transacted during the Class Period.

19.    Plaintiff Robert Ceru ("Ceru") is a natural person who resides in the State of New York.  Plaintiff Ceru purchased and/or sold physical silver during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade and as a consequence thereof was damaged and suffered legal injury.

20.    Plaintiff Christopher DePaoli ("DePaoli") is a natural person who resides in the State of California.  Plaintiff DePaoli transacted COMEX silver futures contracts, COMEX "miNY" silver futures contracts and options, and NYSE LIFFE mini silver futures contracts during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade.  As a result, DePaoli was damaged and suffered legal injury resulting in a net loss on silver futures and options contracts transacted during the Class Period.

21.    Plaintiff John Hayes ("Hayes") is a natural person who resides in the State of Florida.  Plaintiff Hayes transacted COMEX silver futures contracts, CBOT mini silver futures contracts, and options on NYSE LIFFE silver futures contracts during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade and as a consequence thereof was damaged and suffered legal injury.

22.     Plaintiff Laurence Hughes ("Hughes") is a natural person who resides in the State of California.  Plaintiff Hughes transacted COMEX "miNY" silver futures contracts during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade.  As a result, Hughes was damaged and suffered legal injury resulting in a net loss on silver futures contracts transacted during the Class Period.

23.     Plaintiff KPFF Investment, Inc. f/k/a KP Investment, Inc. ("KPFF") is a California corporation with its principal place of business located in Irvine, California.  Plaintiff KPFF purchased and/or sold physical silver during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade.  As a result, KPFF was damaged and suffered legal injury resulting in a net loss on physical silver transacted during the Class Period.

24.     Plaintiff Kevin Maher ("Maher") is a natural person who resides in the State of New York.  Plaintiff Maher transacted COMEX silver futures contracts and options during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade.  As a result, Maher was damaged and suffered legal injury resulting in a net loss on futures and options contracts transacted during the Class Period.

25.     Plaintiff Eric Nalven ("Nalven") is a natural person who resides in the State of Florida.  Plaintiff Nalven transacted CBOT mini silver futures contracts, NYSE LIFFE mini silver futures contracts, and COMEX silver futures contracts during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade.  As a result, Nalven was damaged and suffered legal injury resulting in a net loss on silver futures contracts transacted during the Class Period.

26.     Plaintiff J. Scott Nicholson ("Nicholson") is a natural person who resides in the State of Washington.  Plaintiff Nicholson transacted COMEX silver futures contracts during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade.  As a result, Nicholson was damaged and suffered legal injury resulting in a net loss on silver futures contracts transacted during the Class Period.

27.     Plaintiff Don Tran ("Tran") is a natural person who resides in the State of California.  Plaintiff Tran transacted options on COMEX silver futures during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade.  As a result, Tran was damaged and suffered legal injury resulting in a net loss on options contracts transacted during the Class Period.

## II.     Defendants

### A.     Deutsche Bank Defendants

28.     Defendant Deutsche Bank AG is a German *aktiengesellschaft* with its principal place of business located in Frankfurt, Germany.  It owns 100% of the equity and voting interests in Defendants Deutsche Bank Americas Holding Corporation, DB U.S. Financial Markets Holding Corporation, Deutsche Bank Securities, Inc., Deutsche Bank Trust Corporation, Deutsche Bank Trust Company Americas, and Deutsche Bank AG, New York Branch.

29.     Deutsche Bank AG was a member of the London Silver Market Fixing, Ltd. during the entire Class Period until August 14, 2014, when it withdrew from the LBMA Silver fixing panel.

30.     Deutsche Bank AG has a branch located in this District at 60 Wall Street, New York, NY 10005.  This branch is registered as a foreign branch with the New York Department of Financial Services ("DFS").  Deutsche Bank AG was a Non-Clearing Member Firm of the NYMEX and COMEX during at least part of the Class Period.

9

31.     Deutsche Bank AG filed its U.S. Resolution Plan on July 1, 2014 with the U.S. Federal Reserve Board, the Federal Deposit Insurance Corporation, and the Financial Stability Oversight Counsel because it has over $50 million in U.S.-nonbank assets.  Deutsche Bank AG designated eight U.S. material entities:   Deutsche Bank AG New York Branch; Deutsche Bank Securities Inc.; Deutsche Bank Trust Corporation; Deutsche Bank Trust Company Americas; DB Services Americas, Inc.; DB Services New Jersey, Inc.; Deutsche Bank Americas Holding Corp.; and Deutsche Bank National Trust Company.

32.     Defendant Deutsche Bank AG New York Branch is a wholesale branch of Deutsche Bank AG.  It is licensed by the New York State Department of Financial Services and regulated by the Federal Reserve.  Deutsche Bank AG and Deutsche Bank AG New York Branch are also regulated by the CFTC as a registered swap dealer.

33.     Defendant Deutsche Bank Securities, Inc. is a Delaware corporation and wholly-owned subsidiary of Deutsche Bank U.S. Financial Markets Holding Corporation, which is a wholly-owned subsidiary of Taunus Corporation, which in turn is wholly-owned by Deutsche Bank AG.  It is a registered broker-dealer and investment advisor with the Securities Exchange Commission and a registered Futures Commission Merchant and commodity pool operator with the CFTC.  It is a member of the Financial Industry Regulatory Authority, the Securities Investor Protection Corporation and the National Futures Association, with 21 registered branches located throughout the U.S. and total assets of $226 billion.  It is a member of the New York Stock Exchange and registered with the CFTC.

34.     Defendant Deutsche Bank Trust Corporation is a New York-chartered bank holding company regulated by the Federal Reserve and wholly-owned subsidiary of Deutsche

Bank AG.  It is a registered bank and financial holding company under the Bank Holding Company Act of 1956.

35.    Defendant Deutsche Bank Trust Company Americas is a New York banking corporation and wholly-owned subsidiary of Deutsche Bank Trust Corporation, which is a wholly-owned subsidiary of Deutsche Bank AG.  It is a licensed New York State-chartered insured depository institution regulated by the New York State Department of Financial Services, member of the Federal Reserve, an FDIC-insured bank, and a transfer agent registered with the Securities Exchange Commission.

36.    Defendant Deutsche Bank Americas Holding Corporation is a Delaware corporation with its principal place of business located at 60 Wall Street, New York, NY 10005. It is a second tier holding company for Deutsche Bank AG subsidiaries in the United States.

37.    Defendant DB U.S. Financial Markets Holding Corporation is a Delaware corporation with its principal place of business located at 60 Wall Street, New York, NY 10005. It is a second tier holding company for Deutsche Bank AG subsidiaries in the United States.

38.    Defendants Deutsche Bank AG; Deutsche Bank Americas Holding Corporation; DB U.S. Financial Markets Holding Corporation; Deutsche Bank Securities, Inc.; Deutsche Bank Trust Corporation; Deutsche Bank Trust Company Americas; and Deutsche Bank AG, New York Branch, are collectively referred to herein as "Deutsche Bank" or "Deutsche."

39.    Deutsche Bank AG operates an electronic platform, Autobahn, which allows market participants to electronically trade commodities, including silver.  Since 1996, Autobahn has provided 24-hour access to Deutsche Bank's customers, including those in the United States.

40.     Deutsche Bank was the sixteenth most active U.S. market maker during the Class Period, based on public silver quotes.  This does not include trading through Deutsche Bank's Autobahn service.

41.     Deutsche Bank is a member of the unlawful combination and conspiracy alleged herein, from which, to Plaintiffs' knowledge, it has not effectively withdrawn.

### B.     HSBC Defendants

42.     Defendant HSBC Holdings plc is a British public limited company with its principal place of business in London.  It owns 100% the equity and voting interests in Defendants HSBC North America Holdings Inc., HSBC Bank (U.S.A.), N.A., and HSBC USA Inc.

43.     HSBC maintains COMEX-registered silver depositories (vaults) in which it stores silver at 1 West 39th St., SC 2 Level, New York, NY, and 425 Sawmill River Rd. Ardsley, NY.[13] As of January 22, 2015, HSBC's COMEX-registered New York silver vaults held nearly 35 million metric tons of physical silver.[14]

44.     HSBC Holdings plc filed its U.S. Resolution Plan with the U.S. Federal Reserve Board on July 1, 2013.  HSBC Holdings plc identified six U.S. material entities:  HSBC North America Holdings Inc.; HSBC USA Inc.; HSBC Bank USA, National Association; HSBC Securities (USA) Inc.; HSBC Technology & Services (USA) Inc.; and HSBC Finance Corporation.  HSBC Holdings plc identified that one of its three U.S. global markets core business lines is metals, which provides a hub for its U.S. clients to engage in spot, forwards, swaps, lending, and custodial services.

---

[13] *Ltr to David Stawick*, http://www.cftc.gov/stellent/groups/public/@rulesandproducts/documents/ifdocs/rul082310nymexandcomex001.pdf

[14] http://www.cmegroup.com/delivery_reports/Silver_stocks.xls.

45.     Defendant HSBC North America Holdings Inc. is a Delaware corporation and the top level holding company for HSBC Holdings plc's operations in the U.S.  Its principal place of business is located at 452 Fifth Avenue, New York, NY 10018.

46.     Defendant HSBC USA Inc. is a Maryland corporation and an intermediate level holding company for HSBC Holdings plc's operations in the U.S.  Its principal subsidiary is HSBC Bank USA, National Association.

47.     Defendant HSBC Bank USA, N.A. is HSBC Holdings plc's principal U.S. banking subsidiary and is a national banking association chartered by the Office of the Comptroller of the Currency, with 253 branches in the U.S. and 22 representative offices in the U.S., including 165 branches in the State of New York.  Its main office is in McLean, Virginia, and its principal executive offices are located at 452 Fifth Avenue, New York, NY.  Its domestic operations are located primarily in the State of New York.  HSBC Bank USA, N.A. is subject to regulation by the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the Consumer Financial Protection Bureau and the Federal Reserve Board.  HSBC Bank USA, National Association is the key metals risk management arm of HSBC.

48.     HSBC Bank USA, N.A. was a member of the London Silver Market Fixing Ltd. during the entire Class Period until August 14, 2014.

49.     HSBC Bank USA, N.A. is a member of the LBMA London Silver Fixing Panel.

50.     HSBC Bank USA, N.A. was a COMEX Division Non-Clearing Member Firm during at least part of the Class Period.

51.     HSBC Securities (USA) Inc. is a Delaware corporation and is a registered broker-dealer of securities under the Securities Exchange Act of 1934; a registered Futures Commission Merchant with the CFTC; and a registered swap dealer with the CFTC.  It is a member of the

Financial Industry Regulatory Authority, the New York Stock Exchange, Inc., CME Group, Inc. ("CME"), Intercontinential Exchange ("ICE"), LCH Clearnet Ltd. ("LCH"), and the Options Clearing Corporation.  It is eligible to clear over-the-counter derivatives at the CME, ICE, and LCH.

52.     HSBC Securities (USA), Inc. was a NYMEX Clearing Member Firm during at least part the Class Period.

53.     Defendants HSBC Holdings plc, HSBC North America Holdings Inc., HSBC Bank (U.S.A.), N.A., and HSBC USA Inc. are collectively referred to herein as "HSBC."

54.     HSBC is one of the world's largest metals custodians and the only over-the-counter market maker with foundations in gold, silver, platinum, and palladium.  It has a metals trading hub and analyst teams in New York, out of which its offers services for everything in the precious metals value chain—including financing, exploration and development, operations, reclamation, storage and manufacturing, hedging, vaulting, and leasing.

55.     As a dealer in precious metals, HSBC "frequently maintains large open positions on U.S. futures markets," including entering into cash, forward, and options transactions with its U.S. clients and market participants.[15]

56.     HSBC was the sixth most active U.S. market maker in the silver spot market during the Class Period, based on public silver quotes.  This does not include trading through HSBC's private platform.

57.     HSBC is a member of the unlawful combination and conspiracy alleged herein, from which, to Plaintiffs' knowledge, it has not effectively withdrawn.

---

[15]http://www.cftc.gov/ucm/groups/public/@newsroom/documents/file/metalmarkets032510_charles.pdf.

### C.   Bank of Nova Scotia Defendants

58.   Defendant The Bank of Nova Scotia, commonly known as Scotiabank, is a Canadian bank with its principal place of business in Toronto.  It owns 100% the equity and voting interests in Defendants Scotia Capital (USA) Inc., Scotiabanc Inc., Scotia Holdings (US) Inc., Scotia Capital (USA) Inc., and The Bank of Nova Scotia Trust Company of New York.

59.   The Bank of Nova Scotia's U.S. core business lines include its Global Banking and Markets division, known as ScotiaMocatta.  ScotiaMocatta "deals in precious and base metals trading, finance, and physical metal distribution."  ScotiaMocatta operates as a business through The Bank of Nova Scotia New York Agency.  ScotiaMocatta operates its precious metals wholesale services at 250 Vesey Street, 24th floor, New York, NY, 10281, which is operated by the Bank of Nova Scotia Managing Director, Bimal Das.

60.   Scotiabank maintains a COMEX-registered silver depository (vault) in which it stores silver at 230-59 International Airport Center Blvd., Building C, Ste. 120, Jamaica, Queens, NY.[16]  The Bank of Nova Scotia, through its ScotiaMocatta division, holds nearly ten million troy ounces of exchange-eligible silver bullion in this vault.[17]  As of October 31, 2012, Scotiabank had assets in precious metals, including silver, totaling approximately

---

[16]http://www.cftc.gov/stellent/groups/public/@rulesandproducts/documents/ifdocs/rul082310nymexandcomex001.pdf

[17] *See* CME Group, Warehouse Depositories and Stocks, *at* http://www.cmegroup.com/trading/energy/nymex-delivery-notices.html (CME Report dated Jan. 23, 2014); CFTC Archives, http://www.cftc.gov/files/submissions/rules/approvals/2006/comexscotiamocatta.pdf ("ScotiaMocatta Depository (SMD) is a division, not a subsidiary, of The Bank of Nova Scotia.")

$12,387,000,000. As of January 22, 2015, Scotiabank's COMEX-registered New York silver vault held more than 9 million metric tons of physical silver.[18]

61.     The Bank of Nova Scotia was a COMEX Clearing Member during at least part of the Class Period.

62.     The Bank of Nova Scotia reported to the CFTC that its New York-based traders held COMEX futures and options positions during at least part of the Class Period.[19]

63.     The Bank of Nova Scotia filed its U.S. Resolution Plan on December 20, 2013 to the U.S. Federal Reserve Board, the Federal Deposit Insurance Corporation and the Financial Stability Oversight Counsel.  The Bank of Nova Scotia reported that its Global Banking and Markets division offers a wide range of products in the U.S., including capital markets products and services, such as precious and base metals through ScotiaMocatta.

64.     The Bank of Nova Scotia is a registered Swaps Dealer with the National Futures Association and regulated by the CFTC.

65.     The Bank of Nova Scotia participates in a number of payment, clearing and settlement systems in the United States, including the Federal Reserve Wire Network, the Clearing House Interbank Payments System, the National Securities Clearing Corporation, the Fixed Income Clearing Corporation, the Depository Trust & Clearing Corporation, the Chicago Mercantile Exchange and the Bank of New York Mellon.  The Bank of Nova Scotia conducts a material number or value amount transaction on the Chicago Mercantile Exchange and with the Bank of New York Mellon.

---

[18] http://www.cmegroup.com/delivery_reports/Silver_stocks.xls

[19] ScotiaMocatta Commitments of Traders (CFTC), available at
http://www.scotiamocatta.com/scpt/scotiamocatta/prec/pmcftc_weekly.pdf.

66.     Defendant Scotia Capital (USA) Inc. is a New York corporation and registered broker and dealer in securities with the U.S. Securities and Exchange Commission, and member of the Financial Industry Regulatory Authority and New York Stock Exchange, with its principal place of business located at 1 Liberty Plaza, New York, NY 10006.  Scotia Capital (USA) Inc. is a wholly owned subsidiary of Scotia Capital Inc., which is a wholly owned subsidiary of The Bank of Nova Scotia.

67.     Defendant Scotiabanc Inc. is a Delaware corporation with its principal place of business located at 711 Louisiana Street, Suite 1400, Houston, Texas 77002.  Scotiabanc Inc. is a wholly owned subsidiary of Defendant Scotia Holdings (US) Inc.

68.     Defendant Scotia Holdings (US) Inc. is a Delaware corporation with its principal place of business located at 600 Peachtree Street NE, Atlanta, GA 30308-2219.  Scotia Holdings (US) Inc. is a wholly owned subsidiary of BNS Investments Inc.  The sole common shareholder of BNS Investments Inc. is The Bank of Nova Scotia and the sole preferred shareholder is Scotia Ventures Limited, which is a wholly owned subsidiary of The Bank of Nova Scotia.

69.     Defendant The Bank Of Nova Scotia Trust Company Of New York is trust company regulated by the New York State Department of Financial Services and the Federal Reserve Bank of New York and a subsidiary of Scotia Holdings (US) Inc., with its principal place of business located at One Liberty Plaza, 165 Broadway, 26th Floor, New York, NY 10006.

70.     Defendants The Bank of Nova Scotia, Scotiabanc Inc., Scotia Holdings (US) Inc., Scotia Capital (USA) Inc., and The Bank of Nova Scotia Trust Company of New York are collectively referred to herein as "Bank of Nova Scotia."

17

71.     The Bank of Nova Scotia was a member of London Silver Fixing Ltd. during the entire Class Period until August 14, 2014 and the unlawful combination and conspiracy alleged herein, from which, to Plaintiffs' knowledge, it has not effectively withdrawn.

### D.     UBS Defendants

72.     Defendant UBS AG ("UBS") is a corporation organized under the laws of Switzerland with its principal place of business in Zurich, Switzerland.  It has operations in over 50 countries, including in the United States.  UBS maintains branches in several U.S. states, including Connecticut, Illinois, Florida, and New York, with its U.S. headquarters in New York and Stamford, Connecticut.  UBS is registered with the Office of the Comptroller of the Currency ("OCC"), the Connecticut Department of Banking, and the CFTC as a swap dealer. UBS is licensed and supervised by the Board of Governors of the Federal Reserve System.

73.     Throughout the Class Period, UBS was the third most active market maker in the silver spot market.  According to the UBS FINMA Report, during the Class Period, UBS engaged in silver spot market trading from Stamford, Connecticut.[20]

74.     UBS AG's 2013 U.S. Resolution Plan describes the Investment Bank division of UBS AG, which contains three Core Business Lines.  The Investment Bank is the largest division by owned assets, accounting for 53% of the consolidated total for UBS AG.  One of the three Core Business Lines is the "Investor Client Services Foreign Exchange" ("ICS FX") which is described as follows:  "ICS FX provides a full range of G10 and emerging markets currency and precious metals services globally.  Through ICS FX, UBS is a market-maker in the professional spot, forwards and options markets.  ICS FX also provides clients trading, investing and hedging across the spectrum of gold, silver, platinum and palladium related offerings."  The 2013 UBS U.S. Resolution Plans also describes main products and underlyings that the UBS

---

[20] *See* UBS FINMA Report at 12 (locating precious metals trading in Stamford, Zurich, and Singapore)

Group uses as "an established precious metals ability in both flow and non-vanilla OTC products incorporating both physical and non-physical trading… The vanilla OTCs are in forwards, swaps and options. The non-vanilla OTC business relates to cash-settled forwards similar in nature to nondeliverable forwards, meaning there is no physical delivery of the underlying."

75.     UBS AG was required to designate its "Material Entities" in its Resolution Plan, which are significant to the activities of a "critical operation or core business line" affecting the United States.  The regulations define "Critical Operations" and those operations of the covered company the failure or discontinuance of which "would pose a threat to the financial stability of the United States."  UBS AG designated the following Material Entities in the U.S.:  UBS AG New York WM Branch; UBS AG London Branch; UBS AG Stamford Branch; UBS Bank USA; UBS Financial Services Inc.; UBS Global Asset Management (Americas) Inc.; UBS O'Connor LLC; UBS Realty Investors LLC; UBS Securities LLC; and UBS Services LLC.

76.     UBS AG was a Non-Clearing Member Firm in both the NYMEX and COMEX during at least part of the Class Period.

77.     Subsidiaries UBS Securities LLC and UBS Financial Services Inc. and other U.S.-registered broker-dealer entities are subject to the regulations of the Securities Exchange Commission, the Financial Industry Regulatory Authority, the New York Stock Exchange, the Municipal Securities Rulemaking Board, the U.S. Department of the Treasury, the CFTC and other exchanges in the U.S.

78.     In December 2014, pursuant to changes in its legal structure intended to respond to evolving industry-wide "too-big-to-fail" requirements, UBS Group AG (previously a wholly owned subsidiary of UBS AG) became the publicly-traded holding company for UBS AG and its subsidiaries.  UBS Group AG shares will be listed on the SIX Swiss Exchange and the New

York Stock Exchange.  UBS AG announced on December 17, 2014 that its shares would be delisted in January 2015.  As of December 17, 2014, over 96.68% of UBS AG stock was acquired by UBS Group AG.  As a foreign private issuer, UBS AG and UBS Group AG are required to be in compliance with corporate governance standards applicable to foreign private issuers and jointly file an Annual Report on Form 20-F with the Securities Exchange Commission and submit its quarterly Financial Reporting to the SEC under Form 6-K.

79.    On November 12, 2014, FINMA ordered UBS to pay 134 million Swiss francs (approximately $139 million) to settle the FX and precious metals probe that began in 2008. Following the settlement, FINMA reported, "[t]his conduct was partly coordinated with other banks" and "electronic communications platforms played a key role."  According to BLOOMBERG NEWS, FINMA said it found "serious misconduct" by UBS and a "clear attempt to manipulate fixes in the precious metal market," including Silver Fixing, during its investigation into precious metals and FX trading at UBS.  FINMA's investigation found that UBS was "front running" precious metals trades, *i.e.*, using its advance knowledge of large transactions that would influence prices, to generate illegitimate profits in the silver market.  FINMA Director Mark Branson said in a conference call, "The behavior patterns in precious metals were somewhat similar to the behavior patterns in foreign exchange."

80.    While not a member of the Silver Fixing, UBS is accredited to participate in the new LBMA London Silver Price and as alleged further herein, participated in the unlawful combination and conspiracy with the Fixing Members.

## A.    Jane Doe Defendants

81.    Jane Doe Defendants Nos. 1-100 are other entities or persons, including banks, interdealer brokers, cash brokers and other co-conspirators whose identities are currently

unknown to Plaintiffs.  The Jane Doe Defendants participated in, furthered, and/or combined, conspired, aided and abetted, or agreed with others to perform the unlawful acts alleged herein.

### B.    Agents and Co-conspirators

82.    Other entities and individuals unknown to Plaintiffs at this time participated as co-conspirators and performed acts in furtherance of the conspiracy.  Whenever reference is made to any act, deed, or transaction of any corporation or partnership, the allegation means that the corporation or partnership engaged in the act, deed or transaction by or through its officers, directors, agents, employees, representatives, parent, predecessors or successors-in-interest while they were actually engaged in the management, direction, control or transaction of business or affairs of the corporation or partnership.

### JURISDICTION, VENUE, AND COMMERCE

83.    This action arises under Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, respectively.  Silver is a "commodity" and is the "commodity underlying" silver financial instruments, including COMEX silver futures contracts, as those terms are defined within the Commodity Exchange Act.

84.    This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

85.    The Court may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' claims under the laws of the several states.

86.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c) and (d), because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

21

87.     Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States, including in this District.

88.     During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires and the U.S. mail, to effectuate their illegal scheme.

89.     Defendants' manipulation, conspiracy and conduct alleged herein was in U.S. import commerce and/or had direct, substantial and reasonably foreseeable effects on U.S. domestic commerce, and such effects give rise to Plaintiffs' claims, within the meaning of the Foreign Trade Antitrust Improvements Act.

90.     Silver and silver financial instruments, like COMEX silver futures and options contracts, are commodities that trade in interstate commerce.  Defendants' restraint of trade and intentional manipulation of silver and silver financial instrument prices had direct, substantial and foreseeable effects in the United States and on Plaintiffs and members of the Class.  Billions of dollars of silver and silver financial instruments were traded in the United States during the Class Period.  Defendants, as Fixing Members and sophisticated market participants, knew the results of the Silver Fix are (and were during the Class Period) disseminated in the United States, and are (and were during the Class Period) used to price silver and silver financial instruments, including COMEX silver futures and options contracts.  For these reasons, Defendants knew that manipulating the Silver Fix, would, and did, have direct, substantial and reasonably foreseeable effects in the United States, including on the prices of silver financial instruments such as COMEX silver futures and options contracts.

91.     Defendants' conduct had a substantial effect on the intrastate commerce of each of the fifty United States and its territories.

92.     This Court has personal jurisdiction over each Defendant, because each Defendant transacted business, maintained substantial contacts, is located and/or they or their co-conspirators committed overt acts in furtherance of their illegal conspiracy, in the United States, including in this District.  The scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

93.     The Court has quasi in-rem jurisdiction over at least certain of the Defendants by virtue of their substantial physical assets located in New York, including caches of COMEX-registered silver bullion held in vaults in New York by at least HSBC and Bank of Nova Scotia.

**SUBSTANTIVE ALLEGATIONS**

**I.    THE FIXING MEMBER DEFENDANTS, BY DOMINATING THE SILVER FIX, CONTROLLED THE PRICE OF SILVER**

94.     Prior to and during the Class Period, silver prices were set each business day by the concerted action of the Fixing Members, through an "old-fashioned and opaque,"[21] process called the Silver Fix.

95.     The Silver Fix "was born in the late 19th century when a handful of London bullion dealers agreed to meet daily under a cloud of cigar smoke to set the price for the 'devil's metal.'"[22]   The original members of the 1897 Silver Fix were:  (i) Mocatta & Goldsmid; (ii) Sharps & Wilkins; (iii) Pixley & Abell; and (iv) Samuel Montagu & Co.

---

[21] *London's silver price fix dies after nearly 120 years*, THE FINANCIAL TIMES (May 14, 2014), http://www.ft.com/intl/cms/s/0/db3188b8-db46-11e3-94ad-00144feabdc0.html?siteedition=intl#axzz38yxp1nAQ.

[22] *London's silver price fix dies after nearly 120 years*, THE FINANCIAL TIMES (May 14, 2014), http://www.ft.com/intl/cms/s/0/db3188b8-db46-11e3-94ad-00144feabdc0.html?siteedition=intl#axzz38yxp1nAQ.

96.     Until August 14, 2014, this "venerable City of London institution"[23] was orchestrated by the London Silver Market Fixing, Ltd.  Each business day the three Fixing Members—Defendants Deutsche Bank, HSBC, and Bank of Nova Scotia—met on a secure conference call at 12:00 P.M. London time to fix the price of physical silver.  The Silver Fix, which typically took less than 10 minutes, was conducted as a "Walrasian" or simultaneous auction led by one of the Fixing Members who was designated as the "Chairman."  The Chairman position rotated among the Silver Fix panel members each year.  No other silver market participants were allowed to run or participate in the daily auction.

97.     The Silver Fix ostensibly started with the Chairman's determination of the U.S. Dollar "spot price" of silver, *i.e.*, the cash price of silver for immediate delivery.  This became the opening price for the auction.  Each Fixing Member then examined its order book, which contained orders from clients' brokerage accounts along with proprietary orders from that Fixing Member's own precious metals trading desk.  Based on these orders, each Fixing Member declared how many bars of silver (around 1,000 troy ounces each) it was willing to buy or sell at the opening price in 50-bar increments.

98.     After each participant placed its orders, the transactions were netted against each other.  If the amount of buying interest was equal to the amount of selling interest the Silver Fix was complete.  Otherwise, the Chairman would adjust the price upward or downward and the process would be repeated until the total amount of silver bought was within 300 bars of the total amount sold.  For example, if at the opening price the Fixing Members expressed interest in buying a total of 1000 bars of silver but only 300 bars were offered for sale, the Chairman would

---

[23] *What's The London Silver Fix, And Why's It Going Away?* THE WALL STREET JOURNAL (May 14, 2014), http://blogs.wsj.com/moneybeat/2014/05/14/whats-the-london-silver-fix-and-whys-it-going-away/.

progressively raise the price, inducing the sellers to offer more silver, until the difference between the buyers' and sellers' offers totaled 300 bars or less.

99.     If for some reason this 300-bar threshold could not be reached, the Chairman could unilaterally fix the price of silver and the Fixing Members would divide the excess supply or demand pro-rata among themselves.  For example, if there was one buyer and two sellers and the buyer was willing to purchase 300 bars more than what was being offered, the buyer would reduce its buying interest by 100 bars and each of the sellers would increase its selling interest by 100 bars, collectively absorbing the 300 bar difference.  Once this "price-setting ritual"[24] was completed, the final Fix price was published to the market.

100.     This is what was supposed to happen.  No one knows what actually happened inside the Silver Fix.  Throughout the Class Period, the Fixing Members maintained complete control over the Silver Fix and the resulting Fix price.  The Fixing Members have never allowed anyone to view the Silver Fix, audit its results, or observe the daily auction.  No other market participants were allowed to contribute to Silver Fix.  No one, except for the Fixing Members and their co-conspirators, could influence the Fix price.

101.     This dominant position of control over the Silver Fix and the Fix price gave the Fixing Members control over the price of silver throughout the Class Period.  The Fix price is "globally regarded as the international benchmark" for silver and "globally accepted as the basis for pricing a variety of transactions, including many financial instruments."[25]   The global

---

[24] *Century old London silver fixing firm closes shop*, RESOURCE INVESTOR (May 14, 2014), http://www.resourceinvestor.com/2014/05/14/century-old-london-silver-fixing-firm-closes-shop?ref=hp.

[25] *See London is Home to the International Benchmark Prices for Gold and Silver*, LBMA, https://web.archive.org/web/20140619063614/http://www.lbma.org.uk/pricing-and-statistics (last visited June 19, 2014).

acceptance and use of the Fix price is possible because silver, the forty-seventh element on the periodic table, has the exact same elemental properties regardless of where it is located; an ounce of silver in a COMEX depository located in New York contains the exact same metal as an ounce of silver held in a London vault.  Thus, by controlling the Fix price, the Fixing Members controlled the *global* price of silver, not just the price of silver traded in the London market, *i.e.*, the price of London "Good Delivery" silver bars.[26]

## II.   THE FIX PRICE DIRECTLY IMPACTS THE VALUE OF MULTIPLE SILVER INVESTMENTS

102.    Consistent with its global benchmark status, The Fix price was used to price, benchmark, and/or settle billions of dollars in physical silver and silver financial instruments each day during the Class Period.  As a "global benchmark that is used by everyone from jewelers to miners to price their deals,"[27] the Silver Fix and resulting Fix price "plays a crucial role in the roughly $30 billion a year global trade in silver.  It affects the price of jewelry, helps determine the value of numerous silver investments, and impacts the earnings of mining companies that sell raw material to metals refiners."[28]  Central banks also use the Fix price as a benchmark for buying and selling silver for their reserves.

---

[26] London "Good Delivery" silver bars are produced in a format, e.g., size, shape, and weight that meet London Bullion Market Association guidelines.  The silver contained in these bars is exactly the same as the silver used in other bars worldwide.

[27] *Curtain to fall on London's historic silver benchmark*, MARKETWATCH (May 14, 2014), http://www.marketwatch.com/story/curtain-to-fall-on-londons-historic-silver-benchmark-2014-05-14.

[28] *Curtain to Fall on London's Historic Silver Benchmark*, THE WALL STREET JOURNAL (May 14, 2014), http://online.wsj.com/articles/SB10001424052702304908304579561202115402582.

A.      **Physical Silver**

103.    Physical silver is traded "over-the-counter" ("OTC") between private parties. Because there is no centralized OTC market, the price of silver in these transactions is determined by reference to the Fix price, which the Fixing Members set through the Silver Fix throughout the Class Period.

104.    Physical silver is traded in many different forms.  Outside of the Silver Fix, which is itself an auction for 1000-ounce silver bars, investors buy and sell silver bars, coins, and "rounds," coin-sized pieces of silver with no face value, of various sizes.  Because physical silver is traded in various amounts, the silver market is accessible to large bullion banks, like the Defendants, and also to smaller investors, including Class members.  Regardless of the format, physical silver bars, coins, rounds, and other products are always priced based on the Fix price, which determines the price per ounce of silver.[29]

105.    Physical silver may be held directly by an investor and stored, for example, in a safe deposit box, or kept with a bullion bank, like Defendants Deutsche Bank, HSBC, Bank of Nova Scotia or UBS, who acts as a custodian for the account holder.  Silver stored with a bullion bank is kept in either an "allocated" or "unallocated" account.  An allocated account gives the account holder an entitlement to a specific, designated silver stock, which is segregated, and for which the account holder is provided a list of bar numbers, weights and quality of each bar.  An unallocated account gives the account holder a general entitlement to silver from the bank's stock but specific bars or coins are not set aside or assigned to the account holder.  In both cases, because the bank holds the silver, ownership is typically represented by certificates, such as

---

[29] For example, the prices of silver bars and coins traded on the American Precious Metals Exchange are equal to the spot price of silver plus a premium, which can represent the cost of production as well as the collectable value of some rare coins.  *See First Time Buyers FAQs*, APMEX, http://www.apmex.com/first-time-buyer.

silver certificates sold by Bank of Nova Scotia, which "may look and feel like paper, but they're every bit as valuable as the precious metals they represent," and convertible to silver bullion.[30]

### B.      Silver Financial Instruments

106.     The Silver Fix and resulting Fix price also directly impact the prices of numerous exchange-traded financial instruments, such as silver futures and options contracts, as well as OTC transactions, such as silver swaps and silver forward agreements.  In each case, the Silver Fix impacts the value of these financial instruments by determining the price per ounce of physical silver, which is the "commodity underlying" exchange traded silver futures and options contracts, and the actual metal being exchanged in OTC transactions.

107.     For instance, silver futures and options contracts are traded on the COMEX, short for Commodity Exchange, Inc., which is a division of the New York Mercantile Exchange. COMEX is a Designated Contract Market pursuant to Section 5 of the CEA, 7 U.S.C. § 7. COMEX specifies the terms of trading for silver futures and options contracts, including the trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuations and margin requirements.  Silver futures and options contracts also traded on the NYSE LIFFE exchange[31] and on the CBOT[32] during the Class Period.

---

[30] Bank of Nova Scotia website, at http://www.scotiamocatta.com/products/certificates.htm.

[31] NYSE LIFFE exchange silver futures and options are now traded within the United States on the Intercontinental Exchange ("ICE").  See https://www.theice.com/products/Futures-Options/Foreign-Exchange#/products/31500923/Mini-Silver-Future; ICE website, at https://www.theice.com/products/Futures-Options/Foreign-Exchange#/products/31500927/Options-on-1000oz-Mini-Silver-Future.

[32] *An Introduction to Trading CBOT Electronic Gold and Silver*, CHICAGO BOARD OF TRADE, http://insigniafutures.com/Docs/CBOT_preciousMetals.pdf.

108.    The commodity underlying each silver futures contract is physical silver.  For example, a COMEX silver futures contract is "priced based on," *i.e.*, it derives its value from, an underlying 5,000 ounces of physical silver.  If the price of silver changes, so does the value of the COMEX silver futures contract.  The futures contracts traded on the NYSE LIFFE exchange and CBOT are different only in that they are priced based on a different underlying amount of physical silver, 1000 ounces and 2500 ounces respectively.

109.    The pricing relationship between a silver futures contract and the underlying physical silver is a product of how futures contracts are structured.  Each futures contract represents a bilateral agreement between two parties, a buyer and a seller of silver, who are commonly referred to as a "long" and a "short."  As a silver futures contract nears "expiration," *i.e.*, the last trading day, the long and short halves of each contract become obligations to exchange physical silver.  The longs (as the buyers) are obligated to pay for and take delivery of physical silver, while the shorts (as sellers) are required to deliver physical silver to the buyers. Because each silver futures contract represents an obligation to exchange physical silver in the future, the value of these contracts is directly tied to the price of physical silver.

110.    This process of exchanging silver between buyer and seller is called "settlement." All futures contracts are settled following their expiration, however, in most cases this does not result in an exchange of the physical commodity.  Market participants have the option to offset or "financially settle" their futures positions.  In financial settlement, instead of taking or making delivery of the physical silver, investors in either the long or short position can offset their obligations with contracts for an equal but opposite position.  For example, the buyer of a silver futures contract, who is long, can settle his obligation to take delivery of physical silver by selling futures contracts to initiate an equal but opposite short position.

29

111.   The difference between the two contract prices, meaning the difference between the price at which the initial contract was purchased and the price at which the later offsetting contract was sold, is the profit or loss on that transaction.  Investors with long positions, as buyers of the underlying commodity, generally benefit as the price of the commodity rises since they are able to sell an offsetting short contract at a higher price.  Those with short positions, as sellers of the underlying commodity, generally benefit as the price of the commodity decreases because they are able to buy an offsetting long contract at a lower price.

112.   Similarly, there are two types of options on exchange traded silver futures contracts, commonly known as "calls" and "puts."  A call option gives the holder the right, but not the obligation, to buy a silver futures contract at a specified price, known as the "strike price," prior to some date in the future, at which point the option to purchase that contract "expires."  Conversely, a put option gives the holder the right, but not the obligation, to sell a silver futures contract at the strike price prior to the expiration date.  Because the silver futures contracts underlying options are priced based on a certain amount of physical silver, the prices of option on those futures contracts are also directly impacted by the Fix price.

113.   Figure 1 (below) displays the daily closing price of COMEX silver futures contracts and the results of the Silver Fixing from January 2004 through December 2013. Consistent with the direct pricing relationship described above, over this 10 year period, the price of COMEX silver futures contracts, represented by the dotted line, tracks the results of the daily Silver Fix.  This demonstrates that the prices of COMEX silver futures contracts are directly impacted by changes in the Fix price, which determines the value of the physical silver underlying each COMEX silver futures contract.



**FIGURE 1**

114.    Plaintiffs confirmed the relationship between COMEX silver futures contracts and the Silver Fixing shown in Figure 1 by using a regression analysis.  A regression analysis is a statistical tool that is used to evaluate the relationship between two variables.  Comparing the daily closing prices of front month COMEX silver futures, *i.e.*, the contract closest to expiration, to the results of that day's Silver Fix, showed a statistically significant relationship between the price of COMEX silver futures contracts and the Fix price.  The regression analysis indicates that 99.85% of the variation in the price of COMEX silver futures contracts between January 1, 2004 and December 31, 2013 is explained by the results of the Silver Fix.  This is consistent with the expected relationship between the prices of COMEX silver futures contracts and the price per ounce of the underlying physical silver.

31

115.     The Silver Fix and the Fix price also impacted the value of silver financial instruments traded in OTC markets during the Class Period, including silver swaps and silver forward agreements.

116.     A silver swap is a cash-settled agreement in which two parties agree to a series of cash flows based on an agreed notional quantity of a silver.  One party typically pays a fixed price for the amount of silver listed in the contract while the other pays a variable "floating price," *i.e.* one subject to change over time, equal to the daily Fix price.

117.     A silver forward agreement is like a silver futures contract in that it represents a bilateral agreement to buy or sell a certain amount of physical silver on some future date.  The only difference between a silver forward agreement and a silver futures contract is that a silver forward agreement is not traded on a public exchange.

118.     Defendants, as some of the largest silver market participants, understood the direct impact of the Silver Fix on the prices of silver and silver financial instruments.  To capitalize on this relationship, Defendants executed a comprehensive strategy that involved (a) using their dominant position of control over the Silver Fix to cause a dysfunction in silver pricing; (b) improperly sharing private information, which they used to place trades in the silver market, exploiting the pricing dysfunction created by the Silver Fix; and (c) maintaining a fixed bid-ask spread in the silver market.

III.    **ECONOMETRIC ANALYSIS DEMONSTRATES THAT THE SILVER FIX CAUSES ARTIFICIAL SILVER PRICES**

119.    Implementing the first part of their manipulative strategy, Defendants caused silver prices and the prices of silver financial instruments to be artificial throughout the Class Period by manipulating the Fix price.  The result of this manipulative conduct is an observable dysfunction in the competitive pricing dynamics of the silver market occurring around the time of Silver Fix.  Plaintiffs uncovered this dysfunction in market behavior using well established econometric techniques, including some of the same methodology that was used to discover the LIBOR manipulation[33] and the breakdown of competitive market forces in conjunction with other precious metals benchmarks.[34]

   A.    **The Silver Fix Marks a Statistically Significant Change in Pricing Dynamics**

120.    The first indication that competitive market forces break down around the start of the Silver Fix is the consistent and abnormally large drop in silver prices that begins before the start of the Fixing Members' daily conference call.

---

[33]*See*, *e.g.*, R. Abrantes-Metz, M. Kraten, A. Metz, & G. Seow, *LIBOR Manipulation?* JOURNAL OF BANKING & FINANCE 36 (2012), 136-150 (available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1201389).

[34] *See*, *e.g., Fixing a Leaky Fixing:  Short-Term Market Reactions to the London PM Gold Price Fixing*, Journal of Futures Markets 34 (2014); *see also Silver Linings*, *supra* note 2.



**FIGURE 2**

121.    Figure 2 displays the cumulative unadjusted returns of COMEX silver futures contracts between January 1, 2007 and December 31, 2013.  Cumulative unadjusted returns, which measure the change in value of a long position, represent the price level of COMEX silver futures contracts throughout the day.  Thus a decrease in cumulative unadjusted returns indicates a decrease in the prices of COMEX silver futures contracts.  Figure 2 shows that COMEX silver futures cumulative unadjusted returns begin to decrease just before the start of the Silver Fix.  This 10 basis point drop in COMEX silver futures prices, which is by far the largest of the day, causes silver prices to reach their nadir just after the Silver Fix starts, in many cases before the Fix price is released to the market.



**FIGURE 3**

122.    The drop in COMEX silver futures prices observed during the Silver Fix is not just the largest price drop of the day, it is also highly statistically significant and represents a distinct break from other market activity.  In order to compare the pricing dynamics around the Silver Fix to those observed during the rest of the day, Figure 3 measures the statistical significance of the unadjusted returns in the COMEX silver futures market, between January 1, 2007 and December 31, 2013.  Figure 3 demonstrates that the drop in price around the Silver Fix has several unique features that stand out from other parts of the day.

123.    First, the Silver Fix causes a break in market activity observed before the Silver Fix, visible in Figure 3 as a gap in an otherwise unbroken pattern of returns; nowhere else throughout the trading day is a similar break in the chart observed.  Figure 3 shows that prior to the start of the Silver Fix, pricing dynamics are relatively consistent.  The unadjusted returns occupy a 4 basis point wide band, consistently varying between +2 basis points and -2 basis

points for each five minute interval.   This pattern persists through both the A.M. Platinum/Palladium and Gold Fixings, which, although they are associated with a price decrease in Figure 2, do not cause a statistically significant break from prior the returns displayed in Figure 3.   However, in the 10 minutes leading up to the start of the Silver Fix, the unadjusted returns breakout from their observed range, with multiple 5 minute intervals showing negative returns.   The Silver Fix is the *only* part of the day where there is such a concentration of negative returns.

124.   Second, price drops around the time of the Silver Fix are all highly statistically significant, indicating that those drops are not attributable to general market noise.   Only during the Silver Fix is there a series of price drops well outside the 99.9% confidence interval.   This is unique and distinguishes the Silver Fix from other times of the day.



**FIGURE 4**

125.    The same break from pricing behavior is also visible in the spot market for physical silver.  Figure 4 examines the pricing dynamics in the silver spot market by comparing the magnitude of the change in silver prices across every minute of the day between 7:00 A.M. and 10:00 P.M. London time during 2008.  Examples for additional years displaying similar activity are attached to this complaint as Appendix A.  The change in price at each minute is calculated by comparing the current price of silver to the price 10 minutes before (the "lagged price change"), 10 minutes after (the "lead price change") and the average of the price at those two times (the "centered price change").  The result is a series of spikes representing the intensity of the change in silver prices over time.  If the price at a given minute is very different

from the price 10 minutes before or 10 minutes after, the difference is represented by a large spike, while smaller price changes will create smaller spikes.

126.    Figure 4 shows a large price spike around 12:00 P.M. London time, coincident with the start of the Silver Fix.  This large price change is a distinct break from silver market dynamics observed both before and after the Silver Fix.  In fact, nowhere else in Figure 4 is there a change in silver prices of similar magnitude.  The intensity of the price changes occurring during the Silver Fix is so large that it even dwarfs those that occur when the COMEX trading floor opens in New York at 1:30 P.M. London time.  This dramatic spike in intensity before the broader market opens is statically significant and not the result of general market noise.

127.    Large price spikes, specifically around the start of the Silver Fix when the Fixing Members have their daily, scheduled, unsupervised meeting, are highly suggestive of manipulation.  Large price spikes are only created when the price of silver in a given minute is significantly different from the lagging and leading prices.  For example, the large spike in Figure 4 indicates that the prices during the Silver Fix were significantly different from those 10 minutes before and 10 minutes after the Silver Fix, producing a high intensity price change.  That this kind of price change consistently occurs at a time when the Fixing Members are on the phone discussing the where to set the Fix price is highly indicative of manipulative conduct during the Silver Fix.

**B.    Silver Prices Drop During the Silver Fix at an Abnormally High Frequency**

128.    Absent manipulation, there is no legitimate reason that high intensity price changes, or statistically significant negative returns should only occur during the Silver Fix.  Supply and demand laws (and logic) dictate that if silver legitimately went "on sale" every day at the time of the Silver Fix, buyers should flock to purchase silver at the lower Fix price, buoying silver prices by increasing demand and reducing the intensity of any price change.

38



**FIGURE 5**

129.    Yet the Silver Fix overwhelmingly generated negative returns, representing a decrease in silver prices, during the Class Period.  Figure 5 displays the proportion of days with negative returns in red relative to the proportion of days with positive returns, indicating an increase in silver prices, in green.  Figure 5 shows that during *every year* there are more days where the price of silver decreases during the Silver Fix than there are days where the price of silver increases.  Often times, the number of "Down Days," with negative returns during the Silver Fix, substantially outnumber the "Up Days," with positive returns during the Silver Fix, by a ratio of 2 to 1.



**FIGURE 6**

130.   This abnormally high ratio of days with negative returns is driven in part by the results of the Silver Fix.  Figure 6 displays the behavior of spot market silver prices by analyzing how often in a given year the price of silver at noon London time was greater than or less than the Fix price released a few minutes later.  Figure 6 shows that in every year except for 2010, the percentage of days where the Fix price is lower than the price of silver at the start of the call is significantly larger, at times reaching 60%, 70% or 80% of the days during the year, than the number of days where the Fix price ends up higher.  This indicates manipulation of the Fix price because in a market without manipulation, the Fix price should be evenly distributed, with roughly 50% of fixings higher and 50% lower than the price of silver at the start of the Silver Fix.

40



**FIGURE 7**

131.    In addition to the skewed distribution of Fix prices, physical silver prices decrease during the Silver Fix regardless of what they are at noon London time.  Figure 7 shows the normalized average spot market price of silver during 2008 for two different groups of days. The first group, represented by the red line, depicts the average price per minute across the year for days where physical silver prices at the start of the Silver Fix are greater than the Fix price. The second group, represented by the blue line, shows the average price per minute across the year for days where physical silver prices at the start of the Silver Fix are less than or equal to the Fix price.  Additional charts covering other years are attached to this complaint as Appendix B.

132.    Figure 7 shows a large drop in physical silver prices for days in both groups beginning before the start of the Silver Fix.  This indicates manipulation during the Silver Fix because it violates supply and demand mechanics.  For example, on days where physical silver prices are *less than* the Fix price at 12 P.M. London time, prices should increase.  That prices decrease indicates a dysfunction in pricing dynamics during the Silver Fix.

41



**FIGURE 8**

133.    Figure 8 separates out the "red group" from Figure 7, displaying the normalized average spot market silver price for days during 2008 when the spot market price of silver was greater than the Fix price at noon London time.  Additional examples covering other years are also included in Appendix B.  Significantly, the drop in silver prices seen in Figure 8 begins before the Silver Fix starts.  These drops occur during nearly every year of the Class Period for days in the red group, with the intensity of the drops increasing dramatically after 2004.

**C.    The Decrease in Silver Prices During the Silver Fix Is Abnormally Large**

134.    The sheer size of the drop in silver prices observed during the Silver Fix is evinces Defendants' manipulation.  As with the abnormally high frequency of negative returns, there is no legitimate reason why the size of the drops in silver prices observed during the Silver Fix should be any larger than observed price increases.  Absent manipulation, selling that occurs during the Silver Fix and drives prices lower should be met with an increase in demand as more buyers show up to purchase silver at discount prices.  Thus, the size of price increases and decreases around the Silver Fix should be about the same.

42



**FIGURE 9**

135.    But just like the frequency of Down Days, where silver prices dropped during the Silver Fix, outnumbered Up Days where prices increased, throughout the Class Period, so did the size of those price decreases relative to price increases.  Figure 9 displays the average dollar increase and decrease in spot market silver prices following the Silver Fix between 2001 and 2014.  Figure 9 demonstrates that in absolute dollar terms, the size of price decreases are on average significantly larger than the size of price increases that occur during the Silver Fix.



**FIGURE 10**

136.    To make the comparison easier, Figure 10 demonstrates the difference in size between the price increases and price decreases displayed in Figure 9 above.  Here the distinction is clear.  On average, the size of price decreases around the Silver Fixing have been 1.5 times larger than corresponding price increases.  In some years, like 2001 and 2002, the price decreases during the Silver Fix are 2.5 times larger than price increases.



**FIGURE 11**

137.    Figure 11 further highlights the asymmetry between price increases and decreases around the Silver Fixing by showing that not only is the absolute dollar change or size of price decreases around the Silver Fix larger, as indicated in Figures 9 and 10 above, but so is the relative price change in term of percentage.   Figure 11 demonstrates that the red bars, which show the percent decrease in silver prices, are significantly larger during most years than the blue bars, which represent the percentage price increase.



**FIGURE 12**

138.    These large price drops during the Silver Fix are significantly different from the pricing dynamics observed during the rest of the day.   Figure 12 underscores just how dysfunctional pricing dynamics are during the Silver Fix in relation to those in the broader public silver markets by comparing the average "daily returns," *i.e.*, the change in value of a long position in the spot market across the whole trading day, to the returns for spot market silver during the Silver Fix.   Figure 12 shows that during every year except for 2008, the average returns during the Silver Fix were negative, representing a decrease in price, while the average daily returns across the whole trading day were positive, demonstrating an increase in price. This contrast shows how the Silver Fix causes a breakdown in competitive market forces and indicates manipulative conduct by the Defendants.



**FIGURE 13**

139.    The difference in returns generated during the Silver Fix compared to the rest of the trading day is also remarkable because it ignores all broader market trends, further signifying a dysfunction in competitive pricing dynamics and manipulation by the Defendants.  Figure 13 displays the spot market price of silver in U.S. dollars per ounce between January 1, 2000 and November 10, 2014, and shows the overall increase the price of silver that occurred during the Class Period.  For example, on January 1, 2005, silver begins a historic bull run, increasing in price from $6.78 per ounce to $48.44 per ounce on April 28, 2011.  During this period, when the price of silver is continuously increasing, the Silver Fix consistently causes a large decrease in silver prices during the daily conference call.  This stark contrast is indicative of manipulative conduct as the price behavior during the Silver Fix is the complete opposite of that observed in the general market.

### D.   Prices Drop on an Abnormal Spike in Trade Volume and Price Volatility, Indicative of Trading by the Fixing Members and Co-Conspirators

140.   In addition to its high frequency, large size, and ability to defy broader market trends, the decrease in silver prices observed around the Silver Fix occurs coincident with a spike in both trading volume and price volatility.   These spikes, which normally occur when new pricing information is released to the market, indicate trading by the Fixing Members and their co-conspirators based on private information from inside the Silver Fix.



**FIGURE 14**

141.   Figure 14 shows the average volume of COMEX silver futures contracts traded between 11:30 A.M. and 12:30 P.M London time from January 1, 2007 through December 31, 2013.  Figure 14 demonstrates that trading volume begins to increase just prior to the start of the Silver Fix and gaps upward at noon London time, reaching its peak at 12:02 P.M. after increasing more than threefold, from around 15 contracts per minute before the start of the Silver Fix to over 50 contracts per minute, just 2 minutes after the Silver Fix starts.

48

142.    This spike in volume is significant because it almost always occurs while the Silver Fix is still in progress.  Figure 14 indicates the percentage of Silver Fixes that have completed with a series of vertical red lines.  The average Silver Fix lasts around 4 minutes.  The spike in trading volume in Figure 14 occurs just after the first red line, while roughly 90% of the Silver Fixes are still in progress.  Thus, for almost every trading day, volume spikes while the Fixing Members are still on the phone *before* the Fix price is released to the public.

143.    This sharp increase in trading volume during the Silver Fix goes against well-established economic principles, which dictate that trading volume should increase *after* new information, like the Fix price, is released to the public and not before.  For example, if news came out of a global shortage in silver, trading volume should increase in response to this news as the market adjusts and incorporates the new information into silver prices.  Unless that information is leaked to certain market participants in advance of the public, trading volume should remain stable until *after* news of the shortage is made public.

144.    The Fix price, which is the global benchmark price of silver, should have the same effect on the market.  Trading volume should increase *after* the Fix price is released to the public as the market reacts to this new pricing information and not before.  A spike in volume *before* the Silver Fix is over, while the Fix price is still private information known only to the Fixing Members, shows the Fixing Members and their co-conspirators traded based on private information of the Fix price disclosed from inside the Silver Fix.



**FIGURE 15**

145.    Similar results are observed in the silver spot market, where price volatility unexpectedly increases during the Silver Fix.  Figure 15 displays the average relative price volatility in the silver spot market between 11:30 A.M. and 12:30 P.M. London time from January 1, 2007 through December 31, 2013.  Like the increase in trading volume that occurs in the COMEX silver futures market, price volatility in the spot market begins increasing prior to the start of the Silver Fix and peaks just 2 minutes later at 12:02 P.M. London time, after increasing by close to 40%, while almost 90% of Silver Fixes are still in progress.

146.    The spike in volatility shown in Figure 15 also defies well-established economic principles, which dictate that price volatility should increase in response to new information being released to the market and not before.  Increasing volatility before the Fix price is released indicates trading by the Fixing Members and their co-conspirators based on private information from inside the Silver Fix.  Manipulative trading before the release of the Fix price, did in fact occur in the spot market during the Class Period and is demonstrated in Part III.E. below.

50



**FIGURE 16**

147.    To verify that the spikes in volume and volatility displayed in Figures 14 and 15 above are being caused by Fixing Members and their co-conspirators trading based on private information from inside the Silver Fix, Plaintiffs looked at how silver prices reacted to other information being released to the market by examining the "average rolling forecast errors," *i.e.*, how much the average price of silver in each minute differs from the price in the immediately preceding minute, on days where major economic announcements occur.  For example, Figure 16 displays the average rolling forecast errors in the silver market between January 1, 2004 and August 2014, on days where the U.S. Bureau of Labor and Statistics publishes its report on non-farm payroll ("NFP") data, a key economic announcement.  Figure 16 shows that consistent with well-established economic principles, silver prices do not react until *after* the NFP data is announced, exhibiting low rolling forecast errors prior to the new information being released to the market.

51



**FIGURE 17**

148.    In contrast to the silver market's reaction to the release NFP data, Figure 17 displays the average rolling forecast errors in silver prices during the time of Silver Fix for the same set of days examined in Figure 16 above.  Figure 17 demonstrates that the rolling forecast errors begin to increase 10 minutes prior to the start of the Silver Fix, consistent with the start of the large price drop examined in Figure 2 above.  Forecast errors peak 2 to 3 minutes after the Fixing Members meet on the phone, coincident with the spike in trading volume and price volatility displayed in Figures 14 and 15 above.  These results are drastically different from the market response to the NFP data, information which the Fixing Members do not have access to and unlike the Fix price cannot leak to their co-conspirators prior to publication.



**FIGURE 18**

149.    Further demonstrating that the spikes in volume and volatility are the product of the Fixing Members and their co-conspirators trading based on private information from inside the Silver Fix is the fact that market returns during the Silver Fix predict the direction of the Fix price with an astonishing level of accuracy.   Figure 18 contains two charts demonstrating the predictive power of trades placed in the COMEX silver futures market during the 20 minutes before (-20 to 0) and 15 minutes after (0 to 15) the start of the Silver Fix between January 1, 2007, and December 31, 2013.

150.    The top half of Figure 18 shows the percentage of ongoing Silver Fixes for which the price direction (*i.e.*, higher or lower than the price at noon London time) was correctly predicted by the market price direction (*i.e.*, increasing or decreasing) during the specified time interval.   The solid black line displays the total percentage of ongoing Silver Fixes where the price direction was correctly predicted, while the black and white vertical bars represent the

percentage of correct predictions for two different subsets of days (a) those where the returns, *i.e.*, change in price, during the Silver Fix were "small;" and (b) those where they were "large."

151.   Figure 18 shows that trades placed just after the start of the Silver Fix, but before the Fix price is released to the public, are highly predictive of the Fix price direction.   For example, once the Fixing Members start their daily, secret, unregulated conference call, trades in the minutes before the Fix price is released to the public predict the Fix price direction with 83.6% accuracy.   In contrast, trades placed during the 20 minutes prior to the start of the Silver Fix, *i.e.*, before the Fixing Members all meet on the phone, have a limited predictive value, correctly predicting the direction of the Fix price about 40% of the time.

152.   The predictive value of trades placed while the Fixing Members are on the phone increases even further when there are large returns, *i.e.*, more than 5 basis points on average, to be gained by trading in advance of the public release of the Fix price.   The white vertical bars in Figure 18 report the ability of market activity to predict the results of Silver Fixes that generate these large returns and demonstrate more than 90% accuracy for trades placed during the 2 to 7 minute intervals, and 96.9% accuracy during minute 5.   The analysis in Figure 18 only measures the ability of market returns to predict the results of *ongoing* Silver Fixes, the information driving the high predictive value of these trades placed in the minutes after the start of the Fixing Members' call must be coming from inside the Silver Fix.   That large economic incentives, indicated by large returns, show higher accuracy is indicative of informed trading and manipulation by the Defendants during the Silver Fix.



**FIGURE 19**

153.    The Silver Fix's role as a source of private information for the Defendants is also supported by where the Silver Fix takes place in the context of the trading day.  Figure 19 shows the average trading volume of COMEX silver futures contracts between January 1, 2000 and December 31, 2013.  Figure 19 demonstrates that while the Silver Fix represents a local spike in trading volume it occurs almost an hour and a half before the start of COMEX silver pit hours, where much of the COMEX silver futures volume is traded.  As a result, the increased trading volume during the Silver Fix is most plausibly explained as trading by the Fixing Members, who are already scheduled to meet at that time, and their co-conspirators, who are given access to private information from inside the Silver Fix.



**FIGURE 20**

154.    This is also true of the price volatility spike observed in the silver spot market.
Figure 20 displays the average price volatility in the spot silver market between January 1, 2000
and December 31, 2013.  Just like the spike in trading volume, the local spike in volatility during
the Silver Fix occurs almost an hour and half before the COMEX pit opens.  As a result, the
volatility spike during the Silver Fix is most plausibly explained as trading by the Fixing
Members and their co-conspirators, and not the result of broader public market forces.

56

### E.       Spot Market Activity Directly Connects the Defendants to the Dysfunction in Silver Pricing Observed During the Silver Fix

155.     The characteristic features of the dysfunction in silver pricing described above are also visible in Defendants' spot market activity, directly connecting the large drop in silver prices and increase in price volatility as silver prices decrease rapidly, to each Defendant's conduct.  To demonstrate this, Plaintiffs used Defendants' public spot market quotes during the Class Period to isolate days where the Defendants' spot market quotes corresponded to a "reversion" or change in the direction of prevailing market silver prices.  Plaintiffs chose to screen for reversion days because a sudden change in price direction is consistent with the kind of manipulative conduct identified in the UBS FINMA Report[35] as part of "clear attempts to manipulate fixes in the precious metals markets."[36]

156.     FINMA uncovered Defendant UBS implemented a comprehensive manipulative strategy involving use of confidential, proprietary, non-public information shared among co-conspirators to engage in (a) the "repeated front running. . . of silver fix orders," *i.e.*, orders placed before the start of the Silver Fix that guarantee execution at the Fix price; (b) triggering of client stop loss orders, forcing clients to sell silver to UBS at artificially lower prices; (c) improperly alerting co-conspirators of large incoming or pending trades so they could trade in advance of those orders.[37]  While each tactic caused a sharp change in the silver price trend that benefitted the Defendants, the triggering of client stop-loss orders, *i.e.*, standing orders to sell silver if the price dropped below a certain level, would necessarily be carried out by causing a sharp decrease in silver prices identical to the pricing dysfunction observed during the Silver Fix.

---

[35] *See* UBS FINMA Report, *supra* note 6 at 12.

[36] *See* Logutenkova & Larkin, *supra* note 7.

[37] *See* UBS FINMA Report, *supra* note 6 at 10, 12.



**FIGURE 21**

157.    Figure 21 identifies one of these reversion days, displaying the prices of COMEX silver futures contracts and spot market silver between 11:00 A.M. and 1:00 P.M. London time on November 25, 2009.   Additional example charts for days with similar pricing behavior are attached to this complaint as Appendix C.   Figure 21 shows that on November 25, 2009, the prices of COMEX silver futures contracts and spot market silver were *increasing* prior to 11:40 A.M. London time, then the price trend suddenly changed direction, and silver prices began decreasing into the start of and throughout the Silver Fix.



**FIGURE 22**

158.    Focusing on the individual price quotes in the spot market, Figure 22 shows the evolution of spot silver prices between 11:38 A.M. and 11:44 A.M. London time on November 25, 2009.  During this time period three banks, Defendant UBS, Defendant Deutsche, and BNP Paribas are publicly quoting silver prices in the spot market around the time of the Silver Fix.

159.    Figure 22 shows that the price of silver in the spot market was increasing until, at 11:40:13 A.M. London time, Defendant Deutsche submits a price quote that is substantially lower than the prevailing quotes in the market at that time.  Almost immediately, Defendant UBS, the blue diamond, drops its spot market quote to the same level as Deutsche.  These lower price quotes by Defendants Deutsche and UBS coincide with a change in the trend of spot silver prices, which continues throughout the Silver Fix, and is consistent *inter alia* with the stop loss trigging behavior identified in the UBS FINMA Report.

59



**FIGURE 23**

160.    Moving closer to the start of the Silver Fix, Figure 23 shows that Defendants Deutsche and UBS consistently submit price quotes that are lower than prevailing market prices. For example, beginning at 11:59:44 A.M., Deutsche Bank submits a quote substantially lower than the last quote submitted by BNP Paribas, which starts a reversion in the spot market price trend.  UBS follows suit, lowering its next price quote to $18.65, lower than Defendant Deutsche Bank, and significantly lower than the average market price.  Following Defendant Deutsche Bank's quote at 11:59:44 A.M., silver prices start trending downward into the beginning of the Silver Fix.  Throughout the Fix, Deutsche and UBS continue to place quotes on the lower end of other contemporaneous price quotes in the market leading the price of silver consistently lower.



**FIGURE 24**

161.   Plaintiffs identified more than 1900 days during the Class Period where Defendants' spot market activity caused silver market price trends to reverse direction.   For example, Figure 24 displays the spot market activity between 11:45 A.M. and 12:15 P.M. London time on December 15, 2009.   Only 2 market makers, Defendants Deutsche and UBS, indicated by the blue and green line respectively, were publicly quoting silver prices at this time. Figure 24 demonstrates that on December 15, 2009, silver prices were increasing until UBS initiates a downtrend by quoting continuously lower prices from 11:51 A.M. until around 12:01 P.M.   Deutsche follows UBS, reversing the direction of its quotes at 11:54 A.M.   Both Defendants quote lower prices together, at times below Fix price levels, in the minutes before the Fix price is released.   This string of lower price quotes drives the prices of COMEX silver futures contracts, indicated by the solid black line, and the overall price of silver lower.



**FIGURE 25**

162.    Figure 25 is another example, displaying the mid-point of spot market quotes and COMEX silver futures prices between 11:30 A.M. and 12:30 P.M. on September 20, 2005.  On September 20, 2005, there are only three banks, Defendant HSBC, Defendant UBS, and the Royal Bank of Canada ("RBC"), represented by the blue, yellow, and purple lines respectively, publicly quoting silver prices in the spot market around the start of the Silver Fix.  Noticeably, all three banks, who did not issue quotes prior to 11:44 A.M., suddenly begin quoting lower silver prices around 15 minutes before the start of the Silver Fix.  Following these price quotes, the prices of COMEX silver futures contracts change direction, starting a downtrend three minutes before the start of the Silver Fix and leveling off around 12:30 P.M. once the Defendants' lower silver price quotes stop.



**FIGURE 26**

164.    Figure 26 shows the spot market activity on another day where the Defendants caused prevailing silver market price trends to reverse direction.  Figure 26 displays the spot market activity between 11:30 A.M. and 12:30 P.M. London time on June 6, 2006.  Figure 26 shows that on June 6, 2006, only three market makers, Defendants Deutsche, HSBC and UBS, represented by the green, red, and purple lines respectively, were publicly quoting silver prices before and during Silver Fix.  Prior to the start of the Silver Fix, the prices of COMEX silver futures contracts, represented by the solid black line, were increasing.  However, once the Silver Fix starts, all three Defendants lower their spot market quotes, precipitating a reversal in this increasing price trend.

.



**FIGURE 27**

165.   The evidence of collusion and manipulation is even more compelling when the Defendants miraculously change the direction of their quotes in advance of an extremely short Silver Fix.   For example, Figure 27 displays the mid-point of all bank spot market quotes between 11:30 A.M. and 12:30 P.M. London time on November 15, 2012.   The Fix price, including the time it was released to the public, is indicated with a solid black dot.   On November 15, 2012, the Silver Fix lasted less than 1 minute, yet Defendants UBS and Bank of Nova Scotia, began lowering their quotes *4 minutes before* the Silver Fix started.   This sharp reversion indicates collusion among the Defendants and a planned manipulation of silver prices before the start of the Silver Fix.



**FIGURE 28**

166.   Figure 28 is yet another example where Defendants Bank of Nova Scotia and UBS cause a reversion in the overall silver price trend.  Figure 28 displays the spot market activity between 11:30 A.M. and 12:30 P.M. on May 30, 2013.  The price of COMEX silver futures contracts is indicated by the solid black line while the Fix price in indicated at the time it was released using a solid black dot.  On May 30, 2013, the Silver Fix took about 2 minutes to complete.  Despite this short amount of time, Defendants Bank of Nova Scotia and UBS, dramatically lower their spot market quotes beginning more than 1 minute before the start of the Silver Fix.  This causes a reversion in the COMEX futures contract price trend, which changes direction coincident with the change in Defendants spot market quotes, again indicating a planned manipulation of silver prices.



**FIGURE 29**

167.     The last two examples presented in Figures 27 and 28, correspond to another marker of collusion that did not emerge until 2012 – the shortening of the Fixing Members' daily conference call.  Figure 29 displays the cumulative distribution of the Silver Fix's duration from 2000 through 2013.  The curve on the far right represents the length of the Silver Fix prior to May 2012.  Tracing this curve shows that from January 2000 through May 2012, the Silver Fixing lasted, on average, about 4 minute.  The middle curve displays the cumulative distribution of the length of the Silver Fixing after May 2012.  Significantly, during this time period, the average length of the Silver Fix decreases dramatically to <u>less than 2 minutes</u>.  The shortening of the Silver Fix indicates it was not a legitimate auction and that Defendants colluded before the start of the Silver Fix about what the Fix price would be.

168.     The results indicated by the curve on the far left, which displays the cumulative distribution of "first updates," *i.e.*, notification about the current price of silver that are not the final Fix price, after May 2012 are even more surprising.  Though the Fixing Members are not

required to post updates about the Silver Fix while it is in progress, after May 2012, updates became frequent and occurred on average underlined(less than 30 seconds) after the Silver Fix started. Again these near-instantaneous price updates demonstrate that the Silver Fix was not operating as a legitimate price discovery mechanism and instead was producing a Fix price that was pre-determined by the Defendants.

169.    The shortening length of the Silver Fix and rapid updates are just two more factors demonstrating that silver markets were rigged during the Class Period as Defendants conspired to manipulate and fix the price of silver and silver financial instruments. Combined with the dramatic changes in price direction observed in the spot market, the anomalous spikes in price volatility and trade volume that occur while the Fixing Members are still on the phone, the consistent drop in silver prices that occurs during the Silver Fix, the ability of market returns to predict the direction of the Fix price with amazing accuracy, the statistically significant break in the behavior observed during the Silver Fix, and the evidence of collusion with third parties revealed in the UBS FINMA Report, there is an overwhelming amount of evidence that the Fixing Members and their co-conspirators conspired to manipulate and fix the prices of silver and silver financial instruments for their benefit. This conclusion is further supported by the fact that nothing else, neither macroeconomic factors nor contemporaneous silver market activity explains the dysfunction in pricing seen during the Silver Fix.

**F.      The Dysfunction in Silver Pricing Dynamics During the Silver Fix Is Not Caused by Legitimate Supply and Demand Factors**

**1.      Silver Prices During the Silver Fix Are Not Caused by Macroeconomic Activity**



**FIGURE 30**

170.     To rule out other potential explanations for the dysfunction in pricing dynamics observed during the Silver Fix, Plaintiffs compared silver price activity during the Fixing Members' daily conference call to contemporaneous activity in other markets.  For example, Figure 30 compares the normalized silver prices on May 4, 2011, to the normalized prices of gold, the U.S. Dollar index, which measures the value of the dollar against a basket of other currencies, and the MSCI Emerging Markets Index.  If the change in silver pricing dynamics observed at the time of the Silver Fix were the product of macroeconomic activity, *e.g.*, a natural disaster or housing crisis, all example indices should be impacted.  Figure 30 shows, while silver prices drop during the Silver Fix the prices the other example indices do not react in the same way.  Similar results were observed throughout the Class Period and rule out macroeconomic factors as the cause of the dysfunction in silver pricing during the Silver Fix.

## 2. The Drop in Silver Prices Follows the Start of the Silver Fix



**FIGURE 31**

171.    To rule out the possibility that the pricing dysfunction observed during the Silver Fix was caused by market activity, Plaintiffs measured the cumulative adjusted returns of COMEX silver futures contracts, splitting the results into groups based on the time difference between New York and London. As London does not follow daylight savings time, the time of the Silver Fix relative to the time in New York changes throughout the year.  Figure 31 displays the cumulative unadjusted returns on days where New York time was 4, 5, and 6 hours behind London time, in addition to those days where the COMEX silver futures market was open but there was no Silver Fix, *e.g.*, due to a British holiday.  The drop in COMEX silver prices *always* aligns with the start of Silver Fix and prices *increase* at the Fix time on days with no fixing.

### 3.       The Spike in Trading Volume Follows the Start of the Silver Fix



**FIGURE 32**

172.    Plaintiffs conducted the same analysis for COMEX silver futures volume, calculating the average number of silver futures contracts traded each minute and dividing the results into groups based on the time difference between New York and London.  Figure 32 shows the average trading volume for COMEX silver futures contracts on days where New York time is 4, 5, and 6 hours behind London, as well as the trading volume on days with no Silver Fix.  As with the drop in silver prices, the anomalous spike in trading volume follows the Silver Fix throughout the year.  Significantly, while trading volume always increases after the start of the Silver Fix, volume does not increase at the same time on days where there is no fixing, indicating that the volume spike is caused by the Defendants' trading during the Silver Fix.

**G.    The Dysfunction in Silver Pricing During the Silver Fix Had a Persistent Impact on Silver Prices Well Beyond the End of the Fixing Call**



**FIGURE 33**

173.    While the observed drop in silver prices and spikes in trading volume and price volatility always occur around the time of the Silver Fix, the impact of this pricing dysfunction lasts well beyond the end of the Fixing Members daily conference call.  Figure 33 displays the cumulative unadjusted returns in the COMEX silver futures market between January 1, 2004 and December 31, 2013, on Down Days where the price of silver decreased during the Silver Fix. Separating the Down Days from Up Days, where the price of silver increased during the Silver Fix, removes the "cancelation effects" that result from combining both Up and Down days in Figure 2 above, and demonstrates the true impact of the abnormally large and frequent drop in silver prices that occurs during the Silver Fix.

174.    Figure 33 demonstrates that on Down Days during the Class Period, the price of silver COMEX futures contracts drops more than 15 basis points at the start of the Silver Fix,

71

substantially more than the net result of including both Up and Down Days in Figure 2. Figure 33 also shows that this large price drop has a lasting impact on the prices of COMEX silver futures contracts, extending well beyond the end of the Silver Fix. Following the solid black line, which indicates the mean cumulative unadjusted returns throughout the day, the price of silver on Down Days *does not* recover fully from the price drop that occurs at the start of the Silver Fix.



**FIGURE 34**

175.    The same is true for silver prices in the spot market. Figure 34 shows the price of spot market silver between 7:00 A.M. and 8:00 P.M. London time on Down Days between 2004 and 2013. As observed in the COMEX silver futures market, the price drop around the start of the Silver Fix is more than 15 basis points, substantially larger than the net change in price displayed in Figure 2 above. Similar to the COMEX silver futures market, the impact of this price drop is felt long after the end of the Silver Fixing, as the spot market price of silver *never recovers* to pre-Silver Fix levels.

176.    Together Figures 33 and 34 demonstrate that the Silver Fix has a persistent (and cumulative) impact on the price of silver.  As displayed in both figures, the prices of COMEX silver futures contracts and physical silver do not recover from the price drops induced by the Silver Fix on Down Days, beginning the next trading day lower.  Because there are substantially more Down Days than Up Days, and the size of price drops around the Silver Fix are substantially larger than any price increase, the result of the dysfunction in silver pricing caused by the Silver Fix is a persistent suppression of silver prices throughout the Class Period.  As a result, the Silver Fix affected the prices of silver and silver financial instruments well beyond the end of the Fixing Member's daily conference call and the release of the Fix price.

**IV.**   **DEFENDANTS USED THE DYSFUNCTION IN SILVER PRICES CREATED BY THE SILVER FIX TO GENERATE INCREASED PROFITS**

**A.**   **Informed Traders with Advance Knowledge of the Fix Price Benefit Financially by Taking Advantage of the Dysfunction in Silver Pricing**

177.   By creating a dysfunction in silver pricing through the Silver Fix, the Fixing Members and their co-conspirators created an "arbitrage condition," capable of generating risk-free returns, for anyone part of their conspiracy.  Using this manufactured pricing dysfunction to their financial benefit, "informed traders" with advance knowledge of the Fix price direction established positions in the market that would increase in value once the Fix price was released to the public.  By trading in advance of the public release of the Fix price, informed traders gained a considerable advantage over uninformed traders.

178.   To measure the size of this informational advantage, Plaintiffs calculated the "difference in returns," *i.e.*, the difference between the adjusted returns[38] available to informed traders, with directional insight into the results of the Silver Fix, and the unadjusted returns of uninformed traders with no insight into the direction of the Fix price.  The adjusted returns represent the returns on trades placed by the Fixing Members and their co-conspirators, who know the Fix price prior to its public release.

---

[38] Adjusted returns are calculated using statistical methods to estimate how knowledge of the Fix price direction would increase or decrease the unadjusted returns available to an uninformed trade.  *See Silver Linings* at 42.



**FIGURE 35**

179.     Having an informational advantage generated significant returns for informed traders in the COMEX silver futures market.  Figure 35 displays the cumulative difference in returns experienced by an informed trader with directional insight into the results of the Silver Fix and an uninformed trader with no directional insight, between 11:00 A.M. and 1:00 P.M. London time between January 1, 2007 and December 31, 2013.

180.     Figure 35 shows that there are statistically significant advantages available to informed traders on either side of the Silver Fix.  For example, an informed trader that initiates a position at 11:45 A.M., when the average returns are -10 basis points, and closes that position at 12:05 P.M., when returns are +15 basis points, captures the entire 25 basis point price move.  To understand just how large this advantage is, a 10 basis points per day return results in an annual return of 28%.  A gain of 25 basis points per day would be more than double that, allowing an informed trader to return more than 87% per year simply by using their advance information.



**FIGURE 36**

181.    The same is true in the spot silver market.  Figure 36 displays the cumulative difference in returns observed in the spot silver market between 11:00 A.M. and 1:00 P.M. London time during 2011.  Following the black line, which indicates the average difference in returns, Figure 36 shows that there are advantages on both sides of the Silver Fix available to informed traders.  At its maximum, the informed trader has a more than 40 basis point advantage over the uninformed trader; slightly more than 20 basis points on either side of the Silver Fix.  A 40 basis point return amounts to a gain 172% per year.

182.    These outsized returns provided a serious motive for collusion among the Defendants.  While an informed silver trader could generate around 25 basis points per day in the COMEX silver futures market and more than 40 basis points per day in the spot market, an uninformed trader who was long silver between 2000 and 2013, would return about +4 basis points per day.  The potential to generate 5 or even 10 times more than the public market created an irresistible incentive for Defendants to coordinate trades and share private information.



**FIGURE 37**

183.    With advance knowledge of the Fix price direction, informed traders, including the Fixing Members and their co-conspirators, consistently generated large returns during the Silver Fix throughout Class Period.  Figure 37 shows the difference in returns for informed and uninformed traders between 11:50 A.M. and 12:10 P.M. London time on a quarterly basis from Q1 2000 through Q4 2013.  Areas of positive returns are indicated with shades of green while areas of negative returns are in red.  Noticeably, since 2000, trades placed in the 2 minute window after the start of the Silver Fix show a positive return for informed traders during all but one of the 56 calendar quarters.  These consistent positive returns are *only* available immediately after the start of the Silver Fix, before the release of the Fix price, and thus were only available to the Fixing Members and their co-conspirators, who gained access to the Fix price direction before the rest of the silver market.



**FIGURE 38**

184.   Because the Fixing Members and their co-conspirators were trading based on information that was exclusively within their control, they were able to generate returns like those displayed in Figures 35 and 36 above, regardless of the actual price of silver.  Figure 38 displays the same information in Figure 37 above, the difference in returns between informed and uninformed traders in the spot silver market, but overlays the price of silver, represented by the Fix price.  Figure 38 demonstrates that regardless of what the price of silver was throughout the Class Period there were significant returns available to informed traders, like the Fixing Members and their co-conspirators, with directional insight into the results of the Silver Fix.

185.    To provide specific examples of the power of trading on advance information, Plaintiffs used proprietary software to analyze the time and sales data for COMEX silver futures contracts during the period of 11:55 A.M. - 12:05 P.M. London time (the "Target Window") for each trading day between January 1, 2007 and August 14, 2014 (the "Analysis Period"). Plaintiffs selected this ten minute window because it includes trading activity during the Silver Fix, which begins at noon London time, but prior to the publication of the Fix price to the general public, which on average was at 12:04 P.M. London time.

186.    The analysis split the Target Window into two halves, the five minute period before the start of the Silver Fix, 11:55 A.M. - 12:00 P.M. London time (the "Pre-Fixing Window"), and the five minute period after the start of the Silver Fixing, 12:00 P.M. – 12:05 PM London time (the "Post-Fixing Window").  Plaintiffs then calculated the average price trend for COMEX silver futures contracts during the Pre-Fixing Window and compared that to the average price trend during the Post-Fixing Window on days within the Analysis Period where the total trading volume during the Target Window was at least 100 contracts.

187.    Similar to the analysis of Defendants' spot market quotes, Plaintiffs screened for days where the slope of the price trend observed during the Pre-Fixing Window changed direction during the Post-Fixing Window.  Plaintiffs further narrowed the results to include only those days where the change in slope was accompanied by an increase in trading volume during the Post-Fixing Window, consistent with the spike in trading volume displayed in Figure 14 above.  Plaintiffs' analysis uncovered hundreds of days throughout the Analysis Period where market activity in the nearby most active COMEX silver futures contract around the start of the Silver Fix met this pattern, identifying a tradable advantage to the Fixing Members and their co-conspirators.



**FIGURE 39**

188.     For example, Figure 39 shows the average price and trading volume for the March 2010 COMEX silver futures contract on December 23, 2009.  Figure 39 shows that the price of COMEX silver futures begins to decrease around 5:59 A.M. CST, changing direction one minute before the start of the Silver Fix.  Once the Silver Fix starts at 6:00 A.M. CST (noon London time), trading volume increases from less than 5 contracts per minute to 30 contracts per minute between 6:01 A.M. and 6:02 A.M. CST.

189.     On December 23, 2009, the Fix price was $16.92 per troy ounce, lower than the price of COMEX silver futures contracts at the start of the Silver Fix.  As a result, this decrease in COMEX silver futures prices correctly predicted the Fix price direction, indicating manipulative trading from inside the Silver Fix.  To profit from advance knowledge of the Fix price on December 23, 2009, an informed trader would initiate a short position that would increase in value as the price of COMEX silver futures contracts decreased.



**FIGURE 40**

190.    Figure 40 is another example, showing the average price and trading volume of the March 2009 COMEX silver futures contract during the five minutes before and after the start of the Silver Fix on January 23, 2009.  Figure 40 shows that in the minute leading up to and immediately after the start of the Silver Fix, the trading volume for the March 2009 COMEX silver futures contracts increases significantly while the price of the March 2009 COMEX silver futures contract declines.

191.    The price drop identified in Figure 40 also correctly predicted the direction of the Fix price, $11.46 per troy ounce, on January 23, 2009, while the increasing volume during the Silver Fix indicates manipulative trading by the Defendants and their co-conspirators.  As with Figure 39 above, to profit by trading based on private information from within the Silver Fix on January 23, 2009, an informed trader would establish a short position in the market that would increase in value while the price of silver decreased through the Silver Fix.

81

192.    Plaintiffs also analyzed COMEX silver futures data for large spikes in trading volume occurring during the 30 minutes before the start of the Silver Fix, corresponding to the time period displayed in the difference in return charts, Figures 35 and 36 above.  Plaintiffs again screened days where the spike in volume occurring before the Fix was followed by a change in price trend of COMEX silver futures contracts, but this time limited the results to include only those days where the change in price direction correctly predicted the results of the Silver Fix. This analysis uncovered hundreds of days with the same trading pattern.

193.    Distinct from the pattern identified in Figures 39 and 40, which indicates manipulative trading by the Fixing Members and their co-conspirators during the Silver Fix, a large spike in volume and coincident change in price trend that predicts the results of the Silver Fix in the 30 minutes before it starts indicated collusion among the Defendants regarding the Fix price.  Collusion in advance of the Silver Fix allowed informed traders, like the Defendants and their co-conspirators, to take full advantage of the difference in returns displayed in Figures 35 and 36 above; proving roughly a 25 basis point per day gain in the COMEX silver futures market and up to a 40 basis point per day gain in the spot silver market.



**FIGURE 41**

194.     For example, Figure 41 shows the average price and trading volume of the December 2009 COMEX silver futures contract during the 30 minutes before and after the Silver Fix on November 18, 2009.  Around 5:34 A.M. Central Standard Time, almost 26 minutes before the start of the Silver Fix, there is a large spike in volume, roughly five times larger than the total volume traded during each of the previous 3 minutes.  Prior to this volume spike, the price of the December 2009 COMEX silver futures contract is trending upward, moving from around $18.80 per ounce of silver at 5:30 A.M. Central Standard Time to more than $18.83 per ounce by 5:34 A.M. Central Standard Time.

195.     Following the volume spike, the price of the December 2009 COMEX silver futures contract changes direction and begins trending downward.  The downtrend displayed in Figure 41 correctly predicts the November 18, 2009 Silver Fixing of $18.74 per ounce, about 10 cents per ounce lower than the price of silver when the volume spike occurs.

83



**FIGURE 42**

196.    Figure 42 shows the price and volume of the March 2013 COMEX silver futures contract during the 30 minutes before and after the Silver Fixing on February 11, 2013.  Just as displayed in Figure 41 on February 11, 2013, there is a large spike in volume, hundreds of times larger than the volume traded during the previous minute, almost 30 minutes before the start of the Silver Fix.  This volume spike is followed by a change in the price trend of the March 2013 COMEX silver futures contract, which begins to decrease in price from more than $31.30 per ounce at around 5:30 A.M. Central Standard Time, towards the Fix price of $31.16 per ounce.

197.    Figure 42 represents one of the days after May 2012 where the Silver Fix lasted just two minutes, consistent with the large spike in volume at 5:32 A.M. CST, indicating that Defendants coordinated their manipulative efforts well in advance of the start of the daily fixing call.

84

### B. The Same Informational Advantage that Increased Trading Profits Allowed Defendants to Maintain Artificial, Fixed Bid-Ask Spread in the Spot Market



**FIGURE 43**

198.    Defendants' manipulative conduct extended beyond generating increased trading profits to financially benefit their activity as "market makers," *i.e.*, dealers that both buy and sell silver, at a publicly quoted "bid" (buy) and "ask" (sell) price.  Market makers generate revenue by buying silver at a lower price than they sell it.  The difference between the price at which a market maker is willing buy and subsequently sell silver is known as the "bid-ask spread" and represents the profit to the market maker on each transaction.

199.    Figure 43 displays the activity of the top 65 silver market makers based on public spot market bid ask quotes from January 1, 2000, and December 31, 2013.  Figure 43 shows that the Defendants Bank of Nova Scotia ("BNS"), UBS, HSBC, and Deutsche Bank ("DB"), are

85

among the top 20 silver spot market participants, raking numbers 1, 3, 6, and 15 respectively.[39] As some of the most active silver market makers, Defendants stood to generate huge profits by increasing or maintaining a supracompetitive bid-ask spread, paying artificially less for silver and then reselling it at an artificially higher price.

200.    The UBS FINMA Report is instructive on this point.  FINMA found that UBS shared "flow information" about large current or incoming trades, and the contents of its order book, including the trigger prices of client stop loss orders, with unidentified co-conspirators.[40] Combined with the Fixing Members advance knowledge of the Fix price, by understanding order flow, the Defendants manipulated and fixed their bid-ask spreads in the silver market to generate increased profits.

201.    This aspect of Defendants' manipulative scheme is evidenced by the non-responsive nature of the spread between their spot market silver quotes when compared to the rest of the silver market.  As discussed earlier, information is a commodity in financial markets and new information is generally associated with changes in volume, volatility, and the bid-ask spread as market prices naturally react to incorporate newly released data.  Specifically, bid-ask spreads are typically wider when there is uncertainty about pricing and then narrow as new information provides clarity.  In the silver market, where there is an established, globally relied upon pricing benchmark, *i.e.*, the Silver Fix, bid-ask spreads should be wider prior to the Silver Fix, as there is uncertainty regarding the future results of the Fix price, and then narrow once the Fix price is released to the public.

---

[39] As Deutsche and HSBC both stopped issuing public spot market quotes during the Class Period their actual rank is likely higher because Figure 43 does not include private quotes.

[40] *See* UBS FINMA Report, *supra* note 6 at 12.



**FIGURE 44**

202.    Figure 44, for example, shows the relative intraday spread in the COMEX silver futures market between January 1, 2000 and December 31, 2013.   As expected, prior to the Silver Fix, spreads are wider, reflecting uncertainty about the price of silver.   But once the Fix price released, the spread begins to contract, narrowing more than 20% after the Fix price is released to the public.



**FIGURE 45**

204.    Similar variations are also seen in the spot silver market when the publicly available bid-ask quotes are viewed as a whole.  Figure 45 displays the relative intraday bid-ask spread of all spot market silver quotes between January 1, 2000 and December 31, 2013.  While the overall variation is smaller than seen in the COMEX silver futures market, the general pattern is still the same; the average spreads are wider prior to the Silver Fix as there is uncertainty about the price of silver and then narrow following the publication of the Fix price.



**FIGURE 46**

205.     This narrowing of the bid-ask spread in the spot market is more pronounced when the Defendants' spot market quotes are removed from the analysis.  Figure 46 shows the bid-ask spread for spot market quotes of non-Defendant banks between January 1, 2000 and December 31, 2013.  As with the general market, the non-Defendant bank quotes react to new information provided by the Silver Fix, remaining wider prior to the start of the Silver Fix and then narrowing once the Fix price is released.



**FIGURE 47**

206.    In stark contrast to the rest of the market, the Defendants *never* narrow their spread in response to the new information provided by the Silver Fix.  Figure 47 shows the bid-ask spread in the spot market for all Defendant banks between January 1, 2000 and December 31, 2013.  Unlike the spreads seen in the COMEX silver futures market, or even the broader spot market, the Defendants' bid-ask spreads do not narrow once the Fix price is released.  Instead, they get *wider*, increasing prior to the start of the Silver Fix and continuing to widen throughout the rest of the day.

207.    This artificial bid-ask is indicative of information sharing and collusion among the Defendants.  There is no legitimate reason why Defendants' bid-ask spread fails to react to new information *unless* that information is not "new" to the Defendants at the time it is released to public.  Through their advance knowledge of both order flow and pricing information, Defendants maintained an artificially wide bid-ask spread.

C.  **Defendants' Large Unhedged Trading Positions During the Class Period that Benefited from Their Manipulative Conduct.**



**FIGURE 48**

208.  Defendants were each in a position to benefit from the manipulation described above because their trading positions used to generate profit for the bank (*i.e.*, speculative positions), were substantially larger than those used to offset any financial risk (*i.e.*, hedging positions).  Plaintiffs compiled the following information from public annual reports filed by Defendants with the Securities Exchange Commission.  For example, Figure 48 shows the size of Defendant HSBC's trading and hedging positions for their foreign exchange desk, which includes precious metals trading, between 2005 and 2014.  Figure 48 shows that in all years the Defendant HSBC's trading positions were substantially larger than their hedging position.[41]

---

[41] Defendant HSBC distinguishes between trading assets and liabilities based on the fair value of the asset at that time.  A trading position is considered an asset if it has a positive value



**FIGURE 49**

209.   Defendant Bank of Nova Scotia showed a similar outsized trading position throughout the entire the Class Period.  Figure 49 shows the total trading and hedging positions for Bank of Nova Scotia's exchange traded and over-the-counter derivatives positions, including those for precious metals like silver.  Significantly, as silver began its bull run in 2005, Bank of Nova Scotia's speculative trading position increased dramatically, financially benefitting from the manipulative conduct alleged in this Complaint.

---

and a liability if it has a negative value.  *See, e.g.*, Annual Report and Accounts HSBC Holdings plc, at 128 (2006).



**FIGURE 50**

210.    Other Defendants did not break out speculative trading positions from hedging positions, instead providing a total of their precious metals trading during the Class Period.  For example, Figure 50 shows UBS' trading positions in precious metals and other commodities between 1999 and 2014.  In every year, UBS had a very large trading position in the precious metals market, equal to billions of Swiss franc.  Thus, UBS had a financial interest in the success of the Defendants' conspiracy and stood to profit from their manipulative scheme.



**FIGURE 51**

211.   Defendant Deutsche reported similar financial results.  Figure 51 displays the size of Defendant Deutsche's over the counter precious metals trading positions, including its positions in the silver market, between 2000 and 2009.  As with Defendant UBS, Defendant Deutsche had a very large trading position in these markets, equal to billions of Euro, during every single year.

212.   While each Defendant reported their trading and/or hedging positions differently throughout the Class Period, the one thing that each Defendant has in common is that they all had large, unhedged positions in the precious metals markets.  These large positions, equal to billions of dollars in notional value, were financially benefited by Defendants' manipulative conduct alleged above.

**V.     DEFENDANTS IMPROPERLY SHARED PRIVATE INFORMATION TO COORDINATE THEIR TRADING IN ADVANCE OF THE SILVER FIX**

213.    To further capitalize on their manufactured pricing dysfunction, Defendants' exchanged private information about incoming order flow to coordinate their trading activity in advance of the Silver Fix.  What is currently publicly known about how Defendants' scheme operated comes largely from the UBS FINMA Report[42] and Defendants HSBC's and UBS' settlements with the CFTC and FCA for their involvement in the manipulation of FX markets.

214.    The link between the silver and FX market in this case is embedded in how the Defendants structure their trading desks, and warrants using the Defendants' FX settlements to provide further examples of their manipulative conduct.  For example, UBS has traded metals from its foreign exchange desk, which is located in Stamford, Connecticut, since at least 2008;[43] HSBC even goes so far as to report precious metals trading revenue as FX trading in its annual financial reports.[44]  Thus, it is not surprising that FINMA found that the same "conduct and techniques" used to manipulate the FX markets were applied to manipulate precious metal prices, including the prices of silver and silver financial instruments.

215.    Government regulators found that Defendants' scheme in both the precious metals and FX markets focused on creating an informational advantage for cartel members by sharing private information about the Defendants trading books, including both client orders and their own proprietary trading positions.

---

[42] *See supra* note 6.

[43] *See* UBS FINMA Report at 12 ("precious metals trading has been an organizational unit of the bank's Foreign Exchange Spot Desk since the end of 2008").

[44] *See e.g.,* HSBC Holdings plc Annual Report and Accounts 2011, at 52 (explaining that the company's precious metals business is "reported within Foreign Exchange.").

216.    This information gave Defendants advance notice of incoming orders to buy or sell silver, allowing them to coordinate their trading to take advantage of pending orders *before* they were executed in the public market.  It also allowed the Defendants to manipulate the Fix price in the specific direction that benefitted their silver market positions, and to extract additional illicit profits from the trades placed by their own clients and their co-conspirators' clients.

217.    All of this information was improperly acquired and should never have been shared among the Defendants.  There is no legitimate reason for Defendants, who are supposedly competitors in the silver market, to share their proprietary trading positions and those of their clients with other market participants.

218.    During the Class Period, Defendants stopped competing and conspired to fix the prices of silver and silver financial instruments to artificial levels so as to generate illicit, risk-free profits in the silver market.  Defendants further created and maintained supracompetitive bid-ask spreads between the prices that silver was purchased and sold for during the Class Period.

**A.     Defendants Used Electronic Chat Rooms to Share Private Information Regarding Their Proprietary Trading Positions and Those of Their Clients**

219.    To efficiently share information and coordinate their trading activity, Defendants used electronic chatrooms, which included participants from Defendants UBS, HSBC,[45] and

---

[45] *See Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c)(4)(A) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions Against HSBC Bank plc*, CFTC Docket No. 15-07 (Nov. 11, 2014) at 5 (hereinafter "HSBC FX CFTC Order")

other co-conspirator banks.[46]   Given the highly sensitive nature of the information being exchanged, membership in these group chatrooms was exclusive and often by invite only.[47]

220.   Once inside, a trader had access to a wealth of non-public information that otherwise would not be available outside the cartel.  For example, FINMA uncovered evidence that Defendant UBS' precious metals traders, who transacted in both silver and silver financial instruments, shared information with third-parties including (a) the trigger prices of client stop loss orders; (b) "flow information" about incoming and pending client orders; (c) other positional information from Defendant UBS' order book.[48]   The CFTC found that Defendant HSBC engaged in the same conduct, exchanging the "size and direction of the Bank's net orders" with traders in group chatrooms during their manipulation of the FX market.[49]

221.   Sharing information about incoming order flow allowed the Defendants to coordinate their trading in advance of the Silver Fix, maximizing the impact of trades placed while the Silver Fix was in progress.  For example, if a trader learned that he had "fix orders," *i.e.*, orders to trade with a client at the soon-to-be-determined Fix price, that were in the opposite direction of the rest of the group, that trader would engage in transactions before the Silver Fix to "net off" or cancel out those orders.[50]   The goal of this process, commonly referred to as "taking

---

[46] *See Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c)(4)(A) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions Against UBS AG*, CFTC Docket No. 16-06 (Nov. 11, 2014) at 6 (hereinafter "UBS FX CFTC Order").

[47] UBS FX CFTC Order at 5.

[48]  UBS FINMA Report at 12.

[49] *See* HSBC FX CFTC Order at 5.

[50] *See* UBS FX CFTC Order at 6; HSBC FX CFTC Order at 5.

out the filth" or "clearing the decks,"[51] was to keep incoming order volume stacked in a direction that benefitted positions of the group, and limit that trader's exposure in the opposite direction.[52]

222.    Similarly, when traders had orders in the same direction as what they desired to Fix price to be, then they would (a) match these orders with other traders outside the chat room to reduce the volume of orders in the opposite direction; (b) transfer these orders to a single trader who would then execute one larger order during the Fix; or (c) transact with traders outside of the chat room to increase order volume in that direction.[53]   Traders also would increase the volume by trading during the Silver Fix in the direction favored by the cartel members, a technique known as "overbuying" or "overselling"[54] to push prices further in that direction.[55]

223.    As demonstrated above, this process of managing order flow in advance of the Silver Fix and overbuying or overselling to push the price of silver in a specific direction, manifests itself as an anomalous spike in both trading volume and price volatility that peaks in the minutes immediately after the start of the Fixing Members' conference call.[56]   This spike in volume and price volatility occurs coincident with a large drop in silver prices, indicative of overselling, that begins before the Silver Fix starts an can be traced back to the Defendants'

---

[51] See *Financial Conduct Authority Final Notice Against UBS AG*, FSA Ref. No. 186958 (Nov. 11. 2014) at 17 (hereinafter "UBS FX Final Notice").

[52] See UBS FX CFTC Order at 6-7; HSBC FX CFTC Order at 5-6.

[53] See UBS FX CFTC Order at 7, HSBC FX CFTC Order at 6.

[54] See UBS FX Final Notice at 18.

[55] See *Id*.

[56] See Part III(D) *supra*.

activity in the silver spot market.[57]  This manipulative trading strategy that Defendants' executed during the Silver Fixing injected illegitimate supply and demand into the market, rendering the prices of silver and financial instruments priced, benchmarked, and/or settled to the Fix price artificial during the Class Period.

**B.     Defendants Intentionally Triggered Client Stop Loss Orders, Allowing them To Buy Silver at Artificially Lower Prices**

224.    One of the main reasons Defendants coordinated their trading activity in advance of the Silver Fix was to profit from triggering client "stop loss orders," pending orders to sell silver that are only executed when the price of silver drops below a certain level.  FINMA found direct evidence that UBS both shared the trigger prices for its precious metals clients' stop loss orders with third parties and engaged in trading designed to trigger those orders, another tactic carried over from its manipulation of the FX market.[58]

225.    Intentionally triggering a stop loss order benefits a Defendant because it allows it to buy silver from its client at an artificially lower price.  As silver prices consistently increased during the Class Period, purchasing silver at below market value would financially benefit the Defendants, generating a return whether they held the metal or sold it for a profit.  Again, this manipulative trading strategy created artificial supply and demand, rendering the prices of silver and financial instruments priced, benchmarked, and/or settled to the Fix price artificial during the Class Period.

**C.     Defendants Engaged in Front Running of Incoming Silver Orders**

226.    Defendants also used their advance information of both order flow and the Fix price to "front run," *i.e.*, place trades that would financial benefit from incoming orders.  FINMA

---

[57] *See* Part III(E) *supra*.

[58] *See* UBS FINMA Report at 12.

found that UBS engaged in the "repeated front running . . . of silver fix orders" for its "back book," *i.e.* proprietary trading positions used to generate profit for the bank.[59]

227.    Front running fix orders allows a bank to both reduce its risk and guarantee a profit on what otherwise could be an unsuccessful trade.  A "fix order" is a request to buy or sell a specific amount of silver at the Fix price.[60]  These orders are placed before the Silver Fix starts when the Fix price has yet to be determined.  By agreeing in advance to transact with clients at the Fix price, the bank is exposed to risk that the price of silver will increase or decrease against its interest; *e.g.*, causing it to buy silver from a client at a higher price if the Fix price goes up or sell to a client at a lower price if the Fix price goes down.

228.    To manage this risk, a bank will typically buy or sell silver in advance of the Silver Fix to balance its exposure to the Fix price.  Rather than legitimately manage their risk, UBS and its co-conspirators manipulated the Silver Fix to their advantage, by placing trades in advance of these client fix orders that were guaranteed to increase in value.

229.    FINMA also uncovered evidence that UBS engaged in front running of other silver trades in addition to its clients' Silver Fix orders.[61]  This manipulative trading was also part of the same comprehensive strategy to manipulate and fix the prices of silver and silver financial instruments for the Defendants' financial benefit.  This pattern of front running was an illegitimate trading activity and rendered the prices of silver and silver and financial instruments priced, benchmarked, and/or settled to the Fix price artificial during the Class Period.

---

[59] UBS FINMA Report at 12.

[60] *See, e.g.*, UBS FX Final Notice at 7 (describing a fix order in the FX markets)

[61] UBS FINMA Report at 12.

## VI.     PLAINTIFFS WERE INJURED BY TRANSCTING AT ARTIFICIAL PRICES CAUSED BY DEFENDANTS' MANIPULATIVE CONDUCT

230.    Throughout the Class Period, Plaintiffs sold both physical silver and silver financial instruments, including COMEX silver futures and option contracts, the prices of which were directly and artificially impacted by the Silver Fix.

231.    As described above, Defendants and their co-conspirators artificially suppressed the price of silver throughout the Class Period by using the Silver Fix and conducting manipulative trading.  As a result, Plaintiffs transacted at artificially lower prices each time they sold physical silver or silver financial instruments, and received less than they otherwise would have in a competitive, un-manipulated market.

232.    As a direct result of Defendants' and their co-conspirators' conduct, Plaintiffs were injured and suffered harm in the sales they conducted on days where the price of silver was artificially lower because of Defendants' manipulative conduct, including but not limited to, the days and transactions set out in Appendix D.

233.    For the reasons described above, the impact of the Defendants' and their co-conspirators' manipulative conduct persisted well beyond the end of the Silver Fixing, causing harm to Plaintiffs beyond the days set out in Appendix D.

234.    Defendants' persistent suppression of silver prices also directly and proximately caused injury to Class Members who initiated long positions in silver and silver financial instruments at artificial prices, and held those positions throughout the Class Period.  For example, Plaintiff Ceru, purchased physical silver at artificial prices during the Class Period and held that physical silver through Defendants' persistent suppression of silver prices.  As a result, Ceru suffered legal injury as a direct and proximate result of Defendants' manipulative conduct which artificially reduced the value of the silver he purchased during the Class Period.

## VII.   GOVERNMENT ENFORCERS ARE INVESTIGATING THE SILVER FIX

### A.   Government Enforcers Are Aware that the Silver Market Is Open to Manipulation

235.   In February 2015, both the U.S. Department of Justice and CFTC announced that they began investigating at least 10 banks, including all of the Defendants, for rigging the precious-metals markets by manipulating, among others, the Silver Fix.[62]

236.   Prior to this announcement, both U.S. and European regulators began discussing problems with the Silver Fix in 2014.  In particular, the CFTC said that it had "started internal discussions on whether the daily setting of gold and silver benchmarks is open to manipulation."[63]  In February 2013, CFTC Commissioner Bart Chilton issued a statement to the International Roundtable on Financial Benchmarks, providing in part:

> I'm pleased we are discussing the critically important topic of benchmarks. We've witnessed blatant and brazen monkeying with the marks.  . . . . the idea that pervasive manipulation, or attempted manipulation, is so widespread should make us all query the veracity of the other key marks.  What about energy, swaps, the gold and **silver fixes in London** and the whole litany of "bors?"  Why would they be any different in the minds of those that may have sought to push or pull rates?  For me, this means every single mark needs to be reviewed, and potentially investigated.[64]

---

[62] *See* Jean Eaglesham and Christopher M. Matthews, *Big Banks Face Scrutiny Over Pricing of Metals*, THE WALL STREET JOURNAL (Feb. 23, 2015), http://www.wsj.com/articles/big-banks-face-scrutiny-over-pricing-of-metals-1424744801.

[63] *How London's gold and silver price benchmarks are 'fixed,'* REUTERS (Jan 17, 2014), http://uk.reuters.com/assets/print?aid=UKBREA0G19J20140117.

[64] *Statement of Commissioner Bart Chilton before the International Roundtable on Financial Benchmarks*, Washington, D.C. (February 26, 2013), http://www.cftc.gov/PressRoom/SpeechesTestimony/chiltonstatement022613 (emphasis added).

237.    Commissioner Chilton followed up on these remarks:  "Given what we have seen in Libor, we'd be foolish to assume that other benchmarks aren't venues that deserve review."[65] The UK's FCA has also been looking at precious metals as part of a broader review of financial benchmarks.[66]

238.    Dr. Elke König, the President of BaFin, the German Federal Financial Supervisory Authority, which is one European agency investigating, gave a speech on January 16, 2014, in which she remarked:  "Markets depend on the trust of the wider public that they are performing and that they work honestly."[67]  The head of BaFin warned that "manipulation of the metals as well as the foreign exchange market was 'particularly serious.'"[68]

239.    The benchmark setting process remains under scrutiny by regulators including London's Financial Conduct Authority.[69]  In particular, BaFin is reported to have raided and demanded documents from Deutsche Bank, "signal[ing] that BaFin now has greater concerns

---

[65] *CFTC's Chilton Says 'Foolish' Not to Review Benchmark Pricing*, BLOOMBERG (Mar. 14, 2013), http://www.bloomberg.com/news/2013-03-14/cftc-s-chilton-says-foolish-not-to-review-benchmark-pricing.html.

[66] *Gold price probe extended to Deutsche Bank*, THE FINANCIAL TIMES (Dec. 12, 2013), http://www.ft.com/intl/cms/s/0/b386aa16-6358-11e3-886f-00144feabdc0.html?siteedition=uk#axzz3I2RldBIl.

[67] *How London's gold and silver price benchmarks are 'fixed,'* REUTERS (Jan 17, 2014), http://uk.reuters.com/assets/print?aid=UKBREA0G19J20140117.

[68] *Deutsche puts gold price fix role on sale*, THE FINANCIAL TIMES (Jan. 17, 2014), http://www.ft.com/intl/cms/s/0/02f5a19c-7f97-11e3-b6a7-00144feabdc0.html?siteedition=uk#axzz3I2RldBIl.

[69] *Deutsche puts gold price fix role on sale*, THE FINANCIAL TIMES (Jan. 17, 2014), http://www.ft.com/intl/cms/s/0/02f5a19c-7f97-11e3-b6a7-00144feabdc0.html?siteedition=uk#axzz3I2RldBIl.

over the precious metals markets."[70]  The investigations led Deutsche Bank, which had been on the panel for twenty years, to withdraw from the Fix in January 2014,[71] for having "faced scrutiny from the German regulator, BaFin, over its participation in the London gold and silver benchmark setting process over suspicions that the process may have been subject to manipulation by the key players." [72]

240.   On November 9, 2014, THE FINANCIAL TIMES reported that UBS would settle allegations of misconduct in its gold and silver trading business, including the manipulation of silver prices, as part of a settlement with multiple financial regulatory agencies related to manipulative conduct in the FX market.  While the two markets may seem unrelated, UBS' precious metals and FX businesses are tightly integrated, using joint management and staff who work together and sit on the same floor with forex traders.

241.   Prior to the news of these settlements, UBS disclosed that it launched an internal probe of its precious metals business and pushed hard to speed up its internal precious metals probes to get ahead of rivals in securing immunity agreements.[73]

---

[70] *Gold price probe extended to Deutsche Bank*, THE FINANCIAL TIMES (Dec. 12, 2013), http://www.ft.com/intl/cms/s/0/b386aa16-6358-11e3-886f-00144feabdc0.html?siteedition=uk#axzz3I2RldBIl.

[71] *Deutsche resigns gold and silver price-fix seats*, FINANCIAL TIMES (April 29, 2014), http://www.ft.com/intl/cms/s/0/f00383f2-cfb3-11e3-a2b7-00144feabdc0.html?siteedition=uk#axzz38yxp1nAQ.

[72] *Deutsche puts gold price fix role on sale*, THE FINANCIAL TIMES (Jan. 17, 2014), http://www.ft.com/intl/cms/s/0/02f5a19c-7f97-11e3-b6a7-00144feabdc0.html?siteedition=uk#axzz3I2RldBIl.

[73]*See UBS Probes Precious Metals as Hong Kong Reprimands Rate Trading*, BLOOMBERG (Mar. 14, 2014), available at http://www.bloomberg.com/news/2014-03-14/ubs-probes-precious-metals-as-hong-kong-reprimands-rate-trading.html.

242.    On November 12, 2014, the Swiss Financial Market Supervisory Authority ("FINMA") ordered UBS to pay 134 million Swiss francs (approximately $139 million) to settle allegations of misconduct arising from its FX and precious metals investigation  Following the settlement, FINMA reported, "[t]his conduct was partly coordinated with other banks" and "electronic communications platforms played a key role."  As a result of their findings, FINMA also ordered UBS to cap the variable compensation of UBS' precious-metals staff to 200% of base salary for two years.  According to BLOOMBERG NEWS, FINMA said it found 'serious misconduct" by UBS and a "clear attempt to manipulate fixes in the precious metal market," including Silver Fixing, during its investigation into precious metals and FX trading at UBS. FINMA reported that UBS was front running precious metals trades, *i.e.*, generating a profit by trading with advance knowledge about a transaction expected to influence prices.  FINMA Director Mark Branson said in a conference call, "[t]he behavior patterns in precious metals were somewhat similar to the behavior patterns in foreign exchange."

243.    These investigations are unrelated to earlier probes into the silver market.  In September 2008, the CFTC announced that it was investigating complaints of misconduct in the silver market.[74]  However, these complaints were not related to the Silver Fix, and instead focused on whether COMEX silver futures prices were being manipulated artificially lower, relative to the prices of "retail" silver products like silver coins, by banks that held a large open short position in COMEX futures contracts.[75]  As a result, the earlier investigations were unrelated to, and had nothing to do with, Defendants' manipulation of the Silver Fix.

_____

[74] *CFTC's 2008 Fiscal Year Enforcement Roundup*, U.S. COMMODITY FUTURES TRADING COMMISSION (Oct. 2, 2008), http://www.cftc.gov/PressRoom/PressReleases/pr5562-08.

[75] *CFTC Closes Investigation Concerning the Silver Market*, U.S. COMMODITY FUTURES TRADING COMMISSION (Sept. 25, 2013), http://www.cftc.gov/PressRoom/PressReleases/pr6709-13.

## VIII.  THE DEMISE OF THE SILVER FIX

244.  After 117 years, the Silver Fix officially ended on August 14, 2014.  A series of steps stemming largely from the global government investigations led to its demise.

### A.  Under Government Investigation, Deutsche Bank Put Its Seat on the Silver Fixing Panel Up for Sale

245.  In January 2014, Deutsche Bank abruptly announced that it was putting its seat on the panel up for sale, having "faced scrutiny from the German regulator, BaFin, over its participation in the London gold and silver benchmark setting process over suspicions that the process may have been subject to manipulation by the key players." [76]

246.  Deutsche "said it would continue to participate in price setting until it finds a buyer, but would resign its seat if it fails to do so." [77]  At the time, however, it seemed resignation would be unlikely as the sale was said to present "an opportunity for a new bank to join the elite club of price setters in one of the world's largest precious metals trading hubs."[78]   And "Deutsche said it had already begun talks with other banks to sell its role."[79]

---

[76] *Deutsche puts gold price fix role on sale*, THE FINANCIAL TIMES (Jan. 17, 2014), http://www.ft.com/intl/cms/s/0/02f5a19c-7f97-11e3-b6a7-00144feabdc0.html?siteedition=uk#axzz3I2RldBIl.

[77] *Deutsche puts gold price fix role on sale*, THE FINANCIAL TIMES (Jan. 17, 2014), http://www.ft.com/intl/cms/s/0/02f5a19c-7f97-11e3-b6a7-00144feabdc0.html?siteedition=uk#axzz3I2RldBIl.

[78] *Deutsche puts gold price fix role on sale*, THE FINANCIAL TIMES (Jan. 17, 2014), http://www.ft.com/intl/cms/s/0/02f5a19c-7f97-11e3-b6a7-00144feabdc0.html?siteedition=uk#axzz3I2RldBIl.

[79] *Deutsche puts gold price fix role on sale*, THE FINANCIAL TIMES (Jan. 17, 2014), http://www.ft.com/intl/cms/s/0/02f5a19c-7f97-11e3-b6a7-00144feabdc0.html?siteedition=uk#axzz3I2RldBIl.

**B.      Deutsche Was Unable to Sell What Should Have Been a Valuable Seat**

247.    Deutsche Bank tried to sell its seat on the panel, but, tellingly, there were no takers.[80]  "A source close to the German bank said it had tried to sell its positions but had been 'unable to agree on terms with any prospective buyers.'"[81]

**C.      Deutsche Resigned Unable to Sell Its Seat**

248.    Having found no buyer, Deutsche announced its resignation.[82]  The Silver Fix thus "was put on the fast track to extinction . . . leaving just two banks still taking part— Bank of Nova Scotia and HSBC Holdings PLC."[83]  THE FINANCIAL TIMES reported, "Deutsche's withdrawal from the three-seat silver fixing . . . will probably present a problem,"[84] quoting a precious metals banker as stating, "I don't see how it can function with only two members so they are going to have to work something out." [85]

---

[80] *CME and Thomson Reuters to set silver Benchmark*, FINANCIAL TIMES (July 11, 2014), http://www.ft.com/intl/cms/s/0/7f838fc4-08d8-11e4-8d27-00144feab7de.html?siteedition=uk#axzz38yxp1nAQ.

[81] *Deutsche resigns gold and silver price-fix seats*, THE FINANCIAL TIMES (April 29, 2014), http://www.ft.com/intl/cms/s/0/f00383f2-cfb3-11e3-a2b7-00144feabdc0.html#axzz3I2RldBIl .

[82] *Deutsche resigns gold and silver price-fix seats*, THE FINANCIAL TIMES (April 29, 2014), http://www.ft.com/intl/cms/s/0/f00383f2-cfb3-11e3-a2b7-00144feabdc0.html#axzz3I2RldBIl .

[83] *Concerns Remain Ahead of New Silver Benchmark Debut*, THE WALL STREET JOURNAL (Aug. 14, 2014), http://online.wsj.com/articles/concerns-remain-ahead-of-new-silver-benchmark-debut-1408043599#printMode .

[84] *Deutsche resigns gold and silver price-fix seats*, THE FINANCIAL TIMES (April 29, 2014), http://www.ft.com/intl/cms/s/0/f00383f2-cfb3-11e3-a2b7-00144feabdc0.html#axzz3I2RldBIl.

[85] *Deutsche resigns gold and silver price-fix seats*, THE FINANCIAL TIMES (April 29, 2014), at http://www.ft.com/intl/cms/s/0/f00383f2-cfb3-11e3-a2b7-00144feabdc0.html#axzz3I2RldBIl.

### D.      The Full Panel Announced It Would Be Disbanding

249.    In the wake of this and "on the heels of increased scrutiny by European and US regulators into precious metals price-setting following the Libor scandal and probe into possible forex market abuse,"[86] Defendants announced that they would disband their combination as of August 14, 2014.[87] "The century-old method of setting silver prices—daily chats among a small coterie of banks—[wa]s being scrapped for something more modern." [88]

250.    As reported by THE FINANCIAL TIMES:

> The current daily fix, which has been an integral part of London's $1.6tn-a-year silver market for decades, and controlled by a handful of banks, has lost its luster in recent years due to concerns about transparency and vulnerability to manipulation.  It is shutting down because Deutsche Bank failed to find a buyer for its seat, leaving only two other members.[89]

251.    In May 2014, three months prior to actually closing operations, the Silver Fixing panel members issued the following press release:

> The London Silver Market Fixing Limited
>
> Incorporated in England and Wales With Registered Number 3685039; Registered Office:  One Silk Street, London EC2Y 8HQ
>
> LONDON, UNITED KINGDOM--(Marketwired - May 14, 2014) - The London Silver Market Fixing Limited (the 'Company') announces that it will cease to administer the London Silver Fixing with effect from close of business on 14

---

[86] *London's silver price fix dies after nearly 120 years*, THE FINANCIAL TIMES (May 14, 2014), http://www.ft.com/intl/cms/s/0/db3188b8-db46-11e3-94ad-00144feabdc0.html?siteedition=intl#axzz38yxp1nAQ.

[87] Press Release, The London Silver Market Fixing Limited, REUTERS (May 14, 2014), http://www.reuters.com/article/2014/05/14/idUSnMKWWsY3ca+1e8+MKW20140514.

[88] *Bullion Fixes in Flux*, THE WALL STREET JOURNAL (June 18, 2014), http://online.wsj.com/articles/bullion-industry-to-meet-in-july-to-discuss-london-gold-fix-overhaul-1403082075.

[89] *CME and Thomson Reuters to set silver Benchmark*, THE FINANCIAL TIMES (July 11, 2014), http://www.ft.com/intl/cms/s/0/7f838fc4-08d8-11e4-8d27-00144feab7de.html?siteedition=uk#axzz38yxp1nAQ.

August 2014. Until then, Deutsche Bank AG, HSBC Bank USA N.A. and The Bank of Nova Scotia will remain members of the Company and the Company will administer the London Silver Fixing and continue to liaise with the FCA and other stakeholders.

The period to 14 August 2014 will provide an opportunity for market-led adjustment with consultation between clients and market participants.

The London Bullion Market Association has expressed its willingness to assist with discussions among market participants with a view to exploring whether the market wishes to develop an alternative to the London Silver Fixing.

Q&A

1. What will happen after 14 August 2014? Will the Silver Fixing cease to exist?

With effect from the close of business on 14 August 2014, the Company will cease to administer a Silver Fixing, and a daily Silver Fixing Price will no longer be published by the Company.

2. What will happen in the period up to that date?

The Company intends to continue to administer the daily Silver Fixing and publish Silver Fixing Prices throughout that period.

3. Why a three month notice period?

Although members of the Company may resign on seven clear days' notice, the members have confirmed that they stand ready to continue the Company's operations until (and including) 14 August 2014.

4. What happens after 14 August 2014 for market participants with contracts referencing the Silver Fix?

The Company is not in a position to comment on such matters, but market participants can speak to their contractual counterparties.

5. What does this mean for the gold, and platinum and palladium fixing companies?

This decision relates only to the London Silver Fixing administered by the Company.  The Company is not in a position to comment on other fixings.[90]

---

[90] Press Release, *The London Silver Market Fixing, Ltd*., REUTERS ( May 14, 2014), http://www.reuters.com/article/2014/05/14/idUSnMKWWsY3ca+1e8+MKW20140514.

252.     Once Defendants "decided to pull the plug on the benchmark, they and the London Bullion Market Association "set about finding a replacement."[91]  According to reports, the London Silver Fix was in for a "historic makeover."[92]

253.     The Silver Fix has since been replaced by the "London Silver Price," which despite losing the "unfortunate name," in favor of a bland one, and the "private teleconference," in favor of electronic trading, may not prove to be any better.[93]  THE FINANCIAL TIMES reports that "anyone thinking there has been a complete change in the way the daily snapshot of the silver market is conducted would be mistaken.  The new benchmark . . . keeps some of the main features of the silver fixing, in particular the auction-style process used to calculate the reference price."[94]  Two of the other main features that continue are Defendants HSBC's and Bank of Nova Scotia's participation on the London Silver Price panel.  Whether the new Silver Price is any better than the old Silver Fix remains to be seen.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

254.     Plaintiffs' disclaim any burden to plead facts regarding the statute of limitations.

255.     The statute of limitations relating to the claims for relief alleged herein have been tolled because of fraudulent concealment by reason of Defendants' active and inherently self-concealing conduct.  Plaintiffs' and members of the Class had no knowledge of Defendants'

---

[91] *A Glimpse of the Future as Silver Breaks 117-Year Tradition*, THE WALL STREET JOURNAL (Aug. 15, 2014), http://blogs.wsj.com/moneybeat/2014/08/15/a-glimpse-of-the-future-as-silver-breaks-117-year-tradition/.

[92] Press Release, *The new LBMA Silver Price heralds a new era in precious metals benchmarks*, THOMPSON REUTERS (Aug. 5, 2014), http://blog.financial.thomsonreuters.com/new-silver-fix-heralds-new-era-precious-metals-benchmarks/.

[93] *New silver price is 'improvement' on fix*, THE FINANCIAL TIMES (July 16, 2014), http://www.ft.com/intl/cms/s/0/4053ff04-0ccb-11e4-90fa-00144feabdc0.html#axzz38yxp1nAQ.

[94] *Id.*

unlawful and self-concealing collusive, manipulative, and inequitable acts and could not have discovered them by the exercise of due diligence prior to the time Deutsche Bank announced its withdrawal from Silver Fixing in January 2014.  Plaintiffs thus assert the tolling of the applicable statute of limitations affecting the rights of the claims of relief asserted by Plaintiffs.  Defendants are also equitably estopped from asserting that any otherwise applicable limitations period has run.

256.    Active acts of concealment by Defendants to conceal their violations of law from Plaintiffs and the Class include, *inter alia*, avoiding discussing the manipulation of the Silver Fixing in public forums and, when doing so, providing the public false and misleading information about the Silver Fixing.

257.    By its very nature, as alleged herein, the unlawful activity that Defendants engaged in was self-concealing.   By Defendants' affirmative acts, misrepresentations, and nondisclosures, any applicable statute of limitations on claims asserted by Plaintiffs and members of the Class has been and are tolled.

258.    Moreover, Defendants actively concealed their conspiracy by placing a barrier for the public to access much of the information on the Silver Fixing website, www.silverfixing.com.  Upon visiting the website, the public was greeted ominously.  Visitors were allowed to see nothing without entering into "Terms and Conditions," which required visitors to enter into an ostensibly onerous "contract" with London Market Silver Fixing, Ltd. Any person or entity wishing to learn about the Silver Fix directly from Silver Price Fixing Limited itself was thus faced with a substantial deterrent to investigation.

## CLASS ACTION ALLEGATIONS

259.   Plaintiffs bring this action on behalf of themselves and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of a Class defined as follows:

> All persons or entities that transacted in physical silver or a silver financial instrument priced, benchmarked, and/or settled to the London Silver Fix at any time from January 1, 1999 through the date on which the effects of Defendants' unlawful conduct cease (the "Class").

260.   Excluded from the Class are Defendants, and their officers, directors, management, employees, subsidiaries, or affiliates.  Also excluded is the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.[95]

261.   Members of the Class are so numerous and geographically dispersed that joinder is impracticable.  Further, the Class is readily identifiable from information and records in the possession of Defendants.

262.   Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and members of the Class were damaged by the same wrongful conduct of Defendants.

263.   Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are coincident with, and not antagonistic to, those of the Class.

264.   Plaintiffs are represented by counsel with experience in the prosecution of class action antitrust, commodity manipulation, and other complex litigation, including involving precious and non-ferrous metals and financial benchmark rate collusion and manipulation.

---

[95] Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend the definition of the Class, including, without limitation, the Class Period.

265.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to the Class as a whole appropriate.  Questions of law and fact common to the Class include, but are not limited to:

**a.**   Whether Defendants unreasonably restrained trade in violation of federal antitrust law;

**b.**   Whether Defendants manipulated the price of silver and financial instruments tied to the price of physical silver, such as silver futures, options and other silver financial instruments;

**c.**   Whether Defendants were unjustly enriched;

**d.**   The length of the alleged conspiracy;

**e.**   Damages suffered by Plaintiffs and members of the Class; and

**f.**   Whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

266.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort or expense that numerous individual actions would require.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

113

267.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

268.    Under *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co*., 559 U.S. 393 (2010), a federal class action may prosecuted as to the state law claims under Rule 23 of the Federal Rules of Civil Procedure.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### For Price Fixing In Violation of Section 1 of the Sherman Act

### (15 U.S.C. §1, *et seq.*)

### Against All Defendants

269.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

270.    The combination and conspiracy alleged herein is a *per se* violation of Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 (as amended).

271.    Until August 14, 2014, the price of silver was fixed by Defendants Deutsche Bank, HSBC USA, Bank of Nova Scotia, and their co-conspirators, including Defendant UBS. This combination of three of the world's largest multinational banks, operated, at least in part, through The London Silver Market Fixing Ltd.  The name of their process was the "Silver Fix." The name of their benchmark price was called the "Silver Fixing."

272.    Rather than reflect the market price of silver, the Silver Fix determined the price of silver—worldwide.  Defendants literally fixed the price of silver once per day, every business day.  By their concerted action, Defendants dictated the price of physical silver and thereby financial instruments tied to the price of physical silver, such as COMEX silver futures.  This is

because the prices of financial instruments like COMEX silver futures are directly and proximately caused by, and directly linked to, the price of physical silver that Defendants set.

273.    Each or nearly each business day during the Class Period, the three Fixing Defendants —Deutsche Bank, HSBC, and Bank of Nova Scotia—met on a secure conference call at 12:00 P.M. London time to fix the price of physical silver.  The Silver Fix, which typically took less than 10 minutes, was ostensibly conducted as a "Walrasian" or simultaneous auction led by one of the three Fixing Members designated as the "Chairman."  The Chairman position rotated among the Fixing Members each year.

274.    To begin each daily fixing session, Defendants agreed that the Silver Fix would begin with the Chairman pegging the opening price for the auction.  After the opening price was fixed at a level that the Chairman declared, with the agreement of the Fixing Members, the bidding would begin trading at the initially fixed price.  Each of the Fixing Members then would share with each other whether and how much silver they and their clients would be willing to buy or sell at the fixed price.

275.    After placing orders armed with this insider knowledge, the transactions were netted against each other.  If the Fixing Members agreed that the amount of buying interest was equal to the amount of selling interest the Silver Fixing was complete.  Otherwise, the Chairman would adjust the price and peg it once again, repeating the process until the Fixing Members agreed upon the fixed price to benchmark transactions in physical silver and financial instrument tied to the price of physical silver.  The Fixing Members then caused the Fix to be published to the market, including via interstate wires.

276.    The Fixing Members shared a conscious commitment to a common scheme designed to achieve the unlawful objective of artificially fixing, depressing, pegging,

maintaining, stabilizing, and otherwise manipulating the price of physical silver and financial instruments tied to the price of physical silver, including COMEX silver futures.

277.   Plaintiffs and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

278.   Plaintiffs and members of the Class are threatened with impending future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

## SECOND CLAIM FOR RELIEF

### For Bid Rigging In Violation of Section 1 of the Sherman Act

### (15 U.S.C. §1, *et seq.*)

### Against All Defendants

279.   Plaintiffs incorporate by reference and re-alleges the preceding allegations as though fully set forth herein.

280.   Defendants and co-conspirators known and unknown engaged in hundreds of episodes of illegal episodes of bid rigging, which are *per se* violation of Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1.  By their concerted action, Defendants rigged the supposedly "Walrasian" auction of the Silver Fix with the purpose and effect of suppressing the price of silver and financial instruments tied to the price of physical silver, such as those traded on COMEX.

281.   Defendants intended to and actually did restrain trade.  They shared a conscious commitment to a common scheme designed to achieve the unlawful objective of artificially fixing, depressing, pegging, maintaining, stabilizing, and otherwise manipulating the price of

physical silver and financial instruments tied to the price of physical silver, including COMEX silver futures.

282.    The conspiracy unreasonably restrained trade.  There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' unreasonable restraint of trade.  Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

283.    Plaintiffs and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

284.    Plaintiffs and members of the Class are threatened with impending future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

## THIRD CLAIM FOR RELIEF

**For Conspiracy in Restraint of Trade in Violation of Section 1 of the Sherman Act**

**(15 U.S.C. § 1, *et seq.*)**

**Against All Defendants**

285.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

286.    The overarching price fixing, bid rigging, and otherwise anticompetitive combination and conspiracy alleged herein is a *per se* violation of Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 (as amended).  Alternatively, the combination and conspiracy alleged herein is a quick look or rule of reason violation of Section 1.

287. Defendants intended to and actually did restrain trade. They shared a conscious commitment to a common scheme designed to achieve the unlawful objective of artificially fixing, depressing, pegging, maintaining, stabilizing, and otherwise manipulating the price of physical silver and financial instruments tied to the price of physical silver, including COMEX silver futures.

288. The combination and conspiracy unreasonably restrained trade. There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' unreasonable restraint of trade. Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

289. Plaintiffs and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

290. Plaintiffs and members of the Class are threatened with impending future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

## FOURTH CLAIM FOR RELIEF

### For Manipulation In Violation of the Commodity Exchange Act

### (7 U.S.C. § 1, *et seq.*)

### Against All Defendants

291. Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

292.    Defendants, through their manipulative acts alleged herein, specifically intended to and did cause unlawful and artificial prices in silver and silver financial instruments, including COMEX silver futures contracts in violation of the CEA, 7 U.S.C. § 1, *et seq.*

293.    **Ability to Influence Prices**: Each Defendant individually had and all Defendants collectively had the ability to cause and did cause artificial prices.  Throughout the Class Period, Defendants were both market makers and Silver Fixing Members.  Defendants controlled the Silver Fix, which determined the global benchmark price of silver, used to price, benchmark, and/or settle billions of dollars in silver and silver financial instruments, including silver futures and options.  This dominant position of control, unrivaled by any other market participant, gave the Fixing Members and their co-conspirators the ability to influence the prices of silver financial instruments by setting the Fix price at artificial levels during the Class Period.

294.    Defendants also had the ability to influence the prices of silver financial instruments through their spot market activity.  As some of the largest market makers in the silver market, Defendants had the ability to (and did) influence the prices of silver and silver financial instruments by, *inter alia*, quoting systematically lower silver prices around the start of and throughout the Silver Fix and by maintaining an artificial bid-ask spread.

295.    Additionally, Defendants had the ability to influence the prices of silver and silver financial instruments by controlling the silver order flow, as evidenced in the UBS FINMA Report, which demonstrated that Defendants shared private client information and information regarding their proprietary trading positions to coordinate trading activity for the purpose of manipulating the prices of silver and silver financial instruments.

296.    **Causation and Artificial Price**: Throughout the Class Period, the Fix price was used to price, benchmark and/or settle silver financial instruments, including silver futures and

options contracts, traded in the United States.  By manipulating the Silver Fix and the Fix price, Defendants caused the prices of silver financial instruments to be artificial.  Defendants also caused artificial prices by injecting artificial supply and demand fundamentals into the market through their illegitimate coordinated trading activity including (a) maintain and artificial bid-ask spread; (b) quoting systematically lower silver prices in advance of the Silver Fix; and (c) coordinating trading activity, *e.g.*, to intentionally trigger client stop loss orders.

297.   **Intent**: As evidenced by their coordinated market activity, including the systematic lowering of spot market quotes in advance of the Silver Fix and the maintenance of an artificial bid-ask spread, the overwhelming econometric evidence of manipulation during the Silver Fix, and information revealed in the UBS FINMA Report, Defendants intended to manipulate the prices of silver financial instruments to generate increased profits by *inter alia* (a) placing trades in advance of the public release of the Fix price; (b) triggering client stop loss orders, forcing clients to sell silver to the Defendants at artificially lower prices;  and (c) maintaining an artificial bid-ask spread to reap illicit profits on every silver spot market transaction.  Defendants' manipulation allowed them to reap illicit profits from their own proprietary silver positions in the silver spot, over-the-counter, and futures market, including the COMEX silver futures market.

298.   As a direct result of Defendants unlawful conduct, Plaintiffs and members of the Class have suffered actual damages and injury in fact due to artificial prices of silver financial instruments which they would not have been subject to but for the unlawful conduct of the Defendants.  Plaintiffs and Class members were further legally injured and suffered injury in fact by transacting in silver financial instruments in an artificial and manipulated market operating under the artificial prices caused by the Defendants.  Plaintiff and Class members who purchased

or sold silver financial instruments, including silver futures and options contracts, during the Class Period were injured and are each entitled to their actual damages for the violations of the CEA alleged herein.

## FIFTH CLAIM FOR RELIEF

**For Principal-Agent Liability In Violation of The Commodity Exchange Act**

**(7 U.S.C. § 1, *et seq.*)**

**Against All Defendants**

299.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

300.    Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. §2(a)(1), for the manipulative acts of their agents, representatives and/or other persons acting for them in the scope of their employment.

301.    Plaintiffs and members of the Class are each entitled to actual damages sustained in silver financial instruments, including silver futures and options contracts, for the violations of the CEA alleged herein.

## SIXTH CLAIM FOR RELIEF

**For Aiding and Abetting Manipulation In Violation of The Commodity Exchange Act**

**(7 U.S.C. § 1, *et seq.*)**

**Against All Defendants**

302.    Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

303.    The Defendants each knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA by other Defendants as alleged herein.  Each Defendant did so knowing of other Defendants' manipulation of the Silver Fix, and silver futures, options and

other silver financial instruments, and substantially and willfully intended to assist these manipulations to cause the prices of COMEX silver futures contract prices to be artificial during the Class Period, in violation of §22(a)(1) of the CEA, 7 U.S.C. §25(a)(1).

304.   Under §13(c)(a) of the CEA, 7 U.S.C. §13, Defendants are liable for willfully intending to assist the manipulation.

305.   Other persons willfully intended to assist these manipulations to cause the price of silver financial instruments to reach artificial levels during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).   They are the agents and unnamed co-conspirators as alleged herein.

306.   Plaintiffs and members of the Class are each entitled to actual damages sustained in silver futures, options, and other silver financial instruments for the violations of the CEA alleged herein.

## SEVENTH CLAIM FOR RELIEF

### Manipulation by False Reporting and Fraud and Deceit in Violation of the Commodity Exchange Act, as Amended

### (7 U.S.C. § 1, *et seq*. and CFTC Rule 180.1(a))

### Against All Defendants

307.   Plaintiffs incorporate the allegations in this Complaint by reference and re-allege them as though fully set forth herein.

308.   By their intentional or reckless misconduct, Defendants each violated Section 6(c)(1) of the CEA, as amended, 7 U.S.C. § 9, and caused, or attempted to cause, prices of silver futures and other derivatives contracts and derivatives to be artificial during the Class Period. Defendants delivered and caused to be delivered for transmission through the mails and interstate commerce, by multiple means of communication, including communications to electronic

trading platforms, false or misleading or inaccurate reports concerning order and trade information that affected or tended to affect the price of silver and silver futures, which are commodities in interstate commerce, knowing, or acting in reckless disregard of the fact that such report was false, misleading or inaccurate.

309.   Under Section 6(c)(1) of the CEA, as amended, codified at 7 U.S.C. § 9, and Section 22 of the CEA, as amended, 7 U.S.C. § 25, it is unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the CFTC shall promulgate.

310.   In July 2011, the CFTC promulgated Rule 180.1(a), 17 C.F.R. § 180.1(a) (2011), pursuant to Section (6)(c)(1), which provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> (1)   Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2)   Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
>
> (3)   Engage, or attempt to engage, in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person; or
>
> (4)   Deliver or cause to be delivered, or attempt to deliver or cause to be delivered for transmission through mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in

interstate commerce, knowing or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

311.    Unlawful manipulation under the CEA, as amended, and Rule 180.1 includes delivering, or causing to be delivered for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

312.    During the Class Period, Defendants used or attempted to use or employed manipulative or deceptive devices or contrivances, in connection with a contract of sale or purchase of silver in interstate commerce.   This conduct included the making of untrue, inaccurate or misleading statements of material facts, or omitting material facts necessary to make the statements made not misleading such as:

a.    Making untrue, inaccurate or misleading statements to influence silver prices, including the London Silver Fix (*see, e.g.,*¶¶ 121-145);

b.    Failing to disclose that Defendants entered pre-arranged transactions to move silver prices in a direction to benefit their own trading books (*see, e.g.,* ¶¶ 157-169);

c.    Failing to disclose that Defendants were unlawfully conspiring between and among themselves to manipulate, *inter alia*, silver spot and benchmark prices, as well as silver derivatives prices; and

d.    Failing to disclose that Defendants were reporting silver bids, offers and transactions during the London Silver Fix to move silver spot and benchmark prices uneconomically to benefit their silver trading positions.

313.    Defendants' conduct caused injury to Plaintiffs and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices, and with artificial price trends, during the Class Period.

314.    Plaintiffs and other members of the Class are each entitled to damages for the violations of the CEA alleged herein.

## EIGHTH CLAIM FOR RELIEF

### Unjust Enrichment

### (New York Common Law)

### Against All Defendants

315.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

316.    Plaintiffs are entitled to recovery for unjust enrichment and disgorgement of profits and restitution under common law principles of unjust enrichment of the State of New York.

317.    Each Defendant unjustly enriched itself by its intentional manipulation of silver prices through its conduct and omissions alleged herein, while knowing that Defendants had the ability to cause, and that they were causing, prices to be set at artificial levels.

318.    Plaintiffs' and members of the Class' detriment and Defendants' unjust enrichment were related to and flowed from the wrongful conduct alleged herein, including, without limitation, Defendants' unlawful, manipulative, conspiratorial, and anti-competitive acts described above.

319.    Defendants should not be permitted to retain the benefits conferred by Plaintiffs and members of the Class.  Plaintiffs and the Class accordingly are entitled to disgorgement of

all profits resulting from such manipulation and establishment of a constructive trust from which Plaintiffs and members of the Class may seek restitution.

320.    Plaintiffs and the Class have no adequate remedy at law to seek such disgorgement and restitution under common law principles of unjust enrichment.

321.    It is appropriate to apply New York common law to purchases of physical silver and financial instruments tied to the price of physical silver, including COMEX silver futures, in all fifty states because Defendants' inequitable conduct and enrichment occurred in New York. Defendants reside, are registered, conduct significant business, own property in New York, including vast caches of silver bullion.  The COMEX is located in New York.  Members of the Class traded silver futures on the COMEX, which were fixed and manipulated by the unlawful actions of Defendants.

322.    It is appropriate to prosecute this New York common law claim on a nationwide class basis under *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 822 (1985), and *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010).

## PRAYER FOR RELIEF

Plaintiffs demand relief as follows:

A.    That the Count certify this lawsuit as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be designated as class representatives, and that Plaintiffs' counsel be appointed as counsel for the Class;

B.    That the unlawful conduct alleged herein be adjudged and decreed to violate Section 1 of the Sherman Act;

C.    That Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

126

D.     That the Court award Plaintiffs and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus interest;

E.     That the Court find that Defendants violated the CEA and award appropriate damages;

F.     That the Court award monetary losses suffered by Class Members that were in contractual or quasi-contractual relationships with a Defendants or an affiliate thereof, due to that Defendants' unjust enrichment at the Class Members' expense;

G.     That the Court award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law;

H.     That the Court direct such further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and members of the proposed Class, respectfully demand a trial by jury on all issues so triable.

Dated:   April 17, 2015.

Respectfully submitted,

Barbara J. Hart
Vincent Briganti
Geoffrey M. Horn
Raymond Girnys
Christian P. Levis
LOWEY DANNENBERG COHEN & HART P.C.
One North Broadway
White Plains, NY 10601
Tel.:  (914) 997-0500
Fax:  (914) 997-0035
Email: bhart@lowey.com
        vbriganti@lowey.com
        ghorn@lowey.com
        rgirnys@lowey.com
        clevis@lowey.com

Linda P. Nussbaum
Peter A. Barile III
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
Tel.:  (646) 722-8500
Fax:  (646) 722-8501
Email: lnussbaum@gelaw.com
        pbarile@gelaw.com

*Co-Lead Counsel for Plaintiffs and the Proposed Plaintiff Class*

128