**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

IN RE:

LONDON SILVER FIXING, LTD., ANTITRUST
LITIGATION

*This Document Relates to All Actions*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

1:14-MD-02573 (VEC)

1:14-MC-02573 (VEC)

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF DEFENDANTS
DEUTSCHE BANK AG, HSBC BANK USA, N.A., THE BANK OF NOVA SCOTIA (AND
AFFILIATED ENTITIES) TO DISMISS THE SECOND CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT**

# CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ....................................................................................................................... 4

    A.    THE PARTIES ................................................................................................... 4

    B.    THE SILVER MARKET ..................................................................................... 4

    C.    THE SILVER FIX .............................................................................................. 6

    D.    THE COMPLAINT'S CLAIMS ........................................................................... 8

ARGUMENT .......................................................................................................................... 12

I.    The Complaint Does Not Plead a Violation of the Sherman Act. ................................... 13

    A.    THE COMPLAINT DOES NOT ADEQUATELY ALLEGE AN UNLAWFUL
          AGREEMENT. ................................................................................................. 13

    B.    THE COMPLAINT FAILS TO ALLEGE COMMON MOTIVE. ......................................... 17

    C.    LONGSTANDING STRUCTURAL FEATURES OF THE FIXING PROCESS DO NOT
          SUPPORT AN INFERENCE OF COLLUSION. ........................................................... 20

    D.    THE WORK OF PLAINTIFFS' PAID EXPERTS IS INSUFFICIENT TO ESTABLISH A
          CONSPIRACY TO FIX PRICES. ........................................................................... 21

    E.    THE INVESTIGATIONS MENTIONED IN THE COMPLAINT ARE IRRELEVANT. ............. 26

    F.    PLAINTIFFS LACK ANTITRUST STANDING. ......................................................... 27

    G.    THE COMPLAINT DOES NOT ALLEGE ANTITRUST INJURY. .................................... 32

II.    The Complaint Does Not Plead a Claim for Violation of the CEA. ................................ 34

    A.    THE COMPLAINT FAILS TO PLEAD A PRICE MANIPULATION CLAIM WITH
          PARTICULARITY. ........................................................................................... 35

          1.    The Facts Alleged Do Not Give Rise to a Strong Inference of
               Scienter. ............................................................................................ 35

          2.    The Complaint Fails To Allege the Existence of Artificial Prices,
               or that Defendants Caused Such Prices. .............................................. 38

    B.    THE COMPLAINT FAILS TO PLEAD THE MANIPULATIVE DEVICE CLAIM
          WITH PARTICULARITY. .................................................................................. 42

    C.    THE COMPLAINT FAILS TO ALLEGE PRINCIPAL-AGENT OR AIDING AND
          ABETTING LIABILITY. .................................................................................... 44

    D.    PLAINTIFFS LACK STANDING UNDER THE CEA. ................................................. 44

III.    The Complaint's Antitrust and CEA Claims Are Time Barred. ..................................... 46

    A.    THE ANTITRUST CLAIMS ............................................................................... 46

B.      THE CEA CLAIMS ................................................................. 46

C.      THERE IS NO BASIS ON WHICH TO TOLL THE STATUTES OF LIMITATION. ............... 48

IV.   The Complaint Does Not State a Claim for Unjust Enrichment....................................... 50

**CONCLUSION**.................................................................................................................... 50

# TABLE OF AUTHORITIES

**Cases**                                                                                  **Page(s)**

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
181 F.3d 216 (2d Cir. 1999) (per curiam) ............................................................16

*In re Adelphia Commc'ns Corp.*,
No. 03 MD 1529 (LMM), 2005 WL 1278544 (S.D.N.Y. May 31, 2005) ..............................46

*Allen v. Dairy Farmers of Am., Inc.*,
No. 09-cv-230, 2014 WL 2610613 (D. Vt. June 11, 2014) ......................................29

*In re Amaranth Natural Gas Commodities Litig.* ("*In re Amaranth I*"),
587 F. Supp. 2d 513 (S.D.N.Y. 2008) ....................................................34, 35, 44

*In re Amaranth Natural Gas Commodities Litig.* ("*In re Amaranth II*"),
612 F. Supp. 2d 376 (S.D.N.Y. 2009), *aff'd*, 730 F.3d 170 (2d Cir. 2013) ......................35, 36

*In re Amaranth Natural Gas Commodities Litig.* ("*In re Amaranth III*"),
730 F.3d 170 (2d Cir. 2013) ............................................................34, 35, 42, 44

*Andrews v. Metro N. Commuter R.R.*,
882 F.2d 705 (2d Cir. 1989) ..........................................................................26

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..........................................................................12, 13, 17, 24

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983) ........................................................................................27, 30

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ............................................................................42

*Bazak Int'l Corp. v. Tarrant Apparel Grp.*,
347 F. Supp. 2d 1 (S.D.N.Y. 2004) ....................................................................50

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................13, 24

*Billy Baxter, Inc. v. Coca-Cola Co.*,
431 F.2d 183 (2d Cir. 1970) ............................................................................28

*Brothers v. Saag*,
No. 13-466, 2014 WL 838890 (N.D. Ala. Mar. 4, 2014) ............................................22

*Brown v. Lower Brule Cmty. Dev. Enter., LLC*,
 No. 13-7544, 2014 WL 5508645 (S.D.N.Y. Oct. 31, 2014)....................................12

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
 429 U.S. 477 (1977).......................................................................................32

*Butala v. Agashiwala*,
 916 F. Supp. 314 (S.D.N.Y. 1996) .................................................................49

*Cargill, Inc. v. Monfort of Colo., Inc.*,
 479 U.S. 104 (1986).......................................................................................30

*Certain Underwriters at Lloyd's v. Milberg LLP*,
 08 Civ. 7522 (LAP), 2009 U.S. Dist. LEXIS 97284 (S.D.N.Y. Sept 29, 2009)....................49

*CFTC v. Amaranth Advisors, L.L.C.*,
 554 F. Supp. 2d 523 (S.D.N.Y. 2008)............................................................38

*CFTC v. Parnon Energy, Inc.*,
 875 F. Supp. 2d 233 (S.D.N.Y. 2012)............................................................36

*Chambers v. Time Warner, Inc.*,
 282 F.3d 147 (2d Cir. 2002)...........................................................................4

*Chiarella v. United States*,
 445 U.S. 222 (1980).......................................................................................43

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
 No. 11-04003, 2013 WL 2156358 (N.D. Cal. May 17, 2013).........................22

*Colliton v. Cravath, Swaine & Moore LLP*,
 No. 08-0400, 2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008) .........................18

*In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.* ("*In re Silver I*"),
 No. 11-Md-2213 (RPP), 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012), *aff'd*,
 560 F. App'x 84 (2d Cir. 2014)............................................................... *passim*

*In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.* ("*In re Silver II*"),
 560 F. App'x 84 (2d Cir. 2014) ...........................................................36, 38, 44

*In re Cox*,
 Docket No. 75-16, 1987 CFTC LEXIS 325 (CFTC July 15, 1987) .......................35

*In re Crude Oil Commodity Litig.*,
 No. 06 Civ. 6677 (NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007),
 *reconsideration denied*, 2007 WL 2589482 (S.D.N.Y. Sept. 8, 2007).................20, 34, 36, 38

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
No. 09-cr-3690, 2014 WL 4083938 (N.D. Ill. Aug. 18, 2014)...............................................42

*DeMarco v. Depotech Corp.*,
149 F. Supp. 2d 1212 (S.D. Cal. 2001)...................................................................................22

*Depaoli v. JPMorgan Chase & Co.*,
No. 11-cv-862 (RPP) ...............................................................................................................50

*In re Digital Music Antitrust Litig.*,
812 F. Supp. 2d 390 (S.D.N.Y. 2011)......................................................................................31

*DNAML Pty, Ltd. v. Apple Inc.*,
25 F. Supp. 3d 422, 430 (S.D.N.Y. 2014) ...............................................................................28

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)..................................................................................................................42

*In re Elevator Antitrust Litig.*,
No. 04 CV 1178 (TPG), 2006 WL 1470994 (S.D.N.Y. May 30, 2006), *aff'd*,
502 F.3d 47 (2d Cir. 2007).......................................................................................................15

*In re Energy Transfer Partners Natural Gas Litig.*,
No. 4:07-cv-3349, 2009 WL 2633781 (S.D. Tex. Aug. 26, 2009), *aff'd sub
nom. Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239 (5th Cir. 2010) .............35, 45

*Fin. Acquisition Partners LP v. Blackwell*,
440 F.3d 278 (5th Cir. 2006) ...................................................................................................22

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC*,
711 F.3d 68 (2d Cir. 2013)............................................................................................. *passim*

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)..................................................................................................................22

*Georgia Malone & Co., Inv. v. Rieder*,
19 N.Y.3d 511 (2012) ..............................................................................................................50

*Gotlin v. Lederman*,
367 F. Supp. 2d 349 (E.D.N.Y. 2005) .....................................................................................26

*In re Graphics Processing Units Antitrust Litig.*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007) ...................................................................................26

*Gross v. New Balance Athletic Shoe, Inc.*,
955 F. Supp. 242 (S.D.N.Y. 1997) ..........................................................................................29

*Hayden v. Paterson*,
    594 F.3d 150 (2d Cir. 2010)..........................................................................................24

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
    620 F. Supp. 2d 499 (S.D.N.Y. 2009).........................................................................49

*In re Ind. Farm Bureau Coop. Ass'n*,
    No. 75-14, 1982 WL 30249 (CFTC Dec. 17, 1982) ..................................................39

*Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*,
    713 F. Supp. 2d 286 (S.D.N.Y. 2010).........................................................................15

*Johnson Bros. Liquor v. Bacardi U.S.A., Inc.*,
    830 F. Supp. 2d 697 (D. Minn. 2011)..........................................................................14

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)..........................................................................................36

*Koch v. Christie's Int'l PLC*,
    699 F.3d 141 (2d Cir. 2012)..........................................................................................47

*Lawline v. Am. Bar Ass'n*,
    956 F.2d 1378 (7th Cir. 1992) ......................................................................................34

*Laydon v. Mizuho Bank, Ltd.*,
    No. 12-cv-3419, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014)..................................... *passim*

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR I*"),
    935 F. Supp. 2d 666 (S.D.N.Y. 2013).........................................................28, 33, 34

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR II*"),
    962 F. Supp. 2d 606 (S.D.N.Y. 2013).........................................................................45, 46

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR III*"),
    27 F. Supp. 3d 447 (S.D.N.Y. 2014)...........................................................35, 37, 38, 47

*Maher v. JPMorgan Chase & Co.*,
    No. 10-cv-8548 (RPP) ..................................................................................................50

*Mason v. Am. Tobacco Co.*,
    346 F.3d 36 (2d Cir. 2003)....................................................................................13, 22

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)..............................................................................14, 17, 20

*Mid-W. Paper Prods. Co. v. Cont'l Grp., Inc.*,
    596 F.2d 573 (3d Cir. 1979)..........................................................................................31

*Nalven v. JPMorgan Chase & Co.*,
No. 10-cv-8284 (RPP) ...........................................................................................50

*New York v. Hendrickson Bros.*,
840 F.2d 1065 (2d Cir. 1988)..........................................................................14, 29

*Nicholson v. Bank of Nova Scotia*,
No. 14-CV-5682 (VEC) (S.D.N.Y. July 25, 2014)................................................46

*Nicholson v. JP Morgan Chase & Co.*,
No.10-cv-8724 (RPP) ...........................................................................................50

*In re Nine W. Shoes Antitrust Litig.*,
80 F. Supp. 2d 181 (S.D.N.Y. 2000)....................................................................46

*Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*,
No. 98-cv-4067, 1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999) ....................29, 30, 31

*In re Omeprazole Patent Litig.*,
No. 00-6749, 2010 WL 2079722 (S.D.N.Y. May 19, 2010), *aff'd mem.*, 412 F.
App'x 297 (Fed. Cir. 2011)...................................................................................13

*Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*,
467 F.3d 283 (2d. Cir. 2006)................................................................................32

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
No. 08-6056, 2009 WL 5865686 (S.D.N.Y. May 22, 2009), *aff'd*, 602 F.3d 57
(2d Cir. 2010)........................................................................................................12

*In re Platinum & Palladium Commodities Litig.*,
828 F. Supp. 2d 588 (S.D.N.Y. 2011)...................................................14, 26, 44

*In re Pub. Offering Antitrust Litig.*,
No. 98-Civ-7890 (LMM), 2004 WL 350696 (S.D.N.Y. Feb. 25, 2004) ...............29

*Reading Indus., Inc. v. Kennecott Copper Corp.*,
631 F.2d 10 (2d Cir. 1980)...................................................................................31

*Reed Constr. Data Inc. v. McGraw-Hill Cos.*,
49 F. Supp. 3d 385, 400-07 (S.D.N.Y. 2014) .....................................................22

*Ross v. Am. Express. Co.*,
35 F. Supp. 3d 407, 444 (S.D.N.Y. 2014) ...........................................................21

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000)......................................................................................4

*Salinger v. Projectavision, Inc.*
    934 F. Supp. 1402 (S.D.N.Y. 1996)....................................................................47, 49

*Sheehan v. Daily Racing Form, Inc.*,
    104 F.3d 940 (7th Cir. 1997) ...............................................................................41

*In re Silver I*,
    2012 WL 6700236 ........................................................................................ *passim*

*Simmtech Co. v. Barclays Bank PLC (In re Foreign Exch. Benchmark Rates*
    *Antitrust Litig.)*,
    _ F. Supp. 3d. _, 2015 U.S. Dist. LEXIS 9826 (S.D.N.Y. Jan. 28, 2015) ..............15

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v.*
    *Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 704 (2d Cir. 2013)...................................................................................13

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008)....................................................................................4

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008)..............................................................................................43

*Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*,
    738 F. Supp. 2d 505 (D. Del. 2010).......................................................................26

*Tam Travel, Inc. v. Delta Airlines, Inc. (In re Travel Agent Comm'n Antitrust*
    *Litig.)*,
    583 F.3d 896 (6th Cir. 2009) .................................................................................17

*Transhorn, Ltd. v. United Techs. Corp. (In re Elevator Antitrust Litig.)*,
    502 F.3d 47 (2d Cir. 2007) (per curiam).......................................................... *passim*

*Twombly v. Bell Atl. Corp.*,
    425 F.3d 99 (2d Cir. 2005), *rev'd on other grounds*, 550 U.S. 544 (2007)............17

*Johnson ex rel. United States v. Univ. of Rochester Med. Ctr.*,
    686 F. Supp. 2d 259 (W.D.N.Y. 2010), *appeal dismissed*, 642 F.3d 121 (2d
    Cir. 2011) (per curiam) ........................................................................................34

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    401 U.S. 321 (1971)..............................................................................................46

*Zinser v. Cont'l Grain Co.*,
    660 F.2d 754 (10th Cir. 1981) ...............................................................................29

**Statutes**

7 U.S.C. § 25 ...................................................................................................................47

15 U.S.C. § 15b ...............................................................................................................46

7 U.S.C. § 9 .....................................................................................................................34

7 U.S.C. §13 ....................................................................................................................34

**Other Authorities**

17 C.F.R. § 180.1 .......................................................................................................34, 42

72 Fed. Reg. 69,288 (Dec. 7, 2007) ..................................................................................6

73 Fed. Reg. 44,620 (July 31, 2008) .................................................................................6

76 Fed. Reg. 41,398 (July 14, 2011) (to be codified at 17 C.F.R. pt. 180) ...........36, 42, 43, 44

78 Fed. Reg. 62,017 (October 11, 2013).............................................................................6

Fed. R. Civ. P. 15(a) ..........................................................................................................1

Fed. R. Civ. P. 9(b) ............................................................................................................1

Fed. R. Civ. P. 12(b)(6).......................................................................................................1

Fed. R. Civ. P. 12(f) .........................................................................................................26

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT 05/28/15

Defendants Deutsche Bank AG, HSBC Bank USA, N.A., and The Bank of Nova Scotia,[1] respectfully submit this Memorandum of Law in Support of their Motion to Dismiss Plaintiffs' Second Consolidated Amended Class Action Complaint (the **Complaint** or the **SAC**), under Federal Rules of Civil Procedure 9(b) and 12(b)(6).

## PRELIMINARY STATEMENT

The Complaint has the benefit of a month's review of Defendants' motion to dismiss the First Consolidated Class Action Complaint (the **Initial Complaint** or **CAC**). *See* Fed. R. Civ. P. 15(a); (Def. Mem. Supp. Mot. Dismiss 21, ECF No. 61 (**MTD**)). It is therefore remarkable that it remains so thin on *facts* and so long on "expert" assertions. Also notable are the changes and inconsistencies from one iteration of Plaintiffs' submission to the next. Plaintiffs excised substantial parts of their most recent consolidated pleading, presumably because Defendants pointed out that material allegations supported dismissal, not a ticket to millions of dollars of discovery expense. Worse still, Plaintiffs now include allegations, usually through the mouths of facile experts, that are *inconsistent* with what they alleged, in a signed pleading, to the Court before.

Defendants respectfully ask the Court to hold Plaintiffs to the entirety of their serial allegations and to decline to deem as "facts" mere assertions from paid experts (whose role Plaintiffs now seek to obscure by labeling retained work product "econometric analysis"). (SAC ¶ 119.) The Complaint must be dismissed.

---

[1] The additional affiliated moving entities are Deutsche Bank AG New York Branch, Deutsche Bank Securities Inc., Deutsche Bank Trust Corporation, Deutsche Bank Trust Company Americas, Deutsche Bank Americas Holding Corp., DB U.S. Financial Markets Holding Corporation (together with Deutsche Bank AG, **Deutsche Bank**), HSBC Holdings Plc, HSBC North America Holdings Inc., HSBC USA Inc. (together with HSBC Bank USA, N.A., **HSBC**), Scotia Capital (USA) Inc., Scotiabanc Inc. and Scotia Holdings (US) Inc. (together with The Bank of Nova Scotia, **Scotiabank**) (collectively, **Defendants**). (SAC ¶¶ 32-37, 42, 45-46, 66-69.)

The essence of the Complaint exposes the vice of this form of pleading.  Defendants, it is alleged, participated in an on-again, off-again 15-year conspiracy to suppress the price of silver. (SAC ¶¶ 6, 234.)   The Complaint contends that "studies," each poorly described, entirely undisclosed, and now anonymous,  suggest that this conspiracy suppressed silver prices worldwide by an average of 0.15% during the 10-minute interval of the London silver fixing (the ***Silver Fix***), but only on certain days, from January 1, 1999 through an unspecified end date.  (SAC ¶¶ 5, 259.) Plaintiffs paid self-styled experts to identify some supposed pattern, from some data set, based on some form of analysis; their Complaint then relies on those same paid experts to describe the observed behavior as "anomalous," and then to assert that there must have been a massive conspiracy among Defendants to manipulate the price of silver downward (all during a concededly "historic bull run" (SAC ¶ 139), in which silver prices nearly quadrupled).

The Complaint (the third attempt to state well-pleaded claims) does not allege a single communication among any of the Defendants, much less any conspiratorial ones, nor does it name a single individual who participated in the purported conspiracy or allege how the purported conspiracy operated.  Dismissal is appropriate:  *First*, the Complaint continues to substitute for *facts* expert opinions supposedly suggesting that the pricing patterns around the Silver Fix were anomalous and the result of collusion. Tendentious assertions, premised on undisclosed methodologies, are not entitled to a presumption of truth – especially because the "experts'" qualifications have not been (and cannot be) assessed, and their assumptions and theories have not been tested.  Opinions aside, the Complaint alleges no facts suggesting that downward price movements are unusual for a precious metal with a daily liquidity event like the Silver Fix. Indeed, the Complaint acknowledges a "threefold" increase in the volume of silver futures trading during the Silver Fix.  (SAC ¶ 141.)  Unlike its predecessor, however, the Complaint excises

Plaintiffs' prior admission that the Silver Fix price might have been driven by exogenous forces, and no longer identifies Andrew Caminschi, one of Plaintiffs' "experts," in connection with its assertions of conspiracy, presumably because Defendants previously noted Mr. Caminschi's alternative theory that participants in the public markets, and *not* Defendants acting in the Silver Fix, caused decreases in silver prices.  Excising his name by amendment does not erase the man's opinions, or the fact that Plaintiffs embraced them previously.

*Second*, the Complaint does not allege facts even hinting at the existence of a price-fixing conspiracy or giving rise to a strong inference that Defendants acted with *scienter*, a necessary element of the Complaint's Commodity Exchange Act (**CEA**) claims.  The Complaint speculates that Defendants suppressed prices to capitalize on their "short" trading positions in silver, but it lacks any allegations about Defendants' actual silver positions.  More tellingly, it omits the Initial Complaint's admission that Defendants established "long" positions in silver futures – an admission inconsistent with any claim of common motive and with the premise of the conspiracy and manipulation allegations.  Especially in cases in which the costs of litigation are so asymmetric and so high,  transparent opportunism should not be countenanced, and  Plaintiffs should be held to their allegations.

*Third*, Plaintiffs lack standing to assert antitrust claims and likewise lack standing to bring CEA claims.

*Finally*, the Complaint's claims, which accrued well beyond the limitations period, are time-barred and not saved by the Complaint's now-familiar excision of lengthy allegations from the Initial Complaint that rebut even an inference of fraudulent concealment.

# BACKGROUND

## A.    THE PARTIES

Plaintiffs are individuals and a business that allegedly sold physical silver, silver futures

contracts and options, and mini silver futures contracts between January 1, 1999 and an unspecified

end date (the **Class Period**).  (SAC ¶¶ 18-27.)  The Complaint alleges that Plaintiffs sold silver and

silver derivatives "[t]hroughout the Class Period" (SAC ¶ 230) but does not provide precise timing,

price, or counterparty information for *any* of Plaintiffs' transactions (*see* SAC App'x D at 13-26).[2]

The Defendants are UBS AG and affiliates of Deutsche Bank, HSBC, and Scotiabank

(SAC ¶¶ 28-80), four of at least 65 market makers for physical silver.  (SAC ¶ 199.)

No Plaintiff is alleged to have been a client of any Defendant, to have sold silver or silver-

related investments to any Defendant (directly or indirectly), or ever to have participated in the

Silver Fix or traded silver at or after the time of day when the Silver Fix occurred.

## B.    THE SILVER MARKET

Physical silver and silver derivatives are traded in markets that are large and highly liquid.

(SAC ¶ 3; Ex. 1[3] (Andrew Caminschi, *Any Silver Linings? London Silver Fixing Impact on Public*

*Markets Before and After the Introduction of Contemporaneous Futures Trading*, July 7, 2014

(**Caminschi**) at 23-25.); Ex. 2 (Francesca Freeman, *Curtain to Fall on London's Historic Silver*

*Benchmark,* Wall St. J., May 14, 2014 (**Freeman**).)  Market participants in the silver markets "span

the  globe  and  trade  virtually  around  the  clock,"  and  include  silver  producers  (both  mining

---

[2] The omissions might well be advertent, as a Plaintiff who *bought* and then *sold* silver during the purported manipulation period may not have suffered any injury during the proposed 15-year Class Period.

[3] All references to "Ex." refer to the exhibits to the Declaration of Michael Lacovara, dated May 29, 2015.  On a motion to dismiss, the Court may consider "any statements or documents incorporated" into the Complaint, and "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit," *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *accord Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002), and may take judicial notice of matters of public record, *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).  Citation information is provided in the Lacovara Declaration.

companies and refiners), consumers (such as jewelers and industrials), investors, speculators, private individuals, and central banks.  (Ex. 1 (Caminschi) at 2; Ex. 3 (Jeremy A. Charles, *Commodities Futures Trading Commission: Examination of Futures and Options Trading in the Metals Markets*, March 25, 2010 ("Charles") at 1).)  Participants trade both physical silver and a wide variety of silver derivatives, including futures, exchange-traded funds, and options.  (Ex. 1 (Caminschi) at 2.)

Physical silver can be traded "over-the-counter" (**OTC**) (SAC ¶ 104); silver can also be traded using futures and options (SAC ¶ 106). The Complaint explains how those instruments work (SAC ¶¶ 106-112, 116-117):  in essence, holders of long positions benefit when the price of silver increases; holders of short positions benefit when that price decreases (SAC ¶ 111). Transacting through derivative instruments rarely requires an exchange of physical silver; investors usually "offset" positions by buying or selling an equal number of opposite positions.  (SAC ¶ 110.)  In this way, market participants engage in constant, dynamic hedging of physical positions with derivatives, and *vice versa*.

Silver derivatives are traded across multiple venues, including COMEX, the NYSE LIFFE, the Intercontinental Exchange, and the Chicago Board of Trade.  (SAC ¶ 107 & n.31.)  The market for physical silver is an OTC market consisting of the 11 market maker members of the London Bullion Market Association (**LBMA**).  (*See* Ex. 1 (Caminschi) at 7.)

The silver markets are characterized by significant intraday price volatility, with spikes in prices observed at several times during most trading days, including during the "opening of the COMEX trading pit," at the closing of the COMEX trading pit, and at the opening of U.S. equity markets.  (*Id.* at 23-25.)  Intraday volatility notwithstanding, over the course of the Class Period,

the spot price of silver enjoyed "a historic bull run," "increasing in price from $6.78 per ounce [on January 1, 2005] to $48.44 per ounce on April 28, 2011." (SAC ¶ 139.)

Defendants are among dozens of firms that trade in both physical silver and silver derivatives. (SAC ¶¶ 40, 54-55, 59-61, 74, 76, 199.) Some of those firms also act as custodians for silver investors. Banks with exposure to changes in the price for physical silver use futures, swaps, or options transactions to hedge their positions and balance their cash market risk (*see* Ex. 3 (Charles) at 3-4) – a strategy that can render a bank "price neutral," meaning that it is indifferent to changes in the price of silver.[4]

### C.     THE SILVER FIX

The London Silver Market Fixing Limited (the ***Silver Fixing Company***) is a British private company that administered the Silver Fix until August 14, 2014; the Silver Fix itself has "changed only slightly" since it was established in 1897. (Ex. 1 (Caminschi) at 6.) Originally performed through daily, in-person meetings among the members, the Silver Fix came to be conducted through a single daily teleconference. (*Id.*) That process continued until August 14, 2014, when the Silver Fixing Company was replaced by the London Silver Price. (SAC ¶ 15; *see* Ex. 4 (Xan Rice, *London Silver Price Fix Dies After Nearly 120 Years*, Fin. Times, May 14, 2014).) The membership of the Silver Fixing Company has changed over time; its last remaining members were Deutsche Bank, HSBC, and Scotiabank. (SAC ¶¶ 29, 48, 71.)

Throughout the Class Period (until August 14, 2014), the Fixing members convened by teleconference once each day, at noon London time, to determine a benchmark price for physical

---

[4] Defendants are subject to regulations and risk-based capital requirements obligating them to hedge commodities-related risks. *See* Regulatory Capital Rules: Regulatory Capital, Implementation of Basel III, Capital Adequacy, 78 Fed. Reg. 62,017, 62,094-95, October 11, 2013 (***Regulatory Capital Rules***); Supervisory Guidance: Supervisory Review Process of Capital Adequacy Related to the Implementation of the Basel II Advanced Capital Framework, 73 Fed. Reg. 44,620, 44,623-24 (July 31, 2008) (***Supervisory Guidance***); Risk-Based Capital Standards: Advanced Capital Adequacy Framework, 72 Fed. Reg. 69,288, 69,303 (Dec. 7, 2007).

silver.  (SAC ¶ 96.)  This teleconference typically lasted less than 10 minutes and was conducted as an auction, led by a Chairman, selected from among the Silver Fixing Company's members.  (*Id.*) The auction began with the Chairman's determination of the prevailing U.S. Dollar "spot price" (or current market price of physical silver) in the London market.  (SAC ¶ 97.)  Given the widely disparate sizes of the physical and futures markets, the spot price is largely a function of the futures price:  as Plaintiffs' prior pleading acknowledged, traders in the spot market use "the prices of COMEX silver futures contracts to calculate the spot market price of silver."  (CAC ¶ 122.)  After the Chairman announced the opening price, each member indicated, in 50-bar increments, how many LBMA Good Delivery bars of silver it would be willing to buy or sell at the opening price. (SAC ¶ 97.)  If the amount of buying and selling interest was equal, the Silver Fixing concluded. (SAC ¶ 98.)  If there was an imbalance, the Chairman adjusted the price until the total amount of silver to be purchased was within 300 bars of the total amount sold.  (*Id.*)  If this threshold could not be reached, the Chairman could set the price unilaterally, and the members were obliged to divide the excess supply or demand among themselves *pro rata*.  (SAC ¶ 99.)  Once settled, the Silver Fix price was immediately published to the market.  (*Id.*)

On August 15, 2014, the LBMA Silver Price replaced the Silver Fix.  (SAC ¶ 253.)  The LBMA Silver Price "keeps some of the main features of the silver fixing, in particular the auction-style process used to calculate the reference price."  (Ex. 5 (Xan Rice, *New Silver Price is "Improvement" on Fix*, Fin. Times, July 16, 2014).)  The auction is now conducted electronically, with six participating members:  HSBC, JP Morgan Chase Bank, Mitsui & Co. Precious Metals Inc., Scotiabank, UBS and the Toronto Dominion Bank.  (*See* Ex. 6 ("CME Group and Thomson Reuters Operate the New LBMA Silver Price").)

### D.   THE COMPLAINT'S CLAIMS

Like the Initial Complaint, the Complaint alleges that over a period of 15 years, Defendants agreed to submit false pricing information during the Silver Fix, and to engage in a variety of other misconduct (generally transacting with unspecified inside information about the trajectory of the Silver Fix) so as to manipulate the price of silver and silver financial instruments.  (*See, e.g.*, SAC ¶¶ 4-6; CAC ¶ 133.)   And as in the Initial Complaint, Defendants are alleged to have seized "complete control" over the Silver Fix for the entire 15-year Class Period "to create and exploit an advantage over the rest of the market," including Plaintiffs.  (SAC ¶¶ 4, 12; *see* CAC ¶¶ 108, 135.) The Complaint purports to plead (a) price-fixing, bid-rigging, and conspiracy to restrain trade in violation of the Sherman Act (Claims One, Two, and Three); (b) market manipulation, principal-agent liability, aiding and abetting, and manipulation by false reporting in violation of the CEA (Claims Four, Five, Six, and Seven); and (c) unjust enrichment under New York law (Claim 6). (SAC ¶¶ 269-322.)   The Complaint differs from its forebear in that it adds claims for bid-rigging under the Sherman Act and for manipulation by false reporting under the CEA; omits its prior claim for a violation of New York's Donnelly Act; and refines its unjust enrichment claim to plead a violation of only New York law, rather than the laws of 48 states.  (*See* SAC ¶¶ 269-322; CAC ¶¶ 256-291.)

**Downward Price Movements:**  The centerpiece of the Complaint is "analysis" by paid experts.  After Defendants highlighted Plaintiffs' improper reliance on experts at the pleading stage, Plaintiffs deleted all references to "experts" (CAC ¶¶ 190, 217) – going so far as to remove their names.  The Complaint now refers instead to "econometric analysis" (SAC ¶¶ 119-212), as if the allegations in the Complaint were based on an objective learned treatise.  Not so, and  Plaintiffs

cannot hide that 61 pages of their Complaint purport to summarize studies crafted by paid "experts."[5]

Plaintiffs also revised their descriptions of those studies to conceal methodological defects previously identified by Defendants.  (MTD 21.)  As with the Initial Complaint, the Complaint compiles an alleged review of silver spot and futures prices and trading volume from a portion of the Class Period, January 1, 2000 to August 14, 2014, and declares the results "anomalous" (without describing its methodology and without other indicia of reliability).  (SAC ¶¶ 169, 172, 223.)  But because Defendants previously pointed out that "anomalies" merely "consistent with" collusion do not evidence an antitrust conspiracy (MTD 21), the Complaint *now* alleges that the *same observations* "indicate[]" or are "indicative of" collusion or manipulation.  (*See, e.g.*, SAC ¶¶ 127, 130.)  Regardless of the verb choice, these are paid-for and untested opinions, not factual allegations.

The expert opinions center on "abnormal volume and pricing dynamics . . . observed around the start of the Silver Fix."  (*E.g.*, SAC ¶¶ 9-10.)  Those "dynamics," the Complaint claims, suggest "systematic price suppression" and are "consistent with . . . manipulative conduct."  (*E.g.*, SAC ¶¶ 10, 155.)  The Complaint asserts that the claimed "dysfunction in silver pricing" is evidence that Defendants' conduct had a "persistent (and cumulative) impact on the price of silver" during the Class Period.  (SAC ¶ 176.)  "As a result" of that  "price suppression," the Complaint concludes that "Plaintiffs transacted at artificially lower prices each time they sold physical silver or silver financial instruments, and received less than they otherwise would have in a competitive, un-manipulated market."  (SAC ¶ 231.)

---

[5] For example, an analysis that the Initial Complaint credited to Professor Rosa Abrantes-Metz (CAC at 80, ¶¶ 165-166 & fig.32) now goes unattributed (SAC ¶ 130 & fig.6).  Likewise, the Complaint does not give Andrew Caminschi credit for analysis that the Initial Complaint alleged he performed.  (*Compare, e.g.*, CAC ¶ 229 & fig.48 *with* SAC ¶¶ 179-180 & fig.35.)

In their initial motion to dismiss, Defendants highlighted the fact that the Initial Complaint contained allegations suggesting that exogenous, benign forces caused the "anomalous" behavior that is the linchpin of the Complaint.  For example, Defendants noted that "silver refiners and other industrial producers" might seize on "the high liquidity available around" the Fixing, which would cause prices to decline.  (MTD 35.)  Plaintiffs' response is telling.  The Complaint now asserts that the Silver Fix does not "take place when trading volume is near its peak"  (SAC ¶ 8) – but tries to support that assertion by reference to COMEX silver futures trading (SAC ¶ 141 & fig.14), *not* the physical silver market in which "silver refiners and other industrial producers" would "sell inventory."  (MTD 35.)  The Complaint also abandons another prior factual assertion – that "silver traders use the prices of COMEX silver futures contracts to calculate the spot market price of silver" (CAC ¶ 122) – because Defendants used it to debunk Plaintiffs' claim that spot prices necessarily influenced futures prices (MTD 36-37).

**Defendants' Alleged Financial Incentives:**  The Complaint alleges three ways in which Defendants could have benefitted from manipulating the silver market:  "(a) taking positions in the silver market based on their advance knowledge of the Fix price; (b) manipulating their clients' order flow to financially benefit their [net short, presumably] silver market positions; and (c) maintaining an anticompetitive fixed [bid-ask] spread."  (SAC ¶ 11.)

As to the first, the Complaint alleges that Defendants took advantageous trading positions based on their advance "knowledge of the Fix price direction" (SAC ¶ 177), but contains no factual allegations about what positions Defendants established – other than the aggregate positions taken by Defendants' foreign exchange, derivatives, or precious metals desks, which do not reveal their positions in *silver*.  (SAC ¶¶ 208-210.)  There are thus no facts to show that this hypothesized behavior ever occurred.

Second, as to alleged downward manipulation of silver order prices in light of Defendants' alleged short positions,[6] Plaintiffs claim to have "identified more than 1900 days during the Class Period where Defendants' spot market activity caused [increasing] silver market price trends to reverse direction." (SAC ¶ 161.)  But the Complaint lists only a handful of days.  (SAC ¶¶ 157-166.)  At most, the data for those days show that Defendants reacted to each other's quotes, conduct as consistent with competition as collusion.

Third, the Complaint alleges that Defendants "increas[ed] or maintain[ed] a supracompetitive bid-ask spread." (SAC ¶ 199.)  This allegation stems from an investigation by a Swiss regulator (*FINMA*) (*see* SAC ¶ 200) that did not involve Defendants and is just conjecture as applied here.  The Complaint compares Defendants' spreads to those that the rest of the market quoted and concludes that there can be "no legitimate reason" for the alleged discrepancy, which "is indicative of information sharing and collusion."  (SAC ¶ 207.)  It does not allege, however, that any Defendant ever communicated with any other Defendant about silver bid-ask spreads – only that UBS allegedly shared order "flow information" with unspecified third parties.  (SAC ¶ 200.)[7]

**Government Investigations and Settlements:**  The Complaint's final set of allegations concerns regulatory actions taken in other markets and involving other (non-Defendant) market participants.  The Complaint emphasizes certain Defendants' settlements with the Commodity

---

[6] According to the Complaint, one way in which Defendants carried out this scheme was by "triggering" client stop-loss orders – driving prices down so that they would force clients to sell – thus "allowing [Defendants] to buy silver from [their] client[s] at an artificially lower price." (SAC ¶ 224.)  Even if Plaintiffs were correctly reading their own data – which they are not (*see* MTD 11 n.9) – their Complaint does not allege that Defendants in fact communicated with each other before quoting prices or that either bank mentioned in the one, five-year old example chosen (SAC ¶¶ 159-160) had stop-loss orders to trigger on the day observed.

[7] The Complaint asserts a new bid-rigging claim (SAC ¶ 279-284), but offers no new facts to support it, only the single, unsupported allegation that "Defendants and co-conspirators . . . engaged in hundreds of episodes of illegal bid rigging . . . [and]. . . rigged the supposedly 'Walrasian' auction of the Silver Fix with the purpose and effect of suppressing the price of silver." (SAC ¶ 280.)

Futures Trading Commission (**CFTC**) and the U.K. Financial Conduct Authority (**FCA**) over allegations relating to foreign exchange (**FX**) trading, claiming that because collusive conduct occurred there, it must have occurred here. (*See* SAC ¶¶ 213-225.) Plaintiffs thus seek to impute purported misconduct in FX to Defendants' silver trading desks. But neither settlement included any allegation about precious metals trading, much less silver trading.

The Complaint also highlights UBS's "settle[ment]" of a FINMA inquiry (SAC ¶ 79), but ignores that UBS did not participate in the Silver Fix and that the settlement did not involve any allegation of collusion among Defendants. (*See id*; *see also* Ex. 7 (FINMA, *Foreign Exchange Trading at UBS AG: Investigation Conducted by FINMA*, November 12, 2014).)

Finally, the Complaint alleges that the Department of Justice (**DOJ**) and CFTC announced in February 2015 that they were investigating Defendants in connection with precious metals benchmarking, as if to suggest that the fact of investigations somehow lowers Plaintiffs' pleading burden. (SAC ¶ 16.) [8]

## ARGUMENT

The Complaint must contain adequate "fact pleading" *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, No. 08-6056, 2009 WL 5865686, at *4 (S.D.N.Y. May 22, 2009), *aff'd*, 602 F.3d 57 (2d Cir. 2010). To survive a motion to dismiss, it must set forth "sufficient *factual* matter" plausibly showing Plaintiffs' entitlement to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (emphasis added). Courts "examine only the well-pleaded factual allegations." *Brown v. Lower Brule Cmty. Dev. Enter., LLC*, No. 13-7544, 2014 WL 5508645, at *3 (S.D.N.Y. Oct. 31, 2014).

---

[8] In another example of pleading by insinuation, the Complaint refers to an article in which a German regulator expressed concern about "potential manipulation of the metals as well as the foreign exchange market" (SAC ¶ 238), but omits to mention that "[n]one of the banks have been accused of any wrongdoing." (Ex. 8 (Neil Hume, Alice Ross, and Emiko Terazono, *Deutsche Puts Gold Price Fix Role on Sale*, Fin. Times, Jan. 17, 2014).)

"[L]egal conclusions, deductions or opinions couched as factual allegations" are ignored, *Mason v. Am. Tobacco Co.*, 346 F.3d 36, 39 (2d Cir. 2003) (citation and internal quotation marks omitted), as are "'naked assertion[s]' devoid of 'further factual enhancement,'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)), and allegations couched in "vague" or "general" terms, *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2014 WL 1280464, at *3 (S.D.N.Y. Mar. 28, 2014) (citation and internal quotation marks omitted).

The Complaint's well-pleaded factual allegations must "raise a reasonable expectation that discovery will reveal evidence" consistent with the claims alleged, *Twombly*, 550 U.S. at 556, such that it is not unfair to expose Defendants to the "enormous," *id.* at 559, and "asymmetric costs" of discovery, which can lead to "settlement extortion." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013) (internal quotation marks omitted). Determining whether factual allegations suffice "to justify discovery," *In re Omeprazole Patent Litig.*, No. 00-6749, 2010 WL 2079722, at *6 n.3 (S.D.N.Y. May 19, 2010), *aff'd mem.*, 412 F. App'x 297 (Fed. Cir. 2011), is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## I.      The Complaint Does Not Plead a Violation of the Sherman Act.

### A.      THE COMPLAINT DOES NOT ADEQUATELY ALLEGE AN UNLAWFUL AGREEMENT.

Because Section One of the Sherman Act proscribes "[e]very contract, combination . . . or conspiracy," a well-pleaded Section One claim must include specific facts showing that Defendants entered into an unlawful agreement.[9] *Twombly,* 550 U.S. at 556-57. "[C]onclusory

---

[9] This requirement applies to both the price-fixing and bid-rigging claims asserted in the Complaint. *See, e.g., Transhorn, Ltd. v. United Techs. Corp. (In re Elevator Antitrust Litig.)*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (affirming dismissal of bid-rigging claims where plaintiffs were "unable to allege facts that would provide plausible grounds to infer an agreement"). The Complaint's new bid-rigging claim pleads no new facts and does not

allegation[s] of agreement at some unidentified point," or facts that support merely a "suspicion" or "possibility" of agreement, do not state a claim under Section One. *Id.* at 554-55, 557; *In re Elevator Antitrust Litig.*, 502 F.3d at 50. Rather, the Complaint must offer either (i) facts that constitute "direct evidence" of an illegal agreement among Defendants, or (ii) "circumstantial facts supporting the *inference* that a conspiracy existed." *Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). The Complaint does neither.

Still absent in this third iteration of the complaint is even a single "actual, verbalized communication" of any sort among Defendants, much less specific communications between the Defendants about any specific plan to fix prices or rig bids. *See In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 597 (S.D.N.Y. 2011) (internal quotation marks omitted). Defendants previously highlighted this, but no attempt has been made to cure it – in fact the Complaint is even flimsier than its predecessors in this respect.[10] It does not identify a single telephone call, electronic message, or chat room conversation between or among any of the

---

incorporate prior allegations as evidence of claimed "bid-rigging." The omission of supporting allegations is not surprising, as the facts here are materially different from those in bid-rigging actions, which typically concern conspiracies to submit artificially low contract bids to government agencies. The entity harmed in such cases is the entity to which the artificial bids are submitted – the government agency – not third parties, like Plaintiffs. *See, e.g., Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 78 (2d Cir. 2013); *New York v. Hendrickson Bros.*, 840 F.2d 1065, 1079 (2d Cir. 1988); *cf. infra* at 29. For economy, Defendants address jointly arguments that apply equally to the Complaint's price-fixing and bid-rigging claims. Moreover, the Complaint's "quick look or rule of reason violation of Section One" (SAC ¶¶ 286-288) suffers from the same pleading infirmities as the Complaint's attempt to allege factual content sufficient to plead a *per se* Sherman Act violation. *See, e.g., Johnson Bros. Liquor v. Bacardi U.S.A., Inc.*, 830 F. Supp. 2d 697, 709-12 (D. Minn. 2011) (applying *Twombly* to rule of reason claim and finding that plaintiffs failed to allege an unreasonable restraint on competition); *Laydon*, 2014 WL 1280464, at *13.

[10] The Initial Complaint excerpted two instant messages sent by unidentified traders, allegedly showing some kind of generic "awareness" of price manipulation in the market. (CAC ¶¶ 152-153.) After Defendants noted that neither message was tied to any Defendant, had anything to do with the Silver Fix, or transpired on one of the days that Plaintiffs' paid experts associated with "anomalous" pricing activity (MTD 12 n.12), the messages were deleted from the Complaint, together with references to the FOIA request that led to their production. *See infra* at 48.

Defendants – let alone any communication in which Defendants' employees coordinated activities, discussed the submission of false bids, or agreed to fix artificial prices.[11]

The Initial Complaint was replete with generic *ipse dixits* alleging collusion, the inadequacy of which Defendants highlighted.[12]   The new pleading adds no heft to cure this deficiency.  Plaintiffs merely deleted the unhelpful allegations that Defendants flagged in their first motion to dismiss, and replaced them with equally generic new ones.  (*See, e.g.,* SAC ¶ 169 (the "Fixing Members . . . conspired to manipulate and fix . . . prices"); SAC ¶ 200 ("Defendants manipulated and fixed their bid-ask spreads"); SAC ¶ 2 ("Defendants" reached an "agreement to manipulate and fix silver prices").)  These allegations make no distinction among individual defendants, fail to describe the particular activities of each, and are thus insufficient to support the existence of an unlawful agreement.  *See In re Elevator Antitrust Litig.*, No. 04 CV 1178 (TPG), 2006 WL 1470994, at *2-3 (S.D.N.Y. May 30, 2006) (dismissing bid-rigging and price-fixing claims where conspiracy was alleged "in entirely general terms without any specification of any particular activities by any particular defendant"), *aff'd*, 502 F.3d 47; *Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 297 (S.D.N.Y. 2010) ("Repeating the assertion that the [defendants] 'agreed' and characterizing the conduct as a horizontal [bid-rigging] conspiracy . . . does not, without more, pass muster under *Twombly*.").  Plaintiffs must tender a

---

[11] The contrast to Judge Schofield's recent decision in *Simmtech Co. v. Barclays Bank PLC (In re Foreign Exch. Benchmark Rates Antitrust Litig.)*, _ F. Supp. 3d. _, 2015 U.S. Dist. LEXIS 9826, at *27-28 (S.D.N.Y. Jan. 28, 2015), is instructive.  In *Simmtech*, antitrust claims were allowed to proceed, in large measure because the Complaint offered "direct evidence akin to the 'recorded phone call in which two competitors agreed to fix prices at a certain level' – the Second Circuit's paradigmatic example of direct proof of a Section 1 violation."  The Complaint alleged in some detail the conduct of particular FX traders and their use of various electronic communications platforms, particularly chat rooms and instant messaging, to share "market-sensitive information with rivals" including price information, customer information, and their net trading positions before the setting of the benchmark price.  The names that the FX traders gave chat rooms – including "The Cartel," "The Bandits' Club" and "The Mafia" –  supported the inference that the chat rooms were used for anticompetitive purposes.

[12] *See, e.g.,* CAC ¶ 133 ("Defendants" "agree[d] to submit false pricing information not reflective of legitimate supply and demand"); CAC ¶ 135 ("Defendants colluded with each other about where to fix the price of silver."); MTD 15-16.

Complaint that includes substantive allegations that each of the Defendants, "in *their individual capacities*, consciously committed themselves to a common scheme designed to achieve an unlawful objective." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999) (per curiam) (emphasis added).

The Complaint also fails to allege circumstantial facts that could support an inference of conspiracy. The Initial Complaint identified *one day* – out of a conspiracy that purportedly spanned *15 years* – of supposedly "parallel" conduct. (*See* CAC ¶¶ 138, 216-217.) After Defendants highlighted the Complaint's failure to identify more than a single instance of purported parallel conduct (MTD 16), Plaintiffs amended their Complaint to include a handful of additional alleged examples, but remain mum on conduct for more than *99.6%* of the trading days on which the episodic "conspiracy" supposedly was in effect.[13] The new examples just compound the inadequacy of the old allegation. Each focuses in isolation on behavior of only some Defendants, and several concern non-defendants.[14] Isolated, unrelated incidents are not adequate to support an inference that Defendants engaged in a conspiracy to suppress prices, especially one that lasted a decade and a half. The snippets say nothing about the conduct of other Defendants during the moments covered, much less whether their pricing behavior conformed to, or deviated from, that of the identified Defendants or of all other market participants, including the 65-odd market makers identified in the Complaint (SAC ¶ 199).

Even if the examples demonstrated parallel conduct, they would be insufficient as a matter of law to support the existence of an antitrust conspiracy. "[A]dditional facts or circumstances . . .

---

[13] SAC ¶¶ 158-68. The Complaint alleges that Plaintiffs have identified "more than 1,900 days during the Class Period where Defendants' spot market activity caused silver market price trends to reverse direction." (SAC ¶ 161.) The Complaint discusses *six* of those days.

[14] *See, e.g.*, SAC ¶¶ 158-60 (BNP Paribas), 162 (Royal Bank of Canada). The Complaint does not explain the significance of conduct of non-parties who are not alleged to be conspirators.

16

must . . . lead to an inference of conspiracy" that "could [not] just as easily turn out to have been rational business behavior." *Citigroup*, 709 F.3d at 137.  In a dynamic market, participants can and do adjust their quotes to track market prices – *and to respond to competitors*.  *In re Elevator Antitrust Litig.*, 502 F.3d at 51 ("[s]imilar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy").  That would be especially so when, as one of the examples offered in the Complaint suggests, "only 2 market-makers, Defendants Deutsche and UBS . . . were publicly quoting silver prices at this time." (*See, e.g.*, SAC ¶ 161.)  In a two-seller market, each market participant is much more likely to be sensitive to the quoting decisions of its single competitor than it would be in a market flooded with other participants.  Even the gossamer-thin conduct allegations in the Complaint are, therefore, "not only compatible with, but indeed [ ] more likely explained by, lawful, unchoreographed free-market behavior." *Iqbal*, 556 U.S. at 680; *see also Tam Travel, Inc. v. Delta Airlines, Inc. (In re Travel Agent Comm'n Antitrust Litig.)*, 583 F.3d 896, 904 (6th Cir. 2009).

### B.   THE COMPLAINT FAILS TO ALLEGE COMMON MOTIVE.

Absent direct evidence suggesting the existence of a conspiracy, the Complaint must allege facts that would allow the Court to infer a conspiracy, potentially including facts showing a common motive to conspire.  *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 114 (2d Cir. 2005), *rev'd on other grounds*, 550 U.S. 544.  The Complaint does not even attempt to do this, instead alluding only to a speculative possibility that Defendants could have benefitted from manipulating prices.  The Complaint's confused and unsupported theory of motive – that Defendants stood to gain from persistent price suppression – is inadequate to state an antitrust claim.

As in the Initial Complaint, Defendants are alleged to have engaged in the "persistent suppression" of silver prices because they had financial incentives to do so.  The Complaint adds

no new facts to support this assertion, but it does subtract some – allegations that Plaintiffs once represented were *facts* – that undermine it.  The Initial Complaint alleged that Defendants would sometimes make gains by "establish[ing] long COMEX silver futures positions" (CAC ¶ 135), an act that would have resulted in *losses* had prices been suppressed persistently. The Initial Complaint also conceded that silver prices increased substantially during the Class Period (*see* CAC ¶ 211 ("Between 2000 and 2013, the price of silver increased from $5.14 to $19.50 per ounce.")), a fact that would have made it highly implausible for Defendants – who are subject to risk-based capital controls – to establish and maintain large, unhedged short positions for a 15-year period, a necessary precondition if Defendants were to benefit from long-term price suppression. Defendants highlighted the import of these allegations (MTD 18), and Plaintiffs, in response, just hit "Delete."  Plaintiffs should be deemed bound by factual admissions in the Initial Complaint; they cannot escape their effect by discarding factual allegations that do not serve their case.  *See Colliton v. Cravath*, *Swaine & Moore LLP*, No. 08-0400, 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008).

The Complaint now hypothesizes that Defendants would take "positions in the silver market based on their advance knowledge of the Fix" (SAC ¶ 11), but does not offer a single factual allegation to support that assertion or any facts regarding the silver positions that Defendants established and held during the Class Period. It thus offers no facts that suggest that those (unknown) positions would have benefited from price suppression.  And the Complaint does not allege that one or more Defendants held a net short position in silver for all or any part of the 15-year Class Period – a prerequisite if Defendants were to gain from persistent, long-term price suppression.

The Complaint offers two new (and, again, unsupported) assertions to suggest how Defendants *might* have benefited from price suppression.  First, it alleges that Defendants stood to profit by "increasing or maintaining supra-competitive bid-ask spreads, paying artificially less for silver, and then reselling it at an artificially higher price."  (SAC ¶ 199.)  This is just a guess: Plaintiffs do not allege that Defendants actually profited in this way and do not point to a single quotation that is alleged to be "supra-competitive."  A statement of a hypothetical possibility is not a factual allegation.  Furthermore, by failing to allege that Defendants communicated or entered into an agreement regarding bid-ask spreads, there is no basis to infer that such conduct – if it occurred – was *collusive*.

Second, the Complaint includes a series of new charts that purport to summarize Defendants' trading positions during different (seemingly random, and unavailable for review or testing by Defendants or the Court) segments of the Class Period.[15]  From those charts, the Complaint asserts that "Defendants were each in a position to benefit from . . . manipulation . . . because their . . . speculative positions . . . were substantially larger than . . . [their] hedging positions."  (SAC ¶ 208.)  The new charts suffer from all of the vices and infirmities of the rest of the Complaint's paid-for "expert" allegations, and they add nothing to suggest motive.  None addresses the size of any Defendant's position in *silver* during the Class Period, only their overall positions in inconsistent baskets of "stuff":  "exchange-traded and over-the-counter derivatives" (for Scotiabank), "precious metals and other commodities" (for UBS), "over-the-counter precious metals" (for Deutsche Bank), and foreign exchange trading, "which includes precious metals trading" (for HSBC).  (SAC ¶¶ 208-212.)  None of this

---

[15] *See* SAC ¶¶ 208-212.  The charts address the following periods:  for HSBC, 2005-2014; for Deutsche Bank, 2000-2009; for Scotiabank and UBS, 1998-2014.

information gives the Court a basis from which to draw an inference specific to the market and products at issue here.[16]

The Complaint alleges nothing more than that Defendants held positions from which they hoped to profit. But that allegation is legally insufficient to support either of the Complaint's Section One claims. *Every* trader has some position from which she hopes to profit. "Such a generalized motive . . . could be imputed to any corporation with a large market presence." *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677 (NRB), 2007 WL 1946553, at *8 (S.D.N.Y. June 28, 2007), *reconsideration denied*, 2007 WL 2589482 (S.D.N.Y. Sept. 7, 2007). Alleged motivations "just as much in line with . . . unilateral[]" action as they are with conspiracy are insufficient to state an antitrust claim. *In re Elevator Antitrust Litig.*, 502 F.3d at 51 (quoting *Twombly,* 550 U.S. at 545) (internal quotation marks omitted). This deficiency warrants dismissal. *See Citigroup*, 209 F.3d at 138-39.

### C. LONGSTANDING STRUCTURAL FEATURES OF THE FIXING PROCESS DO NOT SUPPORT AN INFERENCE OF COLLUSION.

The Initial Complaint sought to overcome the absence of direct or circumstantial evidence of collusion by portraying longstanding, publicly visible, structural features of the Silver Fix as "red flags" suggestive of collusion. (*See* CAC ¶¶ 130-31.) Plaintiffs then deleted these allegations.[17] What remain are a few stray references to the "secret" and "unregulated" nature of the fixing process. (*See, e.g.*, SAC ¶¶ 1, 51.) But those allegations suffer from the same deficiency as the now-omitted "red flags." Even if the process were "secret" or "unregulated," its features

---

[16] Moreover, as explained *infra* at 37, the annual reports on which the charts are based largely concern trading between Defendants and their customers, in response to demand from those customers. If individual Defendants took positions opposite their customers, those Defendants cannot be said unilaterally to have dictated the status of their overall positions in silver. What the Complaint ascribes to "speculative" behavior designed to benefit Defendants' silver positions is indistinguishable from market making.

[17] As explained *infra* at 48, this deletion likely was made to blunt the argument in Defendants' motion to dismiss that the longstanding structural features placed Plaintiffs on inquiry notice of their claims long before the start of the Class Period.

were manifest for decades, undercutting the notion that they became suggestive of collusion only on the arbitrary date chosen as the beginning of the Class Period. (*See, e.g.*, SAC ¶¶ 96, 100.) And in any case, the features of the process suggest (at most) that Defendants might have had *opportunity* to engage in wrongful conduct, which is insufficient to plead collusion. *See Ross v. Am. Express Co.*, 35 F. Supp. 3d 407, 444 (S.D.N.Y. 2014) (citing *H.L. Moore Drug Exch. v. Eli Lilly & Co.*, 662 F.2d 935, 941 (2d Cir.1981)).

### D.     THE WORK OF PLAINTIFFS' PAID EXPERTS IS INSUFFICIENT TO ESTABLISH A CONSPIRACY TO FIX PRICES.

The Complaint relies extensively on "econometric analysis" as a substitute for factual allegations of conspiracy.  The source of this analysis – the experts whose qualifications were lauded in the Initial Complaint – has been meticulously scrubbed from the Complaint. Nonetheless, based on untestable and unexplained, and now also anonymous, "analysis," the Complaint asserts that:

- Defendants' manipulative conduct resulted in the "persistent suppression" of silver prices throughout the Class Period.  (*See* SAC ¶¶ 176, 231, 232.)
- Pricing patterns for silver were "abnormal" and "dysfunctional" during the Class Period, and were evidence of Defendants' manipulative conduct.  (*See* SAC ¶¶ 5, 118, 119.)
- Pricing patterns around the time of the Silver Fix were "unique" and distinct from those observed at other times of the day.  (*See* SAC ¶ 124.)
- Abnormal silver price movements cannot be explained by normal market dynamics, such as macroeconomic activity or a spike in trading around the time of the Silver Fix.  (*See* SAC ¶¶ 170 *et seq.*)

Having concealed the source of their expert studies, Plaintiffs seem to ask the Court to accept that they themselves have "uncovered" the pricing behavior described in the Complaint. (*See* SAC ¶¶ 119, 187, 192.)  But even a cursory review of the Complaint reveals that what is now described as "Plaintiffs' analysis" is identical to the studies of the paid "experts."  As the

Complaint does not allege that any Plaintiff, or Plaintiff's counsel, is a competent econometrician, if a Plaintiff or a lawyer really *were* the source of the analysis, it would only be *less* worthy of indulgence or credit.  Regardless of how the Complaint labels the analyses now, their source is clear – paid experts.

The Court should not rely on the undisclosed and untested "conclusions," "finding[s]," and "observ[ations]" of Plaintiffs' paid experts (SAC ¶¶ 4 n.2, 156, 169) to judge the sufficiency of a pleading.  Doing so would violate the Second Circuit's admonition that, in deciding a motion to dismiss, a court should not rely on mere "opinions couched as factual allegations." *Mason*, 346 F.3d at 39 (citations and internal quotation marks omitted).  "[C]onsidering expert opinions at the pleading stage" is "inappropriate," *Brothers v. Saag*, No. 13-466, 2014 WL 838890, at *6 (N.D. Ala. Mar. 4, 2014) (emphasis omitted), because courts cannot meaningfully assess statistical evidence without "a deposition . . . and a subsequent *Daubert* hearing," a "ruling on the expert's qualifications," *DeMarco v. Depotech Corp.*, 149 F. Supp. 2d 1212, 1221 (S.D. Cal. 2001), and decisions on "a myriad of complex evidentiary issues not generally capable of resolution at the pleading stage," *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006).  Statistical analysis necessarily rests on assumptions and opinions of the expert who prepared that analysis – and courts frequently reject such analyses if based on faulty assumptions.  *See*, *e.g.*, *Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 400-07 (S.D.N.Y. 2014); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  At the pleading stage, there is no way for the Court to evaluate these assumptions and to consider the statistical analysis in its proper context.  *Cf. City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, No. 11-04003, 2013 WL 2156358, at *7 (N.D. Cal. May 17, 2013) (disregarding expert opinion at the pleading stage).

This iteration of the Complaint brings the wisdom of these precepts into sharper relief. By now seeking to conceal even the identities of the experts who generated the studies and continuing to provide scant information about the data on which the studies are based, the assumptions that underpin them, and the methodologies that were used to produce them, Plaintiffs have made it impossible for Defendants meaningfully to respond to, and for the Court to evaluate, the studies. Plaintiffs offer only vague generalities – that they "used a regression analysis" and employed "proprietary software to analyze the time and sales data for COMEX silver futures" (SAC ¶¶ 185, 133) – but those phrases are just puffery and jargon.  None describes the nature, source, or quality of the data analyzed, or the assumptions underlying the analysis.

Perhaps the omissions are not accidental, as there are sound reasons to question the reliability of the data used by the "experts."  The Complaint concedes that spot silver is traded "over the counter between private parties" (SAC ¶ 103), not on an exchange, and so there is no reliable, publicly available data about actual trades.  Plaintiffs' experts must therefore be using something other than trade data – yet representing their sources as indicative of actual prices. The Complaint provides no basis to conclude that the data are reliable, thus taking the Court even further from facts, and deepening the risk that years of unnecessary litigation and millions in costs will follow from a tendentious and unreliable data analysis conducted by individuals whom Plaintiffs no longer have even the confidence to name.

Even if considered, the results of the "experts'" analysis lend no support to Plaintiffs' claims, because they do not suggest that Defendants engaged in a conspiracy. The Complaint asserts that price spikes occurred most often around the time of the Silver Fix, a result that is described as "anomalous" and "abnormal."  (SAC ¶¶ 120, 173, 169, 172, 223.)  But the Complaint also concedes – without explanation – that the price trends observed did not occur in every year of

the Class Period, and no explanation is provided as to why the conspiracy was "turned off" (or failed) in the years for which the experts could not make the data fit Plaintiffs' desired conclusion. (*See, e.g.*, SAC ¶ 130 (trend not observed in 2010), ¶ 138 (trend not observed in 2008).)  The Initial Complaint candidly acknowledged that "anomalous" price spikes around the Fix are only "*consistent* with" prices being artificial as a result of Defendants' conduct.  (CAC ¶ 10 (emphasis added).)  Defendants responded in their first motion to dismiss that allegations merely "*consistent with* an unlawful agreement" to fix prices or rig bids are legally deficient.  *In re Elevator Antitrust Litig.*, 502 F.3d at 50 (emphasis added); *Twombly,* 550 U.S. at 557.  In response, Plaintiffs just tweaked their language to pay lip-service to the law; now the experts' findings are described as "*indicative of*" – rather than "*consistent with*" – manipulation and collusion.  (*See, e.g.*, SAC ¶¶ 127, 130.)  Semantic games aside, the new words describe the same findings; giving those findings a new label does not make them a more reliable basis for an inference of conspiracy.

Defendants' motion to dismiss highlighted "obvious alternative explanation[s]" for claimed price spikes.  *Twombly,* 550 U.S. at 567.  Nowhere does the Complaint grapple with the dispositive implications of those explanations.  *See id* at 567-68; *Iqbal*, 556 U.S. at 682; *cf. Hayden v. Paterson*, 594 F.3d 150, 167 (2d Cir. 2010).  Instead, Plaintiffs again take the path of least resistance, deleting allegations from the Initial Complaint that lent support to benign explanations of the observed pricing behavior.  But, again, the Court should not indulge Plaintiffs' desire to ignore their own inconvenient allegations.  Pleading is not a game.  And it remains the case that one of Plaintiffs' paid experts, Andrew Caminschi, offered a plausible alternative explanation for price spikes around the time of the Fix – that the spikes are caused by "[p]articipants of the public markets . . . 'pushing' (manipulating) the short term prices of the public instruments to influence the fixing results."  (*See* Ex. 1 (Caminschi) at 51-52.)  As Defendants pointed out in their first

24

motion to dismiss, his explanation accords with a separate concession in the Initial Complaint – that futures prices often influence spot prices, not *vice versa*. (*See* MTD 37; CAC ¶ 122; *see also* Ex. 1 (Caminschi) at 51-52 ("fixing results . . . are . . . driven by . . . price changes observed in the public markets").)

Rather than dispelling the alternative explanation for price spikes – which they themselves first acknowledged – Plaintiffs excised the concession from their Complaint and downplayed Mr. Caminschi's involvement in its drafting. Worse still, they have introduced new allegations that reverse course entirely, now alleging that because the Silver Fix takes place at noon London time, "before the futures markets in New York are fully open and the vast majority of silver futures contracts are traded," price spikes around the time of the Fix "cannot be explained by normal futures market activity." (SAC ¶ 8.) Aside from being inconsistent with Plaintiffs' prior admission, other allegations in the Complaint, and the statements of Plaintiffs' experts, this explanation focuses exclusively on *COMEX futures* and therefore ignores the large volumes of physical silver and silver financial instruments traded other than on COMEX, including in London and Dubai. (See Exs. 9-10 (DGCX Silver Futures Trading); (EBS Precious Metals (May 2013) at 1).) It also ignores the fact that trading is conducted on the COMEX online platform 23 hours a day, six days a week. (*See* Ex. 11 (CME Group: Metals Trading Hours).)

Plaintiffs and their experts reverse themselves on other critical allegations as well. After Defendants emphasized the significance of Mr. Caminschi's concession that significant price spikes regularly occur at other times in the trading day (Ex. 1 (Caminschi) at 23), Plaintiffs introduced a new, directly contradictory, allegation: that price spikes during the Fix are "unique"

and do not occur at "any other time" in the trading day.[18]   (SAC ¶¶ 6, 36.)   Amending a complaint

"does not make [the allegations in the original complaint] any less an admission of the party."

*Andrews v. Metro N. Commuter R.R.*, 882 F.2d 705, 707 (2d Cir 1989).   That Plaintiffs and their

paid "experts" are so quick to reverse central allegations from the Initial Complaint only

confirms that these untested opinions should be given no weight.

### E.   THE INVESTIGATIONS MENTIONED IN THE COMPLAINT ARE IRRELEVANT.

Continuing to substitute irrelevance and insinuation for facts, the Complaint refers to

reports that regulators have investigated Defendants and other parties for misconduct, and that one

defendant settled a FINMA investigation related to foreign exchange trading.   (SAC ¶¶ 12-13, 16,

79.)   References to settlements in complaints should be stricken, or simply ignored,[19] because

settlements are "not the result of an actual adjudication of any of the issues."   *Gotlin v. Lederman*,

367 F. Supp. 2d 349, 363 (E.D.N.Y. 2005); *In re Platinum,* 828 F. Supp. 2d at 593-94.   Allegations

of pending government investigations "carr[y] no weight in pleading an antitrust conspiracy

claim," *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal.

2007), because "the mere occurrence of [an] investigation is equally consistent with Defendants'

innocence." *Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*, 738 F. Supp. 2d 505, 517 (D. Del.

2010).

The Complaint's allegations are even more thin than typical shopworn attempts to engage

in this sort of pleading.   As Defendants pointed out in their first motion to dismiss, no regulator has

concluded that Defendants unlawfully conspired to manipulate the price of silver.   The Complaint

---

[18] This allegation is especially puzzling because the Complaint extracts a chart that purports to depict large spikes in COMEX trading volume outside the fixing window.   (*See* SAC, ¶ 153, Fig.19.)

[19] To the extent the Court is inclined to strike the offending allegations, Defendants respectfully ask the Court to treat this motion as, in relevant part, a motion to strike pursuant to Rule 12(f).

notes that UBS "settle[d]" an investigation conducted by FINMA (SAC ¶ 79), but ignores that UBS did not participate in the Silver Fixing and that the "settlement" did not involve any allegation of collusion among the Defendants. And while the Complaint selectively extracts a quotation from a FINMA press release, that the underlying conduct "was partly coordinated with other banks" (SAC ¶ 242), the press release shows that FINMA did not identify the banks involved or allege that the coordinated conduct in question related to the Silver Fix. (*See* Ex. 12 (Press Release, *FINMA Sanctions Foreign Exchange Manipulation at UBS*, Nov. 12, 2014).) The Complaint's reference to an investigation into the silver market commenced by the CFTC in 2008 is significant only for what it omits: that the investigation did not result in any finding of wrongdoing by *any* market participant, which makes the collusion now alleged, if anything, *less* likely. (*See* SAC ¶ 243, n.75.)[20] And investigations commenced by the CFTC and DOJ in 2014 and 2015 have not resulted in a finding of wrongdoing on the part of any Defendant and cannot be used to support an inference that Defendants conspired to suppress the price of silver.

### F.   PLAINTIFFS LACK ANTITRUST STANDING.

To seek damages under the Sherman Act, a plaintiff must establish that it "is a proper party to bring a private antitrust action," *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983),[21] because "'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'"   *Id.* at 534 (quoting *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n.14

---

[20] The Complaint also continues to refer to various statements made by Bart Chilton in connection with "internal discussions" at the CFTC about benchmarks generally.  (SAC ¶ 236.)  Mr. Chilton is no longer a CFTC Commissioner, and his musings in 2013 have nothing to do with the allegations in the Complaint.  (*See* Ex. 13 (CFTC, *Former Commissioners*); MTD 18.)

[21] This standing requirement, and the analysis above, apply to both the price-fixing and bid-rigging claims asserted in the Complaint.  *See, e.g., Gatt*, 711 F.3d at 76 (plaintiff lacked standing to pursue bid-rigging claim under Section One (applying *Associated Gen. Contractors*, 459 U.S. at 535 n.31)).

(1972)).   "While any antitrust violation disrupts the competitive economy to some extent and creates entirely foreseeable ripples of injury which may be shown to reach individual employees, stockholders, or consumers, it has long been held that not all of these have the requisite standing to sue for treble damages . . . ."   *Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183, 187 (2d Cir. 1970); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re Libor I*")*,* 935 F. Supp. 2d 666, 687 (S.D.N.Y. 2013).

Four factors determine whether a plaintiff is a proper party to seek damages under the Sherman Act:

> (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

*Gatt*, 711 F.3d at 78 (internal quotation marks omitted).   This analysis is not a multifactor balancing test; rather, the "directness . . . of the asserted injury" must be demonstrated in every case.   *DNAML Pty, Ltd. v. Apple Inc.*, 25 F. Supp. 3d 422, 430 (S.D.N.Y. 2014).

Plaintiffs lack standing most fundamentally because they are (at best) indirect sellers who cannot satisfy the "directness" requirement under *Gatt* and its progeny:  the Complaint does not allege that *any* Plaintiff bought silver from, or sold silver to, any Defendant.  The Complaint does not even allege *indirect* purchases or sales.   Neither Defendants nor the Court has *any* specific information regarding when, how, and with whom Plaintiffs entered into any silver-related purchases; the Complaint offers nothing more than the dates (without time or counterparty) of Plaintiffs' sales of silver and silver financial instruments.   If such information exists, it is within Plaintiffs' possession; the failure to supply it precludes assertion of Section One claims.

Indeed, in cases alleging anticompetitive conduct in the market for a physical good, the Supreme Court has "held that as a general rule, . . . only direct purchasers of [the] monopolized product[]" have standing to sue under the antitrust laws. *In re Pub. Offering Antitrust Litig.*, No. 98-Civ-7890 (LMM), 2004 WL 350696, at *5 (S.D.N.Y. Feb. 25, 2004) (citing *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 729 (1977)). Thus, *Illinois Brick* "precludes an antitrust action by a seller who alleges price-fixing by a defendant with whom he has not dealt directly." *Zinser v. Cont'l Grain Co.*, 660 F.2d 754, 761 (10th Cir. 1981); *Hendrickson Bros.*, 840 F.2d at 1079 (in bid-rigging action, only government agency to whom artificial bids were submitted was "the direct purchaser from the defendant contractors" entitled to recover). Plaintiffs have failed to identify any direct purchases or sales – indeed, *any purchases at all* (*see* SAC App'x D at 13-26) – and they thus lack standing under the Sherman Act.

Presumably because no Plaintiff can allege injury by virtue of being a direct seller of silver to a Defendant, the Complaint seeks to ground standing by suggesting that Plaintiffs suffered harm as a result of general price suppression, asserting that Plaintiffs transacted in silver and silver financial instruments "at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade." (*See* SAC ¶¶ 18-27.) Invoked to support both the Complaint's price-fixing and bid-rigging claims, this is known as an "umbrella theory" of liability (that a plaintiff was injured when it sold a good to non-conspirators who lowered their prices under the price umbrella of the alleged conspirators). Courts in this Circuit have rejected this theory of recovery, and sensibly so. *See Allen v. Dairy Farmers of Am., Inc.*, No. 09-cv-230, 2014 WL 2610613, at *27 (D. Vt. June 11, 2014); *Ocean View Capital Inc. v. Sumitomo Corp. of Am.*, No. 98-cv-4067, 1999 WL 1201701, at *7 (S.D.N.Y. Dec. 15, 1999); *Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 245-46 (S.D.N.Y. 1997) (rejecting umbrella theory of liability

because "the causal connection between the alleged injury and the conspiracy is attenuated by significant intervening causative factors," most notably, the independent pricing decisions of non-conspiring retailers).

**Superior Alternative Plaintiffs.**  Because Plaintiffs fail the fundamental test for antitrust standing,  the existence of direct injury based on the acts of Defendants, there is no basis to regard them as efficient enforcers capable of "vindicat[ing] the public interest in antitrust enforcement." *Associated Gen. Contractors*, 459 U.S. at 541-42.  In determining whether a plaintiff is the "efficient enforcer" on whom standing should be conferred, *Gatt*, 711 F.3d at 76, 78, courts consider "the existence of other parties that have been more directly harmed." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986); *see also Associated Gen. Contractors*, 459 U.S. at 541-42, 545-46.  Here, there are more directly injured parties who could bring suit – namely, market participants who purchased from, or sold to, one of the Defendants directly.  *See Ocean View*, 1999 WL 1201701, at *7 ("there are more direct victims than plaintiff" – who purchased only from non-conspirators – "such as those who purchased . . .  directly from the defendants"); *Gatt*, 711 F.3d at 78 (commissions lost by plaintiffs as a result of defendants' government-contract bid-rigging scheme "far more remote and conjectural" than losses suffered by government agencies to whom false bids were submitted; state agencies the superior plaintiffs "[a]s a consequence of their direct injury").

**Speculative Nature of Injury.**  Because Plaintiffs' alleged injuries were the result of an indirect influence on market prices, their damages claim is too speculative to confer antitrust standing.  *Associated Gen. Contractors*, 459 U.S. at 542.  In another case alleging manipulation of a benchmark purportedly affecting the price of derivatives, the court dismissed plaintiff's antitrust claim as speculative, declining to "hypothesize the impact of [allegedly manipulated Euroyen

TIBOR and Yen-LIBOR benchmarks] on the perceptions of the market participants whose activities would have influenced the prices of Euroyen TIBOR futures contracts." *Laydon*, 2014 WL 1280464, at *10.   To conclude otherwise would have forced the court to analyze a "complicated series of market interactions," *id.* at *8, involving the reactions of countless market players to LIBOR and TIBOR price signals, a task complicated by "many independent factors that could influence perceptions in the market, and pricing decisions," *id.* at *10; *see also Gatt*, 711 F.3d at 78; *Ocean View*, 1999 WL 1201701 at *7 (quoting *Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13 (2d Cir. 1980)).

So it is here.  The Complaint posits simplistically that conspiratorial conduct in London caused market participants, all over the globe and with no relationship with Defendants, to change the prices at which they were willing to buy silver.  But the Complaint fails to grapple with the fact that "countless . . . market variables [other than the alleged conspiracy] could have intervened to affect [the] pricing decisions." *Reading*, 631 F.2d at 13-14; *see Mid-W. Paper Prods. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 584 (3d Cir. 1979).  One of Plaintiffs' own "experts" has acknowledged that price spikes occurred throughout the trading day as a result of factors exogenous to the Silver Fix, including the opening and closing of COMEX, the opening of U.S. equities markets, the Gold Fixing call, and (potentially) a "market push" by traders seeking to shift the benchmark price. (*See* Ex. 1 (Caminschi) at 23, 51-52.)  Although Plaintiffs now attempt to obscure that concession, they are bound by it.  *Supra* at 18.  Assessing Plaintiffs' remote and speculative claimed injury would require the Court to scrutinize these and other complex market interactions, separating the price effects of each from the effects of alleged misconduct – a proscribed undertaking.  *Cf. In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 404 (S.D.N.Y. 2011) (dismissing CD purchasers'

claims because, *inter alia*, their injuries were "more speculative" than those of other potential plaintiffs).

### G.   THE COMPLAINT DOES NOT ALLEGE ANTITRUST INJURY.

A well-pleaded antitrust claim must do more than allege an injury that was caused by purportedly anticompetitive conduct; it must show that Plaintiffs "suffered a special kind of antitrust injury," *Gatt,* 711 F.3d at 76 (internal quotation marks omitted), namely, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977).[22]   In other words, Plaintiffs' claimed damages must be caused by "a competition-*reducing* aspect or effect of the defendant's behavior." *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290, 294 (2d. Cir. 2006) (internal quotation marks omitted) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990)).   This "'ensures that the harm claimed by the Plaintiff corresponds to the rationale for finding an antitrust violation in the first place.'"   *Laydon*, 2014 WL 1280464, at *7 (quoting *Atl. Richfield*, 495 U.S. at 342).

Here, the Complaint fails to allege even injury-in-fact.   The Complaint introduces the new assertion that certain Plaintiffs "suffered *legal* injury resulting in a net loss on silver futures and options contracts transacted during the Class Period."   (*See* SAC ¶¶ 18-27 (emphasis added).) But it offers no facts to support this assertion, even though any supporting facts that do exist would be in Plaintiffs' possession.   Given that the alleged misconduct related to a 10-minute portion of only certain trading days over the course of 15 years, and, in most of those years, is alleged to have affected the silver price by less than 0.2% (SAC ¶ 137 & fig.11), there is no credible basis to infer

---

[22] This requirement, just as the others previously addressed, applies to both Sherman Act claims.  *Gatt*, 711 F.3d at 76 (in putative bid-rigging action, emphasizing "requirement that plaintiffs demonstrate antitrust injury when bringing a private antitrust action").

injury absent facts suggesting that Plaintiffs traded *at the affected times of the conspiracy's "on" days.*  In fact, the Complaint is silent on the particulars of *any* transaction underlying *any* Plaintiff's claims, "such as when [their positions] were initiated, how long they were held, and whether [they] exited those positions by entering into offsetting transactions or held them until their settlement dates." *Laydon*, 2014 WL 1280464, at *8.  As the price of silver increased steadily throughout the Class Period (CAC ¶ 211), there is no way to conclude that Plaintiffs sustained any loss as a result of Defendants' conduct – especially since Plaintiffs were likely both sellers *and* buyers during the 15-year Class Period.

Even if the Complaint does allege *an* injury, it fails to allege an *antitrust* injury:  it does not allege that Defendants' conduct harmed *competition*, as opposed to Plaintiffs personally.  *See Laydon*, 2014 WL 1280464, at *8.  The assertion that Plaintiffs "transacted . . . at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade" (SAC ¶¶ 18 *et seq.*) is not an allegation that competition has been harmed.  *See Laydon*, 2014 WL 1280464, at *8 (no antitrust injury where plaintiff merely alleged that he had "initiated short positions in CME Euroyen TIBOR futures contracts during the Class Period and suffered net losses on such contracts due to the presence of artificial Euroyen TIBOR futures prices proximately caused by Defendants' unlawful manipulation and restraint of trade").

Most charitably construed, the Complaint seeks to allege an injury that flows not from an "anticompetitive aspect" of Defendants' conduct but from Defendants' purported "misrepresentation." *In re LIBOR I*, 935 F. Supp. 2d at 688.  Plaintiffs allege that Defendants made "untrue, inaccurate or misleading statements to influence silver prices, including the London Silver Fix" (SAC ¶ 312) and "rigged the supposedly 'Walrasian' auction of the Silver Fix with the purpose and effect of suppressing the price of silver" (SAC ¶ 280).  But even if

Defendants had injected false information into the marketplace, or caused others to do so, there would be no antitrust law violation unless Defendants had the power to require others in the market to follow their inaccurate prices.  *Cf. Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1383 (7th Cir. 1992) (internal quotation marks omitted).  No market participant was required to reference the Silver Fix price in its contracts, and Plaintiffs, like all market participants, "were free to take various positions in the market, including long and short."  *Laydon,* 2014 WL 1280464, at *9; *In re LIBOR I,* 935 F. Supp. 2d at 686 (quoting *Atl. Richfield*, 495 U.S. at 344).

## II.    The Complaint Does Not Plead Violations of the CEA.

Plaintiffs assert two primary types of claims under the CEA: a price manipulation claim under CEA Section 9(a)(2), 7 U.S.C. §13(a)(2) (Claim Four, SAC ¶¶ 291-298), and a manipulative device claim under CEA Section 6(c)(1), 7 U.S.C. § 9(1), and CFTC Rule 180.1, 17 C.F.R. § 180.1 (Claim Seven, SAC ¶¶ 307-314).  Because both claims are premised on allegations that Defendants "created [a] *false impression*" about supply and demand for silver, *In re Crude Oil*, 2007 WL 1946553, at *5, they "sound in fraud and thus must be pled with particularity" under Rule 9(b).  *In re LIBOR I,* 935 F. Supp. 2d at 714; *cf. In re Amaranth Natural Gas Commodities Litig.* ("*In re Amaranth I*"), 587 F. Supp. 2d 513, 535 (S.D.N.Y. 2008) (any "complaint that alleges manipulation of commodities prices must satisfy Rule 9(b)[]"), *aff'd on other grounds*, 730 F.3d 170 (2d Cir. 2013) ("*In re Amaranth III*").  This heightened pleading rule is designed to deter weak claims and to prevent plaintiffs from using the "long and expensive discovery process" as a "fishing expedition[]" or a means of extorting an unwarranted settlement.  *Johnson ex rel. United States v. Univ. of Rochester Med. Ctr.*, 686 F. Supp. 2d 259, 267 (W.D.N.Y. 2010) (internal quotation marks omitted), *appeal dismissed*, 642 F.3d 121 (2d

Cir. 2011) (per curiam).  Plaintiffs have failed to meet their burden, and the CEA claims should

be dismissed.

### A.   THE COMPLAINT FAILS TO PLEAD A PRICE MANIPULATION CLAIM WITH PARTICULARITY.

A cognizable price manipulation claim must adequately plead that (1) defendants had the

ability to influence market prices; (2) an artificial price existed; (3) defendants caused the

artificial price; and (4) defendants specifically intended to cause the artificial price.  *In re*

*Amaranth III*, 730 F.3d at 183; *In re Cox*, Docket No. 75-16, 1987 CFTC LEXIS 325, at *9

(CFTC July 15, 1987).

### 1.   The Facts Alleged Do Not Give Rise to a Strong Inference of Scienter.

Scienter is a required element of any CEA claim.  *In re Amaranth III*, 730 F.3d at 183

("There is . . . no manipulation without intent to cause artificial prices.").  "[I]n relation to

commodities fraud . . . Rule 9(b) imposes a significant burden on allegations of scienter."  *In re*

*Amaranth Natural Gas Commodities Litig.* ("*In re Amaranth II*"), 612 F. Supp. 2d 376, 383

(S.D.N.Y. 2009), *aff'd on other grounds*, 730 F.3d 170.  "[P]laintiffs must . . . allege facts that

'give rise to a *strong inference* of scienter.'"  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*

("*In re LIBOR III*"), 27 F. Supp. 3d 447, 468 (S.D.N.Y. 2014) (quoting *In re Amaranth II*, 612 F.

Supp. 2d at 384).  To meet that standard, "the factual allegations in the complaint must give rise

to" an inference of scienter "at least as compelling as any opposing inference one could draw

from the facts alleged."  *In re Amaranth I*, 587 F. Supp. 2d at 535-36 (internal quotation marks

omitted).  Knowledge that conduct would influence prices is not enough.  *See In re Energy*

*Transfer Partners Natural Gas Litig.*, No. 4:07-cv-3349, 2009 WL 2633781, at *6-7 (S.D. Tex.

Aug. 26, 2009), *aff'd sub nom. Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239 (5th

Cir. 2010).  Thus, the Complaint must allege with particularity facts either showing that

Defendants had a motive and opportunity to manipulate, or constituting strong circumstantial evidence of conscious misbehavior or recklessness.[23]  The Complaint does neither.

The Complaint asserts that Defendants had a motive to manipulate the price of silver downward because they held "large, unhedged positions in the precious metals markets" that would "financially benefit[]" from the purported manipulation.  (SAC ¶ 212.)  Allegations that a defendant had a particular trading position or strategy are insufficient to support an inference of motive.  *In re Silver II*, 560 F. App'x at 86 ("[A]n inference of intent cannot be drawn from the mere fact that defendant had a strong short position."); *In re Crude Oil*, 2007 WL 1946553, at *8 (a "generalized [profit] motive" is "insufficient to show intent" because it "could be imputed to any corporation with a large market presence in any commodity market").  Moreover, the suggestion that Defendants had net trading positions that would allow them to profit from a prolonged suppression of the price of silver is particularly implausible in light of Defendants' regulatory incentives to hedge trading risk.[24]  And even if Defendants had held "large, unhedged positions," they would have incurred enormous losses – not profits – given that silver prices nearly tripled during the Class Period.  (SAC ¶ 212.)  In *LIBOR*, Judge Buchwald, confronted with a similar contention and comparable long-term market trends, concluded that "it is

---

[23] *See In re Amaranth II*, 612 F. Supp. 2d at 383.  Scienter is defined slightly differently under the price manipulation statute and the manipulative device rule, but the practical pleading burden is essentially the same. Scienter under the price manipulation statute means "the purpose or conscious object of causing or [a]ffecting a price . . . in the market that did not reflect the legitimate forces of supply and demand." *In re Commodity Exch., Inc., Silver Futures & Options Trading Litig. ("In re Silver II")*, 560 F. App'x 84, 87 (2d Cir. 2014) (emphasis omitted) (quoting *CFTC v. Parnon Energy, Inc.*, 875 F. Supp. 2d 233, 249 (S.D.N.Y. 2012)).  Scienter under the manipulative device rule incorporates the definition of "recklessness" used in Rule 10b-5 securities fraud cases. *See* Prohibition on the Employment, or Attempted Employment, of Manipulative Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41,398, 41,404 (July 14, 2011) (to be codified at 17 C.F.R. pt. 180) (*Prohibition*).  A strong inference of scienter under either provision requires motive and opportunity or strong circumstantial evidence of conscious misbehavior or recklessness. *In re Amaranth II*, 612 F. Supp. 2d at 383 (price manipulation statute); *see Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (describing securities fraud "recklessness" standard).

[24] *See* Supervisory Guidance at 44,623-25; Regulatory Capital Rules at 62,093-95.

implausible that all defendants would maintain parallel trading positions in the Eurodollar futures market across the Class Period." *In re LIBOR III*, 27 F. Supp. 3d at 469.[25]

Details regarding each particular Defendant's market position remain elusive. As noted above, the Complaint relies on a hodgepodge of aggregate data that are inconsistent as to composition and time period. *See supra* 19-20. None of those data are particular to silver, and the Complaint does not explain how manipulation of the Silver Fix would benefit any of the combined, multi-commodity positions to which the Complaint refers. Moreover, the few details the Complaint contains regarding Defendants' market positions contradict its claims. Relying on Defendants' annual reports, the Complaint alleges Defendants' "trading positions . . . were substantially larger than [their] hedging positions," such that "Defendants were each in a position to benefit from the manipulation." (SAC ¶ 208.) However, those annual reports recognize that market movements were driven in part by trading between Defendants and their customers, in response to demand from those customers. (*See, e.g.*, Ex. 14, *Annual Report and Accounts of HSBC Holdings plc* (2006) at 128 ("Foreign exchange income remained strong throughout 2006, principally driven by an increase in customer activity . . . .").) To the extent that the reports demonstrate that an individual Defendant took positions opposite its customers, that Defendant cannot be said to have unilaterally dictated the status of its overall position in silver at any point in the Class Period. As a result, the data are not a meaningful proxy for Defendants' motivations (as compared to those of their customers).

The Complaint likewise alleges no facts suggesting conscious misbehavior or recklessness, in contrast to allegations in past benchmark manipulation cases, in which courts

---

[25] Judge Buchwald sustained Plaintiffs' CEA claims in *LIBOR III* only on the theory that the submitting banks were motivated by reputational concerns and the desire to appear financially stable. *See In re LIBOR III*, 27 F. Supp. 3d at 468-70. That theory is not and cannot be alleged here.

deemed as well-pleaded complaints with far more detailed allegations.[26]   The Complaint is

threadbare, with nothing but the observation that "Defendants used electronic chat rooms,"

leaving it to the reader to infer that Defendants would have used chat rooms only to conspire.

(SAC ¶ 219.)  Accordingly, even if facts comparable to those alleged in other benchmark cases

suffice to plead the elements of a price manipulation claim, the Complaint alleges no facts that

could support a finding of conscious misbehavior or recklessness on the part of each Defendant.

*See In re Silver II*, 560 F. App'x at 87 (affirming dismissal where plaintiffs did not "allege any

specific facts indicative of an intent to affect prices similar to those that have been found

sufficient in comparable CEA actions").  Because a complaint must "specifically allege the fraud

perpetrated by each defendant, . . . 'lumping' all defendants together," as the Complaint does

here, "fails to satisfy the particularity requirement." *In re Crude Oil*, 2007 WL 1946553, at *6.

The Complaint offers only undifferentiated speculation about Defendants' motives inadequate to

create "the requisite strong inference of [scienter]." *Id.* at *8 (internal quotation marks omitted).

### 2.      The Complaint Fails To Allege the Existence of Artificial Prices, or that Defendants Caused Such Prices.

The Complaint fails to plead facts showing that silver prices were "artificial," that is,

"prices that do not reflect the forces of supply and demand in the market or do not otherwise

comport with contemporaneous prices in comparable markets." *In re Commodity Exch., Inc.,*

*Silver Futures & Options Trading Litig.* ("*In re Silver I*"), No. 11-Md-2213 (RPP), 2012 WL

6700236, at *12 (S.D.N.Y. Dec. 21, 2012), *aff'd.* 560 F. App'x 84.  "When determining if

artificial prices exist, a court may consider the underlying commodity's normal market forces,

---

[26] *See, e.g., Laydon*, 2014 WL 1280464, at *6 (denying motion to dismiss manipulation claim in case involving Euroyen TIBOR and Yen-LIBOR based on "overwhelming factual content" in the complaint, including "direct evidence [of scienter] from certain Defendants' communications"); *In re LIBOR III*, 27 F. Supp. 3d at 462-63 (permitting trading-motivated claims of manipulation to proceed against banks as to which plaintiffs alleged specific communications evincing intent to manipulate LIBOR); *CFTC v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 532-33 (S.D.N.Y. 2008) (complaint included numerous communications, such as instant messages).

historical prices, supply and demand factors, price spreads, and also the cash market for the commodity at issue." *Id.*; *see also In re Ind. Farm Bureau Coop. Ass'n*, No. 75-14, 1982 WL 30249, at *4 n.2 (CFTC Dec. 17, 1982).

Although the Complaint asserts that "econometric techniques" "uncovered" a "dysfunction in the competitive pricing dynamics of the silver market occurring around the time of [the] Silver Fix" (SAC ¶ 119), it offers no facts suggesting that such price movements were inconsistent with "the forces of supply and demand in the market," *In re Silver I*, 2012 WL 6700236, at *12.  Rather, the Complaint concedes that trading volume was higher around the time of the Silver Fix than at other times of the day  (SAC ¶ 140),  making it unsurprising that prices might move sharply to reflect the level of supply and demand observed during the Silver Fix.  Nor does the fact that prices "decrease[d] during the Silver Fix" more often than they increased in the period on which the Complaint focuses (*e.g.*, SAC ¶ 129) suggest manipulation.  Silver refiners and other industrial producers might use the Silver Fix as an opportunity to sell inventory or hedges, in light of the high liquidity available around the time of the Silver Fix.  (*See* SAC ¶ 140.)

The Complaint does not allege that prices in the Silver Fix did "not . . . comport with contemporaneous prices in comparable markets." *In re Silver I*, 2012 WL 6700236, at *12.  In fact, it alleges the opposite, asserting "a statistically significant relationship between the price of COMEX silver futures contracts and the Fix price" (SAC ¶ 114) and that "[t]he same break from pricing behavior is also visible in the spot market for physical silver" (SAC ¶ 125).  That prices simultaneously moved the same way in the spot and COMEX markets suggests, if anything, that exogenous market forces – not manipulation by Defendants – created the downward price pressure at the time of the Silver Fix.

Similarly, the Complaint does not sufficiently allege facts showing that Defendants were "the proximate cause of [any] price artificiality." *In re Silver I*, 2012 WL 6700236, at *16. In place of factual allegations, the Complaint again substitutes "econometric techniques" (SAC ¶ 119) that purport to show that "anomalous" price spikes occurred most often around the Silver Fix, then (without any factual support) deems Defendants the cause of those "anomalies." For example, the Complaint presents graphs purporting to show a spike in trading volume during the Silver Fix correlating to a decrease in silver prices. (SAC ¶¶ 187-193.) The Complaint contends that the trading volume reflects Defendants' increasing their short positions with advance knowledge of the price decrease; the "informed trader," *i.e.*, Defendants, must be responsible for this spike because a short position "would increase in value while the price of silver decreased through the Silver Fix." (SAC ¶ 191.)

The Complaint ignores that for every seller, there is a buyer, and thus fails to explain why buyers would continue to line up over a 15-year span to purchase futures during a period of declining prices. As noted already, Plaintiffs previously conceded that the existence of price spikes around the Silver Fix was merely "consistent" with prices being artificial as a result of Defendants' conduct. (MTD 36 (quoting CAC ¶ 10).) That is not enough to support an inference that manipulative conduct caused the claimed "anomalies." The Complaint also claims that the Silver Fix directly affects prices of instruments traded on exchanges such as COMEX (SAC ¶ 113), supporting this proposition with only an undescribed regression analysis that purportedly shows "a statistically significant relationship between the price of COMEX silver futures contracts and the Fix price" (SAC ¶ 114). Leaving aside the vices of relying on paid-for studies as the sole support for such a central contention, *see supra* at 8-9, a regression analysis cannot demonstrate a causal relationship between two variables. *Sheehan v. Daily Racing Form,*

*Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) ("[E]quating a simple statistical correlation to a causal relation . . . indicates a failure to exercise the degree of care that a statistician would use in his scientific work[]."); *see also supra* at 7, 10, 25 (noting the opinion of one of the now-anonymized "experts" that price causality could run from the futures market to the spot market, not the reverse, and Plaintiffs' prior contention that commercial traders in fact price spot silver based on COMEX prices).

The Complaint further claims that Defendants quoted "systematically lower silver prices in advance of the Silver Fix," maintained an artificial bid-ask spread, and intentionally triggered client stop-loss orders in order to cause artificial prices.  (SAC ¶ 296.)  But Plaintiffs allege no "specific conduct" by which any Defendant took steps that caused prices to be *artificial*.  *In re Silver I*, 2012 WL 6700236, at *17.  Merely quoting prices that were lower than prevailing prices on the market is not unlawful, and Plaintiffs allege no facts suggesting that such quotes caused market prices to become artificial.  The Complaint's assertions regarding a bid-ask spread and stop-loss orders are inspired by a FINMA report relating to an investigation of the unilateral conduct of a single bank (UBS) relating to *foreign exchange* markets.  *See supra* at 11.  Plaintiffs now seek to extend the statements in that report to somehow make them applicable to the silver trading of all "Defendants."  This is just "speculation on the basis of sheer possibility."  *In re Silver I*, 2012 WL 6700236, at *16.  "[W]ithout corroborating factual allegations as to" causation, the Complaint's "impermissible speculation" does not satisfy Plaintiffs' pleading burden.  *Id.*[27]

---

[27] The Complaint also alleges no facts to suggest that Defendants had the ability to influence prices; on the contrary, as noted *supra* at 4, Plaintiffs have conceded that Defendants are only four of some 65 market-makers for silver (SAC ¶ 199), and that forces exogenous to the Fix, such as activity in the futures market, drive the spot price of silver  (CAC ¶ 122).

### B.     THE COMPLAINT FAILS TO PLEAD THE MANIPULATIVE DEVICE CLAIM WITH PARTICULARITY.

The manipulative device claim under CFTC Rule 180.1 (*see* Claim Seven, SAC ¶¶ 307-314) must also be dismissed.  To begin with, there can be no claim for conduct earlier than August 15, 2011, because the relevant statute and regulation were not effective before that time. *In re Amaranth III*, 730 F.3d at 173 n.1.  The remaining fraction of the claim now rests on the slender reed of, *at most*, three transactions not alleged to have been undertaken through any of the Defendants.  That claim must be dismissed for failure to plead with particularity.[28]

Rule 180.1 is to be interpreted in accordance with "the substantial body of judicial precedent applying the comparable language of SEC Rule 10b-5," on which the Rule was modeled.  *See* Prohibition, 76 Fed. Reg. at 41,399.  Rule 180.1 thus requires the Complaint to allege, at a minimum, (1) a manipulative act, (2) performed in connection with a swap, or contract of sale of a commodity, (3) scienter, (4) reliance, (5) economic loss, and (6) loss causation.  *See* 17 C.F.R. § 180.1; *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007).  The Complaint has not alleged any manipulative conduct in connection with a relevant financial product (*supra* at 41).  Nor has it alleged scienter (*supra* at 40), economic loss (*infra* at 44-45), or loss causation (*supra* at 40, 44-45).  The Complaint also alleges neither actual reliance nor any public misstatements that could support a fraud-on-the-market presumption of reliance.  *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008).  The

---

[28] The Complaint identifies only 13 sales after August 15, 2011 that were allegedly affected by Defendants' conduct. (SAC App'x D at 25-26.)  At least 10 are for physical silver (it is unclear whether the two references to "COMEX Silver Call" relate to physical silver as well).  But "[p]urchasers of physical commodities whose prices were affected by futures trading do not have a claim."  *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09-cr-3690, 2014 WL 4083938, at *38 (N.D. Ill. Aug. 18, 2014) (citation omitted).  All CEA claims based on the trading of physical silver, including the transactions that post-date the effective date of Rule 180.1, must be dismissed.  The three remaining non-physical transactions post-dating August 15, 2011 occurred on dates that do not correspond to any particularized allegation of wrongdoing in the Complaint.

Complaint substantively addresses only three post-August 15, 2011 dates (November 15, 2012; May 30, 2013; and February 11, 2013 (SAC ¶¶ 165-66, 196)), but for two of those dates does not even allege that Defendants' conduct resulted in an artificial suppression of silver prices (*compare* SAC ¶¶ 166, 196 *with* SAC App'x D at 10).

The Rule 180.1 claim should be dismissed on the further ground that it appears to press the notion that Defendants improperly used "advance knowledge of the Fix price direction" to "establish[] positions in the market that would increase in value once the Fix price was released to the public." (SAC ¶ 177.) "Insider trading" liability is premised upon the fiduciary relationship that exists "between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation." *Chiarella v. United States*, 445 U.S. 222, 228 (1980) (citing *Cady, Roberts & Co.*, 40 S.E.C. 907 (1961)). No comparable fiduciary duty exists in futures markets. (*See, e.g.*, Ex. 15 (CFTC, *A Study of the Nature, Extent and Effects of Futures Trading by Persons Possessing Material, Nonpublic Information* at 55-56 (1984)).) The CFTC therefore limited the reach of Rule 180.1 to "trading on the basis of material nonpublic information in breach of a pre-existing duty (established by another law or rule, or agreement, or understanding, or some other source), or by trading on the basis of material nonpublic information that was obtained through fraud or deception." Prohibition, 76 Fed. Reg. at 41,403.

The Complaint's predecessor trumpeted, without citation or support, Defendants' supposed "duty" as members of the Silver Fixing Company not to "cause, exacerbate or further any manipulation of silver or silver futures prices" because of their "position of trust" and status as "sophisticated market participants." (CAC ¶ 275.) The Complaint abandons even that flimsy attempt to plead the requisite duty. Instead, the Complaint now focuses exclusively on

Defendants' trading on the basis of alleged material nonpublic information, with no reference to the requisite fiduciary or comparable duty.  But if there is no duty, there is no wrongful conduct. "[U]nlike securities markets, derivatives markets have long operated in a way that allows for market participants to trade on the basis of lawfully obtained material nonpublic information." Prohibition, 76 Fed. Reg. at 41,403.

### C.     THE COMPLAINT FAILS TO ALLEGE PRINCIPAL-AGENT OR AIDING AND ABETTING LIABILITY.

The Complaint's principal-agent (Claim Five, SAC ¶¶ 299-301) and aiding-and-abetting claims (Claim Six, SAC ¶¶ 302-306) fail for the same reasons as the primary CEA claims.  *See*, *e.g.*, *In re Silver II*, 560 F. App'x at 87; *In re Platinum*, 828 F. Supp. 2d at 599-600.  The principal-agent claim should be dismissed on the further ground that the Complaint does not allege with particularity "that [any] principal manifested an intent to grant [an] agent authority [or that] the agent agreed," *In re Amaranth I*, 587 F. Supp. 2d at 546 (citations and internal quotation marks omitted), or that any Defendant "associate[d] [itself] with [a manipulative] venture, . . . participate[d] in it as in something that he wishe[d] to bring about, [and] . . . s[ought] by his action to make it succeed," *In re Amaranth III*, 730 F.3d at 182 (internal quotation marks omitted); *see also In re Silver I*, 2012 WL 6700236, at *19 (dismissing aiding-and-abetting claim that did "not identify the persons alleged to have been involved in knowingly aiding and abetting the alleged manipulation").

### D.     PLAINTIFFS LACK STANDING UNDER THE CEA.

As shown *supra* at 32-33, the Complaint fails to allege actual damages, a prerequisite to standing under Section 22 of the CEA.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR II*"), 962 F. Supp. 2d 606, 620 (S.D.N.Y. 2013).  To plead actual damages where, as here, the claim is that Defendants engaged in "isolated (though repeated) manipulative

activity," the Complaint must allege "that [Plaintiffs] engaged in a transaction at a time during which prices were artificial as a result of [D]efendants' alleged . . . manipulative conduct," and "that the artificiality was adverse to their position." *Id.* at 622; *cf. In re Energy Transfer*, 2009 WL 2633781, at *9-11.

The Complaint alleges neither. *See supra* at 4. Rather, it now claims that the "impact" of the alleged manipulation "persisted well beyond the end of the Silver Fixing," thus causing harm to Plaintiffs who transacted on a day in which manipulation is alleged as well as "beyond [those] days." (SAC ¶ 233.) But this hypothesis is undermined by multiple allegations in the Complaint itself. (*See* SAC ¶ 138 (deeming Silver Fix price dynamics "dysfunctional" when compared to broader silver market); SAC ¶ 139 (noting "remarkable" "difference in returns generated during the Silver Fix compared to the rest of the trading day"); SAC ¶¶ 122-23 (claiming a "highly statistically significant" price drop in COMEX silver futures prices during the Fix, "the *only* part of the day where there is such a concentration of negative returns").) Those allegations suggest that any disruption caused by the alleged manipulation was limited to the moments immediately before and after the Silver Fix. The Complaint therefore must allege that Plaintiffs traded during that window. *See In re LIBOR II*, 962 F. Supp. 2d at 620-21. The Complaint fails to allege, however, that Plaintiffs ever "engaged in a transaction at a time during which prices were artificial," *id.* at 622, a fact that precludes the existence of actual damages and, accordingly, the existence of standing.[29]

---

[29] The Complaint also fails to allege the timing of Plaintiffs' purchases of their silver investments and thus leaves open the prospect that any or all Plaintiffs purchased silver when prices were artificially low. If Plaintiffs benefited from allegedly artificially low prices, they cannot allege, as they must, that the "artificiality was adverse to their position." *In re LIBOR II*, 962 F. Supp. 2d at 622.

### III.     The Complaint's Antitrust and CEA Claims Are Time Barred.

#### A.     THE ANTITRUST CLAIMS

Claims for violations of the Sherman Act must be brought within four years of the accrual of the asserted cause of action.  15 U.S.C. § 15b.  Antitrust actions accrue, and the limitations period begins to run, "when a defendant commits an act that injures a plaintiff's business."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).  A consolidated class action, such as this one, is "commenced" for limitations purposes when the first Lead Plaintiff files its complaint.  *In re Adelphia Commc'ns Corp.*, No. 03 MD 1529 (LMM), 2005 WL 1278544, at *5-6 (S.D.N.Y. May 31, 2005).   Where, as here, a Complaint alleges an ongoing price-fixing conspiracy, recovery is limited to acts alleged within the four-year statutory period.  *In re Nine W. Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 191-92 (S.D.N.Y. 2000). The Complaint alleges antitrust violations and corresponding injuries dating back to 1999.  The vast majority are alleged to have occurred more than four years before July 25, 2014,[30] the date on which the first Interim Lead Plaintiff filed a complaint in this action.[31]  Thus, all federal antitrust claims based on alleged conduct predating July 25, 2010 fall outside the limitations period and must be dismissed unless there is some basis for tolling.[32]

#### B.     THE CEA CLAIMS

CEA claims must be brought within two years of the date on which a party is placed on inquiry notice of the asserted violation.  7 U.S.C. § 25(c) (2011); *In re LIBOR III*, 27 F. Supp. 3d at

---

[30] **The** Complaint alleges a Class Period that commenced in 1999, and therefore targets almost 12 years of alleged misconduct that is time-barred.  Of the 1,737 "anomalous" dates that Plaintiffs identify, 1,164 are from the period *before* July 25, 2010.  (*See* SAC App'x D at 2-9.)  Additionally, of the 571 sales that Plaintiffs allege they made during the Class Period, *over eighty percent* are alleged to have occurred before July 25, 2010.  (*See id.* at 13-26.)

[31] *See* Complaint, *Nicholson v. Bank of Nova Scotia*, No. 14-CV-5682 (VEC) (S.D.N.Y. July 25, 2014).

[32] **The** Complaint asserts that Defendants engaged in a "continuing violation of Section 1."  (SAC ¶ 278.)  But it offers no facts to explain why the conduct alleged amounts to a continuing violation, rather than a series of separate acts.  *In re Nine W. Shoes*, 80 F. Supp. 2d at 192 ("[A] 'separate new overt act' will not permit the plaintiff to recover for the injury caused by old overt acts that do not fall within the limitations period." (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179 at 189 (1997))).

471.  A party is on inquiry notice when circumstances exist to "'suggest to [a person] of ordinary intelligence the probability that she has been defrauded.'"  *In re LIBOR III*, 27 F. Supp. 3d at 471 (alteration in original) (quoting *In re LIBOR I*, 935 F. Supp. 2d at 698); *see also Koch v. Christie's Int'l PLC*, 699 F.3d 141, 151 (2d Cir. 2012).  The test for inquiry notice "is an objective one and dismissal is appropriate when the facts from which knowledge may be imputed are clear from the pleadings."  *Salinger v. Projectavision, Inc.*, 934 F. Supp. 1402, 1408 (S.D.N.Y. 1996).

Plaintiffs were on inquiry notice of Defendants' alleged manipulation well before July 25, 2012 (two years before the first individual complaint was filed in this action).  The Complaint concedes that "[i]n September 2008, the CFTC announced that it was investigating complaints of misconduct in the silver market," and cites publicly available material from that time period that addresses the CFTC's investigation.  (*See* SAC ¶ 243 n.74.)  Because those materials (and other publicly available materials concerning the CFTC's investigation) were available to Plaintiffs in 2008, the inquiry notice standard is satisfied.[33]

The Initial Complaint made extensive use of the CFTC's investigation to suggest the existence of a conspiracy among Defendants.  Taking Plaintiffs at their word, Defendants argued that the public disclosure of the CFTC's investigation in 2008 placed Plaintiffs on inquiry notice of the conspiracy alleged in their Complaint.  Plaintiffs adopted a familiar tack in response – the Complaint now goes to great pains to allege that the CFTC investigation was wholly *unrelated* to Defendants' alleged misconduct.  (*See* SAC ¶ 243 ("the earlier investigations were unrelated to, and had nothing to do with, Defendants' manipulation").)  But Plaintiffs cannot have it both ways.

---

[33] The Complaint now suggests that the CFTC's investigation focused on complaints that "were not related to the Silver Fix," but then concedes that the core question before the CFTC was "whether silver futures contracts traded on [COMEX] were being manipulated" artificially lower – *exactly* the principal purpose of the silver fixing conspiracy alleged here. (SAC ¶ 243.) The CFTC's investigation was "exhaustive" and analyzed not just silver futures prices, but also "silver market fundamentals and trading within and between cash, futures and over the counter markets." (Ex. 16 (CFTC, *CFTC Closes Investigation Concerning the Silver Markets*).)  The CFTC evaluated "whether there was *any* trading activity in violation of the [CEA] and [CFTC] regulations including the anti-manipulation provisions." (*Id.* (emphasis added).)

They evidently considered the CFTC's investigation relevant enough to their claims to warrant a FOIA request to the agency for materials used in its investigation, and they placed extensive reliance on those materials in the Initial Complaint to substantiate their conspiracy allegations. (*See* CAC ¶¶ 148-154.)   It is difficult to see how Plaintiffs can invoke the publicly disclosed investigation to support allegations of collusion without having to concede that the investigation also placed them on inquiry notice of that purported collusion.

Other allegations in the Complaint (again included for the explicit purpose of suggesting circumstantial evidence of a conspiracy, *see supra* at 20) suggest that Plaintiffs were on notice of their claims well before 2008.   As noted *supra* at 20-21, the Initial Complaint portrayed longstanding, publicly visible features of the Silver Fix as "red flags" indicative of collusion.  (*See* CAC ¶¶ 130-131.)  After Defendants pointed out that many of these so-called "red flags" were of such long standing that, had they indicated collusion, they would have done so *decades* before the arbitrarily chosen start date of the Class Period (*see* MTD 19-21), Plaintiffs just deleted them – an obvious attempt to escape the dispositive effect of those allegations on the timeliness of their claims.  As noted above, even the few allegations that remain about the process (*see, e.g.*, SAC ¶¶ 1-5) suffer from the same deficiencies as the original "red flag" allegations.

## C.    THERE IS NO BASIS ON WHICH TO TOLL THE STATUTES OF LIMITATION.

The Complaint includes the boilerplate assertion that the applicable statutes of limitations should be tolled on account of Defendants' "fraudulent concealment" of operative facts.  (SAC ¶¶ 255-258.)   To plead a claim for fraudulent concealment, a complaint must allege, with particularity, facts showing that:  "(1) . . . the defendant concealed the existence of the antitrust violation[;] (2) . . . plaintiff remained in ignorance of the violation until sometime within the four-year antitrust statute of limitations; and (3) . . . his continuing ignorance was not the result of lack of diligence."  *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 520 (S.D.N.Y.

2009) (internal quotation marks omitted).  "[F]raudulent concealment must be pleaded in compliance with Fed. R. Civ. P. 9(b)."  *Salinger*, 934 F. Supp. at 1412 n.6.  The Complaint does not adequately plead any of these elements.

The public facts that the Complaint pleads to support substantive claims dispose of the fraudulent concealment argument.  *See supra* at 47-48.  In opposition, and even though Defendants raised this issue in detail in their first motion to dismiss, there is only the tired, unsubstantiated allegation that Defendants' conduct was "self-concealing" and that Defendants committed "active acts of concealment." (SAC ¶¶ 255-58.)  Courts give little credence to such empty assertions.  *See Butala v. Agashiwala*, 916 F. Supp. 314, 320 (S.D.N.Y. 1996).  Again, the Complaint's invocation of the 2008 CFTC investigation is damning when it comes to the suggestion of concealment.  (*See* SAC ¶ 243); *Certain Underwriters at Lloyd's v. Milberg LLP*, 08 Civ. 7522 (LAP), 2009 U.S. Dist. LEXIS 97284, at *24 (S.D.N.Y. Sept 29, 2009) (notice of a relevant government investigation clearly triggers a duty on the part of the plaintiff to inquire as to potential fraud).

But it is not just the facts alleged that matter here; it is the *people* alleging them and the counsel representing them.  *Four* of the Plaintiffs in this case, J. Scott Nicholson, Eric Nalven, Christopher Depaoli, and Kevin Maher, initiated class actions in 2010 and 2011 in this District against a number of financial institutions, *including Defendant HSBC*, alleging that each had engaged in the improper suppression of silver futures prices, exactly what the alleged silver fixing "conspiracy" sought to do.[34]  Plaintiffs cannot now plead that they were ignorant of the facts underlying their claims here.

---

[34] *See Nicholson v. JP Morgan Chase & Co.*, No.10-cv-8724 (RPP); *Nalven v. JPMorgan Chase & Co.*, No. 10-cv-8284 (RPP); *Depaoli v. JPMorgan Chase & Co.*, No. 11-cv-862 (RPP); *Maher v. JPMorgan Chase & Co.*, No. 10-cv-8548 (RPP).  Lawyers with four of the law firms representing plaintiffs in the instant litigation were also counsel of record in the prior silver cases.

**IV.     The Complaint Does Not State a Claim for Unjust Enrichment.**

The Complaint's unjust enrichment claim, now asserted under only New York law, must be dismissed, as the Complaint does not sufficiently allege an "actual, substantive relationship" between Plaintiffs and Defendants or that Defendants were enriched at Plaintiffs' expense.  *See Laydon*, 2014 WL 1280464, at *13 (quoting *Reading Int'l, Inc. v. Oaktree Capital Mgmt.*, 317 F. Supp. 2d 301, 334 (S.D.N.Y. 2003)); *see also Georgia Malone & Co., Inv. v. Rieder*, 19 N.Y.3d 511, 519 (2012).  Plaintiffs here do not allege any such relationship with Defendants, and so the unjust enrichment claim must be dismissed.  Plaintiffs also fail to allege, as they must, that "[Defendants were] enriched . . . at [Plaintiffs'] expense."  *See Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 347 F. Supp. 2d 1, 3-4 (S.D.N.Y. 2004).  Plaintiffs allege only that Defendants had "large unhedged positions" in broad categories "including" certain silver products (SAC ¶¶ 208-212).  Plaintiffs' conclusory assertions that these positions were "financially benefited" by the alleged misconduct "fail to satisfy [Plaintiffs'] pleading burden."  *Laydon*, 2014 WL 1280464, at *13 (internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Complaint be dismissed with prejudice.

Dated:  May 29, 2015
          New York, New York

                                        Respectfully submitted,


                                        /s/ Michael Lacovara_____
                                        Michael Lacovara
                                        Leah Friedman
                                        50

Scott Eisman
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
601 Lexington Avenue
New York, New York 10022
Tel: (212) 277-4000
Fax: (212) 277-4001
michael.lacovara@freshfields.com
leah.friedman@freshfields.com
scott.eisman@freshfields.com

*Attorneys for Defendants HSBC Bank U.S.A., N.A., HSBC Holdings Plc, HSBC North America Holdings Inc., and HSBC USA, Inc.*


/s/ Stephen Ehrenberg_____
Stephen Ehrenberg
Kenneth M. Raisler (of counsel)
John J. Hughes, III
SULLIVAN   &   CROMWELL
LLP
125 Broad Street
New York, New York  10005
Tel: (212) 558-4000
Fax:  (212) 558-3588
ehrenbergs@sullcrom.com
raislerk@sullcrom.com
hughesj@sullcrom.com

*Attorneys for Defendants The Bank of Nova Scotia; Scotia Capital (USA) Inc., Scotiabanc Inc., and Scotia Holdings (US) Inc.*


/s/. Joseph J. Bial_____
Charles F. Rule
Joseph J. Bial
Gregory G. Mocek
Amy W. Ray
CADWALADER,
WICKERSHAM & TAFT LLP

51

700 Sixth Street, N.W.
Washington, D.C.  20001
Tel: (202) 862-2200
Fax: (202) 862-2400
Rick.Rule@cwt.com
Gregory.Mocek@cwt.com
Joseph.Bial@cwt.com
Amy.Ray@cwt.com


/s/ Peter J. Isajiw_____
Peter J. Isajiw
CADWALADER,
WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY  10281
Tel: (212) 504-6579
Fax: (212) 504-6666
Peter.Isajiw@cwt.com


*Attorneys for Defendants Deutsche Bank AG, Deutsche Bank AG New York Branch, Deutsche Bank Securities Inc., Deutsche Bank Trust Corporation, Deutsche Bank Trust Company Americas, Deutsche Bank Americas Holding Corp., and DB U.S. Financial Markets Holding Corporation*

52