

New York
44 South Broadway
White Plains, NY 10601
P: +1 914 997 0500 F:
+1 914 997 0035

Pennsylvania
200 Barr Harbor Drive, Suite 400
West Conshohocken, PA 19428
P: +1 610 941 2760
F: +1 610 862 9777

www.lowey.com

New York
485 Lexington Avenue
New York, NY 10017
P: +1 646 722 8500
F: +1 646 722 8501

Delaware
123 Justison Street
Wilmington, DE 19801
P: +1 302 622 7000
F: +1 302 622 7001

www.gelaw.com

March 12, 2018

**BY ECF**
The Honorable Valerie E. Caproni
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007-1312

   Re:  *In re London Silver Fixing, Ltd., Antitrust Litig.*, No. 14-MD-2573 (VEC)

Dear Judge Caproni:

   We write to submit the Second Circuit's opinion in *Charles Schwab Corp. v. Bank of America Corp.*, No. 16-1189-cv, 2018 WL 1022541 (2d Cir. Feb. 23, 2018) ("*Schwab*") as supplemental authority in opposition to Defendants' motions to dismiss Plaintiffs' Third Amended Class Action Complaint [ECF No. 258] ("TAC" or "¶") for lack of personal jurisdiction. *Schwab* (attached hereto as Exhibit A), addressed personal jurisdiction over state law claims related to the USD LIBOR manipulation. *See* 2018 WL 1022541, at *3. Its analysis bears directly on Plaintiffs' claims and establishes that Defendants BNP Paribas Fortis S.A./N.V., Standard Chartered Bank, UBS AG and Barclays Capital Services Ltd. ("PJ Defendants") are subject to jurisdiction here for at least the following reasons.

 **I.** *Schwab* **confirms that Defendants purposefully availed themselves of the forum by entering price-fixed silver transactions in the United States.**

   *Schwab* vacated Judge Buchwald's decision in the USD LIBOR multidistrict litigation to dismiss several California plaintiffs' state law claims for lack of personal jurisdiction.[1] Plaintiffs there alleged a "reputation-driven" conspiracy in which a group of multinational banks (including some Defendants here) conspired to suppress LIBOR by misrepresenting their cost of borrowing "to project an image of financial stability" during the financial crisis. *Id.* at *2; *see also In re LIBOR-Based Financial Instruments Antitrust Litig.*, 2015 WL 6243526, at * 45-48 (S.D.N.Y. Oct. 20, 2015) ("*LIBOR IV*") (describing the reputation-driven suppression of USD LIBOR). This allegedly caused the *Schwab* plaintiffs to receive lower returns on LIBOR-based securities purchased in California, where they sued defendants for violations of the Securities Exchange Act and asserted a number of claims arising under California state law. *Id.* at *3-4.

---

[1] A separate appeal concerning the dismissal of federal antitrust claims for lack of personal jurisdiction is pending before the court. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 17-1569-cv (2d Cir.).

The Second Circuit proceeded to analyze personal jurisdiction claim-by-claim, focusing on: (a) the elements of each claim asserted by plaintiffs; (b) defendants' contacts with California; and (c) the relationship of those contacts to the claims asserted. *Id.* at *6. (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 341 (2d Cir. 2016)).

For instance, for plaintiffs' claims based on transactions in California, *e.g.*, unjust enrichment and breach of the implied covenant of good faith and fair dealing, the Second Circuit held that plaintiffs established personal jurisdiction over each defendant that sold LIBOR-based financial instruments to plaintiffs in California. *Id.* ("Allegations of billions of dollars in transactions in California easily make out a prima facie showing of personal jurisdiction for claims *relating to* those transactions.") (emphasis added).[2]

In contrast, for plaintiffs' claim that defendants committed fraud through their daily false LIBOR submissions to the BBA in London, the Second Circuit held that defendants' sales and marketing of LIBOR-based financial instruments in California were not "suit-related" because those "California transactions did not cause Defendants' false LIBOR submissions to the BBA in London, nor did the transactions in some other way give rise to claims seeking to hold Defendants liable for those submissions." *Id.* at *7. Simply stated, all the suit-related conduct underlying the alleged fraud (*i.e.*, defendants' false submissions to the BBA) took place overseas.

Under *Schwab*'s analysis, the TAC establishes jurisdiction over each PJ Defendant that marketed or sold physical silver and/or silver financial instruments in the United States because Plaintiffs' claims for violation of the Sherman Act, Commodity Exchange Act ("CEA"), and common law are directly related to Defendants' transactions in the forum. In contrast to the "reputation-based" conspiracy alleged in *Schwab*, plaintiffs here allege a "profit motivated" conspiracy in which Defendants manipulated the prices of physical silver and silver financial instruments to increase profits at the expense of U.S. investors. *See In re LIBOR-Based Fin. Instruments. Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2016 WL 7378980, at *3-6 (S.D.N.Y. Dec. 20, 2016) ("*LIBOR VI*") (contrasting the "reputation-based" conspiracy in *Schwab* with a "profit-motivated" conspiracy). Transactions were the cornerstone of this conspiracy and the only way Defendants could achieve their end goal of higher profits. *See Schwab*, 2018 WL 1022541, at *6; *see also Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG*, 277 F. Supp. 3d at 521, 591-92 (S.D.N.Y. 2017) (explaining that transactions intended to benefit from the manipulation of a financial benchmark are suit-related contacts in a profit-driven conspiracy).[3] Thus, each price-fixed transaction in the forum is a "suit related" contact representing the means through which Defendants enacted their

---

[2] The Second Circuit applied the same reasoning whether a defendant dealt directly with a *Schwab* plaintiff or "indirectly," through a non-party broker-dealer affiliate or subsidiary. *See* 2018 WL 1022541 at *9 (holding that "an agency relationship . . . could establish personal jurisdiction over the parent in a state in which the parent 'indirectly' sells the securities").

[3] *Schwab* relied on cases previously cited by Plaintiffs, including: *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171 (2d Cir. 2010) (personal jurisdiction over a defendant which sold "at least one counterfeit Chloé bag" to a New Yorker); *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015) (jurisdiction existed where the out-of-state defendant "mail[ed] one debt collection notice to [one plaintiff in New York], engag[ed] in one debt collection phone call with [her], and mail[ed] a summons and complaint to [the plaintiffs' New York homes].").

conspiracy in the United States. *See Waldman*, 835 F.3d at 335 (explaining that "suit-related" conduct includes any "conduct that could have subjected [defendants] to liability" under the relevant statute.).

Further supporting jurisdiction here, Defendants' conspiracy targeted COMEX, a domestic futures exchange located in this district. *See Silver Fixing, Ltd. Antitrust Litig.*, 213 F. Supp. 3d 530, 562 (S.D.N.Y. 2016) ("*Silver I*") (finding that Defendants' goal was to "capitalize on arbitrage conditions, *particularly in the market for silver futures.*") (emphasis added). The Department of Justice ("DOJ") and Commodity Futures Trading Commission ("CFTC"), regulators empowered by Congress to deter and redress price manipulation in domestic commodity futures markets, have initiated enforcement proceedings against UBS and Deutsche Bank traders for placing false bids and offers ("spoofing") and engaging in other misconduct on COMEX to manipulate silver futures prices. *See* Plaintiffs' June 5, 2017 Letter, ECF No. 248 (regarding Deutsche Bank trader David Liew); Plaintiffs' September 15, 2017 Letter, ECF No. 311 (regarding UBS trader Andre Flotron). Deutsche Bank's David Liew pleaded guilty to CEA violations for spoofing and conspiring to unlawfully trigger stop loss orders with UBS Trader A. *See* ECF No. 248 at 1-2. Significantly, UBS Trader A was stationed *in Stamford, Connecticut*, while coordinating these fraudulent transactions with Liew. *See* Plaintiffs' Opposition to Non-Fixing Banks' Joint Motion to Dismiss ("Pl's. Opp."), ECF No. 336 at 50. So too was his mentor Andre Flotron, who trained UBS Trader A to spoof COMEX silver futures contracts, and manipulated the transactions at issue in the DOJ complaint from UBS's Connecticut office. *See id.*; *see also* ECF No. 248.

The TAC connects each of the PJ Defendants to this same conspiracy, alleging not only that they traded substantial quantities of COMEX silver futures contracts (¶¶ 111, 113)—facts that remain unrebutted by UBS, Standard Chartered and Fortis—but also by providing specific examples of each PJ Defendants' manipulative COMEX transactions. *See, e.g.*, ¶ 259 (UBS), ¶ 288 (Standard Chartered), ¶ 295 (Barclays), ¶ 310 (Fortis). Like the direct seller defendants in *Schwab*, the PJ Defendants' gains came at the expense of U.S. investors, such as Plaintiffs and Class members, who transacted COMEX silver futures contracts at artificial prices because of Defendants' conspiracy. *See Pollock v. Citrus Associates*, 512 F. Supp. 711, 719 (S.D.N.Y. 1981) ("futures contracts trading is a 'zero sum game' (*i.e.*, every gain can be matched with a corresponding loss"). This establishes personal jurisdiction over each PJ Defendant for each of Plaintiffs' claims. *Schwab*, 2018 WL 1022541, at *6 ("solicitation and sale of financial instruments" in the forum gives rise to personal jurisdiction).[4]

## II.   *Schwab* establishes conspiracy jurisdiction over Defendants that manipulated silver prices in furtherance of the alleged profit-driven conspiracy.

Jurisdiction also exists over all Defendants based on the acts of their co-conspirators in the forum in furtherance of that same "profit-motivated" conspiracy. *Schwab*, 2018 WL 1022541, at *9. In *Schwab*, the Second Circuit endorsed for the first time a "conspiracy theory" of jurisdiction where a plaintiff alleges: "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a

---

[4] Direct transactions with the Plaintiffs here are not required. As this Court has already recognized, in the context of futures transactions, "there appears to be little, if any, difference between the injuries suffered by market participants who sold silver to one of the Defendants (the alleged cartel members) and those who sold to non-conspiring third parties." *Silver I*, 213 F. Supp. 3d at 555 (citing *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 779 (2d Cir. 2016)).

co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Id.* (citing *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013)).

The Second Circuit found that while the *Schwab* plaintiffs alleged a plausible conspiracy to suppress LIBOR, they failed to sufficiently demonstrate that the "overt acts" by defendants' co-conspirators in California (*i.e.*, their transactions in LIBOR-based financial instruments) were related to the alleged "reputation based" conspiracy. *See* 2018 WL 1022541, at *9-10.

Here, in contrast, the TAC satisfies all elements of the Second Circuit's test. This Court already found that Plaintiffs plausibly allege a conspiracy to manipulate the Silver Fix. *Silver I,* 213 F. Supp. 3d at 558. The TAC bolsters these allegations with Deutsche Bank Cooperation Materials, demonstrating that Defendants deployed a "'comprehensive strategy' of manipulation" that included: (a) rigging the Silver Fix; (b) fixing the bid-ask spread; and (c) sharing proprietary market-sensitive information about silver trading positions and order flow to align interests and facilitate manipulative trading. *Id.* at 544. The PJ Defendants (along with other Non-Fixing Banks)[5] participated in this same conspiracy to rig silver prices with the Fixing Members, conspiring to "smash" and "push" the Silver Fix, artificially widen spreads, and create an informational advantage among all Defendants. *See* Pl's. Opp., at 12-19; ¶¶ 251-60 (UBS); ¶¶ 288, 290 (Standard Chartered); ¶¶ 297-300 (Fortis); ECF No. 313-7, at 48-50 (Barclays Capital Services, Ltd.). This included manipulative trading directly in the physical silver and COMEX silver futures markets. ¶¶ 111-13, 288, 301, 313-22; *see also* Pl's. Opp. at 4-12. At least two UBS traders *located in Connecticut*—UBS Trader A and Andre Flotron—engaged in manipulative trading in furtherance of Defendants' conspiracy. *See* Pl's. Opp. at 50. Further, communications released by the DOJ and CFTC show that UBS Trader A conspired with Deutsche Bank Trader B, David Liew, to manipulate silver prices by spoofing and triggering stop loss orders on COMEX from UBS's offices in Stamford, Connecticut. *See id.*; *see also* ECF No. 248.

In contrast to the transactions at issue in *Schwab*, here Defendants' domestic transactions (and those of their co-conspirators) are jurisdictionally relevant because the goal of Defendants' conspiracy was to extract unlawful trading profits from U.S. investors, including those who transacted on COMEX. *See Sonterra,* 277 F. Supp. 3d at 591 (citing *LIBOR VI,* 2016 WL 7378980, at *3) ("The first step in evaluating personal jurisdiction in a conspiracy case is to define the scope of the conspiracy, because only acts taken pursuant to that conspiracy are jurisdictionally relevant."). Each Defendants' transactions are therefore "acts in furtherance of a conspiracy" and jurisdictionally relevant to all co-conspirators. *Schwab,* 2018 WL 1022541, at *9. *Schwab* establishes that this Court has jurisdiction over the PJ Defendants based on their co-conspirators' acts within the United States in furtherance of the alleged "profit driven" conspiracy.

### III.   *Schwab* supports exercising jurisdiction over Defendants based on the "effects test."

*Schwab*'s application of the "effects test" further supports jurisdiction here. "The 'effects test' is typically invoked where 'the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects

---

[5] The PJ Defendants along with Bank of America Corporation and Merrill Lynch, Pierce, Fenner & Smith Inc. constitute the Non-Fixing Banks.

harmful to the plaintiff." *See Schwab*, 2018 WL 1022541, at \*10. Exercising jurisdiction in that circumstance "may be constitutionally permissible if the defendant expressly aimed its conduct at the forum." *Id.* (citing *Calder v. Jones*, 465 U.S. 783, 789 (1984)). The *Schwab* plaintiffs argued that the defendants' mere "knowledge" or the "foreseeability" of effects in California satisfied the effects test. *Id.* at \*10. The Second Circuit rejected this argument, holding just because the "effects of LIBOR manipulation were *likely* to reach an economy as large as California's does not mean that Defendants' conduct in London was 'expressly aimed' at that state." *Id.* at \*10.

Here, as the TAC outlines, Defendants manipulated silver prices for the purpose of affecting the value of their trading positions in the United States, including those on COMEX. *See* Pl's. Opp. at 49-57; ¶¶ 5-6, 17, 111, 113, 143-47. Courts in this district have repeatedly held that these allegations are sufficient to satisfy the "effects test" where "profiting from transactions in the forum was part of the motivation for defendants' manipulation." *Sonterra*, 277 F. Supp. 3d 594 n.35; *see also In re N. Sea Brent Crude Oil Futures Litig.*, No. 13-md-02475 (ALC), 2017 WL 2535731, at \*11 (holding "effects test" satisfied by allegations that defendant "intended effects of its alleged conduct [abroad] to be felt in the United States, particularly on NYMEX, where its employees executed trades"); *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 13 Civ. 7789 (LGS), 2016 WL 1268267, at \*6 (S.D.N.Y. Mar. 31, 2016) (finding allegations of large FX positions in United States sufficient to create an inference that defendants "expressly aimed" their profit-driven manipulation of foreign benchmark at the forum). *Schwab* confirms that this Court should reach the same conclusion here.

Respectfully submitted,

/s/ Vincent Briganti                                        /s/ Robert Eisler
Vincent Briganti                                            Robert Eisler

cc:      Counsel of Record (via ECF)