December 14, 2018

VIA ECF
Hon. Valerie E. Caproni
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re:   *In re London Silver Fixing Ltd. Antitrust Litig.*, No. 14-MD-2573

Dear Judge Caproni:

The parties jointly submit this letter reflecting ripe discovery disputes pursuant to the Discovery Schedule (ECF No. 371) and the Court's instructions at the September 5, 2018 conference.

**Scope of Discovery**

| *Plaintiffs' Proposal (same as Gold Plaintiffs)* | *Defendants' Proposal* |
|---|---|
| For custodians agreed upon or ordered by the Court,[1] Defendants apply search terms and produce responsive documents, including documents pertaining to the Silver Fix, the pricing and trading of physical silver and silver-instruments, and inter-bank communications. | Documents relating to the Silver Fixing and documents between 11:05 a.m. and 1:00 p.m. relating to silver trading. |

**Plaintiffs' position**[2] – Plaintiffs' proposal reflects the work that the parties engaged in to agree on relevant custodians and develop a tailored set of search terms designed to locate relevant documents. Defendants had the motive and ability to manipulate the Silver Fix for their benefit in many different ways, and Defendants were communicating with each other about both throughout the day. The fact that Plaintiffs relied on economic analyses around the time of the Fix provides no support for Defendants' argument that communications should be searched only if they happen to fall within a 1 hour and 55 minute window. Plaintiffs' allegations extend beyond the Fix to encompass Defendants' "'comprehensive strategy' of manipulation involving several distinct but related components. SAC ¶ 118." *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 543-44 (S.D.N.Y. 2016) ("*Silver I*"). Among other things, "Defendants are alleged to have improperly shared confidential order information and traded on that information in order to gain an unfair advantage over less-knowledgeable market participants." *Id.*; *see also id.*, at 561 ("Plaintiffs have alleged that Defendants were colluding in chat rooms and via other forms of electronic communication throughout the trading day."); *id.*, at 564 ("Plaintiffs allege that the effects of Defendants' manipulation persisted beyond the Fixing window."). There is no basis for Defendants' proposal to limit the scope of discovery to the Silver Fix, along with a narrow daily window from which responsive documents from other silver-trading activities may be culled. There is no basis to assume that such communications would have occurred only in that narrow window. Indeed, the fallacy of Defendants' proposal can be illustrated if

---

[1] The parties have reached agreement on the custodians whose files will be searched for responsive documents: 23 for HSBC and 19 for BNS, with one additional BNS custodian who will be added if the Court orders joint productions.

[2] In accordance with the Court's instructions, this letter addresses ripe disputes. Plaintiffs wish to advise the Court that the parties are still negotiating certain issues, such as search terms and the scope of non-custodial files to be searched. The parties are also negotiating transaction data. Defendants have stated that they are still trying to determine what information is available (such as what fields exist, whether defendants have a data dictionary to explain the fields, and what instruments were traded during the Class Period). Plaintiffs have requested that Defendants provide dates certain for production of the requested information. Upon receipt of that information, the parties will meet-and-confer in an effort to resolve disputes as to the scope of the transaction data to be produced. In the event the parties are unable to reach agreement on any of these issues, Plaintiffs will promptly advise the Court.

the Court considers two similar emails sent one minute apart, at 11:04 am and 11:05 am. They would have the same evidentiary value, but the email sent at 11:04 am would not be produced. The Court's admonishment to Defendants to "be reasonable. You're in a big antitrust litigation. You're going to have to spend money on discovery. So make a reasonable proposal," (Sept. 5 Tr. at 35), seems to have fallen on deaf ears. In any event, Defendants' burden concerns should be alleviated by the narrow set of custodians and narrow, tailored set of search terms the parties are negotiating and to which Plaintiffs would not have agreed had they been aware of Defendants' two-hour proposal.

**Defendants' position** – Defendants propose defining the relevant scope of discovery to include all communications and other responsive, non-privileged documents about (i) the Silver Fixing or (ii) silver trading that occurred between 11:05 a.m. and 1:00 p.m. each business day. This approach is proportional to the needs of the case and is guided by Plaintiffs' allegations concerning the Silver Fixing and Plaintiffs' overwhelming reliance on statistical allegations concerning trading around the Silver Fixing. (*See, e.g.*, TAC ¶¶ 137, 144, 145, 148, 152-54, 156, 158-62, 164, 168, 170-72, 176-77, 180, 181, 183-89, 192-95, 197, 201, 203, 205-06, 210, 212, 216, 218, 224, 226-28.) Indeed, Plaintiffs' own analyses relied on trading between 11:00 a.m. and 1:00 p.m. (*see* TAC ¶¶ 180, 201, 203), and even shorter windows (*see* TAC ¶¶ 164-169, 184-186, 187-88, 202). Plaintiffs' request for (i) all silver trading during the class period and (ii) all interbank communications from more than 40 custodians for two Defendants is untethered to both the needs of the case and the substance of Plaintiffs' allegations. Indeed, Plaintiffs appear to believe they are entitled to virtually every document concerning Defendants' silver trading businesses across a seven-year period. Neither Plaintiffs' allegations nor Rule 26 grants them any such entitlement.

**Relevant Time Period for Production[3]**

| *Plaintiffs' Proposal* | *Defendants' Proposal* |
| --- | --- |
| Documents and ESI from one year before and one year after the Class Period (Jan. 1, 2006 - Dec. 31, 2014). Trade data from the start of the Class Period through two years after the Class Period ends (Jan. 1, 2007 - Dec. 31, 2015). | Trade data through June 30, 2014. |

**Plaintiffs' position – Trade Data outside the Class Period**: Defendants propose to produce transaction data through June 30, 2014 because that is the date of "the announcement of the first Libor settlement." Plaintiffs see no logical reason to link discovery in this case with a settlement in an unrelated case. Moreover, Defendants offered *Gold* Plaintiffs 18 months of post-Class Period data, whereas *Silver* Plaintiffs would receive only 6 months of post-Class Period data. Not only is this inequitable, but Defendants clearly have no principled objection to the concept of producing at least 18 months' worth of post-Class Period transaction data. The two years' worth of post-Class Period transactional data requested by Plaintiffs is necessary to assess how Defendants' transacting behavior and silver pricing changed after the Class Period, and for Plaintiffs' damages experts to prepare a "but-for" model for damages, for class certification, and for a plan of allocation. Six months of data is insufficient for those purposes. The case Defendants cite does not support their argument. *See Cole's Wexford Hotel, Inc.* v. *Highmark Inc.*, 209 F. Supp. 3d 810, 814-15 (W.D. Pa. 2016) (discovery period of 2009 to 2013 was longer than the class period). *See also Lightsquared Inc. v. Deere & Co.*, No. 13-cv-8157, 2015 WL 8675377, at *4 (S.D.N.Y. Dec. 10, 2015) (discovery that post-dates transactions may retrospectively analyze facts relevant to claims at issue).

**Plaintiffs' position – Communications outside the Class Period.** Plaintiffs propose that Defendants produce documents and ESI for one year before and one year after the Class Period.

---

[3] The parties are continuing to meet and confer on the issue of post-class period trade data. To the extent the parties are able to reach resolution, we will promptly update the Court.

2

Plaintiffs' proposal is proportional and reflects the normal practice in antitrust class action cases which routinely include discovery before and after a class period. Documents outside of the Class Period may shed light on Class Period events, and are relevant to the initiation and demise of the Fix, changes in the Fix process, and any effects from the April 2014 resignation of Deutsche Bank from the Fix. Defendants offer no support for the position that discovery should be limited to the Class Period.

**Defendants' position** – Plaintiffs have requested years of discovery beyond the seven-year putative class period for both trade data and communications. Plaintiffs must demonstrate that discovery beyond the class period is relevant and proportional to the needs of the case. *See Cole's Wexford Hotel, Inc.* v. *Highmark Inc.*, 209 F. Supp. 3d 810, 812, 833 (W.D. Pa. 2016). *First*, Plaintiffs demand two years of post-class period trade data for "expert benchmarking." As a compromise, Defendants have offered to produce 6 months of post-class period trade data through June 30, 2014, two years after the announcement of the first LIBOR settlement (which focused attention on benchmark manipulation). Plaintiffs rejected that proposal. *Second*, despite Defendants' agreement to produce over 40 custodians' reasonably accessible communications for the entire seven year putative class period, Plaintiffs demand two additional years of communications. There is no basis to impose such a significant additional burden on Defendants.

**Joint Productions/Modification of Protective Order**

| *Plaintiffs' Proposal (same as Gold Plaintiffs)* | *Defendants' Proposal* |
|---|---|
| A Supplemental Protective Order (annexed hereto) allowing for joint production and use of documents produced by Defendants | No modification to the Protective Order. |

**Plaintiffs' position** – Defendants' documents would remain subject to the two-tier protections of the Protective Orders. Contrary to Defendants' assertion that nothing has changed, the Parties' agreed-upon custodians are nearly identical across the two cases. This Court has recognized that effective coordination of these actions will minimize burdens and make discovery generally less expensive. Sept. 5, 2018 Tr. at 37, 43. The same people were involved in trading various precious metals, and information learned while trading (or manipulating) one metal is relevant to documents and depositions relating to another metal. The scope of discovery cannot be limited simply to silver trading, but should include documents related to precious metals trading, as such documents by definition also relate to silver. Furthermore, to the extent it is not clear what metal is being referenced in a particular document, Defendants should produce said document as it may be related to the Silver Fix, Silver trading, or precious metals trading. By limiting the scope of discovery to documents and data that directly implicate the Silver Fix, Defendants necessarily are omitting documents relevant to Plaintiffs' claims and responsive to Plaintiffs' requests. Defendants' proposal to proceed without the ability to share Defendants' documents from identical custodians will multiply costs, increase burdens, hamper efficient proceedings, and impede Plaintiffs' ability to coordinate as ordered by the Court. Defendants have acknowledged that the lack of a joint production may create logistical problems for the joint depositions that Defendants have requested for custodians in both cases. Moreover, there is no bad faith here. At the Sept. 5 hearing, the Court explicitly contemplated that the parties could seek a modification of the protective order. *See* Sept. 5 Tr. at 43-44.

**Defendants' position** – These cases have not been consolidated, and involve different metals, different markets and different parties. Documents relating to gold trading are simply not relevant to the *Silver* case, and vice-versa. Although this Court ordered coordination of discovery "to the extent that the Parties should attempt (where possible) to cooperatively resolve any discovery issues impacting both cases so as to minimize duplication and burden," such coordination was not "intended to, or shall be deemed to, modify the terms of the Protective Order." (Disc. Sched. ¶ 3 (ECF No. 371).) The parties negotiated the Protective Order in good faith; both sides made concessions to reach

an agreement. Plaintiffs proposed and Defendants rejected a cross-case sharing provision. Plaintiffs now seek to undo that good faith negotiation without any change in circumstances or the showing of good cause required under the Protective Order.

### Non-Fixing Audio Files

| *Plaintiffs' Proposal (Same as Gold Plaintiffs)* | *Defendants' Proposal* |
|---|---|
| *First*, because HSBC is uniquely situated, it should produce audio from the lines of HSBC's Fixing participant custodians within reasonable time frames before, during, and after the Fixings. *Second*, the parties should continue to try to reach agreement on additional audio files. *Third*, the parties should modify the Discovery Schedules to account for the delay in producing audio files. | Plaintiffs review document productions and then request a reasonable number of specific calls based on documentary record. |

**Plaintiffs' position** – HSBC agreed to produce audio files containing recordings of the Silver Fix Calls for the dates set forth in Appendix D of the TAC. If HSBC cannot locate all of those calls, the parties will meet and confer. Non-Fixing Call audio files, especially inter-bank calls, are highly relevant to this litigation. "Plaintiffs have alleged that Defendants were colluding in chat rooms and via other forms of electronic communication throughout the trading day." *Silver I*, 213 F. Supp. 3d at 560. Defendants propose, however, that all production of Defendants' non-Fixing Call audio should take place after Plaintiffs review Defendants' document productions. Plaintiffs believe Defendants can provide more information about the accessibility of certain audio files. For example, one week ago, BNS learned that its vendor may be able to export audio files in bulk with available metadata from the system that was in use most recently, a fact that would have obviated hours of debate and negotiation. This new information makes further discussions even more likely to be useful between the parties. In any event, Plaintiffs share the Court's frustration that Defendants are only now determining what is available. "[T]his case has now been pending for forever, several years. So the hypothetical of, we could have this, we could have this, I presume that your clients have been instructed to go get these materials. Given that, have you got some material, and have you identified and moved into a producible system some of the fixing calls? (Sept. 5 Tr. at 14.) *See also id.,* at 18 (Mr. Ehrenberg: "[I]t's very difficult to say, without actually going to the source and pulling out the call, I have this call." The Court: "I guess I would have assumed that, by this stage, you would have actually done that, at least for the days in the complaint.").

HSBC's system has certain search capabilities and HSBC offered to produce audio files for **one** custodian (HSBC's Fix submitter) for a narrow time window around the Fixing Call on the dates listed in Appendix D of the complaint. Defendants claim Plaintiffs rejected HSBC's proposal. In fact, Plaintiffs countered, requesting the audio of all HSBC Fixing participant custodians (believed to be an additional four individuals) for a slightly larger, yet still narrow window on those same dates. *HSBC rejected that proposal and has now joined BNS's position that Plaintiffs first review documents and then request "specific calls."* Given the highly probative nature of audio files and the uncertainty that document discovery—particularly if as crabbed as Defendants' propose—will help Plaintiffs target specific audio files, Plaintiffs do not think this "wait and see" approach, standing alone, is sufficient.

**Defendants' position** – In light of the significant burdens associated with bulk collection and review of audio, Defendants have proposed a targeted approach to non-Fixing call audio. While any audio production involves burdensome collection and review, bulk collection is both enormously expensive and time consuming; for certain systems, it is simply not feasible. In addition, reviewing even a single hour of audio for each business day for a year for as few as ten custodians would take thousands of attorney hours. Plaintiffs' alternative proposal to collect files associated with phone numbers for

certain custodians, which is not feasible, is unworkable. Defendants have therefore proposed a targeted approach, where Plaintiffs leverage document discovery to craft a reasonable number of targeted requests by custodian, date and time. Plaintiffs have rejected this approach and continue to insist on bulk collection and review, even declining HSBC's offer to leverage its ongoing review of Fixing calls on behalf of all Defendants to produce non-Fixing audio from their submitter for a window around the Fixing.

### Defendants' Document Request re Expert Materials

| *Plaintiffs' Proposal (same as Gold Plaintiffs)* | *Defendants' Proposal* |
|---|---|
| The requested materials are not subject to production. | Plaintiffs produce all expert analyses generated in connection with preparing the complaints. |

**Defendants' position** – Plaintiffs have produced expert analyses directly referenced in the complaint, but refuse to produce materials relating to analyses performed but not cited in the complaint. By constructing a complaint based entirely upon statistical analysis, Plaintiffs have placed their expert work "at issue," waiving any privilege. *See Granite Partners* v. *Bear, Stearns & Co.*, 184 F.R.D. 49, 55 (S.D.N.Y. 1999). Plaintiffs' cherry-picking of helpful analyses while shielding others from discovery not only places this category of materials at issue, but potentially renders the entire foundation of Plaintiffs' allegations incomplete or misleading and therefore deprives Defendants of their right to test Plaintiffs' assertions. *See id.*; *cf. Financial Guar. Ins. Co.* v. *Putnam Advisory Co., LLC*, 314 F.R.D. 85, 90 (S.D.N.Y. 2016) (waiver is narrow only when shielding documents is not "done in an incomplete, manipulative, or misleading manner"). Here, Plaintiffs' asserted privilege is waived because their allegations "in fairness require[] examination of protected communications." *United States* v. *Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991).

**Plaintiffs' position** – As Defendants concede, Plaintiffs already produced all consultant analysis included in their complaint. Defendants now seek *all* materials reviewed by Plaintiffs' consultants, including those not referenced in Plaintiffs' complaint. Plaintiffs object on the basis that the materials are protected by at least the attorney-client privilege and attorney-work product doctrine, but Defendants argue that Plaintiffs waived any such privilege or protection since they "have placed their expert work 'at issue'" by citing to statistical analyses in their complaint. A plaintiff does not waive privilege over documents not referenced in its complaint, including those reviewed or prepared by its consultants, such as earlier iterations of tests that did not form the basis of the allegations in a complaint. *See Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 314 F.R.D. 85, 90 (S.D.N.Y. 2016) (rejecting request for "all documents concerning the 'economic consultant' analysis." Plaintiff "only required to produce the analysis document referred to in the SAC," and not preparatory documents or communications between counsel and consultants). *U.S. v. Bilzerian*—a *criminal* case holding that a defendant waived attorney-client privilege when he testified *at trial* on direct examination about privileged communications he had with his counsel—is completely inapposite. Plaintiffs have not injected these analyses into the litigation nor do they need the materials to sustain their claims. Materials not included in the complaint are privileged and protected from discovery. Moreover, Defendants' assertion that Plaintiffs' claims are based exclusively on statistical analyses is false, and the Court specifically rejected Defendants' attacks on those analyses. *See Silver I*, 213 F. Supp. 3d at 563. In any event, Defendants can test the theories in the TAC at the appropriate time—during expert discovery.

Respectfully submitted,

| | |
|---|---|
| */s/ Deborah A. Elman* | */s/ Thomas Skelton* |
| Robert G. Eisler | Vincent Briganti |
| Deborah A. Elman | Thomas Skelton |
| Chad Holtzman | Christian Levis |
| Allison McCowan | Jonathan Seredynski |
| GRANT & EISENHOFER PA | LOWEY DANNENBERG P.C. |
| 485 Lexington Avenue, 29th Floor | 44 South Broadway, Suite 1100 |
| New York, NY 10017 | White Plains, NY 10601 |

*Interim Co-Lead Counsel in No. 14-MD-2573*

| | |
|---|---|
| */s/ Stephen Ehrenberg* | */s/ Damien J. Marshall* |
| Stephen Ehrenberg | Damien J. Marshall |
| William H. Wagener | Leigh M. Nathanson |
| Virginia R. Hildreth | Laura E. Harris |
| SULLIVAN & CROMWELL LLP | BOIES SCHILLER FLEXNER LLP |
| 125 Broad Street | 575 Lexington Avenue |
| New York, NY 10004 | New York, NY 10022 |
| | |
| *Attorneys for The Bank of Nova Scotia Defendants and Liaison Defense Counsel* | *Attorneys for the HSBC Defendants* |