**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE LONDON SILVER FIXING, LTD.
ANTITRUST LITIGATION

14-MD-02573-VEC

14-MC-02573-VEC

This Document Relates to:

The Honorable Valerie E. Caproni

ALL ACTIONS

**<u>PLAINTIFFS' OPPOSITION TO THE MOTION OF DEFENDANTS HSBC BANK USA, N.A. AND THE BANK OF NOVA SCOTIA FOR JUDGMENT ON THE PLEADINGS</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................................ii

PRELIMINARY STATEMENT ...........................................................................................................2

BACKGROUND ....................................................................................................................................3

LEGAL STANDARD .............................................................................................................................5

ARGUMENT...........................................................................................................................................6

I.     Plaintiffs' Antitrust Injuries Here Are "Direct."........................................................................6

    A.     Plaintiffs Are the Most Efficient Enforcers Possible of their Futures-Based Claims.............6

    B.     Plaintiffs Are Also Efficient Enforcers for Their Antitrust Claims Arising Out of Transactions in Physical Silver. ...........................................................................................11

    C.     Plaintiffs Have Amply Alleged the Link Between the Silver Fixing and the Prices of the Products They Traded. ..........................................................................................................12

II.    The Remaining Efficient Enforcer Factors Pose No Further Obstacle. ...................................13

CONCLUSION......................................................................................................................................15

# TABLE OF AUTHORITIES

## Cases

*Apple Inc. v. Pepper*,
  139 S. Ct. 1514 (2019) ........................................................................................14

*Aviles v. S&P Global, Inc.*,
  No. 17-CV-2987 (JPO), 2020 WL 1689405 (S.D.N.Y. Apr. 6, 2020) ..................5

*Blue Shield of Virginia v. McCready*,
  457 U.S. 465 (1982) ............................................................................................11

*DNAML PTY, Ltd. v. Apple Inc.*,
  25 F. Supp. 3d 422 (S.D.N.Y. 2014) .....................................................................6

*Faber v. Metro. Life Ins. Co.*,
  648 F.3d 98 (2d Cir. 2011) ....................................................................................5

*Flatscher v. Manhattan School of Music*,
  551 F. Supp. 3d 273 (S.D.N.Y. 2021) ...................................................................5

*Friedman v. Salomon/Smith Barney, Inc.*,
  313 F.3d 796 (2d Cir. 2002) ..................................................................................8

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016) ...........................................................................13, 14

*Gordon v. N.Y. Stock Exch., Inc.*,
  422 U.S. 659 (1975) ..............................................................................................8

*In re London Silver Fixing, Ltd. Antitrust Litig.*,
  213 F. Supp. 3d 530 (S.D.N.Y. 2016) .........................................................passim

*In re London Silver Fixing, Ltd. Antitrust Litig.*,
  332 F. Supp. 3d 885 (S.D.N.Y. 2018) ...................................................................5

*In re Platinum & Palladium Antitrust Litig.*,
  No. 1:14-CV-9391 (GHW), 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017)........10

*J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*,
  451 U.S. 557 (1981) ............................................................................................14

*Leist v. Simplot*,
  638 F.2d 283 (2d Cir. 1980), aff'd sub nom., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. J.J.
  Curran, 456 U.S. 353 (1982) .................................................................................7

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ..............................................................................................6

*Loeb Indus., Inc. v. Sumitomo Corp.,*
  306 F.3d 469 (7th Cir. 2002) ...................................................................................................9

Plaintiffs have adequately alleged proximate cause. *Silver I,*
  123 F. Supp.3d .........................................................................................................................6

*Pollock v. Citrus Assocs. of N.Y. Cotton Exch., Inc.,*
  512 F. Supp. 711 (S.D.N.Y. 1981) ..................................................................................... 7, 8

*Sanner v. Bd. of Trade of Chi.,*
  62 F.3d 918 (7th Cir. 1995) ....................................................................................................9

*Schwab Short-Term Bond Market Fund v. Lloyds Banking Group PLC,*
  22 F.4th 103 (2d Cir. 2021) ............................................................................................passim

*Sonterra Capital Master Fund Ltd. v. UBS AG,*
  954 F.3d 529 (2d Cir. 2020) .................................................................................................13

*Strax v. Commodity Exch., Inc.,*
  524 F. Supp. 936 (S.D.N.Y. 1981) .........................................................................................8

*Strobl v. N.Y. Mercantile Exch.,*
  768 F.2d 22 (2d Cir. 1985) ................................................................................................. 7, 9

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council,*
  857 F.2d 55 (2d Cir. 1988) .....................................................................................................6

**Other Authorities**

*Hearings on S. 2485, S. 2578, S. 2837 and H.R. 13113 before the Senate Comm. on Agriculture and
  Forestry,* 93d Cong., 2d Sess. 259 (1974) ..............................................................................8

NASDAQ Data Link, Silver Price: London Fixing, available at
  https://data.nasdaq.com/data/LBMA/SILVER-silver-price-london-fixing ....................................4

Plaintiffs respectfully submit this Opposition to Defendants HSBC Bank U.S.A., N.A. and the Bank of Nova Scotia's ("Defendants")[1] Motion for Judgment on the Pleadings pursuant to FED. R. CIV. P. 12(c).

## PRELIMINARY STATEMENT

In *Schwab Short-Term Bond Market Fund v. Lloyds Banking Group PLC*, 22 F.4th 103 (2d Cir. 2021) ("*Schwab II*"), the Second Circuit held that certain victims of a scheme to manipulate U.S. Dollar LIBOR did not have antitrust standing to sue, while others did.  In particular, *Schwab II* held that the "bondholder" plaintiffs lacked antitrust standing if they purchased their relevant financial instruments from third parties rather than from the defendants themselves.  *Id.* at 114.  In that case, the affected plaintiffs were holders of LIBOR-denominated bonds who had purchased their instruments from individual, identifiable counterparties (like the State of Israel or General Motors) other than the defendant banks.  *Id.* at 111.  As to such victims, the Second Circuit held that they were not sufficiently "efficient enforcers" of the antitrust laws to bring suit, partly because other plaintiffs in the case— holders of bonds or swaps who *had* transacted directly with the defendants —would be better situated to hold them liable for their price-fixing conspiracy.  *See id.* at 115-16.

Defendants here argue that this Court must reverse its earlier opinion finding that Plaintiffs are efficient enforcers because the facts of our case are "indistinguishable" from those of *Schwab II*. Defs.' Br. at 9. They read *Schwab II* as a "bright line" requirement of a direct transaction between plaintiff and defendant, no matter the market. *See id.*  But Defendants are wrong. *Schwab II itself* expressly distinguished claims about manipulation of the futures market (like Plaintiffs' claims here) from the situation before it. Blindly applying a privity requirement to the very different circumstance

---

[1] HSBC Bank U.S.A., N.A. and the Bank of Nova Scotia list all the other Defendants remaining in the action as "affiliated moving entities." Mem. of Law in Support of the Mot. of Defs. HSBC Bank USA, N.A. and the Bank of Nova Scotia for Judgment on the Pleadings, ECF No. 585 ("Defs.' Br.") at 1 n.1.

of standardized futures contracts traded on a commodity exchange—where the exchange acts as an intermediary rendering the real counterparty anonymous—would mean that no futures trader could ever bring an antitrust claim.  But both Congress and the Second Circuit have made perfectly clear for the past forty years that price-fixers on commodity exchanges *are* subject to private antitrust enforcement. *Schwab II* does not change that settled law in the slightest. Direct contractual privity between plaintiff and defendant has never been, and still is not, required for a futures trader on a commodity exchange to be an efficient enforcer of an antitrust claim.

Knowing that their lead argument is impossibly weak, Defendants advance a grab bag of other arguments in the hopes the Court will find something else to its liking. None succeed. In attempting to apply *Schwab II* to Plaintiffs' physical silver transactions, Defendants once again ignore key differences between the market and conspiracy alleged here and that in *Schwab II*, not to mention the practical reality that Plaintiffs here have aggressively litigated this action for the past eight years all the way through class certification. And Defendants' final protestations that Plaintiffs purportedly did not transact precisely *at* the Fix Price, and that their damages calculations might be complicated, ring desperate. This Court rightly rejected those identical arguments in its motion to dismiss opinion six years ago, and they have not improved with age. Defendants' motion should be denied.

## BACKGROUND

For years, three multinational banks dictated the global price of silver. Until 2014, Defendants Bank of Nova Scotia, HSBC, and (now dismissed) Deutsche Bank conducted a private Walrasian auction every trading day known as the London Silver Fix ("Silver Fixing"), where they traded bids on physical silver, agreed on a price, and published it to the market (the "Fix Price"). Third Amended Complaint, ECF No. 258 ("TAC") ¶¶ 118-22. The Fix Price was the "international benchmark for silver," and all business in silver was "conducted solely on the basis of [that] single published Fixing Price." *Id.* ¶ 124; *see also, e.g.,* NASDAQ Data Link, Silver Price: London Fixing, available at

https://data.nasdaq.com/data/LBMA/SILVER-silver-price-london-fixing, last visited Apr. 14, 2022 ("[A]ll business is conducted on the basis of [the Silver Fixing] price.").

While the Fixing should have reflected an honest effort to measure the competitive forces of supply and demand, Defendants conspired to suppress silver pricing, pushing down prices during the Fixing itself and resulting in a Fix Price repeatedly lower than the prevailing spot market price prior to the call. *Id.* ¶ 153 & Fig. 6. Defendants took advantage of their advance knowledge of the Fix's direction and outcome to enter physical silver and futures positions at massive profits. *Id.* ¶¶ 142-50; 199-219; 244-245. Defendants also used their position to supracompetitively fix the bid-ask spread of their active silver trades before and after the Fix. TAC at ¶¶ 220-243.

Plaintiffs initiated this action in 2014, asserting claims under the Sherman Act, the CEA, and common law unjust enrichment for injuries they incurred when they transacted physical silver and futures at artificial prices as a result of Defendants' conspiracy. *In re London Silver Fixing, Ltd. Antitrust Litig.*, 213 F. Supp. 3d 530, 541, 543 (S.D.N.Y. 2016) ("*Silver I*"). Following a motion to dismiss Plaintiffs' Second Amended Complaint under Rules 12(b)(1), (b)(2), and (b)(6), ECF No. 63, the Court issued *Silver I*, sustaining Plaintiffs' antitrust claims for price fixing and unlawful restraint of trade against Silver Fixing Members, including all Defendants remaining today, for the period of January 1, 2007 to December 31, 2013. *Id.* at 576.[2]

Plaintiffs filed the TAC on June 16, 2017, drawing upon chat communications produced by settling Deutsche Bank defendants to assert claims against additional defendants for a broader range of misconduct relating to silver prices. The Court dismissed all claims against entities that were not

---

[2] The order also sustained Plaintiffs' CEA price manipulation, aiding and abetting, and principal-agent claims against the same Defendants for the same period; and Plaintiffs' CEA manipulative device claims against the same Defendants for the period following August 15, 2011. *Id.*

Fixing Members or affiliates of Fixing Members, but preserved all the claims that had been sustained in *Silver I*. *In re London Silver Fixing, Ltd. Antitrust Litig.*, 332 F. Supp. 3d 885, 927 (S.D.N.Y. 2018).

Following the completion of fact discovery, Plaintiffs moved for certification of the Class on December 20, 2021.[3] Instead of responding to Plaintiffs' motion, Defendants pivoted back to the pleading stage, filing this motion for reconsideration of the Court's antitrust standing analysis from six years ago.

## LEGAL STANDARD

When considering a motion for judgment on the pleadings under Rule 12(c), the Court must "draw all reasonable inferences in [the non-movant's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Flatscher v. Manhattan School of Music*, 551 F. Supp. 3d 273, 280 (S.D.N.Y. 2021) (quoting *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011)). Absent a directly controlling change in law, "a Rule 12(c) motion for judgment on the pleadings that challenges the sufficiency of a complaint on the same ground as an already-denied Rule 12(b)(6) motion to dismiss should meet an identical fate." *Aviles v. S&P Global, Inc.*, No. 17-CV-2987 (JPO), 2020 WL 1689405, at *3 (S.D.N.Y. Apr. 6, 2020).

To establish antitrust standing at the pleading stage, Plaintiffs must plead that they are "efficient enforcers" of the antitrust laws. *Schwab II*, 22 F.4th at 115. To determine whether a plaintiff is an efficient enforcer, courts consider four factors:

(1) the directness or indirectness of the asserted injury;

(2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement;

---

[3] Plaintiffs' class certification motion was accompanied by extensive briefing and the Expert Report of Dr. Hal Singer, which analyzed the economic data produced in this litigation and public data to prepare econometric models.

(3) the speculativeness of the alleged injury; and

(4) the difficulty of identifying damages and apportioning them among direct and indirect

victims so as to avoid duplicative recoveries.

*Id.* (quoting *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 66 (2d Cir. 1988)) (internal

quotation marks omitted). The first factor is the most important; the third and fourth factors are not

an "independent basis for denying standing where" Plaintiffs have adequately alleged proximate cause.

*Silver I*, 213 F. Supp. 3d at 552 (quoting *DNAML PTY, Ltd. v. Apple Inc.*, 25 F. Supp. 3d 422, 430

(S.D.N.Y. 2014)). Plaintiffs here satisfy all four factors.

## ARGUMENT

### I.     Plaintiffs' Antitrust Injuries Here Are "Direct."

As this Court set forth in its *Silver I* opinion finding antitrust standing, "[e]valuating the

directness of an injury is essentially a proximate cause analysis" of "whether the harm alleged has a

sufficiently close connection to the conduct the statute prohibits." *Silver I*, 213 F. Supp. 3d at 552

(quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014)). Defendants assert

that *Schwab II* holds that the *only* way to satisfy this requirement—no matter the context—is a direct

transaction between plaintiff and defendant. Defs.' Br. at 8-10. They further assert that *Schwab II*

somehow requires a plaintiff to have transacted exactly *at* the Fix Price to be "directly" injured. *Id.* at

10. They are wrong on both counts—because their reading of *Schwab II* is wrong, and because they

improperly disregard the TAC's well-pled allegations that Plaintiffs' physical silver and silver futures

transactions were priced according to the Silver Fixing.

### A.     Plaintiffs Are the Most Efficient Enforcers Possible of their Futures-Based Claims.

In the context of futures traded on a commodity exchange, it is simply impossible to

distinguish between plaintiffs who transacted directly with defendants and plaintiffs who did not.  That

6

is because the exchange acts as an intermediary that renders the real counterparty anonymous. *E.g.* *Leist v. Simplot*, 638 F.2d 283, 287 (2d Cir. 1980), aff'd sub nom., *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. J.J. Curran*, 456 U.S. 353 (1982) ("The clearinghouse, a key link in the futures trading system, operates as the seller to all buyers and the buyer from all sellers, thus facilitating the interchangeability of the contracts and the cancelling of positions."). Under Defendants' interpretation, then, there can be *no* possible efficient enforcer when antitrust conspirators manipulate financial instruments that are traded on the exchanges to their benefit, because no injured futures trader will ever have a contractual privity relationship with a defendant.[4] Put another way, they argue that parties like Defendants would be essentially immune from private antitrust enforcement when they engage in price fixing in the silver futures market (or any other exchange-based futures market), no matter how brazenly unlawful their conduct might be in this instance or in the future.

While this construct represents a dream scenario for Defendants, it is contrary to all applicable law. The Second Circuit and courts in this District have long rejected attempts to limit the antitrust laws just because the anticompetitive behavior injured plaintiffs in the futures markets.  Nearly fifty years ago, the Second Circuit instructed that "price manipulation is an evil that is always forbidden under every circumstance by both the Commodity Exchange Act and the antitrust laws," so "application of the latter cannot be said to be repugnant" to the "former."  *Strobl v. N.Y. Mercantile Exch.*, 768 F.2d 22, 28 (2d Cir. 1985).  There "is no indication that Congress intended a private right of action under the CEA to be an exclusive remedy for price manipulation." *Pollock v. Citrus Assocs. of N.Y. Cotton Exch., Inc.*, 512 F. Supp. 711, 717 (S.D.N.Y. 1981).  To the contrary, the "legislative history … reveals that Congress desired the continued application of the antitrust laws to those anti-competitive practices that also violate the Commodity Exchange Act."  *Strobl*, 768 F.2d at 28; *accord*

---

[4] The exchanges themselves do not have standing to bring a §4 claim because they are not injured by the price manipulation in their role as intermediaries.

*Pollock*, 512 F. Supp. at 717 ("[T]he legislative history of the CFTCA indicates that Congress intended that antitrust claims be allowed against brokers and traders operating in the commodity futures markets."); *see also Strax v. Commodity Exch., Inc.*, 524 F. Supp. 936, 940 (S.D.N.Y. 1981) ("We agree with [*Pollock*'s] extensive analysis of the relevant legislative history and his conclusion that Congress intended to permit antitrust claims to be brought against commodities futures trading practices specifically proscribed by the CEA."). For example, during debate of amendments to the CEA in 1974 the House Agriculture Committee unanimously struck from the original draft an exemption from coverage under the antitrust laws for commodities futures transactions. *See Hearings on S. 2485, S. 2578, S. 2837 and H.R. 13113 before the Senate Comm. on Agriculture and Forestry,* 93d Cong., 2d Sess. 259 (1974) (Senate Hearings). There was also significant testimony concerning the amendments that make clear that the CEA does not supplant or supersede the antitrust laws, with Chairman Rodino of the House Judiciary Committee testifying that, "in successive years, wheat, soybeans, and corn have been subjected to anticompetitive and monopolistic practices in commodity markets and have significantly contributed to food prices charged consumers. These developments indicate the urgency of applying antitrust principles to the commodity markets unequivocally . . . ." Hearings on S. 2485, S. 2578, S. 2837 and H.R. 13113 Before the U.S. Senate Committee on Agriculture and Forestry, 93rd Cong., 2nd Sess. 259 (1974).

The fallacy of Defendants' argument becomes clearer still when we compare the commodity market to the securities market. In the securities market, antitrust law has been largely displaced by the Securities Exchange Act regime. *See, e.g., Friedman v. Salomon/Smith Barney, Inc.*, 313 F.3d 796, 801-03 (2d Cir. 2002) (barring price-fixing suit against stock underwriters that restricted investors' resale of public offering stock for a fixed period following the offering, holding that defendants' practice was permitted by securities regulators and therefore immune from antitrust liability); *Gordon v. N.Y. Stock Exch., Inc.*, 422 U.S. 659, 691 (1975) (holding that stock exchanges' system of fixed commission

8

rates was immune from antitrust liability because this immunity was "necessary to make the Exchange Act work as it was intended"). Congress specifically chose to take a different path for the commodity futures markets, and to ensure that the antitrust laws would continue to regulate those markets. *See Strobl*, 768 F.2d at 26-28 (distinguishing the doctrine of implied repeal applicable to securities markets); *id.* at 29 (quoting testimony during Congressional floor debate on the 1974 CEA amendments reaffirming that "antitrust laws are to apply to commodity transactions"). Defendants' argument that *Schwab II* somehow overrides Congress's express intent is specious.

Indeed, *Schwab II* itself recognizes the futures market is special, and manipulation of a benchmark for a futures contract thus *can* give rise to antitrust standing for parties who bought their futures contracts from parties other than the defendants. *See* 22 F.4th at 118. That is the precise holding of two Seventh Circuit decisions that *Schwab II* expressly distinguishes on the ground that they involved futures markets and not mere benchmark manipulation. *See id.* (discussing *Sanner v. Bd. of Trade of Chi.*, 62 F.3d 918 (7th Cir. 1995), and *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002)). In those highly respected antitrust precedents, the Seventh Circuit allowed claims by those injured in the futures market after defendants manipulated the underlying commodity.

Accordingly, *Schwab II* acknowledges the antitrust standing of "plaintiffs who bought or sold various physical commodities in the cash market," "who alleged injuries caused by the defendants' manipulation in the futures market for the same commodity." 22 F.4th at 118 (citing *Sanner*, 62 F.3d at 930; *Loeb*, 306 F.3d at 489). That is because of "the 'lockstep' link between prices in the two markets and the uniquely interrelated nature of a *cash* market for a specific commodity and the *futures* market for that same commodity." *Id.* Indeed, in those Seventh Circuit cases, as here, "the defendant[s] 'intended to impact both the cash and futures markets to [manipulate] prices in both." *Id.*; TAC ¶¶ 191; 194; 199-219; 244-245; 323-327.

Defendants do not even mention these directly-on-point precedents. The best they can do is to throw in a footnote citing cases that allow antitrust standing for exchange plaintiffs where a cartel controls an "overwhelmingly large" share of that exchange market. Defs.' Br. at 9 & n.3. In other words, Defendants effectively assert that they have the right to freely manipulate the silver futures market as long as they don't entirely dominate it. That cannot possibly be the law. Further, that argument improperly attempts to evade the anonymizing, intermediary role of the exchange. A group of banks alleged to have price-fixed futures by manipulating the Sterling LIBOR benchmark recently illustrated this problem in a pending Second Circuit appeal. When confronted with the argument that they might well have been matched up with plaintiffs in exchange transactions, they ducked immediately back behind the safety of the exchange's technical counterparty status. *See* Joint Brief for Defendants-Appellees, at 29 n.15, *Sonterra Capital Master Fund, Ltd. v. UBS AG*, No. 19-2979 (2d Cir. Jan. 20, 2022), ECF No. 146 (the "CME, not any other trader, is the futures trader's counterparty.") They are quite right that the exchange is the counterparty, but the upshot of that is that they are liable to *all* the futures traders they injured, rather than none of them. In any event, as a practical matter, the *Platinum & Palladium* opinion on which Defendants primarily rely for this point is currently on appeal to the Second Circuit. *See* Reply Br. for Pls.-Appellants-Cross-Appellees to Joint Supp. Br. for Appellees & Cross-Appellants at 4 n.2, *In re Platinum & Palladium Commodities Litig.*, No. 20-1458, ECF No. 228 (2d Cir. Feb. 10, 2022) (arguing that the district court's market control requirement "conflates *privity*, which is not required to be an efficient enforcer, with *directness*, which is required").[5] In the event this Court has any doubts about the efficient enforcer status of futures traders, these two pending

---

[5] Defendants' Motion relies heavily on decisions by the *Platinum & Palladium* court and twice trumpets *Schwab II*'s citation "with approval" of *In re Platinum & Palladium Antitrust Litig.*, No. 1:14-CV-9391 (GHW), 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017). Defs.' Br. at 2, 15. Defendants are making too much of a single stray "see also," especially in light of the fact that *Schwab II*'s specific pin cite is to a passage of the *Platinum & Palladium* decision analyzing the *LIBOR* precedents dealing with over-the-counter markets. In any event, the Second Circuit will soon clarify exactly what we should make of the district court's decision in *Platinum & Palladium*.

Second Circuit cases will resolve the question definitively. Plaintiffs are confident that the Second Circuit will find that when it comes to commodity futures contracts, there can be no more efficient enforcers than the traders who transact in the financial instruments manipulated by antitrust conspirators' schemes. Each futures trader is equally "directly" injured by defendants' conspiracy to fix the price of those futures contracts, and therefore has antitrust standing to sue the defendants for redress.

### B.  Plaintiffs Are Also Efficient Enforcers for Their Antitrust Claims Arising Out of Transactions in Physical Silver.

Defendants' attempt to apply the direct transaction requirement for the bonds in *Schwab II* to the physical silver context ignores another key distinction between this case and *Schwab II*. As we have known for forty years from the Supreme Court's decision in *McCready*, a plaintiff may have antitrust standing even without a direct transaction if "her injury was 'inextricably intertwined' with [defendants'] scheme." *Schwab II*, 22 F.4th at 117 (quoting *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 484 (1982)). "*McCready* involved a direct relationship between the pocket-book harm to the plaintiff and the market advantage gained by the defendants, which was the very goal of the conspiracy." *Id.* This case, unlike *Schwab II*, involves just such a "direct relationship."

The TAC describes the direct link between the Fix Price and the price of physical silver, such that "by controlling the Fix price, the Fixing Members and their co-conspirators controlled the global price of silver, not just the price of silver traded in the London market." TAC ¶ 124-27; *cf. Schwab II*, 22 F.4th at 118 (discussing *Sanner* and *Loeb*, which upheld plaintiffs' standing because both alleged a lockstep linkage between defendants' anticompetitive conduct and the injury plaintiffs suffered). And the TAC alleges that Defendants manipulated the Fix Price specifically for the *purpose* of controlling the global price for silver to benefit their own transactions. TAC ¶¶ 113, 141. The defendants' alleged goal in manipulating LIBOR in *Schwab II*, however, was to project an image of financial stability, not

11

to profit from LIBOR-based derivative transactions. *Schwab II*, 22 F.4th at 113. The Second Circuit in *Schwab II* distinguished *McCready* on precisely this ground, stating that plaintiffs' bond transactions "were entirely separate from the purpose of the alleged conspiracy." *Id.* at 117; *see also id.* at 116 (noting the "disconnect between Plaintiffs' injury and the Banks' alleged benefit"). Further, the *Schwab II* court emphasized the "unique nature of the LIBOR conspiracy," which "entailed the fixing of a number that was available for unlimited third parties to reference and incorporate into their own products and transactions." *Id.* at 117. Here, by contrast, Plaintiffs allege that the Defendants manipulated the global price of physical silver for their own financial benefit. Plaintiffs transacted in physical silver and were injured as a result. No more is required.

### C. Plaintiffs Have Amply Alleged the Link Between the Silver Fixing and the Prices of the Products They Traded.

Defendants latch on to a three-sentence footnote of dicta in *Schwab II* stating that antitrust standing is "even more tenuous" for plaintiffs that transacted fixed rate bonds with third parties that "[did] not reference LIBOR at all," but upon which LIBOR allegedly exerted "a kind of gravitational force." Defs.' Br. at 11 (quoting 22 F.4th at 118 n.6). They attempt to analogize those fixed rate bonds to the silver products Plaintiffs traded on the grounds that the prices of silver futures and physical silver "did not expressly reference or incorporate the Silver Fixing price," and instead "deviate[d] from the Silver Fixing price." *Id.* The analogy is strained to the breaking point. Plaintiffs here are traders in physical silver and silver futures who seek to hold Defendants liable for their manipulation of the Silver Fixing that sets the prices of physical silver and silver futures. *See* TAC ¶ 126 (alleging that prices for physical silver are determined by reference to the Fixing); ¶ 137 ("99.85% of the variation in the price of COMEX silver futures contracts between January 1, 2004 and December 31, 2013 is explained by the results of the Silver Fix."). They are in a very different position from the bondholders in *Schwab II*, who conceded that the fixed rate bonds they transacted did not use U.S. dollar LIBOR as a component of price, and whose bond transactions were affected by an array of non-LIBOR factors,

12

such as the "issuer's creditworthiness and other market dynamics." Joint Br. for Plaintiffs-Appellants Regarding Antitrust Standing, at 28, *Schwab II*, No. 17-1569 (2d Cir. Nov. 30, 2017), ECF No. 344. A closer commodity analogy to the *Schwab II* fixed rate bondholders' situation would be a cattle futures trader seeking to hold manipulators of grain prices liable for increased prices of cattle feed and accordingly of cattle. Here, Defendants manipulated precisely the product that Plaintiffs traded.

At its core, Defendants' argument simply ignores the TAC's enormously detailed allegations that the Silver Fixing dictates the price of all physical silver and silver futures transactions, as well as the statistical evidence supporting those allegations that this Court has already credited. *See Silver I*, 213 F. Supp. 3d at 553, 555-56; TAC ¶¶ 124-37. The Second Circuit has repeatedly been forced in recent years to reproach courts in this District in benchmark manipulation cases (including *Schwab II* itself) for overstepping the limits of the pleading stage. *See Schwab II*, 22 F.4th at 124 (rejecting defendants' preferred readings of the evidence at motion-to-dismiss as "incompatible with our obligation to interpret the record in the light most favorable to Plaintiffs"); *Sonterra Capital Master Fund Ltd. v. UBS AG*, 954 F.3d 529, 534-35 (2d Cir. 2020) (reversing dismissal because "at the motion to dismiss stage, Plaintiffs need not prove the allegations in their complaint 'definitively.'"); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 782-83 (2d Cir. 2016) (plaintiffs need not "show" that they were in fact damaged by the artificial prices defendants imposed until "later stages of the litigation"). This Court, by contrast, properly accepted the truth of Plaintiffs' allegations at the pleading stage in its 2016 opinion and should not do otherwise now.

## II.     The Remaining Efficient Enforcer Factors Pose No Further Obstacle.

Defendants' argument on the second efficient enforcer factor, whether Plaintiffs' "self-interest would normally motivate them to vindicate the public interest in antitrust enforcement," holds little water. Defendants argue that their customers who "participated in the Silver Fixing" would make better, more "direct" plaintiffs. Defs.' Br. at 11. But in the context of futures, there are no more direct

plaintiffs: everyone transacts in the same way with the exchange as intermediary. And even for physical silver, there are no other plaintiffs in this action who traded physical silver directly with Defendants— unlike *Schwab II,* where there was "no shortage of other parties in [that] very case who purchased LIBOR-indexed financial instruments directly from the Banks." 22 F. 4th at 118. As this Court already noted in 2016, the "*potential* existence of more direct plaintiffs does not necessarily defeat Plaintiffs' standing" where the Plaintiffs before the Court have suffered "sufficiently direct" injuries. *Silver I*, 213 F. Supp. 3d at 556 (collecting cases) (emphasis added). Further, we know for a fact that Plaintiffs here are sufficiently self-interested to aggressively litigate this case for the past eight years all the way through discovery and class certification. Even though this is a motion for judgment on the pleadings, it is artificial and unnecessary to speculate about a question to which we already know the answer.

Defendants' contentions about the third "speculativeness" factor amount to no more than a concern that Plaintiffs' but-for damages model must be complicated and take into account additional factors beyond the Fixing itself. Even in *Schwab II*, where the court noted that determining damages from pricing of third-party bonds would have "require[d] the court to speculate" how the sellers "factored a non-suppressed LIBOR into the transaction," leading to "'multiple layers'" of hypotheticals, it gave only the slightest weight to this factor. *See* 22 F.4th at 118. Instead, it correctly observed that "antitrust standing should not provide a 'get-out-of-court-free card' to be played 'any time that a damages calculation might be complicated.'" *Id.* at 119 (quoting *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1524 (2019)); *see also Gelboim*, 823 F.3d at 779 ("[S]ome degree of uncertainty stems from the nature of antitrust law.") (citing *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981)). In any event, Defendants once again ignore the reality of the litigation posture here: Plaintiffs have already presented a damages model in their class certification motion. If Defendants wish to challenge that model, the class certification motion is the place, not this belated motion for judgment on the pleadings.

14

Finally, this Court correctly found in 2016 that "any concerns regarding duplication and apportionment [of damages] appear to be hypothetical or minimal." *Silver I*, 213 F. Supp. 3d at 557. Nothing in *Schwab II* even speaks to this issue, let alone changes the conclusion.

## CONCLUSION

For the foregoing reasons, Defendants' motion for judgment on the pleadings should be denied.

Dated: April 14, 2022                                Respectfully submitted,
White Plains, New York

**LOWEY DANNENBERG, P.C.**

By: /s/ *Vincent Briganti*
Vincent Briganti
Margaret MacLean
Johnathan Seredynski
Charles Kopel
44 South Broadway, Suite 1100
White Plains, New York 10601
Tel.: 914-997-0500
Fax: 914-997-0035
vbriganti@lowey.com
mmaclean@lowey.com
jseredynski@lowey.com
ckopel@lowey.com

Robert Eisler
Chad Holtzman (pro hac vice)
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel.: 646-722-8500
Fax: 646-722-8501
reisler@gelaw.com
choltzman@gelaw.com

*Counsel for Plaintiffs*

15