

August 15, 2022

**VIA ECF**
Hon. Valerie E. Caproni
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

    Re:    <u>In re London Silver Fixing, Ltd., Antitrust Litig.</u>, No. 14-MD-2573

Dear Judge Caproni:

    Plaintiffs write in response to Defendants' letter, ECF No. 597 ("Letter"), and pursuant to the Court's Order, ECF No. 593, requiring the parties to submit supplemental briefing concerning the impact of *Gamma Traders – I LLC v. Merrill Lynch Commodities, Inc.*, 41 F. 4th 71 (2d Cir. 2022) ("*Gamma*") on Defendants' pending motion for judgment on the pleadings. ECF No. 584.

    *Gamma*'s holding regarding CEA actual damages for an episodic spoofing case has no application to this case, where Plaintiffs assert both antitrust and CEA claims arising out of a long-term conspiracy among the banks *solely* responsible for setting the worldwide daily Silver Fix benchmark to manipulate silver spot and futures prices tied to that benchmark. TAC ¶ 125, ECF No. 258. The Second Circuit's leading case on pleading standards for injury in benchmark cases makes clear that once a plaintiff plausibly alleges that the manipulation "warp[ed] . . . market factors affecting the prices for [products priced based on the manipulated benchmark]," "no further showing of actual adverse effect in the marketplace is necessary." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 776 (2d Cir. 2016). Having held that the conspiracy was plausible and "exerted some influence on price," the Second Circuit considered that the "extent of that influence and the identity of persons who can sue, among other things, are matters reserved for later." *Id.* at 782-83.

    *Gamma* is a materially different case both factually and legally, which expresses nothing to displace or even qualify the settled law governing benchmark manipulation cases. In an order-driven market, like the futures contract market, spoofers (as alleged in *Gamma*) post large numbers of bids to buy (bids) and offers to sell (offers) for purposes of creating false signals of increased demand to buy or sell a particular futures contract. 41 F. 4th at 75.  The spoofer's illegitimate bids and offers (which are cancelled shortly thereafter by the spoofer) are intended to induce market participants to buy or sell their futures contracts and thereby cause price movements that benefit the spoofer. *Id.* All these events often occur within seconds of one another in a highly liquid market such as the silver futures market. *See* Merrill Lynch Commodities, Inc., Non-Prosecution Agreement, Statement of Facts ¶¶ 29-35 (June 25, 2019), https://www.justice.gov/opa/pr/merrill-lynch-commodities-inc-enters-corporate-resolution-and-agrees-pay-25-million. In *Gamma*, plaintiffs failed to allege that they traded shortly after the spoofers' illegitimate bids or offers were either placed or removed from the market, or even that they had traded a futures contract *later* (even hours later) on the same trading day after an alleged spoofing event had occurred. *Gamma*, 41 F.4th at 77. Instead, the *Gamma*

www.lowey.com

44 South Broadway, Suite 1100, White Plains, NY 10601-4459 (p) 914-997-0500 (f) 914-997-0035
One Tower Bridge, 100 Front Street, Suite 520, West Conshohocken, PA 19428 (p) 215-399-4770 (f) 610-862-9777



plaintiffs asked the court to infer that they must have traded after at least one of defendants' spoofing events at some point during the class period (and therefore adequately pled CEA damages) based on sheer probability, because plaintiffs had traded futures contracts frequently during the class period and defendants spoofed those same futures contracts frequently during the same time period. *Id.* at 77, 78-79. The Second Circuit held otherwise, reasoning instead that given the enormous volume of trading in the market, "Gamma's allegations do not make it plausible—rather than merely speculative—that Gamma's own trades interacted with Defendants' transactions to Gamma's detriment." *Id.* at 79.

Here, by contrast, the Court has already found plausible Plaintiffs' allegations that Defendants manipulated the Silver Fix; that the Silver Fix set and therefore was the starting point for all prices worldwide for silver and silver futures; and that Plaintiffs themselves traded silver and silver futures at artificial prices proximately caused by Defendants' alleged manipulation of the Silver Fix. *In re London Silver Fixing, Ltd. Antitrust Litig.*, 213 F. Supp. 3d 530, 543, 565 (S.D.N.Y. 2016) ("*Silver I*"). Nothing further is required to adequately plead CEA actual damages. *Id.* The arguments Defendants now raise (and unsuccessfully raised at the motion to dismiss stage as well) concerning whether the artificiality their manipulation caused was persistent or transitory in nature, and whether Plaintiffs might have benefitted from the alleged manipulation, *i.e.*, were ultimately net winners or losers based on their overall trading patterns in the futures market, were never reached in *Gamma* for the simple reason that plaintiffs failed to plead in the first instance whether they traded their futures contracts before or after a spoofing event had occurred. *See* 41 F. 4th at 80. The *Gamma* plaintiffs simply gave the court no relevant allegations to evaluate. Here, though, even if *Gamma*'s temporal proximity requirement applied to the benchmark context (it does not), Plaintiffs' robust allegations concerning the artificiality resulting from Defendants' manipulative acts on the prices of silver and silver futures transacted by Plaintiffs easily satisfy the pleading standard applicable to CEA claims (as this Court has already determined). *See Silver I*, 213 F. Supp.3d at 563 ("Plaintiffs adequately allege that the Fixing Members, horizontal competitors in the relevant markets for physical silver and silver derivatives, conspired artificially to suppress the Fix Price in order to gain an unfair trading advantage over other market participants, causing Plaintiffs to suffer losses on their silver investments."); *id.* at 565 ("Plaintiffs have adequately alleged that, on days that Defendants engaged in manipulation, the Fixing marked an abrupt downward aberration in pricing, which abated gradually, but perhaps not completely, over time.")

Absent a directly controlling change in law, "a Rule 12(c) motion for judgment on the pleadings that challenges the sufficiency of a complaint on the same ground as an already-denied Rule 12(b)(6) motion to dismiss should meet an identical fate." *Aviles v. S&P Global, Inc.*, No. 17-CV-2987 (JPO), 2020 WL 1689405, at *3 (S.D.N.Y. Apr. 6, 2020). *Gamma* does not constitute such a change. It is just a different case altogether, evaluating different facts. Defendants' motion for judgment on the pleadings should therefore be denied for the reasons set forth in Plaintiffs' briefing and below.

### I. In *Gamma*, the Second Circuit Addressed the Burden for Pleading Damages Caused by Allegedly Episodic Manipulation, Not Benchmark Manipulation.

*Gamma* arose out of DOJ and CFTC findings that two individual precious metals traders placed and then cancelled orders to create false impressions of market supply and demand that would benefit their own genuine transactions that day. 41 F.4th at 75-76. Defendants argued that the price



impact of any given spoof was fleeting at best, and therefore that plaintiffs would need to plead that they traded immediately after one of Defendants' spoofs to plausibly allege that they were injured. The Second Circuit agreed, holding that plaintiffs failed to allege injury in their specific trades because they had alleged no facts concerning "the duration of a spoof's effects on the market price." *Id.* at 83. The Second Circuit also rejected plaintiffs' argument based on "statistical probabilities across a large set of trades," *i.e.* that because they had traded very frequently throughout the class period, at least one of their trades was likely adversely affected by defendants' spoofing. *Id.* at 79.

In so holding, *Gamma* applied the CEA actual damages analysis in *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 112 (2d Cir. 2018). *See Gamma,* 41 F.4th at 77-82 (citing and quoting *Total Gas*); *see also* Letter at 2 (quoting *Total Gas*, 889 F.3d at 112, 115-16). In *Total Gas*, plaintiffs transacted in exchange-traded natural gas derivatives indexed to the price of natural gas at Henry Hub and alleged that defendants' manipulation of the price of natural gas at different, regional hubs damaged them. *Id.* at 109. The Second Circuit rejected plaintiffs' theory that "shockwaves" of the manipulation somehow impacted pricing at Henry Hub, especially in light of the opinion of plaintiffs' own expert that the price relationship between the regional hubs ran in the opposite direction, *i.e.*, Henry Hub's pricing influenced the regional hubs and not vice versa. *Id.* at 115.

The *Total Gas* panel was, however, emphatic that its actual damages analysis did not address the very different scenario of derivative transactions linked to a manipulated benchmark in a "rule-based manner." *Id.* at 113 ("Commodity and derivative contracts that index their price formulae to prices of other contracts are linked in a rule-based manner, and several cases in this circuit have found such a link to create a sufficient connection for CEA pleading purposes") (citing *In re Commodity Exchange, Inc.* 213 F. Supp. 3d 631, 644-46 (S.D.N.Y. 2016)). It is only in the *absence* of a "formal rule-based price linkage" that plaintiffs must necessarily "plead with greater detail" to demonstrate actual damages. *Total Gas*, 889 F.3d at 113. *Gamma* illustrates the more difficult pleading standard applicable to *Total Gas*' category of non-benchmark CEA cases—but the remaining claims here *are* benchmark manipulation claims, asserted against the very Defendants who controlled and persistently suppressed the daily worldwide benchmark price of silver. The proper pleading standard for this case, accordingly, is that articulated in *Gelboim*: Plaintiffs need only plausibly allege that Defendants' coordinated manipulation of the Silver Fix benchmark, which they wholly controlled, "exerted some influence on [the] price" of the products Plaintiffs traded. *Gelboim*, 823 F.3d at 782. This Court has already found that Plaintiffs have made such allegations, and *Gamma* does nothing to change that conclusion.

## II. Plaintiffs Plausibly Allege That Defendants' Manipulation of the Silver Fixing Caused Persistently Suppressed Silver Prices, Throughout Each Trading Day and the Class Period.

The core flaw that the Second Circuit identified in the *Gamma* plaintiffs' theory of injury was their failure to plead facts supporting their "conclusory" assertion that because defendants engaged in spoofing frequently, prices were rendered "artificial throughout the Class Period." 41 F.4th at 80. The complaint contained no allegations at all about the duration of spoofing's price impact on the market, such that, in the Second Circuit's view, even the plaintiffs' allegations that they had traded on the same day as a spoof were not enough to plausibly allege that those trades were affected. Plaintiffs would have needed to allege that they traded "in close proximity" to the spoof. *Id.* at 81.



As Judge Sullivan put it at oral argument in Gamma, "the whole point of the spoof is to make a kind of quick hit." Oral Argument at 11:36-51, *In re: Merrill, B of A, and Mo*, No. 21-853 (2d Cir. Dec. 6, 2021), *available at* https://www.ca2.uscourts.gov/oral_arguments.html ("*Gamma Argument Recording*").

Benchmark cases are fundamentally different from spoofing cases in this regard. A benchmark like the Silver Fix is published once a day, for the specific *purpose* of setting all prices for the relevant products for that whole day. *See, e.g.*, TAC ¶ 124 ("The guiding princip[le] behind the Fixing is that all business, whether for large or small amounts, is conducted solely on the basis of a single published Fixing price.") There would be no point to the Silver Fix if its effects dissipated the moment it was set. The close temporal proximity requirement that the Second Circuit imposed in *Gamma* in the spoofing context therefore cannot transfer over to a benchmark case.

But more than that, as this Court recognized in 2016, Plaintiffs here *have* supplied ample factual details about the duration of the price impact of Defendants' manipulation of the Silver Fix. The TAC includes robust economic analysis showing price movements in the silver spot market and silver futures market all the way through the trading day, from 7am through 8pm London time (refuting Defendants' bizarre speculation that any changes in prices would have happened while "Plaintiffs were sleeping," Letter at 4). *See, e.g.*, TAC Figs. 33-34. The economic analyses demonstrate clearly that prices do not return to their previous levels for the rest of the day after the precipitous drop following the Fix. Defendants themselves engaged in voluminous trading each day based on their newly manipulated Silver Fix price, further reinforcing the impact of that manipulation throughout the market. *Id.* ¶ 163 & Figs. 14-15. The TAC further explains that not only was the price impact persistent throughout the day, it was also cumulative over time, such that prices do not recover by the next trading day, either. *Id.* ¶¶ 195-98. Thus, Plaintiffs' allegations that they "transacted at artificially lower prices" and "received less than they otherwise would have in a competitive, un-manipulated market" (TAC ¶¶ 328-29) when they traded on days that Defendants manipulated the Silver Fix (*see* TAC Appendix D) rest on detailed factual support that the *Gamma* complaint lacked. This Court properly credited these allegations in *Silver I*, finding that they sufficed to establish actual damages under the CEA. 213 F. Supp. 3d at 564-65. That holding is only further confirmed today by *Gamma.*

### III.   Plaintiffs Do Not Allege Injury Based on "Statistical Probability."

Defendants overread *Gamma* to suggest that statistical analysis has no role to play in alleging price impact. The decision says no such thing. The "statistical probability" theory the Second Circuit addressed in *Gamma* was the plaintiffs' assertion that even if spoofing's effects were short term, such that not all trades in the class period were necessarily affected, they had traded so often that likely at least some of their trades were impacted. *See* 41 F.4th at 79 ("[E]ven if there were a 99.9% probability that any given trade was free of fraudulent influence, after enough trades, it could be argued as a mathematical matter that the frequent trader will have bought or sold at a spoof-influenced price simply because the volume of trades is sufficiently large… Gamma cites no authority to support its statistical-probability style of pleading.")

Plaintiffs' allegations here are quite different. As explained above, Plaintiffs allege that prices never fully recovered from one trading day to the next, and were "persistent[ly] suppress[ed] throughout the Class Period." TAC ¶ 198. This is because Defendants controlled the worldwide



silver benchmark price, such that their manipulation of the benchmark process rendered *every* price artificial. *Id.* ¶¶ 125, 331; *compare Gamma*, 41 F.4th at 79 ("Gamma's trades and Defendants' spoofs represented a tiny share of the overall activity in these markets over the class period."). Defendants' suggestion that Plaintiffs' theory was once different, and speculation that Plaintiffs might therefore now try to "pivot[] to allege price artificiality at all times," (Letter at 4) has no basis in fact. The TAC's plain language and this Court's prior opinions make clear that this has always been the theory, and that makes this case very different from the "statistical probability" pleading rejected in *Gamma*.

### IV.   This Court Has Already Dismissed the Very Claims at Issue in *Gamma*, While Permitting the Distinct Claims Now Before It to Proceed.

Defendants' Letter omits the critical fact that Plaintiffs here already sought to assert claims based on the same type of episodic manipulation as that at issue in *Gamma*. *In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 925 (S.D.N.Y. 2018) ("*Silver II*").  In ruling on the motion to dismiss the TAC, the Court observed that what "began as a benchmark-fixing case" had expanded to a case about both benchmark-fixing and a distinct, "more limited conspiracy to episodically manipulate the silver markets." *Id.* at 890. The Court found that Plaintiffs' allegations regarding episodic manipulation were insufficient "to connect that artificiality [caused by defendants' acts] to actual damage suffered by Plaintiffs." *Id.* at 925. Defendants in *Gamma* unsurprisingly relied heavily (and successfully) on *Silver II* in their briefing and oral argument. *See* Joint Br. for Defs.-Appellees, No. 21-853, ECF No. 71 at 6, 19, 23, 25, 37, 39, 44-45 (citing and analyzing *Silver II*); *Gamma Argument Recording* at 30:03-40 (defendants' counsel advocating adopting *Silver II*); *id.* at 8:50-9:13 (panel questioning plaintiffs' counsel about *Silver II*); *Gamma*, 41 F.4th at 76 (citing the TAC).

The key difference between this action and *Gamma*, which this Court appreciated but Defendants do not, is that this case also expressly alleges claims based on persistent suppression and price-fixing of the Silver Fix benchmark that are separate from the episodic claims the Court dismissed. Indeed, in dismissing the episodic manipulation claims, the Court emphasized their disconnection from the Silver Fix benchmark manipulation claims that it permitted to proceed, characterizing the episodic claims as a different conspiracy altogether. *Silver II*, 332 F. Supp. 3d at 901 ("While the TAC does not allege an 'overarching' conspiracy among the Fixing Banks and Non-Fixing Banks, the Court finds that the chat messages contained in the TAC plausibly allege a conspiracy among the Non-Fixing Banks (and Deutsche Bank) to manipulate the markets for silver and silver-denominated financial assets opportunistically and to fix bid-ask spreads in the market for physical silver.") The Second Circuit, too, drew this distinction, and took the *Gamma* plaintiffs to task for relying on antitrust cases, "since price-fixing behavior – unlike spoofing – results in harms to all market participants." 41 F.4th at 79. There simply is no meaningful comparison between the episodic spoofing by isolated market participants alleged in *Gamma* and the persistent price impact caused by Defendants' coordinated manipulation of the worldwide benchmark used to set all prices for silver and silver futures.

**\*\*\***

For the foregoing reasons and those set forth in Plaintiffs' earlier briefing, Defendants' motion for judgment on the pleadings (as now enlarged to include Plaintiffs' CEA claims, *see* Letter 1 n.1) should be denied.



Dated: August 15, 2022
White Plains, New York

Respectfully submitted,

**LOWEY DANNENBERG, P.C.**

By: /s/ *Vincent Briganti*
Vincent Briganti
Margaret MacLean
Johnathan Seredynski
Charles Kopel
44 South Broadway, Suite 1100
White Plains, New York 10601
Tel.: 914-997-0500
Fax: 914-997-0035
vbriganti@lowey.com
mmaclean@lowey.com
jseredynski@lowey.com
ckopel@lowey.com

Robert Eisler
Chad Holtzman (*pro hac vice*)
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel.: 646-722-8500
Fax: 646-722-8501
reisler@gelaw.com
choltzman@gelaw.com

*Counsel for Plaintiffs*