## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

IN RE:

LONDON SILVER FIXING ANTITRUST
AND COMMODITIES LITIGATION

*This Document Relates to All Actions*

**1:14-MD-02573 (VEC)**

**ORAL ARGUMENT REQUESTED**

## MEMORANDUM OF LAW IN FURTHER SUPPORT OF
## THE MOTION OF DEFENDANTS HSBC BANK USA, N.A. AND
## <u>THE BANK OF NOVA SCOTIA FOR JUDGMENT ON THE PLEADINGS</u>

Damien J. Marshall
Leigh Nathanson
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Tel: (212) 790-5357
Fax: (212) 556-2222
Email: dmarshall@kslaw.com

*Attorneys for the HSBC Defendants*

Stephen Ehrenberg
William H. Wagener
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Tel: (212) 558-3269
Fax: (212) 291-9271
Email: ehrenbergs@sullcrom.com

*Attorneys for The Bank of Nova Scotia
Defendants*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ...................................................................................................................... 3

LEGAL STANDARD .............................................................................................................. 11

ARGUMENT ........................................................................................................................... 12

I.    Plaintiffs Have Not Adequately Pled "Actual Injury" Caused by a Violation of the CEA
      or Antitrust Injury ......................................................................................................... 12

      A.    Plaintiffs Have Not Alleged Privity or Any Direct Transaction with Defendants ..... 12

      B.    Plaintiffs Have Not Alleged a Factual Basis that Could Support an Inference that
            Prices Were Artificial at the Time Their Trades Took Place ..................................... 13

      C.    The Court Cannot Infer Injury Based on "Statistical Probability" ............................. 15

II.   Plaintiffs Lack Antitrust Standing to Assert Their Antitrust Claims ............................ 17

      A.    Plaintiffs Lack Antitrust Standing Because They Did Not
            Transact with Defendants ........................................................................................... 17

      B.    Plaintiffs Lack Antitrust Standing Because There Are More Direct Victims of the
            Alleged Conspiracy ................................................................................................... 22

      C.    Plaintiffs Also Lack Antitrust Standing Because Their Alleged Damages Are Highly
            Speculative And Disproportionate to Any Claimed Wrongdoing ............................. 23

      D.    The Risks of Duplicate Recoveries and Complex Apportionment Also Counsel
            Against Antitrust Standing ......................................................................................... 25

III.  Plaintiffs' CEA Claim is Impermissibly Extraterritorial ................................................ 25

CONCLUSION ......................................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012) ................................................................... 28

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) ............................................................... 17, 23, 25

*Daniel v. Am. Bd. of Emergency Med.*,
  428 F.3d 408 (2d Cir. 2005) ................................................................ 17

*Gamma Traders – I LLC v. Merrill Lynch Commodities, Inc.*,
  41 F.4th 71 (2d Cir. 2022) ........................................................... passim

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
  711 F.3d 68 (2d Cir. 2013) ......................................................... 21, 22, 23

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016) ......................................................... 17, 21

*Harris v. Mills*,
  572 F.3d 66 (2d Cir. 2009) ................................................................ 11

*Harry v. Total Gas & Power N. Am., Inc.*,
  889 F.3d 104 (2d Cir. 2018) ........................................................ passim

*In re Aluminum Warehousing Antitrust Litig.*,
  520 F. Supp. 3d 455 (S.D.N.Y. 2021) ........................................... 9, 20

*In re Aluminum Warehousing Antitrust Litig.*,
  No. 13-md-2481 KBF, 2016 WL 1629350 (S.D.N.Y. Apr. 25, 2016) .................. 16

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
  19 F.4th 127 (2d Cir. 2021) ......................................................... passim

*In re Commodity Exch., Inc., Gold Futures and Options Trading Litig.*,
  328 F. Supp. 3d 217 (S.D.N.Y. 2018) .............................................. 28

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007) ................................................................ 28

*In re LIBOR-Based Fin. Instr. Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018) ............................................................. 6

*In re LIBOR-Based Fin. Instr. Antitrust Litig.*,
   No. 11 MDL 2262 (NRB), 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016).............................. 19

*In re London Silver Fixing Ltd., Antitrust Litig.*,
   213 F. Supp. 3d 530 (S.D.N.Y. 2016) ...................................................... passim

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
   332 F. Supp. 3d 885 (S.D.N.Y. 2018) ...................................................... passim

*In re Miami Metals I, Inc.*,
   634 B.R. 249 (Bankr. S.D.N.Y. 2021)............................................................. 27

*In re Platinum & Palladium Antitrust Litig.*,
   449 F. Supp. 3d 290 (S.D.N.Y. 2020) ............................................. 3, 18, 26, 28

*In re Platinum & Palladium Antitrust Litig.*,
   No. 1:14-cv-9391-GHW, 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017)........................... 9, 24

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
   924 F.3d 57 (2d Cir. 2019) ........................................................................ 23

*L-7 Designs, Inc. v. Old Navy, LLC*,
   647 F.3d 419 (2d Cir. 2011) ....................................................................... 11

*Laydon v. Coöperatieve Rabobank U.A.*,
   __ F.4th __, 2022 WL 10208500 (2d Cir. Oct. 18, 2022) .................................. passim

*Parkcentral Global HUB Ltd. v. Porsche Auto. Holdings SE*,
   763 F.3d 198 (2d Cir. 2014) ................................................................... 27, 29

*Prime International Trading, Ltd. v. BP P.L.C.*,
   937 F.3d 94 (2d Cir. 2019) ............................................................... passim

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
   22 F.4th 103 (2d Cir. 2021) ............................................................... passim

*Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*,
   277 F. Supp. 3d 521 (S.D.N.Y. 2017) ......................................................... 25

*WesternGeco LLC v. ION Geophysical Corp.*,
   138 S. Ct. 2129 (2018)............................................................................. 27

**Statutes**

Commodity Exchange Act ................................................................................. passim

Sherman Act .................................................................................................. 1, 4, 12

**Other Authorities**

Fed. R. Civ. P. 12(c) ................................................................................. 1, 11, 24

Fed. R. Civ. P. 16(b) ........................................................................................... 16

Defendants HSBC Bank U.S.A., N.A. and the Bank of Nova Scotia ("Defendants")[1] respectfully submit this Memorandum of Law in Support of their Motion for Judgment on the Pleadings, pursuant to Federal Rule of Civil Procedure 12(c).

## PRELIMINARY STATEMENT

Six years ago, this Court held that Plaintiffs' Third Amended Complaint (ECF No. 258, the "TAC") "barely" stated a claim by alleging that Defendants had "conspired opportunistically to depress the [London Silver] Fix Price" benchmark and that Plaintiffs, who traded silver or silver derivatives in the United States, were injured thereby. *In re London Silver Fixing Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 558 (S.D.N.Y. 2016) ("*Silver I*"). But the legal landscape has since changed. Recent Second Circuit case law now confirms that this action is ripe for dismissal in its entirety, because Plaintiffs have not pled facts sufficient to establish (1) antitrust injury or antitrust standing under the Sherman Act; (2) "actual injury" under the Commodity Exchange Act ("CEA"); or (3) U.S. misconduct subject to a private CEA lawsuit. Given that Plaintiffs have already had *three opportunities* to amend their pleading and state a viable claim, the action must now be dismissed with prejudice.

*First*, under *Gamma Traders – I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71 (2d Cir. 2022) ("*Gamma*"), Plaintiffs have not adequately pled either antitrust injury or "actual injury" caused by a violation of the CEA. This Court previously held that Plaintiffs adequately pled antitrust injury and actual injury merely by alleging that Plaintiffs sold silver on a day when Defendants allegedly manipulated the Silver Fix. *See Silver I*, 213 F. Supp. 3d at 549-50, 553-57, 565. But *Gamma* holds that a plaintiff must do more than allege that it "traded on the same day"

---

[1] In addition to these entities, the affiliated moving entities are: HSBC Holdings Plc, HSBC North America Holdings Inc., HSBC U.S.A. Inc. (together with HSBC Bank (U.S.A.), N.A., "HSBC"); Scotia Capital (USA) Inc., Scotiabanc Inc., Scotia Holdings (US Inc.), and The Bank of Nova Scotia Trust Company of New York (together with the Bank of Nova Scotia, "Scotiabank") (collectively, "Defendants"). Third Amended Complaint ("TAC") ¶¶ 56, 73.

as the alleged manipulation; instead, the plaintiff must allege "facts regarding *precisely when* its trades took place" and provide "a factual basis that would justify an inference that the market price was still artificial by the time [plaintiff] traded." *Gamma*, 41 F.4th at 77-83 (emphasis added). Put differently, Plaintiffs' allegations must "make it plausible—rather than merely speculative— that [their] own trades interacted with Defendants' transactions to [Plaintiffs'] detriment." *Id.* at 79. Because Plaintiffs have not done so, this Court should enter judgment on the pleadings as to Plaintiffs' antitrust and CEA claims and dismiss this case.

*Second*, Plaintiffs' antitrust claims also fail because they lack antitrust standing under *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103 (2d Cir. 2021) ("*Schwab II*") and *Laydon v. Coöperatieve Rabobank U.A.*, __ F.4th __, 2022 WL 10208500 (2d Cir. Oct. 18, 2022) ("*Laydon*"). Plaintiffs do not allege that they actually traded with Defendants or participated in the Silver Fixing auction. Instead, Plaintiffs are so-called "umbrella plaintiffs," who seek treble damages from Defendants on the theory that the Silver Fixing price somehow *influenced* the price at which *third parties* transacted with Plaintiffs. But under the four-factor test for antitrust standing, a court must first "draw[] a line between those whose injuries resulted from their direct transactions with the Banks" who may have antitrust standing, and "those whose injuries stemmed from their deals with third parties," who do not. *Schwab II*, 22 F.4th at 116, 118; *see Laydon*, 2022 WL 10208500, at *7 (same). Although Plaintiffs' failure to transact with Defendants in and of itself defeats antitrust standing, the remaining three factors only reinforce Plaintiffs' lack of standing: There are more direct victims of the alleged conspiracy (Defendants' Silver Fixing customers); Plaintiffs' damages theory is highly speculative; and there is a risk of duplicate recoveries and complex apportionment issues. Plaintiffs' antitrust claims, based on the theory that the Silver Fixing exerted "gravitational force" on their transactions with third parties

that "d[id] not reference [the Silver Fixing price] at all," are "clearly insufficient to establish antitrust standing."  *Schwab II*, 22 F.4th at 118 n.6.

*Finally*, Plaintiffs' CEA claims also fail under *Laydon* and *Prime International Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94 (2d Cir. 2019) ("*Prime*"), because they "are based predominantly on foreign conduct and are thus impermissibly extraterritorial."  *Laydon*, 2022 WL 10208500, at *1.  Plaintiffs accuse Defendants of manipulating the "London Silver Fixing," a "venerable City of London institution" whereby silver was auctioned before the opening of the U.S. trading pit where "much of the COMEX silver futures volume is traded."  TAC ¶¶ 1, 119, 176.  Although the TAC alleges that "the results of the Silver Fix [were] . . . disseminated in the United States" and influenced U.S. silver prices, *id.* at ¶ 113, the TAC alleges no *misconduct* by Defendants in the United States.  *Laydon* and *Prime* teach that allegations that a non-U.S. benchmark was manipulated outside the United States, by means of conduct outside of the United States, fail to "plead . . . sufficiently domestic conduct" to support a private CEA claim.  *Laydon*, 2022 WL 10208500, at *4; *see In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d 290, 331 (S.D.N.Y. 2020) (CEA claim based on alleged manipulation of platinum fixing auction was impermissibly extraterritorial under *Prime*).

## BACKGROUND

Plaintiffs' TAC alleges that the roughly $30-billion-a-year global trade in silver is a highly liquid market with a long list of participants in myriad lines of business, including silver mining and refining operations, financial institutions and trading firms, futures and options exchanges, jewelers and coin dealers, and individual investors.  *See* TAC ¶ 125.  Plaintiffs are individuals and a corporation who allegedly traded in physical silver and/or exchange-traded silver futures or options.  *Id.* ¶¶ 21-30.  No Plaintiff is alleged to have been a client of any Defendant or to have

transacted in silver or silver-related instruments with any Defendant (either via a direct trade with a Defendant or even indirectly with a Defendant through some type of financial intermediary).  *Id.*

This case focuses on the "London Silver Fixing," a "venerable City of London institution." *Id.* ¶¶ 1, 119.  Every London business day at noon, the three Silver Fixing banks—Defendants and former defendant Deutsche Bank—ran an auction for physical silver by using their respective "order books" (allegedly comprising each Fixing bank's customers' orders and orders from the banks' own trading desks) to discover the price at which these buying and selling interests were balanced.  *See id.* ¶¶ 120-22, 324, 378-80.  That price—a snapshot of supply and demand for physical silver in London at one moment in time—was published as a benchmark, and the Fixing banks used that price to settle their trades with their customers and with each other.  *Id.*  Because the Fix "typically took less than 10 minutes," all this took place before "the COMEX trading floor opens in New York at 1:30 P.M. London time," which Plaintiffs describe as when "the broader market opens" and as the venue "where much of the COMEX silver futures volume is traded."  *Id.* ¶¶ 119, 149, 176.[2]

Plaintiffs allege that the Fixing banks conspired to violate Section 1 of the Sherman Act by manipulating the Silver Fixing price, and violated the CEA by setting the Silver Fixing price at artificial levels during the Class Period, thereby causing Plaintiffs to suffer actual damages and injury-in-fact.  *See id.* ¶¶ 374-83, 390-95, 396-403.  They allege that Defendants engaged in this misconduct before or concurrent with the Silver Fix.  *See*, *e.g.*, *id.* ¶¶ 4, 142 (alleging that Defendants "coordinat[ed] manipulative silver transactions in advance of the daily fixing call" and offering statistics purportedly showing "dysfunction in the competitive pricing dynamics of the

---

[2] Because "London does not follow daylight savings time, the time of the Silver Fix relative to the time in New York changes throughout the year."  TAC ¶ 193.  Depending on the time of year, London is four, five, or six hours ahead of New York.  *Id.* ¶¶ 193-94.  But the Silver Fix always occurs before the COMEX trading pit opens in New York.

silver market occurring around the time of the Silver Fix").  The TAC alleges that Defendants have U.S. operations that involve silver,[3] but alleges no *Fix-related misconduct* occurring in the United States.  Indeed, the TAC does not identify a single person who participated in a single Silver Fixing auction—let alone articulate what he or she supposedly did wrong or where that conduct occurred.

The TAC alleges *when* Defendants began supposedly rendering prices artificial, but it does not specify how long the artificiality lasted.  Plaintiffs claim that unusual *intraday* price movements in the minutes surrounding noon London time, when the Silver Fix always occurred, make it plausible to infer a Silver Fixing conspiracy.  *See, e.g.*, *id.* ¶ 150 ("[T]he prices during the Silver Fix were significantly different from those 10 minutes before and 10 minutes after . . . ."); *id.* ¶ 153 (comparing noon price with "the Fix price released a few minutes later"); *id.* ¶¶ 164-65 (illustrating futures trading volume from 11:30 to 12:30).  Assuming *arguendo* that the TAC adequately pleads that prices were artificial around noon London time, it does not specify the duration of this hypothetical price artificiality, apart from vaguely alleging that it "last[ed] well beyond the end of the Fixing Members['] daily conference call" for an indeterminate period and that it "persist[ed]" and accumulated through an unspecified mechanism.  *Id.* ¶¶ 195, 198.[4]

The TAC is also vague as to *which* prices were affected by the Silver Fix, and by what mechanism.  Plaintiffs do not allege that any futures contract directly references the Silver Fixing Price benchmark.  Instead, Plaintiffs baldly declare that the Silver Fixing price exerted a gravitational force on the price at which every single transaction in the $30-billion-dollar-a-year

---

[3] *See, e.g.*, TAC ¶¶ 46, 59, 63, 74 (Defendants were silver market makers and operated silver vaults in New York).

[4] *See also, e.g.*, TAC ¶ 142 ("[t]he result of [Defendants'] manipulative conduct is an observable dysfunction in the competitive pricing dynamics of the silver market *occurring around the time of the Silver Fix*") (emphasis added); *id.* ¶ 145 (market activity "*around the Silver Fix* [has] several unique features that stand out from other parts of the day") (emphasis added); *id.* ¶¶ 146-47 (Silver Fix is the "part of the day" that is "unique and distinguish[ed] . . . from other times of day"); *id.* ¶ 155 (alleging "dysfunction in pricing dynamics during the Silver Fix"); *id.* ¶¶ 161-62 (comparing price movements "during the Silver Fix" to "the pricing dynamics observed during the rest of the day").

global silver trade was "priced, benchmarked, and/or settled," by erroneously inferring causation from mere correlation.  *Id.* ¶ 125; *see id.* ¶¶ 135-37 (correlation between Silver Fix prices and daily closing price of silver futures allegedly "demonstrates" that silver futures prices are "directly impacted by changes in the Fix price").[5]  The TAC alleges that "the result of the dysfunction in silver prices caused by the Silver Fixing is a persistent suppression of silver pricing throughout the [proposed] Class Period."  TAC ¶ 198.  But the TAC offers no *plausible* explanation of how once-per-day London auctions, run by just three banks and lasting just a few minutes, could dictate global silver prices for twenty-four hours a day over a seven-year period.

Plaintiffs allege that this price suppression harmed not only *sellers* of physical silver and silver-related financial instruments at artificially low prices, *id.* ¶¶ 329-30, but also, incomprehensibly, *purchasers* of silver and silver-related financial instruments.  *See id.* ¶ 332. Nowhere in the TAC do Plaintiffs explain how in-and-out traders that both bought and sold silver at suppressed prices would be injured—a deficiency in the TAC's damages theory that Plaintiffs now (belatedly) seek to address at class certification by pivoting to a new theory that Defendants somehow widened market-wide bid-ask spreads.[6]

The TAC says virtually nothing about Plaintiffs' transactions in physical silver and silver-linked financial instruments.  Plaintiffs do not allege that they bought or sold silver in the Silver Fixing or that they did any business with any Fixing bank.  Nor do Plaintiffs allege that their transactions in physical silver expressly referenced the Silver Fixing price or that they traded a

---

[5] *See In re LIBOR-Based Fin. Instr. Antitrust Litig.*, 299 F. Supp. 3d 430, 486, 494 (S.D.N.Y. 2018) (excluding putative expert opinions on causation that "offer no means of distinguishing changes in [Eurodollar futures] prices caused by changes in LIBOR from other conditions causing changes in both EDF prices and LIBOR" and fail to "bridge the analytical gulf between correlation and causation").

[6] Plaintiffs now seek to represent a class comprising *everyone* who "transacted" in physical silver or silver instruments in the United States from 2007 through 2013, regardless of whether a proposed class member ever dealt with any Defendant.  *See* ECF No. 574, at 1.  Plaintiffs now contend that, in addition to suppressing silver prices (as alleged in the TAC), Defendants' conduct also widened the bid-ask spread on every silver transaction over this seven-year period.  *See id.* at 4-5.

financial instrument that directly referenced the Silver Fixing price.  Plaintiffs do not even allege the time of day when their own trades took place in relation to the Silver Fix.  All Plaintiffs' TAC does is list fewer than 500 sales they made on *days* allegedly impacted by Defendants' manipulative conduct (*see* TAC, Appendix D)—a minuscule fraction of the trading activity that occurred in the $30-billion-dollar-a-year global silver market over the seven-year period at issue.

On May 29, 2015, Defendants moved to dismiss Plaintiffs' Second Consolidated Amended Complaint on multiple grounds, including for lack of CEA injury and lack of antitrust standing. *See* ECF No. 76, at 27-32, 44-45.  Defendants argued that Plaintiffs' allegations that they traded on the same days when manipulation allegedly occurred were insufficient to plead CEA injury because Plaintiffs failed to allege that they traded in close temporal proximity to the Fix.  *Id.* at 44-45.  With respect to antitrust standing, Defendants argued, *inter alia*, that Plaintiffs were not efficient enforcers of the antitrust laws because they did not allege "that *any* Plaintiff bought silver from, or sold silver to, any Defendant" but instead alleged "an 'umbrella theory' of liability," *i.e.*, that Plaintiffs were "injured when [they] sold a good to non-conspirators who lowered their prices under the price umbrella of the alleged conspirators."  *Id.* at 28-29 (emphasis in original).

This Court granted the motion to dismiss in part and denied it in part in *Silver I*.  With respect to the CEA claims, the Court held that "allegations that Plaintiffs sold [silver] on specifically identified dates when Defendants are alleged to have artificially suppressed the Fix Price are sufficient for CEA standing purposes."  *Silver I*, 213 F. Supp. 3d at 565.  The Court reasoned that, despite Plaintiffs' "allegations that the Fixing marked a uniquely dysfunctional period of the trading day," they "adequately alleged that, on days that Defendants engaged in manipulation, the Fixing marked an abrupt downward aberration in pricing, which abated gradually, but perhaps not completely, over time."  *Id.* at 564-65; *see also id.* at 552 (plaintiffs pled

antitrust injury because they alleged "that Defendants artificially depressed the price of silver for some period of time around the Fixing," without addressing whether Plaintiffs pled that they traded during the period when silver prices were allegedly depressed).

With respect to the antitrust claims, the Court held that Plaintiffs' conspiracy allegations were "barely" plausible.  *Id.* at 558.  The Court found that Plaintiffs had "adequately stated an antitrust injury" on the theory that their injury was "'inextricably intertwined' with the Defendants' alleged manipulation of the Fix Price . . . to the extent that Defendants relied on Plaintiffs' and other market participants' trading on a manipulated Fix price in order to carry out their alleged scheme."  *Id.* at 552.  And the Court held that Plaintiffs "plausibly alleged that they are efficient enforcers for purposes of antitrust standing" at the pleading stage and that further consideration of the matter would be "deferred to the class certification stage."  *Id.* at 555, 557.

The Court recognized, however, that Plaintiffs' claims faced serious difficulties.  For example, the Court noted "uncertainty surrounding the viability of the theory of umbrella liability" and that "there appear to be substantial challenges to Plaintiffs' causation theory."  *Id.* at 555.  The Court was "extremely skeptical that *all* market participants who sold silver or silver instruments on alleged manipulation days will ultimately be able to move forward with their claims," and expressed "concern[] that at least some Plaintiffs' alleged injuries are highly speculative."  *Id.* at 555-56 (emphasis in original).  Noting that Plaintiffs "fail[ed] to allege that the Fix Price was the price (or an established component of the price) at which they transacted," the Court found it "difficult to see how Plaintiffs would arrive at a just and reasonable estimate of damages, even with the aid of expert testimony."  *Id.* at 556-57 & n.18 (internal citation and quotation marks omitted).  But the Court let Plaintiffs proceed to discovery, reasoning that a "significant evidentiary record" was needed to decide if Plaintiffs were harmed.  *Id.* at 557.

Since this Court issued its *Silver I* ruling in October 2016, the law in this Circuit has evolved. *Silver I* was one of the first cases to confront the question of which plaintiffs qualify as efficient enforcers in a benchmark manipulation action. But as this Court later recognized, by July 2018 "a critical mass of judges within this district ha[d] concluded that plaintiffs who are not direct purchasers are not efficient enforcers in a benchmark manipulation case." *In re London Silver Fixing, Ltd., Antitrust Litigation*, 332 F. Supp. 3d 885, 905 (S.D.N.Y. 2018) ("*Silver II*") (dismissing claims against Non-Fixing bank defendants). That "critical mass" continued to snowball, with the vast majority of decisions in this district dismissing plaintiffs' claims of benchmark manipulation at the pleading stage on efficient enforcer grounds where plaintiffs transacted exclusively with non-defendants. *See, e.g.*, *In re Aluminum Warehousing Antitrust Litig.*, 520 F. Supp. 3d 455, 477-79 (S.D.N.Y. 2021) (collecting cases); *In re Platinum & Palladium Antitrust Litig.*, No. 1:14-cv-9391-GHW, 2017 WL 1169626, at *22 (S.D.N.Y. Mar. 28, 2017) (dismissing umbrella claims in benchmark case based on alleged manipulation of precious metals fix auction). The Second Circuit endorsed this consensus in *Schwab II*, holding that "the district court correctly drew a line between plaintiffs who transacted directly with defendants [who allegedly manipulated LIBOR] and those who did not, finding that only those who transacted with the Banks suffered a direct antitrust injury." 22 F.4th at 115-16 (internal citation and quotation marks omitted); *see id.* at 118 (citing with approval district court decisions drawing same line in benchmark cases). The Second Circuit followed *Schwab II* in *Laydon*, holding that a U.S. futures trader who transacted on an impersonal exchange—not directly with a defendant—lacked antitrust standing. *Laydon,* 2022 WL 10208500, at *2, *7.

The Second Circuit has also addressed what is required for a plaintiff to plead antitrust injury or "actual injury" caused by a violation of the CEA. In *Harry v. Total Gas & Power N.*

*Am., Inc.*, 889 F.3d 104 (2d Cir. 2018) ("*Total Gas*"), the court held that a plaintiff must plead "facts indicating that the defendant's actions caused price artificiality during the time in which plaintiff was trading," and that in the absence of a "formal rule-based price linkage" between the alleged manipulation and her trades, the plaintiff would "have to plead with greater detail." *Id.* at 112-16 & n.3 (dismissing CEA and antitrust claims because plaintiffs failed to plead injury).  The Second Circuit elaborated on that pleading standard in *Gamma*, holding that plaintiffs' identification of nine dates when their trading allegedly coincided with defendants' harmful manipulation was insufficient to plead CEA injury absent a specific "factual basis that would justify an inference that the market price was still artificial by the time" plaintiffs traded, including allegations about the intraday timing of plaintiffs' trades and allegations regarding "how long it takes for the market price to return to a nonartificial level."  41 F.4th at 80.  And, *Gamma* specifically rejected the argument that plaintiffs that fail to specify the time of their trades should "proceed[] to discovery" anyway.  *Id.* at 81.

Finally, the Second Circuit has held that CEA claims alleging that defendants manipulated a foreign benchmark are impermissibly extraterritorial, unless defendants engaged in substantial misconduct in the United States.  *Prime* affirmed the dismissal of private CEA claims brought by U.S. oil futures traders against defendants that engaged in sham Brent crude oil transactions outside the United States, reported to a foreign entity that set the "Dated Brent Assessment" benchmark, which benchmark allegedly affected the price of futures in the United States.  *See* 937 F.3d at 100, 107-08.  Similarly, *Laydon* held that CEA claims alleging that defendants' "foreign trade desks" made false submissions to a British entity that set a foreign-exchange benchmark were impermissibly extraterritorial, even if that benchmark allegedly affected U.S. futures prices via an indirect causal chain.  *See* 2022 WL 10208500, at *6.  Put differently, private CEA claims that

allege a "'ripple effect' or chain of events that resembles a falling row of dominoes commencing" abroad and ultimately harming U.S. traders must be dismissed. *Prime*, 937 F.3d at 108.

These developments in circuit law necessitate revisiting this Court's prior rulings. As explained below, Plaintiffs have not adequately pleaded antitrust or CEA injury, Plaintiffs are not efficient enforcers of the antitrust laws, and Plaintiffs' CEA claims are impermissibly extraterritorial. These deficiencies establish that this case should be dismissed in its entirety.

## LEGAL STANDARD

On a motion for judgment on the pleadings pursuant to Rule 12(c), courts "employ[] the same . . . standard applicable to dismissals pursuant to [Rule] 12(b)(6)." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011) (internal citations omitted). Under this standard, courts must accept as true the complaint's well-pled factual allegations but need not accept "legal conclusions" or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quotation marks and alterations omitted). Courts then determine whether the complaint states a plausible claim for relief. *L-7 Designs*, 647 F.3d at 430.

A motion for judgment on the pleadings may be made at any time "[a]fter the pleadings are closed," as long as it is made "early enough not to delay trial." Fed. R. Civ. P. 12(c). The Second Circuit regularly affirms the dismissal of CEA and antitrust claims at the pleading stage where a plaintiff is not an efficient enforcer of the antitrust laws; has not pled antitrust injury or "actual injury" caused by a violation of the CEA; or has pled an impermissibly extraterritorial CEA claim. *See, e.g.*, *Laydon*, 2022 WL 10208500, at *1; *Schwab II*, 22 F.4th at 109; *Gamma*, 41 F.4th at 82-83; *Total Gas*, 889 F.3d at 115-16.

## ARGUMENT

**I.  Plaintiffs Have Not Adequately Pled "Actual Injury" Caused by a Violation of the CEA or Antitrust Injury**

To plead "actual injury" under the CEA, Plaintiffs must establish that they were personally harmed by Defendants' manipulative trading activity. *Gamma*, 41 F.4th at 78. Thus, Plaintiffs must plausibly allege that Defendants "t[ook] an action that had an impact on the [Plaintiffs'] position, and that that impact [was] negative." *Id.* (quoting *Total Gas*, 889 F.3d at 112) (internal quotation marks omitted). Plaintiffs can either allege that they traded directly with Defendants, or "plead additional facts to make it plausible" that the impact of Defendants' conduct on Plaintiffs "was harmful rather than neutral or beneficial," including a "factual basis that would justify an inference that the market price was . . . artificial" due to Defendants' conduct at the specific time Plaintiffs traded. *Id.* at 79-80.

The same principles apply to Plaintiffs' Sherman Act claims. Both CEA and antitrust plaintiffs must plausibly plead both that the defendant's action "had an impact on [their] position" and that the impact was "negative." *Total Gas*, 889 F.3d at 112. As described below, Plaintiffs' failure to "allege a plausible connection between their trading and defendants' [activities]," *Gamma*, 41 F.4th at 81 (quotation marks and alterations omitted), requires dismissal of both their CEA and antitrust claims. *See Total Gas*, 889 F.3d at 115-16 (plaintiffs who failed to plead CEA injury also failed to plead antitrust injury "[f]or similar reasons"); *Gamma*, 41 F.4th at 77-83 ("Gamma's pleadings did not meet the *Total Gas* standard").

### A.  Plaintiffs Have Not Alleged Privity or Any Direct Transaction with Defendants

The "most direct way to plead [CEA] injury is to allege privity—*i.e.*, that the defendant directly traded with the plaintiff while manipulating the market price." *Gamma*, 41 F.4th at 78. The seven Plaintiffs who remain in this case allege merely that they "purchased and/or sold

physical silver" with unidentified counterparties (*see* TAC ¶ 26) or that they "transacted" in exchange-traded silver instruments (*id.* ¶¶ 23-27, 29-30).  Because Plaintiffs do not allege any direct transactions with any Defendant, *see* ECF No. 585, at 1-2, 8-11; TAC ¶¶ 21-30, they lack privity with Defendants.  Nor do Plaintiffs even allege that "the Fix Price was the price (or an established component of the price) at which they transacted."  *Silver I*, 213 F. Supp. 3d at 556 n.18.  Because they cannot establish privity, Plaintiffs must "plead additional facts to make it plausible that the impact on [Plaintiffs] was harmful rather than neutral or beneficial," *Gamma*, 41 F.4th at 79.  As explained below, Plaintiffs cannot meet this burden either.

### B.  Plaintiffs Have Not Alleged a Factual Basis that Could Support an Inference that Prices Were Artificial at the Time Their Trades Took Place

The clear import of *Gamma* is that Plaintiffs cannot plausibly plead actual injury by simply alleging that they entered into silver-based transactions on the same days that Defendants allegedly engaged in manipulative conduct.  *See Gamma*, 41 F.4th at 80 (plaintiffs failed to plead actual injury under the CEA by identifying nine dates on which they traded and harmful manipulation allegedly occurred).  Rather, Plaintiffs must plausibly plead facts sufficient for a court to infer that "[D]efendants' actions caused price artificiality *during the time in which plaintiff was trading*."  *Id.* (quoting *Total Gas*, 889 F.3d at 112 n.3 and affirming dismissal where "the complaint provided no factual basis that would justify an inference that the market price was still artificial by the time Gamma traded") (emphasis added).

Plaintiffs' allegations here are no different than those rejected by the Second Circuit in *Gamma*.  Plaintiffs allege that, on a handful of occasions, they transacted in silver on the same day that Defendants allegedly manipulated the Silver Fix.  *See* TAC, Appendix D; *Silver I*, 213 F.

Supp. 3d at 549-50, 553-57, 565.[7]  But just as in *Gamma*, Plaintiffs have not alleged anything

about *when* their trades occurred in relation to the Silver Fix on those days, or adequately alleged

the *duration* of the effects of Defendants' alleged manipulation.  Here, as in *Gamma,* Plaintiffs

failed to plead factual detail regarding *"*how long the effects of [the manipulative conduct] last, or

that [Plaintiffs'] trades happened so close in time to the [manipulative activity] that [the court] may

reasonably infer price artificiality affecting [Plaintiff's] trading").  *Gamma*, 41 F.4th at 81.

　　This Court previously sustained Plaintiffs' claims because they alleged that the "abrupt

downward aberration in pricing" marked by the Fixing "abated gradually, but perhaps not

completely, over time."  *Silver I*, 213 F. Supp. 3d at 564-65; *see also id.* at 552.  *Gamma* makes

clear, however, that plaintiffs must do more than speculate that prices might have stayed artificial

for an unspecified period of time after Defendants' episodes of misconduct.  *See Gamma,* 41 F.4th

at 80 (because complaint lacked "allegations to support the inference that the effects of the

[manipulation] linger for the remainder of the trading day," there was "no factual basis that would

justify an inference that the market price was still artificial by the time [plaintiffs] traded").  Even

if the Court credits Plaintiffs' conclusory assertion that the Silver Fix had some "lingering" effect

on prices—and it should not, given that Plaintiffs allege a "downward aberration in pricing" that

necessarily rebounded, *see id.* at 557, 565—Plaintiffs come "nowhere close" to justifying an

inference that they sold in the window during which Defendants' suppression purportedly affected

prices, because Plaintiffs "never actually allege when [their] own trades took place."  *Gamma*, 41

F.4th at 80-81.  Given that the Silver Fix occurred at noon London time, the only *plausible*

inference to draw is that Plaintiffs—who all reside in North America, TAC ¶¶ 21-30—traded silver

long after any price effects of the Silver Fix had abated.  Without specific, non-conclusory "factual

---

[7] The TAC does not identify *any* days on which Plaintiff Hughes bought or sold a silver instrument, instead merely alleging that Hughes "transacted COMEX 'miNY' silver futures contracts during the Class Period."  TAC ¶ 25.

allegations to support the inference that the effects of the [Fixing] linger for the remainder of the trading day," the Court cannot presume that defendants' alleged conduct "caused price artificiality during the time in which [Plaintiffs were] trading."  *Id.* at 80 (quotation marks omitted).

Plaintiffs claim that Defendants' alleged manipulation of the Silver Fix caused "persistent" suppression of all silver prices throughout the Class Period.  ECF No. 598, at 3-4; *see* TAC ¶ 198. But as the Court has recognized, this claim of persistent artificiality (in an effort to allege injury) is in significant "tension" with Plaintiffs' claim that "the Fixing marked a uniquely dysfunctional period" (in an effort to allege conspiracy).  *Silver I*, 213 F. Supp. 3d at 564-65.  Regardless, under *Gamma*, Plaintiffs' claim of persistent suppression is "precisely the sort of merely conclusory statement that [courts] need not credit, even on a motion to dismiss."  *Gamma*, 41 F.4th at 80 ("All Gamma pleads is that Defendants' manipulation of the markets for precious metals futures contracts caused prices to be artificial throughout the Class Period.") (citation omitted); *see also Laydon*, 2022 WL 10208500, at *8 (theory that benchmark manipulation injured every futures trader for several years is "highly speculative," "indirect and imprecise," and "vastly overbroad").[8]

### C.    The Court Cannot Infer Injury Based on "Statistical Probability"

Acknowledging that any attempt to plead injury based on "statistical probability" would be futile post-*Gamma*, Plaintiffs have already conceded that they "do not allege injury based on 'statistical probability.'"  ECF No. 598, at 4-5.  But inferring injury necessarily involves the use of probability, absent concrete allegations of (1) the exact time and direction of Plaintiffs' trades

---

[8] Plaintiffs' allegations that (1) silver prices tended to decline on days when silver prices declined during the Silver Fix, and (2) silver prices declined during the Silver Fix more often than they increased, hardly support a plausible inference that Silver Fixing activity, representing "a small share of overall market activity during [the seven-year class] period nevertheless could have had a *continuous effect on the price in every market at issue for [seven] years*." *Gamma*, 41 F.4th at 80 n.5 (emphasis in original); *see* TAC ¶¶ 195-98.  Whereas $30 billion of silver traded globally each year, the Fix was a daily auction for 1,000-ounce bars of silver.  *See* TAC ¶¶ 120, 125.  The price was "fixed" when that day's buying and selling interests were balanced within 300 bars (worth only $1.5 to $14 million, at silver prices ranging from $5 to $47 per ounce).  *See id.* ¶¶ 121, 136 & Fig. 1.  By any measure, the Fix was a "small share of overall [silver] market activity."  *Gamma*, 41 F.4th at 80 n.5.

and (2) the exact time, duration and direction of price artificiality.  *Gamma* establishes that a plaintiff cannot plead CEA injury by simply pointing to a "large set of trades" and asking the court to infer that plaintiff must have come out on the losing end of defendants' market manipulation at least once.  *Gamma*, 41 F.4th at 78-79.

And even if it were permissible to infer CEA injury from "statistical probability," such an inference would not be warranted here.  *Gamma* held that plaintiffs' allegations that defendants spoofed thousands of times and plaintiffs made *thousands* of trades did not permit an inference that plaintiffs were harmed.  *Id.*  Here, Plaintiffs' allegations are even weaker because the TAC lists *fewer than 500* sales they allegedly made on days impacted by Defendants' manipulative conduct (*see* TAC, Appendix D)—a minuscule fraction of the trading activity in the $30-billion-dollar-a-year silver market over the seven-year period at issue.  Moreover, the fact that the Silver Fix occurred at noon London time makes it likely that Plaintiffs (all of whom lived in North America) were sleeping rather than trading silver whenever prices were artificial.  This makes it even more "unreasonable" to infer injury here.  *Gamma*, 41 F.4th at 78; *see Silver II*, 332 F. Supp. 3d at 925 n.36 (fact that plaintiffs "traded in the same 24 hour period as [Non-Fixing bank traders] discussed manipulation of the silver markets" is "too thin a basis" to infer injury).

Accordingly, *Gamma* makes clear that all of Plaintiffs' claims must be dismissed because Plaintiffs have failed to plead any "factual basis that would justify an inference that the market price was still artificial by the time [Plaintiffs] traded."  *Id.* at 80.[9]

---

[9] To the extent that Plaintiffs seek to amend the scheduling order to permit yet another amended complaint, any such request should be rejected because "[t]he time for raising entirely new theories of the case has long since passed."  *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 KBF, 2016 WL 1629350, at *1 (S.D.N.Y. Apr. 25, 2016) (denying motion for leave to file amended complaint three years after case filing, after discovery and during class certification briefing); *see* Fed. R. Civ. P. 16(b) (modifying scheduling order requires "good cause").

## II.     Plaintiffs Lack Antitrust Standing to Assert Their Antitrust Claims

To survive the pleading stage, an antitrust plaintiff must demonstrate that it has antitrust standing.  *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 436-37 (2d Cir. 2005).  The antitrust standing requirement reflects the judgment that "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation."  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) ("*AGC*").

To establish antitrust standing, private plaintiffs must plausibly allege that they are "efficient enforcers" of the antitrust laws—*i.e.*, that they are "proper part[ies] to perform the office of a private attorney general."  *Schwab II*, 22 F.4th at 115.  To determine whether plaintiffs are efficient enforcers, courts consider the four *AGC* factors:  (1) "the directness or indirectness of the asserted injury"; (2) "the existence of more direct victims"; (3) the extent to which the plaintiff's damages claim is "highly speculative"; and (4) "the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other."  *Laydon,* 2022 WL 10208500, at *7 (citation omitted); *see also, e.g.*, *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 138 (2d Cir. 2021) ("*Amex*") (same).  "Built into the [efficient enforcer] analysis is an assessment of the 'chain of causation' between the violation and the injury."  *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016).  Here, these factors make clear that Plaintiffs lack antitrust standing—thus providing an additional, independent basis for dismissing Plaintiffs' antitrust claims at the pleadings stage.

### A.     Plaintiffs Lack Antitrust Standing Because They Did Not Transact with Defendants

"[T]he efficient-enforcer inquiry remains, fundamentally, one into proximate cause."  *Amex*, 19 F.4th at 143.  Accordingly, the first and most important *AGC* factor, directness of injury,

turns on "traditional proximate cause considerations" and is determined according to the "first-step rule." *Schwab II*, 22 F.4th at 116; *see also Amex*, 19 F.4th at 139.  Under that rule, only injuries that occur "'at the first step following the harmful behavior are considered proximately caused by that behavior.'" *Schwab II*, 22 F.4th at 116 (quoting *Amex*, 19 F.4th at 140); *see Laydon*, 2022 WL 10208500, at *7 (same).

Plaintiffs' TAC confirms that they do not satisfy the first-step rule.  Plaintiffs do not allege that they were customers of any Defendant (or of settling Defendant Deutsche Bank).  *See* TAC ¶¶ 21-30.  Nor do they allege that they traded physical silver or any over-the-counter silver derivative with any Defendant.  *See id.*  Instead, Plaintiffs allege that they either traded physical silver with third parties or traded silver futures or options on exchanges such as COMEX.  *See* TAC ¶¶ 23-27, 29-30.  Plaintiffs also do not allege that Defendants HSBC and Scotiabank (or even all of the Fixing Banks together, including Deutsche Bank) had a large share of the highly liquid market for exchange-based silver derivatives during the Class Period, which quickly forecloses even a tenuous argument that the named Plaintiffs who traded exchange-traded instruments are efficient enforcers.  *See Laydon*, 2022 WL 10208500, at *7 (plaintiff was not efficient enforcer, where he failed to allege that defendants "controlled the Euroyen TIBOR futures contract").[10]

In *Schwab II*, the Second Circuit held, on indistinguishable facts, that the indirect nature of plaintiffs' claimed injury—*on its own*—provided "ample justification" for rejecting their claims. 22 F.4th at 118.  There, plaintiffs bought bonds that explicitly referenced LIBOR from third parties,

---

[10] Courts occasionally find that plaintiffs who traded on-exchange have antitrust standing if they adequately allege the defendants have overwhelmingly large market shares in the 90% range.  *See In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d 290, 311-12 (S.D.N.Y. 2020) ("The Exchange plaintiffs are not efficient enforcers of the antitrust laws because Plaintiffs have not adequately alleged that Defendants dominated the market for platinum and palladium derivatives.").  Here, Defendants did not have such a high market share on exchange trading that they became "de facto, 'the market.'"  *Silver II*, 332 F. Supp. 3d at 909.  Plaintiffs allege, at most, that the Fixing banks were "among the top 20 silver spot market participants" (TAC ¶ 221), which sheds no light on their market share in silver futures, *see Silver II*, 332 F. Supp. 3d at 909 ("At the risk of stating the obvious, the Non-Fixing Banks' role/influence on the spot market for physical silver has no necessary relationship to their role in the futures markets.").

and they accused defendants of suppressing LIBOR and thereby reducing the interest paid on plaintiffs' bonds.  *See id.* at 116-18.  The court explained that although defendants had allegedly manipulated the benchmark, "the decision of a third party to incorporate LIBOR as a term in a financial instrument . . . snap[ped] the chain of causation linking Plaintiffs' injury to the Banks' misconduct" for purposes of antitrust standing.  *Id.* at 116.  "Because the harm that befell [plaintiffs was] far removed from Defendants' conduct, it cannot be said that Defendants proximately caused the alleged antitrust injury."  *Id.* at 117.  As a result, plaintiffs lacked "statutory standing to raise a federal antitrust claim related to those purchases."  *Id.* at 118.

The Second Circuit thus drew a bright line between plaintiffs who transacted directly with defendants and those who did not, in order to avoid imposing disproportionate liability for alleged injuries resulting from plaintiffs' transactions with third parties "over which Defendants had no control, in which Defendants had no input, and from which Defendants did not profit."  *Id.* at 117-18 (quoting *In re LIBOR-Based Fin. Instr. Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2016 WL 7378980, at *16 (S.D.N.Y. Dec. 20, 2016), *affirmed in part and reversed in part and remanded on other grounds by Schwab II*, 22 F.4th at 103).  *Schwab II* held that the district court "correctly drew a line between Plaintiffs who transacted directly with Defendants and those who did not, finding that *only those who transacted with the Banks suffered a direct antitrust injury*."  *Schwab II*, 22 F.4th at 115-16 (emphasis added).  This Court should draw the same line here.

In fact, Plaintiffs' claims here are significantly weaker than those in *Schwab II* because they do not "allege that the Fix Price was the price (or an established component of the price) at which they transacted."  *Silver I*, 213 F. Supp. 3d at 556 n.18.  The court in *Schwab II* explained that claims based on fixed-rate bonds that did not reference LIBOR would be "even more tenuous" than claims based on LIBOR-linked bonds, holding that any "gravitational force" LIBOR exerted

19

on "bonds that do not reference [it] at all" was "clearly insufficient to establish antitrust standing." *Schwab II*, 22 F.4th at 118 n.6.

Plaintiffs concede, as they must, the obvious fact that the prices of physical silver and silver derivatives constantly fluctuate intraday, and deviate from the once-a-day Silver Fixing price. *See* TAC ¶ 144 (silver prices allegedly "reach their nadir just after the Silver Fixing starts"); *id.* ¶¶ 144-150 & Figs. 2-4 (illustrating intraday price fluctuations). And there is no allegation—much less a plausible allegation—that persons who transact in physical silver (*e.g.*, coin dealers and jewelers) could not deviate from the Silver Fixing price if they so chose, or that Defendants dictated the bid-ask spread in the entire futures market. Thus, any alleged injury to Plaintiffs "is far removed from Defendants' conduct," was not proximately caused by Defendants, and cannot support antitrust standing. *Schwab II*, 22 F.4th at 117; *see Aluminum Warehousing*, 520 F. Supp. 3d at 487-88 (the lack of any "constraint—legal, economic or otherwise—that would have *required* smelters to charge plaintiffs the full [benchmark]" means that "plaintiffs' alleged harms . . . are most proximately attributable to the pricing decisions of third parties").

Neither the Plaintiffs who suffered their alleged losses in exchange-based transactions nor the sole Plaintiff who traded physical silver can establish that they are efficient enforcers here. Previously, the exchange-based Plaintiffs acknowledged that Defendants are "quite right that the exchange"—and not any Defendant—"is the counterparty" to their exchange-based transactions, but argued that *Schwab II* has no application whenever a plaintiff trades on an exchange. ECF No. 589, at 6-11. That argument is foreclosed by *Laydon*'s holding that a purchaser of exchange-traded Euroyen futures "failed to allege that his injury was proximately caused by Defendants" because he had not "transacted directly with any Defendants" but rather with "unknown third parties" on the exchange. *Laydon*, 2022 WL 10208500, at *7. And endorsing such a position would

improperly make *every* exchange trader an efficient enforcer with standing to sue for treble damages, regardless of the size of Defendant's market share on the exchange—which would allow for the very same "sweeping" and "disproportionate" liability the Second Circuit has repeatedly sought to prevent. *Schwab II*, 22 F.4th at 117 (quotation marks omitted); *see Laydon*, 2022 WL 10208500, at *8 (holding that damages based on exchange trading volume would be "vastly overbroad" (citing *Gelboim*, 823 F.3d at 779 (noting concern of damages disproportionate to wrongdoing where defendants "control only a small percentage" of the market))); *Silver II*, 332 F. Supp. 3d at 908 (non-Fixing defendants would face disproportionate liability to a class comprising "every participant in a silver or silver-denominated transaction on a U.S.-based exchange").

Plaintiffs' contention that dismissing their private antitrust claim would create a "right to freely manipulate the silver futures market" (ECF No. 589, at 10) is plainly not true.  The federal government has plenary authority to bring *public* antitrust enforcement actions, without regard to the efficient enforcer requirement for *private* antitrust actions.  *See Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75-76 (2d Cir. 2013).  But unlike federal "agencies, [private] Plaintiffs do not have the right to bring suit against any person they reasonably suspect has committed" market manipulation.  *Total Gas*, 889 F.3d at 109.  The limited reach of private litigation has absolutely "nothing to do with government enforcement."  *Laydon*, 2022 WL 10208500, at *6 n.14; *see Gatt*, 711 F.3d at 75 (Congress did not authorize "private [antitrust] plaintiffs [to] recover[] damages . . . merely by showing injury causally linked to an illegal presence in the market") (citation omitted); *Gamma,* 41 F.4th at 83 (CEA does not "deputize traders to rove the commodities markets hunting for bad behavior").

Moreover, to the extent Plaintiffs attempt to distinguish *Schwab II* by suggesting that the injuries allegedly suffered by the Plaintiff who traded physical silver with third parties are

"inextricably intertwined" with Defendants' alleged scheme, the plaintiffs in *Schwab II* made precisely the same argument, and the Second Circuit rejected it.  *Schwab II*, 22 F.4th at 117 (plaintiffs' injury was not "inextricably intertwined" with defendants' scheme because defendants had had no financial stake in Plaintiff's physical-silver transactions with third parties, which "took place merely because of LIBOR's unlimited public availability as a reference point for innumerable transactions").

Schwab II and *Laydon* thus confirm that Plaintiffs—who neither traded with Defendants nor entered into a transaction that referenced the Silver Fixing Price—are not efficient enforcers, regardless of whether they dealt in exchange-traded futures and options or physical silver.

### B.    Plaintiffs Lack Antitrust Standing Because There Are More Direct Victims of the Alleged Conspiracy

While the Second Circuit noted in *Schwab II* that it could affirm the district court based on the first efficient enforcer factor alone, it found that the remaining factors "on the whole[] likewise cut against a finding of standing."  22 F.4th at 118-19.  Here, the second *AGC* factor—"the existence of more direct victims" of the alleged antitrust violation, *Amex*, 19 F.4th at 138—also cuts strongly against a finding that Plaintiffs have antitrust standing.

If Defendants had suppressed the Fix price as Plaintiffs allege, then Defendants' customers who sold silver in the Silver Fixing (or otherwise sold silver to Defendants at the Fix price) would be the direct victims of that misconduct and thus the appropriate private parties to enforce the antitrust laws.  *See Laydon*, 2022 WL 10208500, at *8 (party to swap indexed to benchmark would be a direct victim of benchmark manipulation); *Schwab II*, 22 F.4th at 118-19 (plaintiffs "who purchased LIBOR-indexed financial instruments directly from [defendants]" were the direct victims); *Gatt*, 711 F.3d at 79 (plaintiff lacked antitrust standing, where agencies that awarded government contracts in rigged auctions suffered more "direct injury").  The fact that these more

directly injured victims exist but chose not to sue only weakens Plaintiffs' standing argument:  "If there is substance to the plaintiff's claim, it is difficult to understand why the direct victims of the conspiracy have not asserted any claim in their own right . . . . If the 'superior' plaintiff has not sued, one may doubt the existence of any antitrust violation at all."  *Gatt*, 711 F.3d at 79 (quotation marks omitted); *see also AGC*, 459 U.S. at 542 n.47 (same); *Laydon*, 2022 WL 10208500, at *7 (same).

### C.    Plaintiffs Also Lack Antitrust Standing Because Their Alleged Damages Are Highly Speculative And Disproportionate to Any Claimed Wrongdoing

The third *AGC* factor also cuts against a finding that Plaintiffs are efficient enforcers because Plaintiffs' damages claim is "highly speculative."  *Amex*, 19 F.4th at 138; *see also AGC*, 459 U.S. at 545 ("tenuous and speculative" causation theory "weigh[s] heavily against" antitrust standing); *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 67 (2d Cir. 2019) (damages theory that "would require the creation of an alternative universe" and predictions about what third parties would have done was highly speculative) (internal quotation marks omitted).

This Court has already recognized that the damages theory in the TAC is "highly speculative."  *Silver I*, 213 F. Supp. 3d at 556.  Indeed, the fact that "[p]laintiffs do not deny that other market variables may have affected silver prices before and after the Silver Fixing," *id.* at 557, conclusively establishes this factor.  *See Laydon*, 2022 WL 10208500, at *8 (damages theory is highly speculative when "countless other market variables" besides the alleged misconduct "could have intervened to affect . . . pricing," such that plaintiff's "theory of antitrust injury depends upon a complicated series of market interactions"); *Amex*, 19 F.4th at 141-42 (third efficient enforcer factor considers "whether the 'alleged effects on the [plaintiff] may have been produced by independent factors'" and the "uncertainty of how eliminating [Defendants' misconduct] would affect [their] competitors' [prices]" (quoting *AGC*, 459 U.S. at 542)).

The concern about speculative injury is "especially pronounced for umbrella purchasers," like Plaintiffs here, "who may have traded hours or days after [non-Fixing defendants'] manipulation." *Silver II*, 332 F. Supp. 3d at 910.  Plainly, disentangling the effects of market forces from the effect of alleged Silver Fixing manipulation on the prices of physical silver and every silver derivative, at every point in time over a *seven-year period*, would "engage the court in hopeless speculation." *Platinum & Palladium*, 2017 WL 1169626, at *23-25 (analyzing similar claim based on alleged manipulation of precious-metal fixes).

To the extent Plaintiffs rely on their revised theory of damages offered at class certification, this Court need not consider such theory for purposes of this Rule 12(c) motion for judgment *on the pleadings*.  Plaintiffs' putative class certification expert claims that Defendants' misconduct *both* suppressed the prices charged by everyone in the market *and* widened the bid-ask spread charged by everyone in the market, such that *everyone* who traded silver over a seven-year period was injured.  *See* ECF No. 574, at 5-6.  That new theory is at least as speculative as the damages theory in the TAC.[11]  And, *Laydon* teaches that any such computation of "damages based on [futures] trading volume" would be "vastly overbroad." *Laydon*, 2022 WL 10208500, at *8.  In sum, Plaintiffs' damages theory would be "difficult to apply" here because it would "require the court to speculate about how [third parties] would have factored a non-suppressed [Silver Fixing] into the[ir] transaction[s]," which would entail "creat[ing] an alternative universe based on multiple layers of speculation."  *Schwab II*, 22 F.4th at 119 (cleaned up).  "Such 'highly

---

[11] Even assuming *arguendo* that real-world spreads were wider than predicted by Plaintiffs' "model," it is sheer speculation to attribute those wider spreads to Defendants' actions rather than modeling error or the independent pricing decisions of myriad third parties.  To compute damages, the Court would still need to disentangle the effects of the allegedly manipulated Fixing—on sale prices, purchase prices, and bid-ask spreads—from the effects of "countless other market variables."  *Platinum & Palladium*, 2017 WL 1169626, at *25.

speculative' damages claims are disfavored in selecting efficient antitrust enforcers." *Id.* (citing *AGC*, 459 U.S. at 542-43.).

### D.   The Risks of Duplicate Recoveries and Complex Apportionment Also Counsel Against Antitrust Standing

The fourth *AGC* factor, "the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other," *Amex*, 19 F.4th at 138, is either neutral or slightly favors Defendants.  Apportioning liability to everyone in a multibillion-dollar market, including actors that have no direct relationship with Defendants, would be "extraordinarily difficult" and would "lead to benumbing damages amounts that far exceed the aggregate harm to third parties." *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 565-66 (S.D.N.Y. 2017).  Likewise, determining whether in-and-out traders that both bought and sold at manipulated prices were harmed on net (and if so, the amount of such harm) would be extraordinarily difficult.  The same is true where damages are premised on a wider bid-ask spread, which creates a zero-sum game whereby either the buyer benefits at the seller's expense, or *vice versa.  See Laydon*, 2022 WL 10208500, at *8 (assessing damages based on trading volume is "vastly overbroad," speculative, and requires complex apportionment).

Regardless, the fourth factor is of limited importance:  even if it favored Plaintiffs, this factor alone would "not establish antitrust standing." *Amex*, 19 F.4th at 143; *see Schwab II*, 22 F.4th at 119-20 (even though the fourth factor favored plaintiffs, "on the whole, the last three *AGC* factors ultimately bolster[ed]" the conclusion that plaintiffs who did not transact with any defendant were not efficient enforcers).

### III.   Plaintiffs' CEA Claim is Impermissibly Extraterritorial.

Plaintiffs' CEA claim also fails because it fails to plead misconduct by Defendants in the United States as required by *Laydon*.  The scope of the CEA is interpreted "in light of the

presumption against extraterritoriality." *Laydon*, 2022 WL 10208500, at \*4 (quoting *Prime*, 937 F.3d at 102).  The CEA provision that authorizes private actions, 7 U.S.C. § 25(a)(1), "lacks any affirmative intention by Congress to give [it] extraterritorial effect." *Laydon*, 2022 WL 10208500, at \*4 (internal quotation omitted).  *Laydon* makes clear that a private CEA plaintiff must plead two things:  "not only a domestic transaction, but *also* sufficiently domestic conduct by the defendant." *Id.* (emphasis added); *see In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d 290, 331 (S.D.N.Y. 2020) ("[A]n allegation that a foreign course of conduct has caused malign effects in the United States is not enough to salvage an otherwise extraterritorial claim.").  Although Plaintiffs adequately plead that they transacted in silver in the United States, their failure to plead domestic misconduct by Defendants is fatal to their CEA claim.

In *Laydon*, a U.S. resident who traded Euroyen TIBOR futures on a U.S. exchange alleged that certain "panel banks for the [British Bankers Association] in setting Yen-LIBOR" conspired with each other and various derivatives brokers to manipulate the Yen-LIBOR and Euroyen-TIBOR benchmarks.  2022 WL 10208500, at \*2.  According to the *Laydon* plaintiff, defendants made false submissions to the BBA that were used to set an inaccurate Yen-LIBOR benchmark, which in turn affected the Euroyen TIBOR benchmark and ultimately "cause[d] artificial Euroyen TIBOR rates and artificial Euroyen TIBOR futures prices." *Id.*  "As for domestic conduct, Plaintiff primarily relie[d] on a handful of communications sent from Defendants' foreign-based employees" via U.S. servers, but did not "allege that Defendants' employees sent artificial submissions to the BBA from within the United States." *Id.*

The *Laydon* court held that "Plaintiff's CEA claims are impermissibly extraterritorial because the conduct he alleges is predominantly foreign," because his futures contract was "tied to the value of a foreign asset," and because his "conspiracy allegations describe conduct and

communications that occurred overseas on foreign trade desks." *Laydon*, 2022 WL 10208500, at *5 (internal quotation omitted). The Court rejected plaintiff's arguments that his claim "must be domestic" because plaintiff had "purchased a Euroyen TIBOR futures contract on . . . a U.S.-based exchange," and because one allegedly conspiratorial e-mail was sent from the United States during a five-year putative class period. *Id.* The Court reasoned that the benchmark rates at issue were not themselves commodities, and that the future at issue "incorporated an index tied to a foreign market, with that index being set by a foreign entity." *Id.* at *5-6; *see also Prime*, 937 F.3d at 100, 107-08 (CEA claim based on foreign manipulative trading of foreign commodity that manipulated foreign benchmark disseminated by foreign agency was extraterritorial).

Plaintiffs' CEA claim is impermissibly extraterritorial under *Laydon*, because the TAC fails to "plead . . . sufficiently *domestic conduct*" by which the Fix was manipulated. *Laydon*, 2022 WL 10208500, at *4 (emphasis added); *see Parkcentral Global HUB Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014) (dismissing securities-law claim as "so predominantly foreign as to be impermissibly extraterritorial" because "the relevant actions . . . are . . . predominantly German").[12] Plaintiffs claim that Defendants manipulated the daily "London Silver Fixing" auction for "London 'Good Delivery'" silver bars, which was a "venerable city of London institution" that occurred at noon London time—before the COMEX silver futures pit even opened in the United States. TAC ¶¶ 119, 124, 176.[13] The TAC alleges that "Defendants"

---

[12] Plaintiffs' allegations that Defendants had ancillary contacts with the United States, such as maintaining silver vaults in New York, do not establish a domestic violation of the CEA. Only conduct "relevant to the statute's focus"—market manipulation—is relevant to whether a private CEA claim is domestic. *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2137 (2018); *see also Prime*, 937 F.3d at 107-08.

[13] "Good Delivery" refers to standards set by the London Bullion Market Association ("LBMA") for silver bars that are "acceptable in the settlement of a Loco London contract—where the bullion traded is physically held in London." *About Good Delivery*, LBMA, https://www.lbma.org.uk/good-delivery/about-good-delivery (last visited October 31, 2022); *see In re Miami Metals I, Inc.*, 634 B.R. 249, 255 n.5 (Bankr. S.D.N.Y. 2021) (citation omitted) ("All Loco London transactions are backed by silver that actually is physically in place in London.").

had "complete control" over the Fix, but does not identify *who* at Defendants supposedly manipulated the Fix or specify the location of any misconduct. *See id.* ¶ 123.

Nor does the TAC contain allegations that could support a plausible inference of domestic misconduct. To allege Fix-related "wrongdoing in Europe—absent any evidence of linkage between such foreign conduct and conduct [in the United States]—is merely to suggest . . . that 'if it happened there, it could have happened here.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (affirming dismissal of antitrust claim at pleading stage); *see also, e.g.*, *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 70 (2d Cir. 2012) (complaint with "only a few allegations that mention or even hint at the location of the securities transactions" did not "adequately allege . . . domestic securities transactions"); *In re Commodity Exch., Inc., Gold Futures and Options Trading Litig.*, 328 F. Supp. 3d 217, 230 (S.D.N.Y. 2018) (refusing to infer that if two banks "were willing to share information and collude in Singapore," they "must have also been sharing information in London" to manipulate PM Gold Fix). The Court should not give Plaintiffs' bare-bones pleading the benefit of the doubt, especially when Plaintiffs admit they possess "more than 350,000 pages of documents and 75 audio tapes" provided by Deutsche Bank that they claim contained "direct, 'smoking gun' evidence of a conspiracy." TAC ¶ 3.[14]

Plaintiffs' claim here—that "Defendants caused them to suffer losses by manipulating the [Silver] Fix because the [Silver] Fix is a global benchmark" is "virtually the same argument" rejected by the Second Circuit in *Prime. Platinum & Palladium*, 449 F. Supp. 3d at 331 (dismissing CEA claim based on alleged conspiracy to manipulate platinum fixing benchmark in

---

[14] Plaintiffs "unhelpfully excised the time-stamps and locations from the chat messages" quoted in the TAC. *Gold*, 328 F. Supp. 3d at 229. The TAC identifies only one chat as involving a U.S. person: a Deutsche Bank trader in New York chatted with an unidentified HSBC trader about shorting silver. TAC ¶¶ 281-82. Even if that chat related to a Fixing conspiracy—and it absolutely does not—a single U.S. communication does not make a CEA claim domestic. *See Laydon*, 2022 WL 10208500, at *5 (CEA claim extraterritorial, despite "several instances of communications . . . from or [that] went through the United States").

London, which allegedly suppressed price of platinum futures worldwide).  In both *Laydon* and *Prime*, Defendants allegedly engaged in misconduct abroad in order to manipulate a benchmark set abroad, which in turn affected U.S. futures prices at the end of an indirect causal chain.  *See Laydon*, 2022 WL 10208500, at *2 (fraudulent submissions to British Bankers Association distorted the Yen LIBOR benchmark, which distorted the Euroyen TIBOR benchmark, which distorted the price of Euroyen TIBOR futures on U.S. exchanges); *Prime*, 937 F.3d at 100 (fraudulent Brent oil transactions and submissions to Platts distorted the Dated Brent Assessment benchmark, which in turn distorted the price of Brent crude-related futures on U.S. exchanges).  That is exactly what Plaintiffs allege here.  *Cf.* TAC ¶¶ 4, 113 (Defendants "rigged the Silver Fix . . . [by] coordinating manipulative silver transactions in advance of the daily fixing call," thereby manipulating a benchmark set in London that was "disseminated in the United States, and. . . used to price silver and silver financial instruments").

In sum, Plaintiffs have failed to carry their burden to "plead . . . sufficiently domestic conduct by the defendant[s]" to sustain a private CEA claim.  *Laydon*, 2022 WL 10208500, at *4. Rather, the relevant misconduct alleged in the TAC is "so predominantly foreign as to be impermissibly extraterritorial."  *Prime*, 937 F.3d at 106 (quoting *Parkcentral*, 763 F.3d at 216). Plaintiffs' CEA claim should be dismissed.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Third Amended Complaint be dismissed in its entirety and with prejudice.

Dated: November 10, 2022
New York, New York

Respectfully submitted,

| | |
|---|---|
| /s/ *Damien J. Marshall* | /s/ *Stephen Ehrenberg* |
| Damien J. Marshall | Stephen Ehrenberg |
| Leigh Nathanson | William H. Wagener |
| KING & SPALDING LLP | SULLIVAN & CROMWELL LLP |
| 1185 Avenue of the Americas, 34th Floor | 125 Broad Street |
| New York, NY  10036 | New York, NY  10004 |
| Tel:  (212) 790-5357 | Tel:  (212) 558-3269 |
| Fax:  (212) 556-2222 | Fax:  (212) 291-9271 |
| Email:  dmarshall@kslaw.com | Email:  ehrenbergs@sullcrom.com |
| | |
| *Attorneys for the HSBC Defendants* | *Attorneys for The Bank of Nova Scotia Defendants* |