March 14, 2023

**VIA ECF**

Judge Valerie E. Caproni,
United States District Court for the Southern District of New York,
Thurgood Marshall United States Courthouse,
40 Foley Square,
New York, New York 10007.

      Re:    <u>In re London Silver Fixing, Ltd., Antitrust Litig.</u>, No. 14-MD-2573

Dear Judge Caproni:

      We write on behalf of Defendants in the above-referenced action in response to Plaintiffs' March 7, 2023 letter regarding the impact of the Second Circuit's decision in *In re Platinum & Palladium Antitrust Litig.*, 2023 WL 2229364 (2d Cir. Feb. 27, 2023) ("*Platinum*") on Defendants' motion for judgment on the pleadings (ECF No. 604). Although there are factual parallels between *Silver* and *Platinum* with respect to the manner of operation of the respective Fixing processes, there are significant differences in the allegations of conspiracy and the locus of misconduct that render *Platinum* meaningfully distinguishable from this case. Defendants' motion should either be granted on the basis of the current briefing and this supplemental submission or, as the Court has done in the past following intervening Second Circuit decisions, the motion should be denied without prejudice to renew in light of the *Platinum* decision.

      To begin, *Platinum* does not even address—much less foreclose—Defendants' lead argument under *Gamma Traders – I LLC* v. *Merrill Lynch Commodities, Inc.*, 41 F.4th 71 (2d Cir. 2022) ("*Gamma*") and *Harry* v. *Total Gas & Power North America, Inc.*, 889 F.3d 104 (2d Cir. 2018) ("*Total Gas*") that the entire case must be dismissed because Plaintiffs have not adequately pled either antitrust injury or "actual injury" caused by a violation of the CEA. The Second Circuit's silence on the issue is not tantamount to a decision. On this basis alone, the Court should grant Defendants' motion.

      With respect to antitrust standing and CEA extraterritoriality, the *Platinum* court rejected challenges to claims brought by U.S. futures traders premised on alleged manipulative trading in U.S. futures markets. The *Platinum* plaintiffs alleged manipulative trading in U.S. futures in advance of the Fix by traders located in the U.S. for the purpose of influencing the Fixing price. This trading conduct, the Second Circuit held, injured *Platinum* plaintiffs "at the first step" and satisfied the domestic conduct prong of the extraterritoriality test under *Prime International Trading, Ltd.* v. *BP P.L.C.*, 937 F.3d 94, 105 (2d Cir. 2019) ("*Prime*").

      Here, however, Plaintiffs allege the opposite: that Defendants conspired to directly manipulate the London Silver Fix through conduct in London for the purpose of affecting futures prices in markets around the world. In other words, Plaintiffs here purport to be injured by the alleged *effect* that the manipulated Silver Fix price had on the price of futures, and not by virtue of any well-pled manipulative futures transaction by a U.S.-based Defendant employee in furtherance of Fix manipulation. *Laydon* establishes, and *Platinum* does not alter, that a plaintiff injured in one market does not have standing to pursue antitrust claims premised on the manipulation of

another market, even where that manipulation has knock-on effects in the market in which Plaintiff was trading. *See Laydon* v. *Cooperatieve Rabobank U.A.*, 55 F.4th 86, 98-99 (2d Cir. 2022). None of the TAC paragraphs identified in Plaintiffs' letter contains any allegations of conduct by a U.S.-based person—in stark contrast to *Platinum*, which alleged, among other things, that "Defendants . . . had precious metal traders in the U.S. [who] would also actively trade in Physical and NYMEX Platinum and Palladium before, during, and after the Fixing," (Ex. A (Platinum TAC) ¶ 64), and where the court concluded that the "alleged 'constant communication' between the defendants' domestically based 'precious metals traders' and 'the participant[s] in the Fixing' show[ed] that much of the alleged manipulation was domestic.'" *Platinum*, 2023 WL 2229364, at *14.

**1.     The *Platinum* Decision Has No Bearing on Plaintiffs' Failure to Plead Actual Injury.**

Nothing in the Second Circuit's opinion in *Platinum* impacts the first—and independently dispositive—argument in Defendants' 12(c) motion: that under *Gamma Traders* and *Total Gas*, Plaintiffs have not adequately pled either antitrust injury or "actual injury" caused by a violation of the CEA. *Compare Gamma*, 41 F.4th at 77-83 (a plaintiff must allege more than that it "traded on the same day" as the alleged manipulation) *with* ECF No. 617 (Pls' Letter) at 4 (acknowledging that *Silver* Plaintiffs allege only that "they traded on days that Defendants manipulated the Fixing"); *see also Total Gas*, 889 F.3d at 113 (absent privity, a plaintiff must plead "additional facts to make it plausible that the impact [of defendant's conduct] on her was harmful rather than neutral or beneficial"). *Platinum* did not even cite *Gamma* or *Total Gas*, let alone alter their clear application to this case.

Conceding that *Gamma* is not mentioned anywhere in *Platinum*, Plaintiffs speculate that the Second Circuit must have rejected *Gamma's* application because the *Gamma* decision was issued before *Platinum*. The Court did no such thing. In *Platinum,* the district court was not confronted with a *Gamma* challenge—because *Gamma* had not yet been issued—and instead dismissed plaintiffs' antitrust claims because they "lacked antitrust standing" and their CEA claims as "impermissibly extraterritorial." 2023 WL 2229364, at *1. The Second Circuit overturned the district court on these two issues, and its decision not to address the separate questions of antitrust and CEA injury in no way changes *Gamma*'s applicability here. *See, e.g.*, *Deem* v. *DiMella-Deem*, 941 F.3d 618, 624–25 (2d Cir. 2019) (because "a *sub silentio* holding is not binding precedent," a decision that did not "squarely" address prior precedent would "not [be] read to be in conflict with" that precedent, "much less a binding holding that" prior case was not good law).[1]

Nor are Plaintiffs correct that they have more plausibly alleged antitrust and CEA injury than did the *Platinum* plaintiffs. (ECF No. 617 (Pls' Letter) at 4.) Plaintiffs indisputably failed to allege the time of day when their trades occurred in relation to the Silver Fix, or the *duration* of the effects of Defendants' alleged manipulation, which is fatal under *Gamma*. As this Court has

---

[1]     Moreover, whereas the panel in *Platinum* ordered supplemental briefing regarding the impact of two subsequent decisions regarding antitrust standing, the panel did not request supplemental briefing regarding *Gamma*. Then, nearly six months after supplemental briefing had concluded, the parties submitted notices of supplemental authority under Rule 28(j) discussing *Gamma*. The panel did not in any way address these later filings or the issues that they raised.

repeatedly held, what Plaintiffs actually allege is not persistent suppression but "an abrupt downward aberration in pricing" around the noon Silver Fix that "abated gradually" before the Silver Fix the following day. *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 545 (S.D.N.Y. 2016) ("*Silver I*"); *In re London Silver Fixing, Ltd. Antitrust Litig.*, 332 F. Supp. 3d 885, 909 (S.D.N.Y. 2018) ("*Silver II*") ("Plaintiffs have plausibly alleged a conspiracy involving the Fixing Banks to suppress the Fix Price through the daily fixing call.").[2] If anything, it is *uniquely implausible* to infer that Plaintiffs here were harmed by Defendants' alleged actions because, "unlike other fixings [including platinum], the Silver Fixing takes place at noon London time, which is . . . before the markets in the United States are fully open and before the COMEX silver pit opens." *Silver I*, 213 F. Supp. 3d at 545.

In short, *Platinum* does not change the fact that Plaintiffs plead no "factual basis that would justify an inference that the market price was still artificial by the time [Plaintiffs] traded," which is fatal to their ability to allege actual injury. *Gamma*, 41 F.4th at 80.

**2. Plaintiffs Lack Antitrust Standing Because, Unlike in *Platinum*, They Allege They Were Injured by the Ripple Effect of an Upstream Conspiracy to "Fix the Fix."**

Plaintiffs also ignore critical distinctions between *Silver* and *Platinum* regarding the markets in which the alleged manipulation took place.

*Platinum* addressed allegations that defendants had engaged in misconduct "[a]part from the Fixing itself," namely direct manipulation of futures prices. *Platinum*, 2023 WL 2229364, at *9 ("Apart from the Fixing itself, the Exchange Plaintiffs allege that the defendants engaged in collusive trading to move the NYMEX market downward."). This futures-market manipulation was allegedly the *means* by which Defendants manipulated the Platinum and Palladium Fix. (Ex. A (*Platinum* Third Amended Complaint) ¶ 10 ("Defendants drove these downward movements first by moving Physical and NYMEX Platinum and Palladium prices in advance of and even during the Fixing . . . thus altering the starting price, inducing clients to change their directions to the Defendants, and giving cover to an auction-rate that would otherwise have stood out.").)

---

[2] Since "barely" surviving a motion to dismiss against the Fixing banks on grounds that the banks suppressed the Fix price, Plaintiffs have repeatedly tried to walk away from both their own pleadings and the Court's decisions on those pleadings by arguing that this case is in fact about a conspiracy that persistently caused artificial prices all day, every day throughout the class period. (ECF No. 617 (Pls' Letter) at 4.) This tactic reaches its logical conclusion in Plaintiffs' class certification motion premised on an expert damages report that effectively abandons the Fix suppression conspiracy in favor of an entirely separate "bid-ask spreads" conspiracy. (*See* ECF No. 563-1 (Class Certification Report of Hal. J. Singer, Ph.D.) at ¶¶ 50-53, ¶¶ 75-78.) To the extent the Court seeks renewed briefing, Defendants will address Plaintiffs' continued about-face. *See New Hampshire* v. *Maine*, 532 U.S. 742, 749 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.").

By contrast, Plaintiffs here do not allege that Defendants directly manipulated futures markets to manipulate a separate physical market benchmark. Instead, Plaintiffs allege the opposite—that Defendants manipulated the Silver Fix price, which in turn allegedly affected futures prices. (*See, e.g.*, TAC ¶ 136 ("[P]rices of COMEX silver futures contracts are directly impacted by changes in the Fix price, which determines the value of the physical silver underlying each COMEX silver futures contract."); *id.* ¶ 142 ("Defendants caused silver prices and the prices of silver financial instruments to be artificial throughout the Class Period by manipulating the Fix price.")). To the extent that Plaintiffs allege any participation by Defendants in futures markets, it was to reap the rewards from their purported manipulation of the Silver Fix (*see, e.g.*, TAC ¶¶ 271, 373), *not* to manipulate those futures markets.

*Platinum* distinguished *Laydon* v. *Cooperatieve Rabobank U.A.*, 55 F.4th 86 (2d Cir. 2022), on the ground that the *Laydon* plaintiffs had pled a more "attenuated causal chain" between defendants' acts and futures traders' injuries. *Platinum*, 2023 WL 2229364, at *10 n.3 ("[T]his case differs from [*Laydon*, where] a plaintiff alleged that defendant banks made fraudulent submissions to the British Bankers' Association, a body that set the Yen-LIBOR benchmark rate, *which in turn* affected a second benchmark rate that was set by the Japanese Bankers Association, causing losses to traders in futures that referenced the second benchmark rate.'") (emphasis added). Here, like in *Laydon*, Plaintiffs' theory posits a "series of causal steps that separate [D]efendants' conduct and [Plaintiffs'] purported injury," *id.*, namely a manipulation of the Silver Fix price which then had an impact on futures prices.

Indeed, this Court has held that Plaintiffs "barely" pled a plausible conspiracy to manipulate the Silver Fix, "based on allegations that the Fixing Members conspired opportunistically to depress the Fix Price between January 1, 2007 and December 31, 2013." *Silver I*, 213 F. Supp. 3d at 558; *see id.* at 563 ("Plaintiffs adequately allege that the Fixing Members, horizontal competitors in the relevant markets for physical silver and silver derivatives, conspired artificially to suppress the Fix Price in order to gain an unfair trading advantage over other market participants, causing Plaintiffs to suffer losses on their silver investments."). This Court then dismissed claims alleging that other banks conspired to manipulate the silver futures markets because Plaintiffs did not "allege [futures] market control." *Silver II*, 332 F. Supp. 3d at 909. Nor do Plaintiffs allege that The Bank of Nova Scotia or HSBC controlled the silver futures market. *Id.* Because Plaintiffs have not plausibly pled that Defendants directly manipulated the silver futures market, *Platinum* is inapposite.

3. **Plaintiffs' CEA Claims Are Impermissibly Extraterritorial Because, Unlike in *Platinum*, the Alleged Conspiracy Took Place in London Around the Silver Fix.**

*Platinum* reiterated that "stating a proper claim under [CEA] section 22 has two requirements": (i) a domestic transaction, and (ii) domestic conduct by defendants "that is violative of a substantive provision of the CEA." 2023 WL 2229364, at *13 (quoting *Prime International Trading, Ltd.* v. *BP P.L.C.*, 937 F.3d 94, 105 (2d Cir. 2019)). *Platinum* does not change that Plaintiffs have failed to plead domestic misconduct by Defendants that violates the substantive provisions of the CEA.

As discussed above, the *Platinum* complaint alleged futures-related misconduct on U.S. exchanges, by persons in the United States, purportedly in furtherance of a conspiracy to

manipulate the Platinum and Palladium Fix. The *Platinum* plaintiffs alleged that U.S.-based traders "were actively trading in Physical and NYMEX Platinum and Palladium before, during, and after the Fixing, including by using non-public information from the Fixing in real time." (Ex. A (Platinum Third Amended Complaint) ¶ 190.) They pled that "Each of the Defendants . . . had precious metal traders *in the U.S.* and elsewhere. *These traders* would receive information from the Fixing, transmit information to the participants in the Fixing, and provide commentary to clients and other entities on the status of the Fixing. *Each of the Defendants' precious metals traders* would also actively trade in Physical and NYMEX Platinum and Palladium before, during, and after the Fixing, including proprietary trading, and including by utilizing real time, non-public information from the participants in the Fixing." (*Id.* ¶ 64 (emphasis added).) As the *Platinum* panel stressed, the "alleged 'constant communication' between the defendants' domestically based 'precious metals traders' and 'the participant[s] in the Fixing' show[ed] that much of the alleged manipulation was domestic.'" 2023 WL 2229364, at *14. Moreover, unlike the Silver Fixing (which occurred well before U.S. business hours at a time when the COMEX trading floor was not open), there was a "PM Fixing" for platinum and palladium that was scheduled "to accommodate the U.S. trading day." (Ex. A (Platinum Third Amended Complaint) ¶ 57.)

No such domestic misconduct is alleged here. Rather, Plaintiffs allege only that "Defendants artificially depressed the price of silver *for some period of time around the Fixing* in order to profit from silver and silver futures trading at prices that were advantageous to them vis à vis Plaintiffs and other less-informed market participants." *Silver I*, 213 F. Supp. 3d at 552 (emphasis added). They allege that Defendants engaged in trading on COMEX and benefited from their "advance knowledge of the Fix price direction" to "consistently generate[] large returns," but they do not link this trading to the Fixing conspiracy they allege. (TAC ¶ 205; *see also id.* ¶ 249 ("Defendants' silver trading positions directly contributed to the pricing dysfunction in the silver market as Defendants engaged in collusive trades to create and profit from artificiality in the price of physical silver and silver financial instruments."); *id.* ¶ 285 (alleging chat between Deutsche Bank and HSBC "shar[ing] information regarding Deutsche Bank's and HSBC's net silver trading positions during and after the Fix"); *id.* ¶ 16 ("Defendants also illegally shared proprietary information about their incoming silver order flow heading into the start of the Silver Fix in order to coordinate illegitimate transactions in advance of the daily auction.").) Not one of these allegations—the very allegations Plaintiffs marshalled in their letter to the Court—makes the claim that *U.S.-based* traders engaged in any manipulative trading or other domestic conduct in violation of the CEA as required under *Prime*. Even if it were permissible to rely on inference, which Plaintiffs may not do under *Prime*, the only plausible inference to be drawn from the TAC and the timing of the Silver Fix is that any futures manipulation would have occurred in London. This case is thus less like *Platinum* and more like *Prime*, where the Second Circuit held CEA claims to be impermissibly extraterritorial because plaintiffs made "no claim that any manipulative [commodities] trading occurred in the United States." *Prime*, 937 F.3d at 105-06.

### 4. Conclusion

For the foregoing reasons, the Court should either grant Defendants' motion for judgment on the pleadings or deny it without prejudice to renew in light of the *Platinum* decision.

-6-

Respectfully submitted,

| | |
|---|---|
| */s/ Stephen Ehrenberg* | */s/ Damien J. Marshall* |
| Stephen Ehrenberg | Damien J. Marshall |
| William H. Wagener | Leigh Nathanson |
| SULLIVAN & CROMWELL LLP | Laura Harris |
| 125 Broad Street | KING & SPALDING LLP |
| New York, NY 10004 | 1185 Avenue of the Americas, 34th Floor |
| | New York, NY 10036 |
| *Attorneys for The Bank of Nova Scotia Defendants* | *Attorneys for the HSBC Defendants* |